**Certified Copy Transcript**

### In the Matter Of:

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC

---

## DEPOSITION OF

## BRUCE BAILEY

*July 19, 2012*

---



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999

Case 3:12-cv-00020-CAR   Document 52   Filed 04/04/13   Page 2 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.   DEPOSITION OF
BRUCE BAILEY on 07/19/2012   Page 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

**CERTIFIED COPY**

MONICA ROBINSON,

       Plaintiff,

  vs.               CIVIL ACTION FILE NO.
                       3:12-cv-00020-CAR

INTEGRATIVE DETENTION
HEALTH SERVICES, INC.;
HART COUNTY, GEORGIA;
SHERIFF MIKE CLEVELAND;
BRUCE A. BAILEY, LPN;
BRIAN EVANS, EMT; MIKE
ADAMS, EMT; and ROBERT
J. WILLIAMS, M.D.,

       Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF
BRUCE BAILEY

1:30 p.m.
July 19, 2012

120 Gordon Street
Washington, Georgia

Blanche J. Dugas, RPR, CCR No. B-2290



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 3:12-cv-00020-CAR   Document 52   Filed 04/04/13   Page 3 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.   DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                        Page 2

```
 1                    APPEARANCES OF COUNSEL

 2

 3   On Behalf of the Plaintiff:
          CRAIG T. JONES, Esquire
 4        Page Perry, LLC
          Suite 1050
 5        1040 Crown Pointe Parkway
          Atlanta, Georgia  30038
 6        770.673.0047
          770.673.0120 (facsimile)
 7        cjones@pageperry.com

 8   On Behalf of the Defendants Integrative Detention
     Health Services, Inc., Bruce A. Bailey, LPN, Brian
 9   Evans, EMT and Mike Adams, EMT:
          JEFFREY A. BROWN, Esquire
10        Brown & Adams, LLC
          Suite 400, The Rothschild Building
11        1214 First Avenue
          Columbus, Georgia  31901
12        706.653.6109
          706.653.9472 (facsimile)
13        jbrown@brownadamsllc.com

14   On Behalf of the Defendant Hart County, Georgia:
          WALTER J. GORDON, Esquire
15        Gordon Law Firm
          Post Office Box 870
16        415 East Howell Street
          Hartwell, Georgia  30643-0870
17        706.376.5418
          706.376.5416 (facsimile)
18        walter@gordonlawfirm.com

19   On Behalf of the Defendant Sheriff Mike Cleveland:
          ANDREW H. MARSHALL, Esquire
20        Begnaud & Marshall, LLP
          1091-B Founders Boulevard
21        Post Office Box 8085
          Athens, Georgia  30603-8085
22        706.316.1150
          706.316.1153 (facsimile)
23        dmarshall@athens1867.com

24

25
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   On Behalf of the Defendant Robert J. Williams, M.D.:
          JOHN A. DICKERSON, Esquire
 2        McClure, Ramsay, Dickerson & Escoe, LLP
          38 Falls Road
 3        P.O. Drawer 1408
          Toccoa, Georgia  30577
 4        706.886.3178
          706.886.1150 (facsimile)
 5        jad@mrdelaw.com

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1                    INDEX OF EXAMINATION

 2    EXAMINATION                          PAGE

 3    EXAMINATION                            5
      BY MR. JONES

 4

 5                      - - -

 6                  INDEX TO EXHIBITS

 7    EXHIBIT     DESCRIPTION            PAGE
        4      Notice of deposition under    6
 8             Rule 30(b)(6)

 9        5      Policy and procedure manual   34

10

11            (Original Exhibit No. 4 has been
       attached to the original transcript.  Craig
12     Jones retained Exhibit No. 5)

13

14

15

16

17

18

19

20

21

22

23

24

25
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1                    Deposition of Bruce Bailey
                          July 19, 2012
2

3              MR. JONES:  Same stipulations?

4              MR. BROWN:  That's fine.

5              MR. JONES:  And this is actually the

6        deposition of a designated representative

7        of defendant Integrative Detention Health

8        Services, Incorporated, and the designated

9        representative is Bruce A Bailey; is that

10       correct?

11             THE WITNESS:  Yes, sir.

12             MR. JONES:  And let's go ahead and

13       swear him in, please.

14   BRUCE A. BAILEY,

15   having been first duly sworn, was examined and

16   testified as follows:

17   EXAMINATION

18   BY MR. JONES:

19       Q.     Mr. Bailey, I'm Craig Jones.  I represent

20   Monica Robinson.  Do you know Ms. Robinson?

21       A.     No.

22       Q.     Have you ever met her?

23       A.     No.

24       Q.     Did you ever examine her?

25       A.     No.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q.      Do you recall being consulted about her
 2   care while she was at the Hart County jail?
 3        A.      Yes.
 4        Q.      I'm going to try to limit the scope of the
 5   deposition today just to kind of talk about kind of
 6   some organizational issues with IDHS and the
 7   relationship between the different players, you know,
 8   in the case.  I'm not going to ask you about the
 9   specific medical issues or the care, you know, of Ms.
10   Robinson unless it somehow relates to these topics.
11              We're here because I sent out a notice and
12   of course we all agreed on the time and place.  I sent
13   out a notice of deposition under Rule 30(b)(6).
14   Here's a copy of it.  It's been marked as Exhibit 4.
15   I'm just sequentially numbering exhibits because we
16   may refer back to the others from the previous
17   deposition.
18              MR. JONES:  And here's some copies.
19              (Plaintiff's Exhibit 4 was marked for
20         identification.)
21        Q.      (By Mr. Jones)  I think what we're going to
22   do most of the time today is we're just going to walk
23   through this notice and I'm going to ask you about
24   each of these points on it.  Have you had an
25   opportunity to look over this?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A.      I have.

2      Q.      Did you bring any documents with you today?

3      A.      Was I supposed to?

4      Q.      No.   I just wondered if you did.   I didn't

5   specifically subpoena or request any documents in

6   here.   I did indicate I was going to ask about certain

7   documents and sometimes people will bring those along.

8   I know your lawyer has furnished some documents to me

9   that we'll talk about in a minute.

10         MR. BROWN:   I was going to say, just

11      for the record, a year from now when we're

12      reading it again that I did give you before

13      the deposition a current copy of the

14      contract between IDHS and the local

15      hospital.

16         MR. JONES:   Yeah.

17         MR. BROWN:   As well as a copy of the

18      policies and procedures for IDHS and Hart

19      County jail that would have been in force

20      and effect at the time Ms. Robinson was

21      incarcerated.

22         MR. JONES:   Great.   And I appreciate

23      that and I appreciate you putting that on

24      the record.   I was going to hit on that as

25      we get to those topics.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     Q.    (By Mr. Jones)  Just as kind of initial

2  housekeeping before we get into it, did you bring

3  anything else with you, as far as any information

4  about the case?

5     A.    No.

6     Q.    Have you reviewed any documents to prepare

7  for the deposition today?

8     A.    Not really.

9     Q.    So let's just go into Plaintiff's Exhibit 4

10  here.  If you'll turn to the second page, I've got

11  each topic kind of listed A, B and C on down the line.

12  The first topic I wanted to ask you about is the names

13  of the supervising physicians, nurses, emergency

14  medical technicians or other medical providers

15  employed or contracted by IDHS in July or August 2010.

16     I'll just kind of ask you some questions

17  about that.  First of all, let's talk about who was

18  actually working for IDHS back in July to August of

19  2010 time frame.  It would have been you; right?

20     A.    Me.

21     Q.    You're the owner of the company?

22     A.    I am.

23     Q.    Is it a corporation?

24     A.    It is.

25     Q.    So are you the only shareholder or does



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1    somebody else own shares too?
2        A.      Nobody else owns shares.
3        Q.      Does your wife also do some work for the
4    company?
5        A.      She does.
6        Q.      What does she do?
7        A.      She's technically CFO and she pulls call
8    occasionally.
9        Q.      Is she a nurse also?
10       A.      She's a paramedic.
11       Q.      Paramedic.  Okay.  And what is your -- I
12   understand you're now an RN?
13       A.      I am.
14       Q.      But you were an LPN back in 2010?
15       A.      I was finishing up RN school.
16       Q.      Okay.  And --
17       A.      And a paramedic.
18       Q.      And a paramedic.  Okay.  And at the time, I
19   understand from Dr. Williams' deposition -- correct me
20   if I'm wrong -- but we talked to Dr. Williams this
21   morning, and he said y'all had contracts on two jails
22   at the time; is that right?
23       A.      It is.
24       Q.      Did you have any contracts with any jails
25   directly other than through IDHS --
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A.      No.

2      Q.      -- during that time frame?

3      A.      Huh-uh (negative).

4      Q.      So as I understand it, y'all were covering

5   the Hart County jail and also the Wilkes County jail?

6      A.      Yes, sir.

7      Q.      And did you have the same personnel

8   covering both jails or did you have different people

9   in each place?

10      A.      Different people.

11      Q.      Tell me who you had in Hart County.

12      A.      Mike Evans -- Mike and Brian Evans.

13      Q.      Mike Adams?

14      A.      Mike Adams and Brian Evans, yes.

15      Q.      And what level of training do those guys

16   have?

17      A.      They're critical care paramedics with

18   advanced training.

19      Q.      And so is that the highest level of

20   paramedic?

21      A.      It is.

22      Q.      You're involved in training paramedics,

23   aren't you?

24      A.      Yes, sir.

25      Q.      Do you teach the course at, like, one of


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 3:12-cv-00020-CAR   Document 52   Filed 04/04/13   Page 12 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.        DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                             Page 11

1    the local colleges?

2        A.       I assist with the course.  I'm not a

3    primary instructor.

4        Q.       Where do you assist at?

5        A.       I've assisted at Augusta Tech and Athens

6    Tech before.

7        Q.       And so what are the different

8    certifications that you would assist in the training

9    for?

10       A.       Just certifications?

11       Q.       Well, actually I'm not sure I'm using the

12   terms correctly.  Is it like EMT?  I guess I should

13   say different levels.  You've got EMTs and you've got

14   different levels of paramedics?

15       A.       We teach emergency medical responders,

16   first responders.  I also teach EMTs and paramedics.

17   I also teach nurses and physicians classes.

18       Q.       What do you teach to nurses and physicians?

19       A.       Advanced cardiac life support, pediatric

20   advanced life support, advanced trauma life support.

21       Q.       So you basically teach them, like, how to

22   do CPR and things like that?

23       A.       CPR and advanced level care.

24       Q.       What's the difference between an EMT and a

25   paramedic in Georgia?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1       A.      EMTs is your basic entry level in the

2    emergency medical field.   Paramedics are your advanced

3    medical --

4       Q.      Are there two levels of EMTs?

5       A.      There's technically three, but Georgia is

6    doing away with -- or hasn't -- hasn't done any

7    cardiac technicians in a long time.   So they're kind

8    of doing away with that.   There are still some that

9    are grandfathered in as cardiac technicians, but

10   they're limited to what they can and cannot do.

11      Q.      I mean, if you do the cardiac tech, aren't

12   you -- I mean, aren't you basically a paramedic at

13   that point?

14      A.      No.   No.   Cardiac technicians can only give

15   cardiac drugs.

16      Q.      Okay.   As I understand it, these courses

17   that you assist with the teaching, these are so that

18   people can get their licenses; right?

19      A.      Yes.

20      Q.      So you have some familiarity with what the

21   requirements are to get each of those licenses?

22      A.      Some.

23      Q.      As far as the training they had to have.

24   Why don't you tell us about each of the levels.

25   What's the first level of an EMT?



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A.      The first level would be first responder.
2   It's basically just someone that can go out and
3   administer CPR and provide initial -- take vital signs
4   and provide oxygen until the EMS can get there.
5      Q.      A lot of firefighters will have that?
6      A.      Firefighters, volunteer firefighters.
7      Q.      And maybe rescue squad people, volunteer
8   rescue squad people?
9      A.      Yes.
10     Q.      What's the second level?
11     A.      The second level would be EMT, which are
12  intermediates, which can basically provide a little
13  bit higher care, but can start IVs and administer
14  fluid challenges and oxygen, higher supplies of
15  oxygen.
16     Q.      And then the third is the cardiac tech?
17     A.      Cardiac technician would be the next step,
18  which Georgia doesn't recognize anymore, other than
19  the ones that are grandfathered in, and they're able
20  to provide advanced cardiac life support and that's
21  it.  So they can give cardiac-related drugs.
22     Q.      They can give cardiac-related drugs?
23     A.      Uh-huh (affirmative).
24     Q.      Do they have to have a doctor prescribe it
25  or order it by the phone or something?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        A.        Most of them are written in our policies

2    and procedures, protocols.

3        Q.        So the protocols allow them to basically

4    have it upfront?

5        A.        AHA protocols.   American Heart Association

6    protocols.

7        Q.        And it allows them to make a judgment about

8    whether or not to give it?

9        A.        If they need to administer it.

10        Q.        And then let's talk about the different

11    levels of paramedics.

12        A.        The base level is just your paramedic which

13    is able to give drugs that -- each EMS service is a

14    little bit different.   Some of them have different

15    drugs, but they're able to give any drug that's

16    licensed by their physician to administer.

17        Q.        And then there's a critical care?

18        A.        Critical care paramedic is a little bit

19    advanced.   It's more into advanced airways, advanced

20    triage, advanced care of patients with medical and

21    trauma-type conditions.

22        Q.        So there's two levels of paramedics?

23        A.        It's witnessed as -- or recognized as one

24    level of paramedics, but critical care paramedic is a

25    certification that they have to have.

**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.      So that's the difference then?

2    A.      Yes.

3    Q.      A paramedic is licensed and then the --

4    A.      Licensed and it's -- critical care is the

5    certification above the -- above and beyond the

6    paramedics license.

7    Q.      So critical care certification comes from

8    the state or from somebody else?

9    A.      It comes from the -- I'm trying to

10   remember, CCEBMS.  It's a certification committee.

11   Q.      Critical care?

12   A.      Critical care certification committee.

13   Q.      Do you have to be at a certain level there,

14   you know, of either EMT or paramedic in order to be

15   able to provide care in like a -- I guess in an

16   institution as opposed to, say, out on the road where

17   you're providing emergency services?  I guess what I'm

18   asking about is --

19   A.      Clarify.

20   Q.      Yeah.  When you're working in a jail, you

21   know, you're basically like a primary care provider,

22   aren't you?

23   A.      Yes.

24   Q.      And so do you know whether -- I mean, if

25   you don't have the answer, I understand.  But as a


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.
BRUCE BAILEY on 07/19/2012

DEPOSITION OF
Page 16

1  layperson, I think of a paramedic or an EMT as

2  somebody that comes, you know, and hopefully can

3  stabilize me and get me to the hospital, you know,

4  before my heart stops beating.

5       A.     A lot of hospital emergency rooms use

6  paramedics because their training is somewhat more

7  detailed to triaging, patient assessment and providing

8  higher levels of care.

9       Q.     So from what you're saying, it sounds like

10 being a paramedic or an EMT has nothing to do with

11 where you work?

12      A.     It does not.

13      Q.     So you can work in a doctor's office even?

14      A.     Yes, sir.

15      Q.     You can work in a jail?

16      A.     Yes, sir.

17      Q.     You don't have to work for an ambulance

18 service?

19      A.     Right.  Yes, sir.

20      Q.     And do you know of other jails around the

21 state of Georgia -- other than the ones that you

22 contract with, do you know if they also use paramedics

23 for primary care in the jail?

24      A.     I know initially when we founded the

25 company and started working the company, Clarke County



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1    used paramedics in their jail.
2        Q.      How did you decide to set up a company?
3    How did you go about doing it?
4        A.      It was originally set up by another
5    gentleman and one of his deputy friends in Greene
6    County, and I initially started working for them and I
7    purchased the company from him when he moved.
8        Q.      When you purchased it, did you just take
9    over the liabilities and contracts or did you actually
10   give him money?
11       A.      No, I bought the company from him.
12       Q.      And who was the guy you bought it from?
13       A.      I remember his first name is Don.  That's
14   all I remember.
15       Q.      Don?
16       A.      Yeah, that's all I remember.
17       Q.      So the company was already set up when you
18   bought it?
19       A.      It was.  It was already incorporated and I
20   bought the incorporation.
21       Q.      Did he already have policies and procedures
22   and all that?
23       A.      No, he did not.
24       Q.      So when you bought the company, what jails
25   were he covering?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        A.       When I bought the company, he was covering

2   Wilkes County jail.

3        Q.       And that was it?

4        A.       That was it.

5        Q.       So you bought the company and then you took

6   over the contract for Wilkes County?

7        A.       Yes.

8        Q.       And then did he have anybody working for

9   him when you bought the company?

10       A.       Me.

11       Q.       You were working for him already?

12       A.       I was, yes, sir.

13       Q.       So what was your job function then?

14       A.       Primary clinic nurse.

15       Q.       And you actually are a -- at that time,

16  were an LPN?

17       A.       Yes.

18       Q.       Where did you get your training?

19       A.       Athens Tech.

20       Q.       How long had you been licensed as an LPN?

21       A.       Since '96.

22       Q.       And then when did you get the RN license?

23       A.       Last year.

24       Q.       In 2011?

25       A.       Yes, sir.  I had been working on it for a



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 3:12-cv-00020-CAR   Document 52   Filed 04/04/13   Page 20 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.        DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                                           Page 19

1   year.

2        Q.      And where did you get it?

3        A.      Excelsior College.

4        Q.      Where is that?

5        A.      New York.  Albany, New York.

6        Q.      Okay.  Did you have to go there or is it

7   like an online --

8        A.      It's online.

9        Q.      It's an online thing.  So when you took

10  over the company, do you remember what year that was?

11       A.      I want to say it was 1998.

12       Q.      I know we've got a copy of the contract

13  with Hart County and it says y'all started that in

14  2002.  Does that sound right?

15       A.      Yes.

16       Q.      And then that contract there in 2002, did

17  y'all -- that contract was originally just for a year,

18  wasn't it?

19       A.      It was originally for 90 days.

20       Q.      Ninety days?

21       A.      Yes, sir.

22       Q.      And then was it ever extended or how did

23  that work?

24       A.      I presented them with the opportunity to

25  continue my services and offered a contract and they



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 3:12-cv-00020-CAR   Document 52   Filed 04/04/13   Page 21 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.      DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                                              Page 20

1   said they would continue off of what we had.

2       Q.      Who is they?

3       A.      The sheriff and the county commissioners, I

4   guess.

5       Q.      Well, I'm trying to -- back in 2002, are

6   you saying that after the 90 days, you offered to make

7   it a longer-term contract?

8       A.      I did.

9       Q.      And do you remember who the sheriff was

10  back then?

11      A.      Mike Cleveland.

12      Q.      Mike Cleveland.  Same as now?

13      A.      Same as now.

14      Q.      So he's been the sheriff the whole time

15  you've been there?

16      A.      Yes, sir.

17      Q.      And did you talk to any of the county

18  commissioners too back then?

19      A.      Not after -- not after the initial.  After

20  the initial -- after the initial 90 days, I did not.

21  I just brought it to the sheriff and the jail

22  administrator and they said we'll just continue the

23  way we are.

24      Q.      Did you ever go back to them after that and

25  try to get something more -- I guess get a new



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    contract or modify this contract?

2         A.    No.  We really haven't changed the terms of

3    the contract other than continuation.  So I never did.

4    I would ask them about it occasionally and they would

5    say, no, we're good.

6         Q.    You said you'd ask them about it

7    occasionally.  What would be the occasion you would

8    ask about it?

9         A.    When they're doing the budget process, I'd

10   ask them if I needed to change anything or redo

11   anything or if we needed to do anything different, and

12   they would say, "No, we're -- as long as you're not

13   upping your price, we're okay."

14        Q.    That's kind of the big question, isn't it,

15   the price?  You've got people you're paying, right, to

16   go --

17        A.    Yes, sir.

18        Q.    -- in and work there; right?

19        A.    Yes, sir.

20        Q.    Has their pay gone up any in the last nine,

21   ten years?

22        A.    No.

23        Q.    So we've got Mike Adams; is that right?

24        A.    Yes.

25        Q.    And then we've got Brian Evans?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A.      Yes.

 2        Q.      And have both of them been there the entire

 3   time, at the Hart County jail?

 4        A.      Mike Adams has.  Brian Evans came on in

 5   2008 or 2009.  I'd have to look at his application.

 6        Q.      Are these guys also deputy sheriffs?

 7        A.      Not to my knowledge.

 8        Q.      Do they perform any other function there at

 9   the jail other than medical?

10        A.      No, not that I'm aware of.

11        Q.      Do you know what other -- if they have

12   other jobs in addition to working for you?

13        A.      I'm sure.  They work for Hart County EMS.

14        Q.      They work for Hart County EMS?

15        A.      Yes, sir.

16        Q.      And so how do you have their compensation

17   set up with you?  Are they on a salary or --

18        A.      They're contract employees.  Hourly.

19        Q.      How often do you pay them?

20        A.      Once a month.

21        Q.      And who cuts the checks?

22        A.      Our company.

23        Q.      And your wife, does she do that as CFO?

24        A.      She does.

25        Q.      So she takes care of the books basically?
```



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A.      Yes, sir.

 2        Q.      And does she cut the checks to them

 3   individually or does she pay the EMS for them?

 4        A.      No, she cuts them individually.

 5        Q.      And at end of the year, y'all send them a

 6   W-2 or something like that?

 7        A.      1099.

 8        Q.      1099.  And you call them contract

 9   employees.  What does that mean?

10        A.      They're contracted -- subcontracted

11   employees that work for our company.

12        Q.      Do they have any kind of agreement that

13   they sign to work with you, or did they way back then

14   when you first hired them?

15        A.      They provide their credentials and agreed

16   to work.  There's not any formal contract signed or

17   anything like that.

18        Q.      And as far as the day-to-day operation --

19   day-to-day -- I want to get a sense of what they

20   actually do at the jail; okay?  Are they also

21   full-time employees with the EMS, as far as you know?

22        A.      As far as I know.

23        Q.      And so, I guess they arrange their

24   schedules with EMS so somebody's available to cover

25   the jail if necessary?
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     A.      Clarify.  I'm not for sure what you're

2  asking there.

3     Q.      I might have to ask them.  But do you know,

4  do they work the same shift at the EMS?

5     A.      They do not.

6     Q.      They do not?

7     A.      They do not.

8     Q.      So in theory, anyway, one of them would

9  always be available if something came up at the jail?

10    A.      Yes.

11    Q.      I take it there's not always somebody --

12 one of them is not always present at the jail; right?

13    A.      Right.

14    Q.      Are there certain days that they go to the

15 jail?

16    A.      Usually two days a week.

17    Q.      Do you know what day that is?

18    A.      It depends on their schedule, which one is

19 doing it, which one's got the week.

20    Q.      So each of them will basically cover two

21 days a week or do both of them cover two days?

22    A.      Both of them cover two days a week.  Brian

23 may do one week.  Mike may do the next week.  It just

24 depends on their schedule and who feels like working.

25    Q.      Who sets their schedule for that week?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        A.        They do.   They're independent contractors.

2    I cannot dictate.

3        Q.        They basically coordinate their schedule?

4        A.        Yes.

5        Q.        And then they decide who's going to work

6    which day?

7        A.        Yes.

8        Q.        Is it always the same days?

9        A.        It varies some.

10        Q.        It's not necessarily Tuesday and Thursday

11   or --

12        A.        No.   They usually let the jail know which

13   days they're coming.

14        Q.        And I take it if something happens on one

15   of the days they're not there, then they're available

16   as needed?

17        A.        They are.

18        Q.        And is their pay the same every week or do

19   they get more if they get called to the jail on a day

20   that they're not already there?

21        A.        We have a call-in fee that we pay them.   A

22   flat fee.

23        Q.        A call-in fee?

24        A.        A call-in fee if they're there for

25   30 minutes or two hours.



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q.      So if each of them is at the jail one day a
 2   week, okay, do they get a call-in fee for that or do
 3   they get a flat fee for that day?
 4        A.      They get a flat hourly fee.
 5        Q.      Flat hourly for that day?
 6        A.      Yes.
 7        Q.      So if they're there for two hours, they get
 8   paid for two hours.  If they're there for eight hours,
 9   they get paid for eight hours?
10        A.      Yes.
11        Q.      And then if they're not on that day and
12   they get called in, then they get a call-in fee?
13        A.      Yes.
14        Q.      And that call-in fee would be the same
15   whether they're there for five minutes or five hours;
16   right?
17        A.      Yes.
18        Q.      How much is their hourly fee at the present
19   time?
20              MR. BROWN:  Do you know?  I object to
21        the form.
22              THE WITNESS:  Can I answer it?
23        Q.      (By Mr. Jones)  I mean, I'm  going ask you
24   what was it in 2010.
25              THE WITNESS:  I know what it is.  Can
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1           I answer it?
2                     MR. BROWN:  That's fine.
3                     THE WITNESS:  It's $25 an hour.
4           Q.      (By Mr. Jones)  What I really want to know
5     is what was it back in July and August 2010?
6           A.      It was $25 an hour.
7           Q.      It was the same back then.  Sometimes it's
8     easier for people to remember things now and think
9     back on whether it's changed or not.
10          A.      It hasn't changed.
11          Q.      So $25 an hour.  So is there a set number
12    of days -- a set number of hours that they generally
13    work on the two days a week that they're there?
14          A.      They -- not set number of days.  They see
15    the inmates that have filled out sick-call requests
16    and follow up with any prior visits that they have to.
17    They've got a little list of what they do and they
18    just kind of go through it.
19          Q.      Well, do you know what you, say, pay them
20    on average in a typical week?
21          A.      Probably ten to 15 hours.  It just kind of
22    varies depending on how long they're there.
23          Q.      So that's total for both of them?
24          A.      That's total for one, whoever does it for
25    that week.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     Q.     You're saying usually one person will cover
2 both days that week instead of --
3     A.     Depends.  Depends.  They work their
4 schedule out.  It just depends on how they want to
5 work it.  I don't dictate it.  I just make sure they
6 get there one day during the week, one of them does.
7     Q.     Do they have set hours kind of like office
8 hours, you know, on the days they are there?
9     A.     No.
10    Q.     So in order for an inmate to be seen by one
11 of them, the inmate generally is supposed to fill out
12 a sick call request?
13    A.     Yes.
14    Q.     But, I mean, I understand if it's an
15 emergency or something like that, then they don't have
16 to do it; right?
17    A.     No.  Well, if it's an emergency, the
18 jailers will usually call the on-call person and I'll
19 send somebody over.
20    Q.     Call?
21    A.     On call.
22    Q.     Okay.  Got it.  So they would call -- the
23 jailers then, if it's an emergency, they would call
24 them directly and not call you?
25    A.     The inmates will tell them -- the jailers


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   will find out what the emergency is and they would

 2   call the on-call person.

 3       Q.    And if it's like a real emergency, they'd

 4   just call 911?

 5       A.    Just call 911.

 6       Q.    So who is the main point of contact that

 7   you have at the jail, like if you need to deal with

 8   somebody there?

 9            MR. BROWN:  An employee of the jail?

10            MR. JONES:  Yeah.

11            THE WITNESS:  That would be -- I just

12        went blank on his name.  Bobby Millford.

13       Q.    (By Mr. Jones)  Bobby Millford?

14       A.    The chief jailer.

15       Q.    Chief jailer.

16       A.    Yes.

17       Q.    And if the jail staff needs to call in

18   somebody on the medical staff, do they know the

19   schedules so they know who to call, or do they have to

20   call you to find out?

21       A.    They do.  They have a posted schedule every

22   month.

23       Q.    So the people that are at the jail, the

24   jailers, the deputies, they can check the schedule,

25   they know who's coming in when?
```



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1        A.      They know who's on call each day.

2        Q.      I see.  There's a call schedule?

3        A.      Yes.

4        Q.      And then what do you call the schedule for

5    the people when they come in?  For -- what do you call

6    that?

7        A.      The clinic schedule.

8        Q.      The clinic schedule.  Is the clinic

9    schedule posted too or is it just whenever these guys

10   show?

11       A.      Usually they will contact the jail each

12   week and tell them when they're showing up.  I know

13   Mike had worked on a clinic schedule, but I'm not sure

14   if he actually gave them a copy of it.  He may give to

15   Bobby, but I don't know if he gives it to the jailers.

16       Q.      The clinic schedule, then, would be that

17   they're going to come in on a certain day at a certain

18   time and they're going to stay until they get done

19   whatever they need to get done?

20       A.      Right.

21       Q.      So it won't be, say, 9:00 to 12:00

22   necessarily or 9:00 to 5:00.  It would just be coming

23   in and we'll stay as long as it takes.

24       A.      (Witness nods head affirmatively.)

25       Q.      Is that right?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 3:12-cv-00020-CAR    Document 52    Filed 04/04/13    Page 32 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.    DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                          Page 31

```
 1          A.      Yes.
 2          Q.      I see you nodding and all that, but since
 3   she's got to take it all down --
 4          A.      Yeah.
 5          Q.      -- try to make sure you answer everything
 6   verbally.  The other folks that you have working in
 7   Wilkes County, have any of them ever worked at Hart
 8   County as well?
 9          A.      Just me.
10          Q.      Just you.  You work there?
11          A.      Initially when the contract was set up
12   until I got Mike trained, I did all the clinics, and I
13   still -- if they're not available, I'll be the one to
14   respond to go up there on emergency.
15          Q.      How many people do you have working at the
16   Wilkes County jail?
17          A.      Two.
18          Q.      Two.  And are they also paramedics?
19          A.      One of them is.
20          Q.      One of them is a paramedic.  Is he a
21   critical care paramedic?
22          A.      She is.
23          Q.      She is.  And what's the other person's
24   training?
25          A.      An RN paramedic.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q.      The RN paramedic?

2      A.      It's me.

3      Q.      That's you.  So it's you plus that person?

4 So when you go out to the jail, do you pay yourself

5 the same hourly rate, or does the company pay you or

6 do you not get a salary since you're the owner of the

7 company?

8      A.      I usually don't get a salary.

9      Q.      Yeah.  Whatever the profit is, you get;

10 right?

11     A.      We really don't make that big of a profit.

12     Q.      Whatever is left over after you pay the

13 bills --

14     A.      It would come to me.

15     Q.      -- that's what you live off of?

16     A.      Yes.

17     Q.      And then your wife, she has her own -- she

18 has another job, too; right?

19     A.      She does.

20     Q.      And do you also have another job?

21     A.      I do.

22     Q.      What is that?

23     A.      I work full time here at Wills Memorial and

24 I'm also full time at McDuffie Hospital.  I just

25 started McDuffie about two weeks ago working full time



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 3:12-cv-00020-CAR   Document 52   Filed 04/04/13   Page 34 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.      DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                          Page 33

1    in the ER.

2         Q.      So the folks that work at Wilkes County, do

3    they have the same policies and procedures that they

4    follow there, the folks -- the IDHS folks -- they have

5    the same policy and procedure manual there that they

6    have at Hart County?

7         A.      Yes.  We only have one policy and procedure

8    manual.

9         Q.      And I have a copy of this here, which your

10   lawyer provided to everybody, that I understand is a

11   copy of y'all's.  Does that look right?

12        A.      Yes.

13        Q.      And there's a cover sheet, there's a place

14   for everybody to sign -- for people to sign.  Am I

15   correct in assuming that the Wilkes County one is just

16   like that, it's just got maybe different names on the

17   front?

18        A.      It has a different sheriff.

19        Q.      Different sheriff and a different -- is

20   there a county commissioner on there too?

21        A.      No.  The sheriff, medical director and me.

22        Q.      So it would be a different sheriff for

23   Wilkes County.  And let me mark that.  I'm going to

24   hold onto that because it's the only copy I have, but

25   we're going to mark this as Plaintiff's Exhibit 5.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1           (Plaintiff's Exhibit 5 was marked for

2      identification.)

3           MR. JONES:  For the record, I'm going

4      to retain Plaintiff's Exhibit 5 since it's

5      the only copy I have.

6      Q.     (By Mr. Jones)  Now, in order to be either

7   a paramedic or an EMT, are you supposed to have your

8   license under a particular institution or under a

9   doctor or somebody like that?

10     A.     Our licenses are issued by the state of

11  Georgia.

12     Q.     And do you have to have, like, a sponsoring

13  agency or a sponsoring physician or anybody?

14     A.     Not to obtain a license.

15     Q.     When you're working as a paramedic or

16  working as an EMT, you have to have some higher

17  medical authority that you account to; right?

18     A.     Yes.

19     Q.     You don't need that for your license,

20  right, but in order to actually practice, to do what

21  you do, there's got to be somebody higher up than

22  you --

23     A.     Yes.

24     Q.     -- that you take direction from; right?

25     A.     Yes.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q.     And you're presently an RN.  And as an RN
 2   or as an LPN, which you were back in 2010, who would
 3   you have reported to with regard to, you know, medical
 4   care of inmates at Hart County jail?
 5        A.     Dr. Robert Williams.
 6        Q.     So what does that actually mean?  What
 7   would you look to him for?
 8        A.     Anything that's not covered in our policies
 9   and procedures that he has approved or protocols, then
10   we refer to him and it's usually verbal conversation
11   between me and him since I work full time here, I
12   usually catch him at the hospital and talk to him
13   about it.
14        Q.     When you say here, we're talking about at
15   Wills Memorial Hospital in Washington, Georgia --
16        A.     Yes, sir.
17        Q.     -- where we're taking the deposition today?
18        A.     Yes, sir.
19        Q.     And you work here also?
20        A.     Yes, sir.
21        Q.     The treatment protocols that you're
22   expected to follow, those are contained in the policy
23   and procedure manual?
24        A.     Yes.
25        Q.     Are there any other protocols or standing
```



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 3:12-cv-00020-CAR   Document 52   Filed 04/04/13   Page 37 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.      DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                            Page 36

```
 1   orders that you practice under that are not in that
 2   manual?
 3        A.     No.
 4        Q.     So if you're following the protocols that
 5   Dr. Williams approved, are you in essence acting under
 6   his authority, under his direction?
 7        A.     Yes.
 8        Q.     And if the protocols don't authorize you to
 9   do something or they don't tell you what to do in a
10   particular situation, and then you go to Dr. -- you
11   then go to Dr. Williams and ask him what to do?
12        A.     Yes.
13        Q.     So let's talk about the people that work
14   for you.  Who would they answer to, as far as, you
15   know, medical decisions?
16        A.     They would still answer to Dr. Williams.
17        Q.     They answer to Dr. Williams too.  Would
18   they go directly to Dr. Williams or would they go up
19   the chain of --
20        A.     Go up the chain of command.
21        Q.     Up the ladder through you.  So they would
22   maybe -- I guess they would ask you at first?
23        A.     Right.
24        Q.     And then it may be something that you have
25   the authorization to do, but they don't; correct?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 3:12-cv-00020-CAR   Document 52   Filed 04/04/13   Page 38 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.          DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                                Page 37

1      A.      If it fell outside the protocols, the

2    medical protocols we have, then I contact Dr.

3    Williams.  So that way he's not getting multiple phone

4    calls.  He just gets one point of contact.

5      Q.      And I haven't had time to read through all

6    these protocols, and we're not going to go into them

7    in any detail here today, but are there some protocols

8    that say what a paramedic can do and there's some that

9    say what a nurse can do, or are they basically -- kind

10   of basically blanket protocols for anybody working in

11   the jail as a medical provider?

12     A.      Blanket protocols for the medical providers

13   that I use for the jail.

14     Q.      I see.

15     A.      They're -- any level of provider that I use

16   are authorized to do those.

17     Q.      So the protocols don't delineate between

18   what type of license you have or anything like that?

19     A.      Not that I'm aware of.

20     Q.      Although I guess are there certain -- I

21   guess are there certain things that a paramedic can't

22   do that a nurse can do irrespective of the protocols?

23     A.      Not that I'm aware of.  Not in those

24   protocols.

25     Q.      So I guess do you have any decision-making



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    authority with regard to medical care of inmates where

2    you're allowed to make the decisions independently

3    that's not somehow based either on the protocols or

4    based upon asking Dr. Williams what to do?

5         A.     The only thing I would have is seeking

6    emergency medical care if a patient presented with a

7    complaint that fell outside that.

8         Q.     And even, of course, the jail staff can do

9    that?

10        A.     Jail staff can.

11        Q.     They can call 911?

12        A.     They can call 911 if they need to.

13        Q.     Can you have a patient sent to the

14   hospital -- an inmate sent to the hospital without

15   clearing it with Dr. Williams?

16        A.     Yes.

17        Q.     Even if it's not an emergency?

18        A.     Non-emergency, no.

19        Q.     What if you examine a patient and you think

20   that, you know, they ought to have some tests of some

21   sort, can you order the test or do you have to

22   recommend that Dr. Williams do that?

23        A.     If it falls under the protocols, I can

24   order the test as an outpatient order or if it

25   doesn't, then I contact Dr. Williams and ask him what



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    he would like for me to do.

2        Q.      But your authority is limited to what's in

3    those protocols?

4        A.      Yes.

5        Q.      Have you compared these to protocols to

6    other jail protocols?

7        A.      I have.

8        Q.      And what was the occasion for doing that?

9        A.      Initially when we -- when I built the

10   database for the protocols, I compared them with

11   several different states' jails' protocols that were

12   online that the Medical Association of Georgia had

13   given me to meet national standards.

14       Q.      And so where did the ones you -- the ones

15   that you came up with, where did you get them from?

16       A.      They're a variety.

17       Q.      So did you actually kind of put something

18   together yourself based upon information you got from

19   other places?

20       A.      I did.

21       Q.      Okay.  And then, of course, I guess, did

22   Dr. Williams approve them?

23       A.      He did.

24       Q.      And somewhere, I guess there's a hard copy

25   that shows where he signed off on these?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1        A.      There is.
2        Q.      When was that?   I know this says last
3   revised -- looks like 2005.
4        A.      2005 would be the last revision.
5        Q.      Here's my copy.
6        A.      Right.
7        Q.      So sometime after, I'd say, '98, you took
8   over the --
9        A.      Yes.
10       Q.      So, I guess, sometime after '98, you came
11  up with some protocols; right?
12       A.      In 2000 when Wilkes County went for their
13  first MAG certification.
14       Q.      They went for MAG certification?
15       A.      Yes.
16       Q.      And were you working there at the time?
17       A.      I was.
18       Q.      So did MAG provide some protocols?
19       A.      The national correctional healthcare manual
20  provided some protocols.   That's what I used.
21       Q.      So Wilkes got their certification then;
22  right?
23       A.      They did.
24       Q.      They got their MAG accreditation?
25       A.      Accreditation.
```



Case 3:12-cv-00020-CAR   Document 52   Filed 04/04/13   Page 42 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.          DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                                Page 41

1          Q.      When the Wilkes County jail got its MAG

2     accreditation, were these IDHS protocols in effect or

3     was it some different protocols?

4          A.      A previous version.

5          Q.      A previous version?

6          A.      Yes.  When national standards changed,

7     that's when I changed the manual.

8          Q.      Okay.  So in 2005, you changed the manual

9     because the national certification standards changed?

10         A.      They did.

11         Q.      And so did you, again, use the national

12    correctional medicine?

13         A.      I did.  I used their manual as an overview

14    or guide as to what I needed.

15         Q.      Is there a protocol in here on drug seeking

16    behavior?

17         A.      Drug seeking?

18         Q.      Or dealing with inmates that you suspect of

19    drug seeking.

20         A.      There is a -- I'm trying to remember what

21    the name of it is.  It's a withdrawal procedure.

22         Q.      But that's for dealing with --

23         A.      Narcotic or alcohol withdrawal.

24         Q.      But in terms of -- I'm talking about -- you

25    know what drug seeking is; right?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1         A.      I do.
2         Q.      There's not a protocol that specifically
3   deals with that, that's more a matter of your
4   judgment, your medical judgment?
5         A.      We don't allow narcotics in jail.
6         Q.      Right.  So even if, say, they need pain
7   medicine, you're not going to give them a narcotic;
8   correct?
9         A.      Unless Dr. Williams tells -- prescribes it
10  or tells us to use it.
11        Q.      What narcotics has he prescribed in jail
12  before?  Methadone?
13        A.      Tylenol 3.  We have used methadone to --
14  for patients that are -- to get them off of it and
15  occasionally Lortab.
16        Q.      Is there a protocol that shows what a
17  comprehensive physical examination -- what a physical
18  examination would consist of?
19        A.      As in an intake physical or sick-call
20  physical?
21        Q.      Sick-call physical.
22        A.      It's on the sick-call form.
23        Q.      The sick-call form.  Okay.  In other words,
24  there's blanks you fill in for certain?
25        A.      An overview of all the systems.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.
BRUCE BAILEY on 07/19/2012

DEPOSITION OF
Page 43

1     Q.     A checklist basically.  Do these protocols

2 deal with the medical intake as well or is that

3 something that the county -- the jail people do?

4     A.     There's a medical intake in this policy in

5 there.

6     Q.     There is?

7     A.     Should be.

8     Q.     Do you know what standard number is?

9     A.     I don't remember off the top of my head.

10     Q.     We'll have time to look at this later.  But

11 tell us how the intake procedure works.  I mean, when

12 the inmate -- there's really -- are we talking about

13 two different procedures?  We're talking about the

14 booking and then we're talking about a separate

15 medical?

16     A.     If they're on medication or have any of

17 medical history, then the nurses -- when they're

18 booked in, the jailers will call the nurse on call if

19 they're on medicine, to get their medicines approved,

20 or if they have any issues or medical condition

21 issues, and then the nurse will tell them to fill out

22 a sick-call slip and see the nurse on the next visit

23 so we can clarify.

24     Q.     I'm going to show you what's marked as

25 Plaintiffs' Exhibit 3.  These are Ms. Robinson's



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.     DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                          Page 44

1    records from the jail.  And the top page of that is a

2    medical questionnaire.  Is that something that gets

3    filled out by the jail staff?

4         A.    Jail staff.

5         Q.    That's part of the booking procedure?

6         A.    That is.

7         Q.    And so you don't have anything to -- your

8    people don't have anything to do with creating that

9    questionnaire, do you?

10        A.    No.

11        Q.    Now, if there's any affirmative responses

12   in that questionnaire, does that information get

13   forwarded to you or is it up to the discretion of the

14   jail officers?

15        A.    There's certain questions, if they answer

16   yes to, they have to notify medical.

17        Q.    Do you see on that questionnaire, are there

18   any questions there that would require medical to be

19   notified?

20        A.    Yes, if she's been hospitalized, pain

21   issues, and also does the inmate have any other

22   medical problem, yes, back problems.

23        Q.    Would that information in and of itself be

24   a reason to have the patient examined?

25        A.    If the patient filled out a sick-call slip,



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    yes.   The patient is given -- when they call in,

2    they'll give the patient the opportunity when the

3    nurses called to fill out a sick-call slip and have

4    the patient follow up with the nurse on the first --

5    on the next visit, and it's left up to the

6    responsibility of the patient to fill out the

7    sick-call slip.

8         Q.      Okay.

9         A.      Or if the jail staff feels they need to,

10   they will.

11        Q.      Now, is there a medical screening of some

12   sort that goes on at some point after the inmate is

13   booked or do you have to have a sick-call slip for

14   that?

15        A.      Sick-call slip to see the nurse.

16        Q.      So this medical questionnaire that's done

17   by the booking officer, is that the only medical

18   screening that gets done on everybody?

19        A.      Not necessarily.

20        Q.      Well, is there any other -- you said not

21   necessarily.   What do you mean?

22        A.      I mean, if the inmate came in with vermin

23   on them, they would see the sick call.

24        Q.      I'm sorry.   I didn't ask the question very

25   clearly.   I guess what I'm trying to find out is you



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   got somebody who has no medical complaints, they don't

2   fill out a sick-call form, they appear to be in good

3   health.  Everybody that comes in, they fill out that

4   medical questionnaire whether they're sick or not;

5   right?

6        A.     Yes.

7        Q.     Is there anything else that gets filled out

8   as a matter of course on everybody that comes in

9   medically other than that medical questionnaire?

10       A.     Not by -- not by us unless they come to

11  sick call.

12       Q.     If they come to sick call or your people

13  get involved in some way, then you would create some

14  sort of medical record; right?

15       A.     Right.

16       Q.     But as long as they're not sick, as long as

17  they don't have any complaints, there's no other point

18  at which they have a physical of any kind when they

19  come in the jail?

20       A.     Not unless they're going to prison and the

21  prison asked for it, then -- or going to a halfway

22  house and the halfway house asks for it.  There's not

23  going to be anything else.

24       Q.     So basically what happens from a medical

25  standpoint is when an inmate comes into the jail, the



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    booking officer asked them the questions on that

2    questionnaire; right?

3        A.    Yes, sir.

4        Q.    And then that's it unless -- unless there's

5    a sick-call request or there's some reason why they

6    need to see the medical staff?

7        A.    They're told how to access medical care.

8        Q.    I got it.  So I think the questions I've

9    asked so far pretty much covered topics A, B and C on

10   the notice.  I take it Dr. Williams is the only person

11   who's ever issued any protocols for IDHS, at least at

12   the time you've been there?

13       A.    Yes.

14       Q.    Topic D is the nature and professional

15   relationship between IDHS and defendant Robert J.

16   Williams, M.D.  Did y'all have a contract with him?

17       A.    We do.  We do at this time.

18       Q.    You do.  I know you do -- you do now;

19   right?  Did you have one back when you first hooked up

20   with him?

21       A.    No.

22       Q.    We've got an agreement for physician

23   medical director that your lawyer gave to me.  It

24   says -- it's dated August 1st, 2010, between IDHS,

25   Wills Hospital and Dr. Williams.  That's when he



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.     DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                          Page 48

1 became an employee of the hospital; right?

2    A.    Yes.

3    Q.    And up until then, you had been paying him

4 directly; right?

5    A.    Yes.

6    Q.    You were paying him a thousand dollars a

7 month or, you know, $500 per jail per month --

8    A.    Yes.

9    Q.    -- for services as a medical director?

10   A.    Yes.

11   Q.    Now, if he actually had to get involved in

12 the care of a patient, either providing consultation

13 over the phone or seeing the patient, was there any

14 way for him to be compensated additionally for that?

15   A.    His office got compensated.  He would send

16 a bill.

17   Q.    His office would send a bill?

18   A.    Yes.

19   Q.    If they came to his office?

20   A.    Yes.

21   Q.    But if you just called him and wanted, you

22 know, approval for -- to call in a prescription, you

23 know, or order a test or something like that, would

24 his office send a bill for that phone call?

25   A.    No.  That was part of his medical --



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    medical director's fee.   Provide consultation over the
2    phone and at the Wilkes County jail if needed.
3         Q.      But if someone came to see him in his
4    office, then his practice could bill for that as an
5    office visit?
6         A.      They could.
7         Q.      And would they bill IDHS or would they bill
8    the patient or the county?
9         A.      They would bill the county.
10        Q.      So if the county brings somebody to him, he
11   bills the county for that?
12        A.      Yes.
13        Q.      That doesn't come out of IDHS?
14        A.      No.
15        Q.      So the only money that IDHS would ever pay
16   to Dr. Williams would be the monthly fee for medical
17   director services?
18        A.      Only for Hart County.
19        Q.      How about for the other county?
20        A.      The other county, we have an all-inclusive
21   contract.
22        Q.      What does that mean?
23        A.      That means we pay -- up to a certain amount
24   per year, we pay all expenses out of our money.
25        Q.      So they're paying you more than $2,000 a



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 3:12-cv-00020-CAR   Document 52   Filed 04/04/13   Page 51 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.      DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                           Page 50

1    month for that, aren't they?

2        A.      Yes.

3        Q.      What are they paying you for that?

4            MR. BROWN:  For Wilkes County?

5            MR. JONES:  Wilkes County, yeah.

6            MR. BROWN:  Object to form.

7        Relevance.  You can tell him.

8            THE WITNESS:  Six thousand -- $6,666,

9        I think it is.

10       Q.      (By Mr. Jones)  What's the difference in

11   the level of service that Wilkes County gets for 6,000

12   a month and for what Hart County gets for 2,000 a

13   month?

14       A.      Wilkes County has all inclusive.  That

15   means Integrative Detention Health Services is

16   responsible for all medical bills and also all

17   medications.

18       Q.      What's the difference in size between the

19   Hart County jail and the Wilkes County jail?

20       A.      I don't know numbers.  I don't know how big

21   they are, how many inmates they house.

22       Q.      You've been in both jails; right?

23       A.      I have.

24       Q.      Is Wilkes County jail bigger than the Hart

25   County jail?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     A.     To me, it is.

2     Q.     Well, to me, Warrington is bigger than

3  Hartwell, but I don't know.  Maybe that ain't right.

4  Wilkes County -- and you've never gotten paid based on

5  the number of inmates or anything like that, have you?

6     A.     In Wilkes County?

7     Q.     In any county.

8     A.     No, not in -- technically with my Wilkes

9  County contract, it goes up to 70 inmates.  Anything

10  over that, I can charge an extra fee, but I never

11  have.

12     Q.     So is that basically -- that's like a per

13  capita rate?

14     A.     Right.

15     Q.     Is that based on the number of inmates in

16  the jail or the number that you actually see?

17     A.     It's based on a percentage of what is

18  usually housed, I guess you can say.  They average 50

19  inmates, and that's kind of what we set the price at.

20  If they go above, below, we don't adjust.

21     Q.     So with the Wilkes County with 50 inmates,

22  that's kind of what you -- is that kind of the norm

23  that you use to calculate what you think is a fair

24  fee?

25     A.     For Wilkes County.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q.      Yeah, based on what is likely to happen?

2      A.      For Wilkes County, yes.

3      Q.      Where do you get those numbers from to be

4    able -- in terms of how to structure your pricing?

5      A.      The average daily population.

6      Q.      Is there some organization that kind of

7    gives you guidelines on how to price things based upon

8    the population?

9      A.      No, not that I'm aware.

10     Q.      So you basically did it based on your

11   experience --

12     A.      Experience.

13     Q.      -- working Wilkes and also the other jails

14   you work, you kind of know what to expect with a given

15   number of people?

16     A.      Yes.

17     Q.      So you think Wilkes, the population has

18   gone above 50 and maybe as high as 70 at times?

19     A.      At times.

20     Q.      Do you have any idea how many inmates would

21   be -- and I'm sure we can get this from the sheriff

22   real easy.  Do you have any idea how many inmates

23   would be in the Hart County jail at a given time?

24     A.      I don't.  I've never asked and never

25   calculated it on a number of inmates for them.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q.      What's the most number of inmates y'all
 2   have ever seen in a day in Hart County?
 3        A.      I'd have to look that up.
 4        Q.      Do you know what's average, typical?  I
 5   mean, usually four, five a day?
 6        A.      Usually anywhere from five to 20.  It just
 7   depends.
 8        Q.      And how is that compared to Wilkes?  About
 9   the same?
10        A.      Wilkes, I see a lot more at Wilkes.
11        Q.      Wilkes is bigger, isn't it?
12        A.      Well, inmatewise.  I see them -- I see a
13   lot more.
14        Q.      Are there differences, in terms of the
15   female population, or does that not really make a
16   difference from your standpoint?
17        A.      I wouldn't -- I wouldn't know.
18        Q.      So I take it the deal with Dr. Williams is
19   that he's an independent contractor, at least --
20        A.      He was.
21        Q.      He still is really, isn't he?
22        A.      Technically.
23        Q.      You're just paying the hospital --
24        A.      Paying the hospital.
25        Q.      -- instead of paying him.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1          You used to send him a 1099?

2     A.    I did.

3     Q.    And I guess now you send it to the

4  hospital?

5     A.    I do.

6     Q.    And the hospital is now getting a thousand

7  a month instead of Dr. Williams?

8     A.    Yes.

9     Q.    And then they're paying him a salary,

10 that's included in -- you don't know what --

11    A.    I don't know.

12    Q.    You're not paying him anything in addition

13 to that?

14    A.    No.

15    Q.    This policy and procedure manual that we're

16 holding here that's marked Plaintiff's Exhibit 5,

17 these are the only written policies and procedures

18 that were in effect at the Hart County jail in 2010?

19    A.    Yes.

20    Q.    And also, I think you already said this,

21 but all the protocols that were in effect in 2010 are

22 also in this book?

23    A.    Medical protocols are in there.

24    Q.    In fact, fair to say this book here hasn't

25 changed since 2005 and it's still in effect today?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 3:12-cv-00020-CAR   Document 52   Filed 04/04/13   Page 56 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.          DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                                Page 55

```
 1        A.      Has not and still is.

 2        Q.      It's even got the same name still -- same

 3   signature on the front; right?

 4        A.      Yes.

 5                MR. BROWN:  I want to qualify one

 6           thing just for evidentiary purposes on the

 7           record.  What we've been able to give you

 8           thus far as we talked about before is a

 9           printed out duplicate --

10                MR. JONES:  Okay.

11                MR. BROWN:  -- of what would be

12           contained in an actual binder that my

13           understanding is actually physically kept

14           at the facility.  So what I'd like to be

15           able to do is before we say categorically

16           today is that what you have is 100 percent

17           verbatim exactly what is at the facility,

18           I'd like to be able to take what is

19           actually at the facility and put them page

20           by page and just make certain that we have

21           it, but we will make certain that whatever

22           is 100 percent enforce and effect at that

23           facility will be produced to you so that

24           we're all talking --

25                MR. JONES:  Yeah, produce it to me
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   and the next time I take his deposition or

2   whatever, we'll establish at that time that

3   that is the official version.

4        MR. BROWN:  I just wanted to say that

5   now.  I'm the one who physically made those

6   copies.  Since I can't work computers and

7   copy machines very well, I may have made a

8   mistake.  If it is a mistake, it's because

9   of me.

10  Q.     (By Mr. Jones)  When is the last time you

11  were at the Hart County jail?

12  A.     Probably a year ago.

13  Q.     And was that to see an inmate?

14  A.     It was to meet with Mike and Brian.

15  Q.     What were you meeting them about?

16  A.     We were just meeting to talk.

17  Q.     Were you talking about this lawsuit?

18  A.     Oh, no.  Huh-uh (negative).

19  Q.     And when was the last time you went before

20  that?

21  A.     I haven't really been in a while.  The only

22  time I go is if the sheriff or the jail administrator

23  would need me.  I usually communicate with them via

24  phone.

25  Q.     Do you ever talk to anybody else from the



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 3:12-cv-00020-CAR   Document 52   Filed 04/04/13   Page 58 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.        DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                                                    Page 57

1    county except for a sheriff and the people working in

2    the jail?

3         A.     No.

4         Q.     Like, do you ever talk to a clerk or county

5    commissioner or anybody like that?

6         A.     No.

7         Q.     Have you talked about trying to get them to

8    pay more money?

9         A.     No.

10        Q.     Or try to take it up a notch and maybe do

11   an all-inclusive contract?

12        A.     I mentioned it two years ago and was told

13   they were happy with what they had.

14        Q.     Who told you that?

15        A.     Bobby Millford.

16        Q.     He's the chief jailer?

17        A.     Chief jailer.

18        Q.     So you got the sheriff, and I guess there's

19   a chief deputy?

20        A.     Chief deputy.

21        Q.     And chief jailer?

22        A.     Chief jailer.

23        Q.     Do you know who the chief deputy is?

24        A.     Tommy Whitmire, last I heard, but I'm not

25   sure if he is or not.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q.      That name's familiar.  So we've got -- we
2   basically have taken care of Topics E and F.  Topic G,
3   the terms of the contract and business relationship
4   between IDHS and Hart County with respect to the care
5   of inmates at the jail.  We've got the contract.  I've
6   asked you some questions about it.  There's never been
7   any changes in that contract at all, has there?
8      A.      No.
9      Q.      And the contract -- attached to the
10  contract there's a letter.  Right at the end of it is
11  a letter to the sheriff and then it spells out all of
12  the -- go back a couple more pages to the front.
13  There you go.  A letter to the sheriff and it spells
14  out all the services; right?
15     A.      Uh-huh (affirmative).
16     Q.      And mentions Dr. Williams by name as being
17  the medical director.  He's the only medical director
18  that's ever served under that contract?
19     A.      It just says medical director.  It
20  doesn't --
21     Q.      There's a place further back.  I'm sorry.
22  If you go back to about the fourth page.  Right there.
23     A.      Right.
24     Q.      Description of services.
25     A.      Uh-huh (affirmative).



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 3:12-cv-00020-CAR    Document 52    Filed 04/04/13    Page 60 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.    DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                          Page 59

```
1        Q.      This says he's medical director/physician
2   of record.
3        A.      Yes.
4        Q.      What is your understanding of what a
5   medical director is?
6        A.      A medical director sees all -- oversees all
7   care provided.
8        Q.      Oversees the care provided by other people?
9        A.      By other people.
10       Q.      And gives them direction?
11       A.      Yes.
12       Q.      And those people are answerable to him;
13  right?
14       A.      Yes.
15       Q.      After that, it says, slash, physician of
16  record.  What does that mean?
17       A.      Physician of record would be if that's who
18  they require or that's who they wanted to do their --
19  provide their medical services.  If they wanted to
20  send them to his office or send him to the hospital to
21  be seen here, that's who would be the physician of
22  record to see him.  I offered that with the county if
23  they chose somebody else to be the physician of
24  record, they could.
25       Q.      All right.  H says the circumstances under
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   which IDHS obtained and maintained a contract to
 2   provide medical care at the Hart County jail,
 3   including negotiations and communications with Hart
 4   County and its sheriff.  We've kind of talked about it
 5   in a general way, but how did you first come to get
 6   this contract?
 7        A.    I was in Elbert County at the time and I
 8   was asked if I had ever approached Hart County by one
 9   of our -- our local EMS director because he was
10   originally from Hart County, and I told him I had not
11   and he said that he would call and see if they were
12   interested in talking to me.  And basically I went
13   from there and set it up.
14        Q.    Who had they been using?  How they had been
15   doing it before that?
16        A.    I'm not for sure.  I don't remember.
17        Q.    Who was the EMS director?  Was it here
18   in --
19        A.    In Wilkes County.
20        Q.    In Wilkes County that had told you that?
21        A.    Yes.
22        Q.    Who was that?
23        A.    Blake Thompson.
24        Q.    Blake Thompson.  And he knew you were
25   working in Elbert County at the time?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     A.     Yes.

2     Q.     And you already had IDHS at that point?

3     A.     I did.

4     Q.     You don't have Elbert County anymore, do

5  you?

6     A.     No.

7     Q.     How come you don't have that one anymore?

8            MR. BROWN:   If it's relevant, I think

9     you --

10           THE WITNESS:   I voluntarily pulled

11     out.

12     Q.     (By Mr. Jones)  So during the time of the

13  contract with Hart County, have you had contracts --

14  and this is -- we're talking about the last ten years

15  here.  During that time, have you had contracts with

16  other jails besides Wilkes?

17     A.     I have.

18     Q.     Was Elbert during that time or had you

19  pulled out before?

20     A.     Elbert County was before Hart County and I

21  pulled out in 2006 or 2007, I think.

22     Q.     And then I think Dr. Williams said y'all

23  had one at Lincoln County.

24     A.     We did.

25     Q.     When was that?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A.        Shortly after I took over the company, I

 2   started it in Lincoln County and then I pulled out

 3   after probably about six months into the new sheriff's

 4   term.  I can't remember which year it was.

 5        Q.        What was your reason for pulling out of

 6   those?  I mean, was it financial?

 7        A.        No.

 8        Q.        It wasn't about whether it was a good deal

 9   or not?

10        A.        No.

11        Q.        Personality differences, politics?

12        A.        Somewhat politics, I guess you would say.

13        Q.        As far as, like, local sheriff politics,

14   that kind of thing, they had somebody else they

15   wanted?

16             MR. BROWN:  Let's take a two-minute

17        break.

18             MR. JONES:  Yeah, I mean, you know --

19        it's probably beyond the scope of this, but

20        you know I'm going to ask him again in his

21        other deposition.

22             MR. BROWN:  I understand.  I just

23        don't want him to testify to anything that

24        could have some repercussions.  I don't

25        think it can, but let us talk about it for
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    just a couple seconds.

2         MR. JONES:  That's fine.

3         (A recess was taken.)

4         MR. BROWN:  I want to clarify one

5    thing.  In Plaintiff's Exhibit 1, which is

6    the contract, I just wanted to clarify so

7    when you leave today you understand that

8    all of these documents together are not the

9    contract.  The contract is the three-page

10   document that is signed by --

11        MR. JONES:  Right.

12        MR. BROWN:  -- Bruce and by the

13   sheriff or somebody at the jail.  The

14   letter on the Integrative Detention Health

15   Services, that is something that was before

16   the contract.

17        MR. JONES:  I see.

18        MR. BROWN:  So this was kind of an

19   introduction of IDHS to the people in Hart

20   County, and after this came the contract.

21   Just because -- I just wanted to make sure

22   you didn't think that they were kind of --

23        MR. JONES:  Okay.  That's actually

24   good.  I'll come back to that in a minute.

25   Q.    (By Mr. Jones)  Go ahead and say whatever



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.     DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                          Page 64

1    you were going to say about the reason you pulled out

2    of those two counties.

3        A.      The reason I pulled out of Elbert County,

4    there was an inappropriate relationship between one of

5    my employees and one of the jail employees, and I

6    asked -- I gave them my 60 day notice and told them I

7    was pulling out.

8        Q.      Okay.

9        A.      And for Lincoln County, there was some

10   inappropriate redoing of medications that -- by one of

11   the jail staff that was not in line with my policies

12   and procedures, so I asked to be -- have my 60 day

13   notice and that I was pulling out.

14       Q.      The employee that had the inappropriate

15   relationship, is he still an employee of yours?

16       A.      She is not.

17       Q.      She is not.  Okay.  The deputy -- the jail

18   staff member that -- what were they doing?  What were

19   they doing with the medication?  Compounding it or

20   something?

21       A.      Taking medication home and repackaging it.

22       Q.      To save money?  What do you mean?  How were

23   they repackaging it?

24       A.      The medication comes in blister packs.

25   They were taking it home -- the jailers are taught to



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 3:12-cv-00020-CAR   Document 52   Filed 04/04/13   Page 66 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.       DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                                Page 65

1    give the blister pack, look at the medication, the
2    patient's name, the medication administration record
3    and then give the patient the medicine.  She was
4    taking them home and putting them in a different
5    package and just putting the inmate's name on it to
6    give out, and I told her that that did not meet my
7    standard of care and she said she was going to
8    continue to do that and I told her I couldn't.
9        Q.      Did you go over her head and try to get
10   that resolved?
11       A.      I tried.
12       Q.      And basically there was a dispute, I guess,
13   between you and -- between you and the higher ups in
14   that jail and didn't agree on the best way to handle
15   that situation?
16       A.      I wouldn't call it a dispute.  They said
17   one thing and I said that's not my policy and
18   procedure, sorry.
19       Q.      Was that the only thing or was that the
20   final straw in that case?
21       A.      That was the one and only straw.  I stand
22   firm with my medication administration policy.
23       Q.      So they weren't going to change a practice
24   and they weren't going to get rid of her so you took
25   yourself out?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        A.      I did.

2        Q.      Did you make any staffing changes because

3   of the situation with Monica Robinson?

4        A.      No.

5        Q.      Did you have any criticism of anybody at

6   the jail about the handling of her case?

7        A.      No, I have not.

8        Q.      I want to go back to the point that your

9   lawyer made right at the -- when we started after the

10  break here.  He said that we have a contract and then

11  there's that letter, which I guess I assumed was a

12  cover letter that went with the contract, but it's a

13  letter attached to the back of the contract and as I

14  understand it, the letter actually got sent out before

15  the contract was signed.

16       A.      It did.  This was the actual letter sent to

17  the sheriff and sent to a variety of sheriffs stating

18  what we could and could not offer them and how we

19  could save them money.

20       Q.      So this was basically more like a sales

21  pitch than the actual --

22       A.      Yes.

23       Q.      -- terms of the deal?

24       A.      Yes.

25       Q.      And then the contract itself sets out what



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 3:12-cv-00020-CAR   Document 52   Filed 04/04/13   Page 68 of 85

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.          DEPOSITION OF
BRUCE BAILEY on 07/19/2012                                                Page 67

```
 1   the deal is?
 2        A.      Yes.
 3        Q.      But as far as the services that you provide
 4   under the contract, does that include everything
 5   that's in that letter or is there stuff in the letter
 6   that is not included in the contract?
 7        A.      There's items in the letter that the
 8   sheriff can add or delete at their -- at their whim to
 9   make it work for them.  And that's how we set it up
10   initially.  And you'll see the proposal of how we did
11   our services.
12        Q.      So the letter is basically a proposal?
13        A.      It is.
14        Q.      And what's the date on the letter?
15        A.      I don't see a date.
16        Q.      Do you know when you sent it in relation to
17   the contract, if you don't know the date?
18        A.      It's probably early 2002.  That's all I
19   would know.
20        Q.      How many of those letters have you sent out
21   over the years?
22        A.      Roughly ten.
23        Q.      You've sent proposals to ten sheriffs and I
24   guess you ended up having contracts with maybe half of
25   them at some point?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     A.     At some point in time.

2     Q.     Will you look at that letter and tell me if

3  all the pages are there.  Because it looks to me like

4  there might be a page missing somewhere.  There's one

5  place where it doesn't seem to flow naturally to me.

6  Maybe that's the way you intended it.  I don't know.

7  You want to know what I'm referring to?

8     A.     I think this page is out --

9     Q.     You think it's out of order maybe?

10     A.     Yes.  I think this page is supposed to be

11  Page 2 -- yeah, this is supposed to be Page 2, I

12  believe.  I'd have to look at my originals.

13     Q.     Because what was throwing me was the first

14  page of it lists like 15 different items.

15     A.     Right.

16     Q.     Then the next page is some bullet points,

17  but there's nothing above it saying what those bullet

18  points mean.

19     A.     The description of services should be No.

20  2, then it goes through the bullet points.

21     Q.     Do me a favor, will you, this is going to

22  be an exhibit to the deposition.  Just on that letter,

23  will you write in the lower right-hand corner, but

24  high enough up that it doesn't get chopped off by the

25  copier, just write Page 1 -- just write the order of

**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   the pages, 1, 2, 3, 4, 5.  That would be 1 obviously.

2        A.      (The witness complies.)

3        Q.      Okay.  Great.  So you went and talked to

4   somebody at the county at the recommendation of

5   somebody here, the guy that was --

6        A.      Mike Thompson.

7        Q.      Did he tell you who to talk to, who his

8   contact was there?

9        A.      He told me the sheriff's name and the chief

10  jailer's name, and I think he had called them and gave

11  them my name and told them I would be calling.

12       Q.      And how many meetings did you have with

13  them?

14       A.      We had one lunch meeting and then we went

15  to -- the next meeting was with the commissioners.

16       Q.      How many commissioners were there, do you

17  remember?

18       A.      I don't remember.

19       Q.      Do you know any of the commissioners'

20  names?

21       A.      No.

22       Q.      Have you had any dealings with any of the

23  commissioners since that meeting?

24       A.      No.

25       Q.      You never had any occasion to call them or



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.
BRUCE BAILEY on 07/19/2012

DEPOSITION OF
Page 70

1    anything?

2        A.     No.

3        Q.     What county do you live in, by the way?

4        A.     Wilkes County.

5        Q.     You live in Wilkes County.  So how did the

6    $2,000 a month figure get arrived at?

7        A.     It was basically the price that I had

8    adjusted for Wilkes County initially, and in speaking

9    to the sheriff, I asked him how many clinics he wanted

10   and where he wanted to stand with the number of

11   emergency call-ins per month and things like that, and

12   we adjusted according to that.

13       Q.     So he gave you some information?

14       A.     He basically asked me -- he said, you know,

15   we'd like to have a nurse there, you know, twice a

16   week, and I told him what we do twice a week and we

17   would throw in an additional three hours for three at

18   the onset and kind of maintain that.  And then during

19   the 90-day trial, we would do five free call-ins a

20   month if needed during that initial 90 days, then we

21   would start charging for it.

22       Q.     But you ended up not charging for call-ins;

23   right?

24       A.     No, we eventually did.  Yes.

25       Q.     So I thought it was just a flat right of



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  $2,000 a month?

2      A.      No, it was -- the first 90 days are free.

3  After that, the call-in fees took into effect and

4  extra hours.

5      Q.      So you're saying that now you get $2,000 a

6  month plus call-in fees?

7      A.      Plus call-in fees and any additional hours

8  the nurse is there, and that has been that way since

9  the 90 days ended.

10     Q.      So how much are you getting on average per

11 month from them now?

12     A.      Maybe 22, $2,300, I think.  I'm not sure.

13 It depends on how many they see, how many inmates they

14 see and the length of time there.

15     Q.      So is it fair to say that the extra call-in

16 fees and, for lack of a better word, overtime, you

17 know, the going beyond the clinic days, maybe adds ten

18 or 15 percent?

19     A.      Maybe.

20     Q.      Two thousand a month?

21     A.      Yeah, maybe about that much.

22     Q.      Maybe adds two or 300 a month?

23     A.      And that goes to Mike and Brian for

24 working.

25     Q.      It goes straight to them?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        A.        Yes, sir.

2        Q.        You don't get any of that?

3        A.        I don't see any of that.  If they work the

4    extra hours, they get paid the extra hours.

5        Q.        On that letter, that proposal, the last

6    page of that, isn't there some dollar --

7        A.        This is.

8        Q.        -- in kind of a grid there?

9        A.        It is.

10       Q.        And had they accepted that proposal, what

11   would they have been paying you?

12       A.        Sir?

13       Q.        Had they gone with what you put down there

14   on that grid, what would they be paying you per month?

15       A.        For the first three months, $2,000, and any

16   call-ins above five would be $40 after that.

17       Q.        Okay.

18       A.        And then after the initial three months, if

19   they continue, then they would be charged call-in fee

20   and the additional hours.

21       Q.        So basically that's the same price schedule

22   you have now, isn't it, more or less?

23       A.        More or less basically.

24       Q.        So they tried to get you down to a lower

25   amount of money?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1          A.     No.

2          Q.     So you basically said, I'll do it for

3    $2,000 a month?

4          A.     Basically.

5          Q.     And you haven't raised what you're paying

6    anybody --

7          A.     No.

8          Q.     -- during that time?

9                 So your costs have not gone up?

10         A.     Not my costs for this, no.

11         Q.     And you've never asked them to pay you any

12   more?

13         A.     It pretty much remains the same.

14         Q.     You have asked them if they wanted to --

15         A.     If they wanted to renegotiate the prices or

16   anything like that or if they're happy with it, and

17   they say, yeah, we're happy.

18         Q.     But what they've got is a contract that

19   says they'll do this for 90 days; right?

20         A.     That was the initial contract for the 90

21   days.

22         Q.     So basically y'all are still treating that

23   contract as if it's -- I mean, y'all are still going

24   by that contract, even though it's been way more than

25   90 days; right?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   A.      We are performing the services outlined in
2   the contract, I'll say.
3       Q.      So when does it end?  Just whenever
4   somebody gets tired of it?
5       A.      I would guess.  I know I'd probably get a
6   60-day notice or a 30-day notice if one or the other
7   is unhappy, I would say.
8       Q.      Is that what it says in there?
9       A.      I'm not sure.  I would have to read through
10  it again.
11      Q.      It says whatever it says.  Neither side has
12  ever threatened to, you know, terminate it?
13      A.      No.  No.
14      Q.      Is there a provision in there that says
15  you've got to give a certain amount of notice?
16      A.      No, that's not what I was showing him.
17      Q.      So, I mean, this was a 90-day trial basis.
18  When y'all discussed that and agreed to it, what was
19  your understanding as to what would happen after 90
20  days?
21      A.      That we would continue on if they liked us.
22  If they didn't, they would ask us to leave.
23      Q.      So what was the point of the 90 days?  Just
24  to give them 90 days to back out if they didn't like
25  it?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A.      Right.

 2        Q.      So basically you've got a perpetual --

 3   you've got a contract that basically goes on until

 4   either side decides they want to terminate it and

 5   gives notice?

 6               MR. BROWN:  Objection to form.

 7        Q.      (By Mr. Jones)  There's no time limit on

 8   that agreement, is this, anymore, in terms of what --

 9               MR. BROWN:  If you understand his

10          question, if you can answer it, you can.

11        Q.      (By Mr. Jones)  I'm really asking you what

12   you're operating under.  You've got a 90-day contract

13   there.

14        A.      The term of the agreement was for 90 days,

15   and it's understood that the agreement would be

16   extended for additional terms if mutually agreed upon

17   by both parties.  Basically we mutually agreed and

18   went on.

19        Q.      All right.  So basically both sides have

20   been happy for ten years basically?

21        A.      To my understanding.

22        Q.      All right.  And the last topic, we've

23   covered.  The only medical director of Hart County

24   jail during your watch has been Dr. Williams.

25        A.      Yes.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1          MR. JONES:  I'm done.

 2          MR. DICKERSON:  No questions.  He

 3   does want to read and sign if that can be

 4   before any notary.

 5          MR. JONES:  Yes, that's fine.

 6          (Deposition concluded at 2:57 p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1                    DISCLOSURE

2

3        Pursuant to Article 10.B of the Rules
and Regulations of the Board of Court
Reporting of the Judicial Council of
4    Georgia which states:  "Each court reporter
shall tender a disclosure form at the time
5    of the taking of the deposition stating the
arrangements made for the reporting
6    services of the certified court reporter,
by the certified court reporter, the court
7    reporter's employer or the referral source
for the deposition, with any party to the
8    litigation, counsel to the parties, or
other entity.  Such form shall be attached
9    to the deposition transcript," I make the
following disclosure:

10

11       I am a Georgia Certified Court
Reporter.  I am here as a representative of
12   Discovery Litigation Services, LLC.
Discovery Litigation Services, LLC was
13   contacted to provide court reporting
services for the deposition.  Discovery
14   Litigation Services, LLC will not be taking
this deposition under any contract that is
15   prohibited by O.C.G.A. 9-11-28(c).

16       Discovery Litigation Services, LLC
has no contract/agreement to provide
17   reporting services with any party to the
case, any counsel in the case, or any
18   reporter or reporting agency from whom a
referral might have been made to cover this
19   deposition.

20       Discovery Litigation Services, LLC
will charge its usual and customary rates
21   to all parties in the case, and a financial
discount will not be given to any party to
22   this litigation.

23

24                    Blanche J. Dugas
CCR No. B-2290

25



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH SERVICES, INC.
BRUCE BAILEY on 07/19/2012

DEPOSITION OF
Page 78

1  STATE OF GEORGIA:

2  COUNTY OF FULTON:

3

4          I hereby certify that the foregoing

5  transcript was reported, as stated in the

6  caption, and the questions and answers

7  thereto were reduced to typewriting under

8  my direction; that the foregoing pages

9  represent a true, complete, and correct

10  transcript of the evidence given upon said

11  hearing, and I further certify that I am

12  not of kin or counsel to the parties in the

13  case; am not in the employ of counsel for

14  any of said parties; nor am I in any way

15  interested in the result of said case.

16

17

18

19          *Blanche J. Dugas*

20          BLANCHE J. DUGAS, CCR-B-2290

21

22

23

24

25

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1                          CAPTION

2

3          The Deposition of BRUCE BAILEY, taken in

4    the matter, on the date, and at the time and place set

5    out on the title page hereof.

6              It was requested that the deposition be

7    taken by the reporter and that same be reduced to

8    typewritten form.

9              It was agreed by and between counsel and

10   the parties that the Deponent will read and sign the

11   transcript of said deposition.

12

13

14

15

16

17

18

19

20

21

22

23

24

25



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

MONICA ROBINSON,                        *
                                        *
    Plaintiff,                          *
                                        *
v.                                      *       CIVIL ACTION NO.
                                        *       3:12-cv-00020-CAR
INTEGRATIVE DETENTION                   *
HEALTH SERVICES, INC.,                  *
HART COUNTY, GEORGIA,                   *
SHERIFF MIKE CLEVELAND,                 *
BRUCE A. BAILEY, LPN,                   *
BRIAN EVANS, EMT,                       *
MIKE ADAMS, EMT, and                    *
ROBERT J. WILLIAMS, MD,                 *
                                        *
    Defendants.                         *


## NOTICE OF DEPOSITION UNDER RULE 30(b)(6)

To:  Integrative Detention Health Services, Inc. (IDHS) and Counsel of Record

    YOU ARE HEREBY NOTIFIED pursuant to Rule 30(b)(6) of the Federal

Rules of Civil Procedure that you are hereby required to designate one or more

representatives having personal knowledge of the following matters to appear at a

deposition on Thursday, July 19, 2012, commencing at 11:00 a.m. at the library of

Wills Memorial Hospital, 120 Gordon Street, Washington, Georgia 30673, to be

examined under oath regarding the following subjects:

1



PLAINTIFF'S EXHIBIT 4

a)   The names of the supervising physicians for all nurses, emergency medical technicians, or other medical providers employed or contracted by IDHS in July or August 2010;

b)   The names of the supervising physicians for all nurses, emergency medical technicians, or other medical providers employed or contracted by IDHS who provided services at the Hart County jail in July or August 2010 ;

c)   All protocols and standing orders issued by any physician referenced in (a) or (b) above;

d)   The nature of the business and professional relationship between IDHS and Defendant Robert J. Williams, M.D.;

e)   Medical policies and procedures in effect at the Hart County jail in July and August 2010;

f)   Medical or nursing protocols and physician's standing orders in effect at the Hart County jail in July and August 2010;

g)   The terms of the contract and business relationship between IDHS and Hart County with respect to the care of inmates at the jail;

h)   The circumstances under which IDHS obtained and maintained a contract to provide medical care at the Hart County jail, including negotiations

and communications with Hart County and its sheriff; and

i)      The name and address of any physician serving as medical director of the Hart County jail, or otherwise responsible for providing medical oversight over medical providers caring for inmates at the jail, in July and August 2010.

This deposition will be recorded stenographically before an officer duly qualified to administer oaths, and will continue until examination is complete.

Respectfully submitted this __12__ day of June, 2012.

 

CRAIG T. JONES
Ga. Bar No. 399476
Attorney for Plaintiff

PAGE PERRY, LLC
1040 Crown Pointe Parkway, Suite 1050
Atlanta, GA 30038
(770) 673-0047
cjones@pageperry.com

DOUGLAS C. MCKILLIP
Ga. Bar No. 495422
Attorney for Plaintiff

THE MCKILLIP LAW FIRM, LLC
648 South Milledge Avenue
Athens, GA 30605
(706) 546-6279
doug@dougmckillip.com

## CERTIFICATE OF SERVICE

I certify that on this day, I served the foregoing **NOTICE OF DEPOSITION UNDER RULE 30(b)(6)** of Integrative Detention Health Services, Inc. upon opposing counsel via First Class U.S. Mail to the following:

Andrew H. Marshall, Esq.
Begnaud & Marshall LLP
P.O. Box 8085
1091-B Founder's Boulevard
Athens, Georgia 30603-8085

Walter J. Gordon, Esq.
Gordon Law Firm
P.O. Box 870
Hartwell, Georgia 30643

Jeffrey A. Brown, Esq.
Brown and Adams, LLC
P.O. Box 139
Columbus, Georgia 31901

John A. Dickerson, Esq.
McClure, Ramsay, Dickerson & Escoe, LLP
P.O. Drawer 1408
Toccoa, Georgia 30577

This 12 day of June, 2012.

_____
CRAIG T. JONES
Ga. Bar No. 399476
Attorney for Plaintiff

PAGE PERRY, LLC
1040 Crown Pointe Parkway, Suite 1050
Atlanta, GA 30038
(770) 673-0047

4