Page 3

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION
- - -

Monica Robinson,          :

          Plaintiff,       :

     vs.          :  Case No. 3:12 CV 20-CAR

Integrative Detention     :
Health Services, Inc.,    :
Hart County, Georgia,     :
Sheriff Mike Cleveland,   :
Bruce A. Bailey, LPN,     :
Brian Evans, EMT, Mike    :
Adams, EMT and Robert J.  :
Williams, M.D.,           :

          Defendants.      :

- - -

DEPOSITION

of Lawrence H. Mendel, D.O., taken before me,
Margaret A. Marsh, a Notary Public in and for the
State of Ohio, at the offices of Armstrong & Okey,
Inc., 222 East Town Street, Second Floor, Columbus,
Ohio, on Thursday, November 8, 2012, at 1:53 p.m.
- - -

ARMSTRONG & OKEY, INC.
222 East Town Street, Second Floor
Columbus, Ohio  43215-5201
(614) 224-9481 - (800) 223-9481
FAX - (614) 224-5724

### Page 2

```
 1   APPEARANCES:
 2        Page Perry, LLC
          By Mr. Craig T. Jones
 3        1040 Crown Pointe Parkway, Suite 1050
          Atlanta, Georgia 30338
 4
 5             On behalf of the Plaintiff.
 6        Brown & Adams, LLC
          By Mr. Jeffrey A. Brown
 7        P.O. Box 139
          Columbus, Georgia 31902-0139
 8             On behalf of Defendants Integrative
               Detention Health Services, Inc., Bruce A.
 9             Bailey, LPN, Brian Evans, EMT, and Mike
               Adams, EMT.
10
11        McClure, Ramsay, Dickerson & Escoe, LLP
          By Mr. Austin L. Perry
12        38 Falls Road
          P.O. Drawer 1408
13        Toccoa, Georgia 30577
14             On behalf of Defendant Robert J.
               Williams, M.D.
15        Begnaud & Marshall, LLP
          By Mr. Andrew H. Marshall
16        P.O. Box 8085
          Athens, Georgia 30603
17
18             On behalf of Defendant Hart County,
               Georgia, and Sheriff Mike Cleveland.
19                  - - -
20
21
22
23
24
```

### Page 3 (Index)

```
 1                     INDEX
 2                     - - -
 3   Witness                              Page
 4   Lawrence H. Mendel, D.O.
        Examination by Mr. Brown            5
 5      Examination by Mr. Marshall       227
        Examination by Mr. Perry          231
 6      Examination by Mr. Brown          261
 7                     - - -
 8   Defendant's Exhibit              Identified
 9   1 Notice to Take the Deposition of    11
        Dr. Lawrence H. Mendel
10
     2 Plaintiff's Rule 26(b)(2) Expert    36
11      Disclosure as to Dr. Lawrence H
        Mendel
12
     3 Hart County Hospital Discharge     215
13      Summary
14   4 Annals of Internal Medicine;        93
        Timeline; Robinson Case Documents
15      Received; Mendel Medical Services,
        Inc.; Invoice; Michigan Quality
16      Improvement Consortium Guideline;
        Management of Acute Low Back Pain;
17      L. Mendel, Depositions and Trial
        Testimony; Deposition Review Notes
18      Dr. Williams; Deposition Review
        Notes Bruce Bailey Part Two; Notes
19      for Discussion Robinson Depo; Affidavit
        of Lawrence H. Mendel, D.O.; Role of
20      Dr. Williams; Deposition Review Notes
        Brian Evans; Deposition Review Notes
21      Michael Adams; Depo Review Notes
        Monica Robinson; Deposition Review
22      Notes Bruce Bailey
23                     - - -
24
```

### Page 4

```
 1        (Witness sworn.)
 2        MR. BROWN:  This is the discovery
 3   deposition of Dr. Lawrence Mendel?
 4        THE WITNESS:  Yes.
 5        MR. BROWN:  Am I pronouncing it
 6   correctly?
 7        THE WITNESS:  Yes.
 8        MR. BROWN:  Taken for all purposes
 9   allowed under the Federal Rules of Civil Procedure.
10   Form of the question -- I would propose that all
11   objections except those to the form of the question
12   and responsiveness of the answer be reserved until
13   the first use.  Is that fine?
14        MR. JONES:  Yes.
15        MR. PERRY:  Yes.
16        MR. MARSHALL:  Yes.
17        MR. BROWN:  Is Dr. Mendel going to read
18   and sign his deposition?
19        MR. JONES:  He'll reserve the right to do
20   that.
21        MR. BROWN:  Okay.  I'll certainly be fine
22   with that being done before any notary public.
23                  - - -
24
```

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 5

1          LAWRENCE H. MENDEL, D.O.
2    being first duly sworn, as prescribed by law, was
3    examined and testified as follows:
4                 EXAMINATION
5    By Mr. Brown:
6          Q.  Dr. Mendel, my name is Jeff Brown.  We
7    met a few minutes ago, is that correct, for the first
8    time?
9          A.  Yes.
10         Q.  I represent four of the defendants in
11   this lawsuit that we're here talking about today.  I
12   represent Bruce Bailey, who was a nurse.  I represent
13   Mike Adams, who was a paramedic.  I was represent
14   Brian Evans, who was one of the paramedics.  I
15   represent IDHS, who is the company that they were
16   affiliated with.
17             We just want to explore some of your
18   opinions this afternoon.  It may take a little while.
19   If I ask you a question that does not make any sense
20   from a medical standpoint, which may very well
21   happen, make sure you correct me.  I want to make
22   sure you understand my questions before you answer
23   them.  Is that okay?
24         A.  Yes.

Page 6

1          Q.  If you need to take a break for any
2    reason, just let us know.  Phone call, anything you
3    need to take care of.  We've got all the time in the
4    world.  Craig has to leave at 6:30, but the rest of
5    us can stay later.
6             MR. JONES:  There you go.
7          Q.  Could you tell us your full name, please?
8          A.  Lawrence Harold Mendel.
9          Q.  Where are you from originally?
10         A.  Columbus, Ohio.
11         Q.  So this is your hometown?
12         A.  Yes.
13         Q.  What is your date of birth?
14         A.  May 24, 1954.
15         Q.  Where are you currently employed?
16         A.  That's a multipart question.  I work part
17   time for the State of Ohio. I also work under
18   contract to Corrections Corporation of America.  I
19   also am employed by Ohio State University.
20         Q.  And those are the three entities by whom
21   you're employed right now?
22         A.  The three primary entities.  I'm also
23   under contract to the State of Missouri Department of
24   Corrections.

Page 7

1          Q.  Anybody else?
2          A.  Well, I do work with a group called Moore
3    and Associates.  It's a correctional consulting firm.
4          Q.  That's sporadic, though; is that right?
5          A.  Yes.
6          Q.  Anybody else?
7          A.  Well, I have a personal corporation,
8    Mendel Medical Services, and I draw a payroll from
9    that as well.
10         Q.  Is that all of them?
11         A.  I believe so.
12         Q.  What do you do in your free time?
13         A.  Sleep.
14         Q.  Of the various entities that you've just
15   listed, which of these entities do you spend the bulk
16   of your time with?
17         A.  It's pretty well distributed.  I work one
18   day a week for the Ohio Correctional System.  I work
19   roughly one day a week for Correctional Corporation
20   of America.  And as far as then other projects
21   through Mendel Medical Services, that probably makes
22   up the majority of the other time.
23         Q.  So then three days a week?
24         A.  Roughly, yes.

Page 8

1          Q.  How often do you work with Ohio State
2    University?
3          A.  Periodically.
4          Q.  When you say "periodically," is that one
5    day a month?  Two days a month?
6          A.  It depends on what their staffing needs
7    are.  I'm under contract to -- my arrangement with
8    them is to provide vacation coverage at one of their
9    locations.  So it's highly variable.
10         Q.  How often do you work with the State of
11   Missouri?  How much time do you put in there?
12         A.  That is also kind of inconsistent.  My
13   current contract is to do mortality reviews for them.
14   So they send me a mortality review when they have a
15   case that they have a concern about; and I review
16   that, write a report, and send it back to them.
17             I received yesterday a contract offer.
18   They want me to also consult on other matters, and
19   we've negotiated a contract; but that hasn't started
20   yet.
21         Q.  What's a mortality review?
22         A.  When they have an in-custody death which
23   the circumstances they felt were questionable,
24   clinical circumstances, they ask me to review the

Page 9

1  case and make recommendations with regard to specific
2  actions to be taken.
3      Q.  So it's kind of a peer review or a
4  quality-assurance-type thing?
5      A.  Essentially, yes.
6      Q.  How many more -- how long have you been
7  doing that work with the State of Missouri?
8      A.  I believe I started in 2008.
9      Q.  Okay.  And approximately how many
10  mortality reviews have you done since that time?
11      A.  Probably about 12 to 14.  Maybe a few
12  more.
13      Q.  Okay.  But that's total?
14      A.  Yes.
15      Q.  So it's just a couple a year?
16      A.  Generally, yes.
17      Q.  So you spend about one day a week with
18  the Ohio Department of Corrections; one day a week
19  with your correctional corporation -- the Corrections
20  Corporation; periodically cover for vacationing folks
21  at OSU; sporadically with Missouri.  What about Moore
22  and Associates?  What is Moore and Associates, and
23  what do you do with them?
24      A.  They do correctional consulting, and I

Page 10

1  work with them.  We just submitted a bid to do a
2  consulting project for the Virginia Department of
3  Corrections, and we're waiting to hear about that.
4      Q.  What are you all proposing to do for the
5  Virginia Department of Corrections?
6      A.  They solicited a request for a proposal
7  for a comprehensive review of their entire medical
8  operation, facilities, staffing, policies,
9  procurement, pharmaceuticals, hospital contracts, and
10  allocation of services, whether it's better to have
11  that going to a hospital or to move some more of
12  those services to their on-site facility.
13      Q.  So the RFP that was just submitted was to
14  win the contract to do the review but not to actually
15  provide any services for --
16      A.  That's correct.
17      Q.  -- correctional care?  Okay.  And Mendel
18  Medical.  What do you do with Mendel Medical?
19      A.  I have a corporation.  I've done some
20  consulting projects on my own, and I also do expert
21  witness work through the corporation.
22      Q.  All right.  So today you are here as an
23  employee or a principal of Mendel Medical, Inc.; is
24  that right?

Page 11

1      A.  Yes.
2      Q.  Are you the sole shareholder, I guess, of
3  Mendel Medical, Inc.?
4      A.  Yes.
5      Q.  Okay.  What is your primary work address
6  where you receive the bulk of your mail?
7      A.  I have a business post office box.  It's
8  1255 North Hamilton Road, Columbus, Ohio  43230.
9  It's Box No. 71.
10      Q.  I'm showing you Defendant's Exhibit
11  No. 1, which is just a copy of your deposition
12  notice.  You've seen that before today; right?
13      A.  Yes.
14          MR. PERRY:  Thank you.
15      Q.  When did you first receive this notice?
16  When did you first see it?
17      A.  I don't know the exact date.  I'd say
18  roughly a month ago.
19      Q.  Okay.
20      A.  If it's important to know the exact date,
21  I can retrieve that.
22      Q.  No.  It's probably included in some of
23  the materials that we've asked you to bring.  Did you
24  bring any materials with you?  I think we had asked

Page 12

1  for about 11 different things.
2      A.  Yes.
3      Q.  Can we go through and just kind of
4  establish what you did and did not bring today?
5      A.  Sure.
6      Q.  The first one:  "All materials provided
7  to Dr. Mendel, or reviewed by him, in connection with
8  this case, including, but not limited to, medical
9  records, depositions, radiology films, reports from
10  other physicians and any and all other materials
11  relevant to this case."
12          Did you bring that material?
13      A.  Yes.
14      Q.  Is it on a disk here?
15      A.  Yes.
16      Q.  Was it provided to you on a disk or did
17  you put it onto a disk?
18      A.  It was provided to me electronically
19  through e-mail attachments, so that's why I didn't
20  bring paper originals because I've never had those
21  documents as paper originals.
22      Q.  So you've worked exclusively
23  electronically on this particular case as far as
24  reviewing the records?

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 13

1    A.  Yes.
2        MR. BROWN:  Sometime during the break, I
3   guess we'll have to see if we can look on this and
4   sec.
5        Q.  Do you recall what medical records you
6   have seen or what medical records you were provided?
7        A.  I brought a list of the documents that
8   I've received.  The medical records that I received
9   included a listing of records from the jail, a
10  listing of the records from the hospital, Ty Cobb
11  Hospital, and I believe the discharge summary from
12  the Athens Hospital.
13       Q.  Is that all the medical records that
14  you've been provided?
15       A.  There may have been some other records
16  that were attachments to depositions that I saw, but
17  that's all that I recall.
18       Q.  All right.  Which are the medical records
19  from the jail facility, records from Ty Cobb
20  Hospital, from the Ty Cobb Healthcare Group, and the
21  discharge summary from Athens Regional Medical
22  Center.  Do you remember which discharge summary it
23  was?
24       A.  It was from the initial hospitalization.

Page 14

1        Q.  Okay.  What depositions have you
2   reviewed?
3        A.  That list is -- well, the documents are
4   all included on this disk.  Actually I also have
5   those in electronic form here.  So I can go through a
6   list.  Can you repeat your question, please?
7        Q.  What depositions have you reviewed?
8        A.  Okay.  I will have the answer to that
9   momentarily.  I reviewed the two depositions from
10  Bruce Bailey, one as a corporate representative and
11  one -- and then a second one.  I reviewed the
12  deposition of Dr. Robert Williams.  I reviewed the
13  deposition of Michael Adams and Brian Evans.
14       Q.  All right.  Is that all of them?  Five
15  depositions?
16       A.  I believe so.  I reviewed a few pages of
17  one of the custody officer's depositions, but I don't
18  recall the name.
19       Q.  Do you have them saved on your iPad, the
20  pages that you reviewed?
21       A.  I have the deposition.  I can tell you
22  the name, if you'd like me to look it up.
23       Q.  If you can.  We're just trying to make
24  sure we understand today everything that you've had

Page 15

1   the opportunity to review.
2        A.  I believe it was the deposition of Sheila
3   Roper.
4        Q.  Okay.
5        A.  Yes.  It was the deposition.  It was just
6   only a few pages from that.
7        Q.  Was it just that a few pages were sent or
8   the entire deposition was sent and you only reviewed
9   a few pages?
10       A.  I did not get those depositions.  Those
11  depositions were not sent to me until Tuesday
12  afternoon, and I haven't had time to review beyond a
13  few pages of those.
14       Q.  Tuesday.  Are we talking about November
15  the 6th?
16       A.  Yes.
17       Q.  Okay.  Did you ask for those or were
18  those just sent?
19       A.  No, I did not ask for those.
20       Q.  Were there other depositions that have
21  been sent that you have not had an opportunity to
22  review?
23       A.  No.
24       Q.  So you've reviewed two depositions of

Page 16

1   Bruce Bailey, Mike Adams, Brian Evans, Dr. Williams,
2   portions of Sheila Roper, and no other depositions?
3        A.  Oh, excuse me.  There was one more.
4   Monica Robinson's deposition I reviewed as well.
5        Q.  Okay.  And so there have been no others
6   that have been sent to you that you have not
7   reviewed?
8        A.  That's correct.
9        Q.  All right.  Did you review -- strike
10  that.
11            Did you bring any correspondence,
12  memoranda, notes, reports, or other documents that
13  you have either received or that you have generated
14  in connection with this case?
15       A.  Yes.
16       Q.  Where are they?
17       A.  Right here.  (Indicating.)
18       Q.  Can I peruse through them?
19       A.  Sure.  I'll just give you the whole
20  thing.
21       Q.  I'll let you hold onto the deposition
22  notice.  All right.  At some point in time, we'll
23  want to be able to get copies of these and attach
24  them to the deposition.  But as we sit here going

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

---

Page 17

1 through them, Dr. Mendel, I have a typewritten, it
2 looks like, outline sheet that says, "Role of
3 Dr. Williams." Are these notes that you took from
4 your review of Dr. Williams' deposition?
5      A.  No.
6      Q.  What are these?
7      A.  That's a summary of the issues that I
8 identified with regard to Dr. Williams' role in the
9 case particular to his obligations to the facility.
10     Q.  All right. When did you prepare this?
11 Do you know?
12     A.  The final version of that I prepared
13 yesterday.
14     Q.  When was the first version that you
15 prepared?
16     A.  I prepared the first version of that
17 probably around October 20.
18     Q.  Of 2012?
19     A.  Yes.
20     Q.  Okay. And have you forwarded this to
21 anybody?
22     A.  No.
23     Q.  Okay. This is what you made for your
24 benefit and your own use to be used in connection

---

Page 18

1 with giving your opinions in this case?
2      A.  Yes.
3      Q.  All right. We'll go through them in a
4 little more detail. I'm just trying to get a laundry
5 list.
6          Now, next you've got deposition review
7 notes of Bruce Bailey. Now, are these then notes
8 that you took in connection with your review of
9 Mr. Bailey's deposition?
10     A.  Yes.
11     Q.  And it looks like as designated
12 representative of IDHS. So it looks like this was
13 your review of the 30(b)(6) or the corporate
14 representative deposition; is that right?
15     A.  If that's what it says at the top, yes.
16     Q.  Did you do one for Mr. Bailey's personal
17 deposition?
18     A.  I believe I did.
19     Q.  When did you prepare this one? Do you
20 know?
21     A.  As I was reviewing that deposition.
22     Q.  Do you remember when you were provided
23 that deposition?
24     A.  Sometime after October 1.

---

Page 19

1      Q.  2012?
2      A.  Yes.
3      Q.  Then we've get depo review notes for
4 Monica Robinson. Obviously she was deposed middle of
5 October so you hadn't had this one very long. She
6 was deposed early October, I think. So you hadn't
7 had this one but a few weeks; is that correct?
8      A.  That sounds about right.
9      Q.  The same thing with Brian Evans and the
10 same thing with Mike Adams? They were made
11 contemporaneously with your review of the
12 depositions?
13     A.  Yes.
14     Q.  Doctor, have any of these been provided
15 to anybody else or are they just for your personal
16 use?
17     A.  They have not been provided to anybody
18 else.
19     Q.  I also have a copy here of a listing of
20 your cases where you've served as an expert witness.
21 That's also part of your expert report?
22     A.  That is not correct.
23     Q.  Okay. What is this?
24     A.  That is a list of cases that I've been

---

Page 20

1 deposed or testified at trial.
2      Q.  So either as a retained expert or as a
3 fact witness; is that right?
4      A.  Well, let me clarify. Your initial
5 statement was that -- that list does not include
6 cases that I've reviewed in which I was not deposed
7 or testified.
8      Q.  Okay. All right. On this list, however,
9 are these cases where you have given trial or
10 deposition testimony as a retained expert?
11     A.  Yes.
12     Q.  And is it exclusively as a retained
13 expert; nothing where you were a caregiver?
14     A.  Correct.
15     Q.  Do you have any idea how many other cases
16 where you have been retained but have not given any
17 testimony?
18     A.  No, I do not.
19     Q.  All right. We've got another copy of
20 your affidavit that is not dated or signed. Is this
21 a draft copy of the affidavit that you ultimately
22 signed, do you believe?
23     A.  I believe that that is the final version
24 of the affidavit that was filed.

---

5 (Pages 17 to 20)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 21

1    Q.  How did you go about drafting the
2  affidavit?
3    A.  I reviewed the medical records.  I
4  prepared some notes.  Then I communicated with
5  Mr. Jones, and we worked together to draft the
6  affidavit.
7    Q.  So a lot of the actual pen to paper was
8  done by Mr. Jones relying on materials and things
9  that you had provided to him either through oral
10  communication or through writing?
11    A.  Yes.
12    Q.  And he gave it to you to check over and
13  make sure that it was consistent with what your
14  opinions were and things of that nature?
15    A.  That's correct.
16    Q.  I understand to get that done because we
17  have to follow all the rules and have certain things
18  that are prepared.
19    Do you have a copy in here or are there
20  any copies of the notes or things that you may have
21  provided to Mr. Jones at the time or at any time
22  before this final affidavit was prepared?
23    A.  There may be remnants of those other
24  notes.  I revised and updated that information as

Page 22

1  additional documents were made available to me.
2    Q.  All right.  Notes for discussion on
3  Robinson depo.  What does that mean?
4    A.  Those are kind of a summary of issues
5  from the case that I prepared, first, to discuss with
6  Mr. Jones.  And since I was asked to bring my notes,
7  I brought those notes.
8    Q.  So instead of handwritten notes, you do
9  most of it on a computer?
10    A.  Yes, especially if the documents are
11  electronic.
12    Q.  Okay.  All right.  Then we've got
13  deposition review notes for Bruce Bailey part two.
14  Would this be the deposition that he gave
15  individually, it looks like?
16    A.  Yes.
17    Q.  Okay.  And I've got a copy of deposition
18  notes, deposition review notes, for Dr. Williams.  I
19  have a copy of one invoice.  It is dated February
20  7th, 2012, for 5.8 -- 5.08 hours at $300 an hour for
21  1,525.  Now, below that are some entries beginning
22  October 21, October 29, October 31.  It says
23  November 30, which might be a typographical error.
24  November the 9th.  Well, I don't know.  Are these the

Page 23

1  5.08 hours that you spent prior to the February
2  invoice?  Is that how that works?
3    A.  Yes.
4    Q.  Okay.  So then the time that you spent in
5  October would have been in 2011; is that right?
6    A.  Most likely.  I -- I was asked to provide
7  a copy of all invoices.  That's the only invoice that
8  I've submitted to date, and I was also asked to
9  provide documentation of time in the case; and
10  there's a spreadsheet on that disk.
11    Q.  On this disk?
12    A.  Yes, that details additional time
13  subsequent to that invoice.
14    Q.  Okay.  Just so I understand this invoice,
15  $1,500 was what it took to arrive at your final
16  affidavit that you signed in February of this year;
17  right?
18    A.  Most likely, yes.
19    Q.  So this would be late 2011 and very early
20  2012; and you will have documentation on the disk
21  that will substantiate and tell us the time that you
22  have spent reviewing depositions and any other work
23  that you have done after the February 7, 2012,
24  invoice?

Page 24

1    A.  Yes.  Now, the disk was prepared, I
2  believe, on the 6th.
3    Q.  Of November?
4    A.  November, yes.  And I have subsequent
5  time.  If it's requested, I will furnish that
6  additional documentation as well, if that's
7  requested.  And I also want to -- before this gets --
8  this listing here is what I maintain because of a
9  requirement in federal court, but it does not state
10  on here which cases were defense and which ones are
11  plaintiff.
12    Q.  We're going to go through the list.
13    A.  Okay.
14    Q.  I've got it a little bit further down in
15  my notes, so we'll go through that in a few minutes.
16  I appreciate that.  If you think of something like
17  that, please stop me and we'll make sure we get
18  everything covered.
19    Now, you've got something here.  It's a
20  two-sided sheet of paper from the Annals of Internal
21  Medicine.  And even with my fancy reading glasses
22  that I have had to start wearing in the last two
23  months, and I'm not happy about it, I can't read a
24  word on this.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 25

1          MR. JONES:  They go with your cast real
2   well, though.
3          MR. BROWN:  This aging process is not
4   good.
5      A.  I had that note.  I printed it off.  I,
6   too, was unable to read it.  I did have it in a form
7   when I could zoom in electronically and see a little
8   bit on it, but I never used it subsequent to that
9   since this.  It's so difficult to read.
10     Q.  All right.  Is that document also
11  included on the disk that you gave us?
12     A.  I don't believe so.
13     Q.  Okay.  We have then something called the
14  Michigan Quality Improvement Consortium Guideline,
15  Management of Acute Low Back Pain.  Is this something
16  that you relied on in forming your opinions?
17     A.  No.
18     Q.  What is the purpose of this, and why is
19  it in your package?
20     A.  I provided it to Mr. Jones as a reference
21  to the type of clinical information that a medical
22  director might rely upon to develop a protocol for
23  the purpose of use in a correctional facility or
24  other setting and also to give him some background

Page 26

1   information in preparation for the depositions that
2   he was preparing to take.
3      Q.  Now, at the top right-hand side and down
4   at the bottom, it says that this was approved by
5   MQIC, which I think is Michigan Quality Improvement
6   Consortium, Medical Directors, March 2008, 2010,
7   2012.  And in parentheses it says that it was revised
8   September 2011, June 2012, and September 2012.  And
9   at the top right-hand corner, it says,
10  "September 2012."
11         Does that tell me that this is the
12  September 2012, the fall of 2012, version of this
13  form?
14     A.  Yes.
15     Q.  Do you know how this form was changed
16  from the one that would have been applicable in 2008
17  or 2010?
18     A.  No, I do not.
19     Q.  But you did not rely on this in forming
20  your opinions?
21     A.  I did not.
22     Q.  All right.  Now, there are some other
23  things.  And thank you for bringing that to us today.
24  Did you, and is it included on your disk, did you

Page 27

1   provide for us copies of communications between you
2   and Mr. Jones that are in writing or by e-mail?
3      A.  We had no communications in writing.  I
4   made a copy of the e-mails and provided that to
5   Mr. Jones.
6      Q.  Okay.  So there were no written letters
7   that came through the mail; but to the extent there
8   have been e-mail communications, they're on this
9   disk?
10         MR. JONES:  No.  They're on a different
11  disk.
12         MR. BROWN:  They're on a different disk?
13         MR. JONES:  Yes.  I sent you an e-mail
14  asserting an objection.  I am interpreting your
15  request consistently with the rule.
16         MR. BROWN:  Okay.
17         MR. JONES:  And the only thing that we
18  withheld would be strategic.
19         MR. BROWN:  Certainly.  Anything that has
20  your mental impressions and things of that nature, I
21  understand.
22         MR. JONES:  Exactly.
23         MR. BROWN:  But are there other things or
24  other communications between the two of you that

Page 28

1   don't fall under your --
2          MR. JONES:  No, because I wouldn't have
3   given you all these sheets that list all of his --
4   all these other things if that were the case.  I
5   mean, a lot of this stuff is attachments to e-mails.
6      Q.  (By Mr. Brown)  What I'm talking about,
7   obviously if you received medical records, if you
8   received depositions, if you received things
9   electronically, they were typically attached to an
10  e-mail; is that right?
11     A.  Yes.
12     Q.  And the best evidence of exactly when you
13  received any of the records or any of the depositions
14  would be the date on the e-mail to which it would
15  have been attached; is that right?
16     A.  Yes.
17     Q.  I would like to go back and supplement
18  and ask you to provide things of that nature.  Now,
19  if you're talking with Mr. Jones and Mr. Jones is
20  saying, "Well, yeah, I think so and so did this," or,
21  "I think so and so did that, and I think Jeff Brown
22  is an idiot because he's walking around in a cast
23  today," you know, I don't need to know things like
24  that.

Lawrence Mendel

Page 29

1      MR. JONES: There isn't anything like
2  that. The transcripts that came in October the 19th,
3  they got forwarded. We're basically talking about
4  forwards.
5      MR. BROWN: And that's fine. If we can
6  just go back and follow up with that so we can check
7  off that neat box on my checklist.
8      Q. (By Mr. Brown) All right. You've given
9  us --
10      A. Well, wait. Just to clarify.
11      Q. Okay.
12      A. So the -- is there something I need to do
13  during a break to get additional information?
14      Q. If you can do it during a break or if you
15  need to do it after we adjourn today, if we can look
16  at the dates of the e-mails to which all the evidence
17  was attached.
18      A. Okay. So you want -- so that's in the
19  records that you're requesting that --
20      Q. Yes, sir.
21      A. Is the time that the transcript comes out
22  sufficient time to respond to that?
23      Q. I think so.
24      MR. JONES: I mean, there's some great

Page 30

1  significance to the fact that -- knowing the exact
2  date that a transcript became available on
3  October 19, when between October 19 and November 6 he
4  received it? Is that the point?
5      MR. BROWN: It goes back further than
6  that. It goes back to the time that you were first
7  contacted and the initial records that were forwarded
8  to you and the initial activity.
9      MR. JONES: And you'll provide the same
10  thing about all your expert communications as well?
11      MR. BROWN: Absolutely. You'll get
12  everything from my experts and any experts that I
13  identify except to the extent that it is removed from
14  the scope of discovery because it's got my mental
15  impressions.
16      MR. JONES: Okay. Well, that's what
17  we've done. We've already done that.
18      MR. BROWN: All right. Well, correct me
19  if I'm wrong; but didn't you just say you haven't
20  given me any e-mails today?
21      MR. JONES: Right, because I've sent
22  e-mails that have got my mental impressions on them.
23      MR. BROWN: I'm not asking for those
24  e-mails.

Page 31

1      MR. JONES: You have everything else.
2      MR. BROWN: Okay. Then I'll ask it this
3  way: When an e-mail was forwarded to you including
4  documents, including medical records, including a
5  deposition transcript, is it your position that the
6  e-mail also included your mental impressions and your
7  thoughts and things that would render that e-mail
8  nondiscoverable?
9      MR. JONES: I will tell you what. I will
10  go through them; and if there's any that do not
11  contain my mental impressions, I will make them
12  available.
13      There may be some that contain nothing.
14  I know that's the reason they were not produced
15  because they weren't communications at all. It was
16  simply forwarding a transcript and/or a document, and
17  then that's been -- that's been produced.
18      If there were mental impressions, you
19  didn't get it. If it was a non-e-mail, I didn't
20  consider that. If there was no content, I probably
21  didn't consider that a communication at all, other
22  than the document that was attached that you did get.
23      So you're saying you want the e-mails
24  that say, "Attached is so and so"?

Page 32

1      MR. BROWN: Yes, please.
2      MR. JONES: That's fine. I'll give you
3  that.
4      THE WITNESS: It may be possible to
5  provide specific dates to you before the conclusion
6  of the deposition today.
7      MR. BROWN: That's fine.
8      THE WITNESS: Do you have that disk with
9  you?
10      MR. JONES: Yes. But you've got to
11  remember, I also have every e-mail either in a sent
12  box or my inbox that we've had. And since I'm
13  asserting an objection on behalf of my client to
14  prevent any privileged materials from being
15  disclosed, it's probably best that I conduct that
16  review.
17      THE WITNESS: Fine. Okay.
18      MR. JONES: That's my preference rather
19  than having you do it on a break and then me having
20  to look over your shoulder. There's not that much,
21  frankly.
22      MR. BROWN: I didn't expect there would
23  be. That's fair enough. So we're clear.
24      MR. JONES: Yes.

8  (Pages 29 to 32)

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

Page 33

1    MR. BROWN: There may be an e-mail of
2  October the 20th. Dear, Dr. Mendel, enclosed please
3  find the attached deposition. All it says?
4    MR. JONES: I will agree to produce that
5  in accordance with our agreed upon understanding of
6  the rule.
7    MR. BROWN: Okay.
8    MR. JONES: And I think I've gone beyond
9  what most attorneys would do here. I asked him to
10  produce it. I asked him to put it on a disk. He
11  gave it to me. I'll review this. I'll review my
12  own, and I'll give you what's not privileged.
13    MR. BROWN: All right. Very good.
14    MR. JONES: And we didn't -- all these
15  other notes and things that magically disappear from
16  most expert's files, they didn't disappear from his
17  file.
18    Q. (By Mr. Brown) Are copies of these on
19  this disk?
20    A. I don't believe so.
21    Q. Okay. Things that you received
22  electronically are stored on the disk electronically;
23  and things that you generated, you have here in paper
24  form?

Page 34

1    A. Yes.
2    Q. So we do need to get copies of the paper
3  forms before we leave together?
4    A. Yes.
5    MR. JONES: I would suggest we do that on
6  the first break.
7    MR. BROWN: Oh, sure. That's fine.
8    MR. JONES: They're going to want to use
9  them in their questions too.
10    MR. BROWN: They're going to -- yes.
11  They'll be using them.
12    Q. (By Mr. Brown) You've given us an
13  accounting of all the time that you've spent because
14  you've given us one invoice, and you've got a
15  spreadsheet identifying other time that you've spent
16  on your disk; correct?
17    A. Yes.
18    Q. You've given us all the invoices because
19  you've only submitted one to date; correct?
20    A. Yes.
21    Q. A listing of all background sources and
22  other persons, if any, that you consulted with in
23  connection with your review of this case. Did you
24  review any periodicals, treatises, textbooks,

Page 35

1  anything in formulating your opinions?
2    A. No.
3    Q. So in response to No. 6, none. This is
4  all from your personal experience, your education,
5  training, and experience?
6    A. Yes. I did review -- and it's referred
7  to in some of these notes. I did review the rules of
8  the Georgia EMS Board.
9    Q. And they are in the things where there
10  would be a note for discussion?
11    A. Yes.
12    Q. And you've got your current CV?
13    A. Yes.
14    Q. Publications either authored or
15  co-authored. Are those included in your CV?
16    A. Yes.
17    Q. Research projects that you're currently
18  involved in. Would those be listed in your CV?
19    A. I'm not involved in any current research
20  projects.
21    Q. Because of all your spare time, you just
22  don't have any time to squeeze that in? That was a
23  joke or an attempt at humor.
24    The cases that you've testified in. We've

Page 36

1  got that.
2    Governmental charts, tables, or
3  statistical sets upon which you are relying in
4  formulating your opinions. These two things, to the
5  extent they were --
6    A. Neither of those are governmental
7  entities. And, again, I did not rely on either of
8  those in formulating my opinions.
9    Q. And so then the response, there would be
10  no government charts or tables that you relied on?
11    A. That's correct.
12    MR. BROWN: All right. Okay. Looking at
13  Exhibit No. 2, here is a copy of your -- the Rule 26
14  disclosure, Craig, that you gave to us earlier.
15    MR. JONES: If you're going to be moving
16  off of this stuff, I don't know if you want to copy
17  that.
18    (Discussion held off the record.)
19    (Recess taken.)
20    Q. (By Mr. Brown) Let's go through your CV
21  or part of Defendant's Exhibit No. 2 that I've given
22  you. That is an exhibit that includes all the
23  materials that were provided by Mr. Jones to us. It
24  includes your affidavit dated February of 2012 and

9 (Pages 33 to 36)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 37

1  then your CV after that.
2      So if you will just turn to your CV, we'll
3  spend a few minutes going through it.  You got your
4  undergraduate degree from Kent State University?
5      A.  Yes.
6      Q.  What was it in?
7      A.  Biology.
8      Q.  1976.  Ohio University.  Where is Ohio
9  University?
10     A.  Athens, Ohio.
11     Q.  And you received a doctor of osteopathy;
12 is that right?
13     A.  Yes.
14     Q.  That was in 1982?
15     A.  Yes.
16     Q.  What did you do between your graduation
17 from Kent State and starting medical school?
18     A.  I worked at various jobs and went to
19 graduate school.
20     Q.  What were you studying in grad school?
21     A.  Economics.
22     Q.  Was there any reason that you chose to
23 pursue a D.O. degree as opposed to an M.D. degree?
24     A.  Some of my classmates had been -- had

Page 38

1  started school there and spoke very favorably about
2  the program.
3      Q.  Did you apply to any other programs other
4  than Ohio University?
5      A.  In what year?  Yes.  Yes, I did.
6      Q.  Did it take you a while to get into med
7  school?  Certainly there's no offense intended by
8  that question.
9      A.  Well, I applied in 1976; and I did not
10 get accepted.  Then I applied again in 1978 and got
11 accepted to Ohio University.
12     Q.  Okay.  You did your internship at Doctors
13 Hospital here in Columbus; is that correct?
14     A.  Yes.
15     Q.  Was there any particular course that you
16 concentrated on?  Well, you were a family practice
17 physician; is that right?
18     A.  I did a rotating internship, which at
19 that time was a requirement for every type of
20 residency.
21     Q.  That included some family practice, some
22 surgery, some anesthesiology, a little bit of
23 everything; is that right?
24     A.  Yes.

Page 39

1      Q.  That was a one-year program.  Then you
2  did a residency in internal medicine at Doctors
3  Hospital from '83 to '84.  Did you do a residency in
4  family medicine?
5      A.  No, I did not.
6      Q.  Were you ever board certified in internal
7  medicine?
8      A.  No.
9      Q.  Was it common for people to do an
10 internal medicine residency and then become certified
11 in family practice?
12     A.  I don't know whether it's common.
13     Q.  Okay.  But that's the route that you
14 chose.  Was it always your intent to go into family
15 practice?
16     A.  Well, I -- no, not necessarily.  My
17 training was geared towards family medicine.  The
18 curriculum at Ohio University is very much geared
19 toward family medicine, and it was always a
20 consideration to do some type of primary care.
21     Q.  You have -- we'll come to discuss your
22 employment in more detail in a few minutes, but some
23 of your memberships -- if you need to take a break at
24 any time, we can do that.

Page 40

1      What is the Academy of Correctional Health
2  Professionals?
3      A.  It's an organization of correctional
4  health professionals that was started by the National
5  Commission on Correctional Healthcare.
6      Q.  Do you know how long ago that this entity
7  was formed?
8      A.  Not exactly.
9      Q.  What do you have to do to gain membership
10 in that?
11     A.  I believe you have to be a certified
12 correctional health care --
13     Q.  -- professional?
14     A.  There are requirements you have to have.
15 I believe five years of correctional health care
16 experience.  You have to submit documentation that
17 you have, and then you have to sit for an exam.
18     Q.  Similar to a board certification exam?
19     A.  Yes.
20     Q.  Where is that administered?
21     A.  Currently they do it regionally.
22     Q.  Okay.  When did you first gain your
23 certification as a certified correctional health care
24 professional?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 41

1    A. 1999.
2    Q. Did you have to go through a
3  recertification process?
4    A. I have to submit documentation every year
5  that I've maintained the requirements.
6    Q. And what are the requirements?
7    A. I have to attend a certain number of
8  sessions, CME hours in correctional health care.
9    Q. Do your CME hours in correctional health
10  care satisfy your CME hours in your family practice
11  board certification?
12    A. They go towards that requirement, but
13  they're generally insufficient to meet the family
14  practice requirements.
15    Q. Okay. Do you know how many hours a year
16  you have to do to maintain your certification as a
17  health care professional?
18    A. I believe it's 12.
19    Q. And where do you send those to?
20    A. To the National Commission On
21  Correctional Healthcare.
22    Q. Where is that located?
23    A. They're located in Chicago, Illinois.
24    Q. Okay. And you are a member of the

Page 42

1  Society of Correctional Physicians. What is that?
2  What is the Society of Correctional Physicians?
3    A. It is a national organization of
4  correctional physicians.
5    Q. Okay. Where are they based?
6    A. Their offices are -- administrative
7  offices are run by the National Commission on
8  Correctional Healthcare, but it's a separate
9  organization.
10    Q. Where is the National Commission on
11  Correctional Healthcare?
12    A. Chicago, Illinois.
13    Q. So it's the same entity that you report
14  your CME hours?
15    A. It's technically in the same building,
16  but it's different people that administer the SCP.
17    Q. In either the Academy of Correctional
18  Health Professionals or the Society of Correctional
19  Physicians, do you hold any office or leadership
20  position?
21    A. No.
22    Q. Have you ever?
23    A. No.
24    Q. Do either of these two societies, either

Page 43

1  the Society or the Academy, do they publish any
2  journals or materials that you read on a regular
3  basis?
4    A. Let me back up. I was a committee member
5  for the Society of Correctional Physicians roughly
6  ten years ago.
7    Q. What committee?
8    A. I don't recall what the committee was
9  called.
10    Q. Do either of these entities publish any
11  journals or other materials that you read on a
12  regular basis?
13    A. Yes.
14    Q. What are the periodicals?
15    A. The Academy of Correctional Health
16  Professionals provides at least a monthly e-mail that
17  summarizes some of the current issues in correctional
18  health care, and the Society of Correctional
19  Physicians publishes a quarterly newsletter.
20    Q. Have you ever been published in either of
21  these?
22    A. Yes.
23    Q. Which ones?
24    A. I've been published in the Society of

Page 44

1  Correctional Physicians' newsletter.
2    Q. How many times?
3    A. One time.
4    Q. What was the topic?
5    A. The topic was telemedicine.
6    Q. That was in 2010, wasn't it?
7    A. No. I believe it was farther back than
8  that. It's on my CV.
9    Q. Okay. We'll get to it then. That's
10  fine.
11    A. Okay.
12    Q. July 2010, "Evaluating Options for
13  Bringing Imaging Procedures in House"?
14    A. That's a different publication.
15    Q. Okay. Oh, "Disaster Planning,"
16  Correctional Health Care Report?
17    A. Also a different publication.
18    Q. Okay.
19    A. 1999 is the answer to your question.
20    Q. Is that pronounced Desmoteric --
21    A. Yes.
22    Q. -- News? That's the newsletter that they
23  publish?
24    A. Yes.

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 45

1    Q.  When did you obtain your board
2  certification in family practice?
3    A.  I believe it was 1999.
4    Q.  And have you had to go through the
5  recertification process?
6    A.  Yes.
7    Q.  When?
8    A.  I believe it was 2007.
9    Q.  When are you up to be recertified again?
10   A.  2014, I think.
11   Q.  Okay.  Did you make -- did you try to
12 obtain board certification between the completion of
13 your internship and residency and your actual
14 becoming board certified in '99?
15   A.  No.
16   Q.  Okay.  You just -- did it just take that
17 long for you to decide to get the board
18 certification?  Had it not been important to you
19 before?
20   A.  It really hadn't been relevant to my work
21 at the time.
22   Q.  We've talked about the Certified
23 Correctional Healthcare Professional, and you are a
24 fellow in the Society of Correctional Physicians.

Page 46

1  What is that?
2    A.  It's a special qualification recognition
3  by the Society for --
4    Q.  When did you become -- okay.  2004.  What
5  do you have to do to become a fellow?
6    A.  Well, first you have to meet the
7  qualifications.  You have to have a certain amount of
8  time in correctional health care.  You have to have
9  either published or done presentations, national
10 correctional health care conferences, and you have to
11 be nominated by one of the officers of the
12 organization.
13   Q.  Okay.  Are you licensed to practice
14 medicine in Ohio?
15   A.  Yes.
16   Q.  Any other states?
17   A.  Yes.
18   Q.  Can you tell me which ones?  Missouri?
19   A.  Kentucky, Kansas, Oklahoma, New Mexico.
20 Read those.  Oh, Tennessee.  I believe that's a
21 complete list.
22   Q.  So Ohio, Missouri, Kentucky?
23   A.  No.  I did not say Missouri.
24   Q.  I assumed that since you had an

Page 47

1  employment relationship with the Missouri Department
2  of Corrections.  So you are not.  You are licensed in
3  Ohio, Kentucky, Kansas, Oklahoma, New Mexico, and
4  Tennessee?
5    A.  Yes.
6    Q.  All right.  Has your license in any of
7  these states ever been subject to any disciplinary
8  action?
9    A.  No.
10   Q.  No reprimands?  Board orders?
11 Suspensions?  Limitations?
12   A.  No.
13   Q.  Okay.  What hospitals do you have
14 privileges at?
15   A.  Ohio State University Medical Center.
16   Q.  Is that the only one currently?
17   A.  Yes.
18   Q.  Okay.  Are your privileges current?
19   A.  Yes.
20   Q.  Have you had privileges at any other
21 facilities other than The Ohio State University?
22   A.  Yes.
23   Q.  Is it a lot of them?
24   A.  No.

Page 48

1    Q.  Okay.  What are the others?
2    A.  I had hospital privileges at Oakwood
3  Forensic Hospital in Lima, Ohio.
4    Q.  Any others?
5    A.  Not in the last 20 years.
6    Q.  And have your privileges ever been
7  limited or suspended or revoked in any way at any
8  hospital?
9    A.  No.
10   Q.  Some correctional health care training
11 where you talk about it in chronological order.  What
12 is a conference participant at the National
13 Conference on Correctional Healthcare from '88 to
14 2001 and then from 2003 to 2010?  Did you just attend
15 the conference?
16   A.  I attended all of those conferences, and
17 I presented at several as well.
18   Q.  Can you tell me which ones you presented
19 at?
20   A.  Some of them are listed here.  1991,
21 1998, 2010, and 2012.
22   Q.  Where were you looking?
23   A.  Page 4.
24   Q.  Presentations.  What was the topic in the

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 49

1 1991 presentation?
2    A. I believe it was peer review.
3    Q. What about '98?
4    A. I believe it was telemedicine.
5    Q. 2010?
6    A. Mortality review.
7    Q. 2012?
8    A. Involuntary medical treatment.
9    Q. Involuntary medical treatment?
10    A. Involuntary medical treatment.
11    Q. Let me look at that real quick. Okay.
12 Forgive me, but I don't see one that says 1991. Are
13 you looking at Item No. 8?
14       MR. MARSHALL: I'll show you.
15       MR. BROWN: Okay.
16    Q. (By Mr. Brown) I'm sorry. Never mind.
17 Must be the glasses. All right. Conference
18 participant at the American Correctional Association.
19 Does that mean that you attended it, or were you also
20 a presenter?
21    A. I have attended several. I have also
22 presented at several.
23    Q. Are the presentations listed in Item
24 No. 8 on your CV under the conference presentations?

Page 50

1    A. No.
2    Q. Do you know which ones you would have
3 presented at?
4    A. I don't recall.
5    Q. Would you keep any records of that at
6 home?
7    A. Probably not. It's been many years.
8    Q. Looks like you may have last participated
9 in that in 2004, close to ten years ago. What about
10 the America Correctional Health Services Association?
11 Are you still active in working with that entity, or
12 have you done anything else with that entity?
13    A. I was not a member for several years, and
14 I just rejoined recently.
15    Q. And then the National -- and what is an
16 accreditation surveyor on the National Commission on
17 Correctional Healthcare?
18    A. The National Commission on Correctional
19 Healthcare is one of the accrediting bodies for
20 correctional health care in the US, and I was an
21 accreditation surveyor. I was trained to go to the
22 facilities to evaluate compliance with policies and
23 evaluate the adequacy of care.
24    Q. Did you do that periodically? Was that a

Page 51

1 full-time basis job that you did that?
2    A. Periodically.
3    Q. Do you know how many accreditation
4 processes you participated in?
5    A. I think roughly 30.
6    Q. What type of facilities would you --
7 would it be at a state level or a local level? Tell
8 me about that.
9    A. It varied. Some were juvenile
10 facilities. Some were county jails. Some were state
11 prisons. One was an INS private facility. A wide
12 variety of correctional facilities.
13    Q. Any particular areas that you
14 concentrated on as a surveyor?
15    A. I had my greatest interest in jails, so
16 my preference was to do jail surveys when they were
17 available to fit my schedule.
18    Q. Actually go out and visit the jail --
19    A. Yes.
20    Q. -- the physical facility itself? And
21 what would you be looking at when you would be out at
22 the physical facility? What would you be reviewing
23 for accreditation purposes?
24    A. Typically an accreditation survey would

Page 52

1 be done by a team of two or more individuals. As the
2 clinician, my primary responsibility was to review
3 records to assess compliance with policy. I also
4 usually assisted with interviews. They had an
5 interview process to cross-reference the application
6 of the policies to make sure the policies were not
7 just on paper but were actually being adhered to.
8    Q. And you last did that in 2006?
9    A. Yes.
10    Q. Why did you stop working with them?
11    A. I stopped because they had asked me to
12 withdraw from a case that I was an expert witness on
13 that had been accredited. The facility -- the
14 facility asked the commission to ask me to withdraw
15 from the case, but it was too far along in the case
16 for them to get another expert.
17    Q. So you were offering testimony in the
18 case where one of the facilities you had helped
19 credential or accredit was being looked at; is that
20 right?
21    A. No. I had never been to that particular
22 facility. The facility was a accredited by the
23 national commission. For the record none of the
24 issues in the litigation involved accreditation

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 53

1    issues, and I made that clear to the national
2    commission; but they told me I would not be able to
3    be an accreditation surveyor unless I withdrew so we
4    had not revisited that issue.
5      Q.   Do you remember -- were the facilities,
6    the 30-plus facilities that you participated in the
7    accreditation process, were they located in any
8    particular states?
9      A.   All over the country.
10     Q.   Have you ever participated in the
11    accreditation in any facilities in Georgia?
12     A.   No. I did -- I was contracted by a
13    facility in DeKalb County to review their current
14    processes to see what steps would be needed to
15    achieve accreditation, but I did not complete any
16    accreditation surveys in the state.
17     Q.   Did you actually go down to DeKalb County
18    and work with them at all?
19     A.   Yes.
20     Q.   When was that?
21     A.   I believe 1999.
22     Q.   You've never been asked to look at Hart
23    County, have you?
24     A.   No. And I was initially trained to do

Page 54

1    accreditation surveys by Ms. Parker, who was the head
2    of the accreditation section for the Medical
3    Association of Georgia; and I believe that their
4    surveys, the accreditation surveys in the State of
5    Georgia, are done by the Medical Association of
6    Georgia and so I would not have had an opportunity to
7    do an accreditation survey in the state.
8     Q.   It was Ms. Parker?
9     A.   Yes. And the office is now held by Clyde
10    Maxwell.
11     Q.   All right. Any of your presentations
12    that you have listed here, have any of them involved
13    the administering of health care to inmates in county
14    jails specifically?
15     A.   Repeat the question.
16     Q.   I don't know if I can. Any of the
17    presentations that you have given, have they involved
18    the administration of health care to inmates in
19    county jails specifically?
20     A.   Not specifically the county jails.
21      MR. JONES: And you're talking
22    specifically about conference presentations on his
23    CV?
24      MR. BROWN: Yes.

Page 55

1      MR. JONES: Okay.
2     A.   Not specifically county jails.
3     Q.   (By Mr. Brown) Because it looks like on
4    one of these, you gave a presentation on mortality
5    review. We discussed that earlier. That's when an
6    inmate dies under some type of circumstances that
7    somebody wants to have it looked at, and that's when
8    they would have you look at it; correct?
9     A.   Yes.
10     Q.   You've done a pretty good amount of work
11    with telemedicine; is that right?
12     A.   Yes.
13     Q.   It looks like you gave, one, two, three,
14    four, presentations involving telemedicine. And then
15    I think we've talked about the others. Tell me a
16    little bit about the telemedicine that you have
17    worked with. How did you get involved with
18    telemedicine, and what is telemedicine?
19     A.   I got involved with telemedicine when I
20    first attended a presentation in 1991 on the topic.
21    Telemedicine involves using video conferencing and
22    other technologies to provide care to remote
23    locations.
24     Q.   Is that just an area that has been a

Page 56

1    particular interest to you over the years?
2     A.   Well, in 1994, I requested funding for
3    the State of Ohio to do a pilot project; and the
4    pilot project was successful. And over the course of
5    the next two years, the telemedicine program was
6    expanded to every prison in Ohio. I was also asked
7    to consult to the Georgia Department of Corrections
8    on telemedicine.
9      The Ohio program remains in operation
10    today. They provide -- to date they've provided over
11    30,000 patient consultations in roughly -- currently
12    they have about four specialty areas they provide
13    care, and we also use it in conjunction with the
14    urgent care.
15      In July of 2011, I started providing
16    telemedicine to a facility in Kansas from my house.
17    I've done that pretty much on a weekly basis since
18    July of 2011. I'm also currently the acting medical
19    director for that facility.
20     Q.   What is the name of that facility?
21     A.   Leavenworth Detention Center.
22     Q.   All right. Now, when you say the pilot
23    project for the Ohio Department of Corrections is
24    successful and it's in every prison in Ohio, is this

14 (Pages 53 to 56)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 57

1   state level prisons? Does this include county jails?
2   City jails? Anything of that nature?
3       A.  Well, the telemedicine program that I
4   established originally was just involving state
5   prisons.  Since that time I've also consulted with a
6   number of county jails and have started two programs
7   that are currently doing telemedicine as well.
8       Q.  What two counties?
9       A.  Jefferson County, Kentucky, and Cuyahoga
10  County, Ohio.
11      Q.  Up in the north part of the state?
12      A.  Yes.
13      Q.  They've received a fair amount of
14  attention in the last couple of days.  That's why I
15  know that.  How do you spell Cuyahoga?
16      A.  C-U-Y-A-H-O-G-A.  I expect the court
17  reporter already knew that, though.
18      Q.  It was Jefferson County?
19      A.  Kentucky.
20      Q.  Kentucky.  Do you know how large the
21  facility is in Jefferson County, Kentucky, that
22  employs telemedicine?
23      A.  I believe it's roughly 1,200 beds.
24      Q.  How about the facility in Cuyahoga

Page 58

1   County?
2       A.  I believe they are in excess of 2,000
3   beds.
4       Q.  Are those the only two programs that you
5   have personally been involved with setting up that
6   involved county jails?
7       A.  I did some work in Texas with a couple of
8   facilities that work with a couple counties and also
9   provided some guidance to a county in New York State.
10  I can't remember the name of the county.  Just north
11  of New York City, but I don't remember the name of
12  the county.
13      Q.  Do you know if they actually set up a
14  telemedicine program or if you just consulted with
15  them and whether they did or didn't, you don't know?
16      A.  They had a program already in place, and
17  I wrote some policies for them and helped them set up
18  an expansion of their program.
19      Q.  All right.  Now, I think you said that
20  you consulted with the Georgia Department of
21  Corrections?
22      A.  Yes.
23      Q.  That was a state level?
24      A.  Yes.

Page 59

1       Q.  Okay.  You didn't consult with any
2   counties to set up any telemedicine programs in any
3   counties in Georgia, did you?
4       A.  No.
5       Q.  For any of the presentations that you've
6   given, do you know if you have any materials that you
7   distributed to attendees; and, if so, do you have
8   copies of those more likely than not?
9       A.  I know I have -- I can make available the
10  PowerPoint that was distributed at the 2012 and most
11  likely the 2010 National Commission on Correctional
12  Healthcare presentations.
13      Q.  Tell me what the 2012 involved again.
14      A.  2012 was involuntary medical treatment.
15      Q.  What is involuntary medical treatment?
16  What does that involve?
17      A.  We were -- we discuss the legal
18  principles and some cases that involved involuntary
19  treatment of individuals.  One of the cases was an
20  individual who was unable to give informed consent
21  because he had a very low blood sugar.  The other
22  cases involved mentally incapacitated individuals.
23      Q.  And so the topic -- or did your
24  presentation discuss the appropriateness of giving

Page 60

1   that treatment when they're incapable of
2   communicating their wishes or desires to you?
3       A.  Well, the primary focus was on reviewing
4   the process to assess whether someone is capable and
5   discuss the medical processes and psychiatric
6   processes that can impair the ability to give
7   informed consent.
8       Q.  I don't think I need that one.  What was
9   the 2010 one again?
10      A.  Mortality review.
11      Q.  Okay.  Now, of the publications, have you
12  listed all of them that you've done?  One, two,
13  three, four, what, five?  The most recent was what?
14  The "Evaluating Options for Bringing Imaging
15  Procedures in House"?  Is that just x-rays, MRIs, CTs
16  coming to the jail instead of sending inmates out
17  somewhere else?
18      A.  Yes.
19      Q.  The primary theme behind that is what?
20  Cost savings and reducing the chances of escape?
21  Things of that nature?
22      A.  Yes.
23      Q.  "Technology in Correctional Medicine."
24  Would that have to do predominantly with

Page 61

1   telemedicine?
2       A.  That chapter had two subjects.  One was
3   telemedicine; the other was eletronic medical
4   records.
5       Q.  "Understanding Cost Issues in
6   Telemedicine."  That's to show that telemedicine is,
7   what, overall cheaper than other means of providing
8   care?
9       A.  Well, it's cheaper under some
10  circumstances, hence, the title.
11      Q.  Okay.
12      A.  Or it's cost effective under some
13  circumstances but not under others.
14      Q.  All right.  Let's go to your employment
15  for a minute now and go back to the first part of
16  your CV.  What is Clinicare Consultants?
17      A.  It's a company that was formed by a
18  Columbus area physician to provide various medical
19  services.
20      Q.  What types of various medical services?
21      A.  Well, at the time that I worked for
22  Clinicare, their primary business was providing
23  physicians and other providers to the Ohio prison
24  system.

Page 62

1       Q.  You're not with them anymore?
2       A.  No.
3       Q.  What were the inclusive dates of your
4   affiliation with them?
5       A.  I only worked with them for a couple of
6   months.
7       Q.  Now, with The Ohio State University, I
8   think you said that's the Department of Family
9   Medicine; right?
10      A.  Yes.
11      Q.  That's when you worked with them
12  periodically to cover for full-time faculty members
13  who may be out for vacation or whatever reason?
14      A.  Right.  Current.  I did work for them on
15  a regular basis from -- in November of 2001 through
16  June 2004 also.
17      Q.  All right.  While you were working with
18  Ohio State University then and now, what percentage
19  of the time do you spend working with inmates or in
20  correctional medicine?
21      A.  95 percent.
22      Q.  And that's actually providing hands-on
23  care, or is that teaching?
24      A.  Hands-on care.

Page 63

1       Q.  So, what, does Ohio State have the
2   obligation to provide health care to the state prison
3   system or something?
4       A.  Well, in November 2001, they had a
5   contract with the Franklin County Jail to provide --
6   to provide comprehensive medical services to the
7   jail.  They were responsible for the nurses, for the
8   physicians and other providers, pharmacy services.  I
9   believe they also had responsibility for supplies and
10  equipment and hospitalization.
11      Q.  All right.  And that was 2001 to 2004?
12      A.  Yes.
13      Q.  95 percent of your time was hands-on
14  treatment?
15      A.  Yeah.  Maybe 98 percent in that setting.
16      Q.  You were then truly a clinician at that
17  point in time?
18      A.  Yes.
19      Q.  Since you're now back in the Department
20  of Family Medicine as a clinical assistant professor,
21  from October 2010 to the present, how much of the
22  time as a clinical assistant professor do you spend
23  in actual hands-on treatment of inmates?
24      A.  At least 95 percent of the time.

Page 64

1       Q.  Okay.  What facilities?
2       A.  In October 2010 I was providing -- they
3   had a contract to provide coverage at Marion
4   Correctional Institution and North Central
5   Correctional Institution.
6       Q.  How large a facility is Marion?
7       A.  Probably about 2,000 inmates.
8       Q.  How about North Central?
9       A.  Probably around 1,700.
10      Q.  And are they state facilities?
11      A.  Yes.
12      Q.  And when you were there, are you actually
13  at the facility providing hands-on care; or is it
14  telemedicine?
15      A.  No.  It's in person.
16      Q.  Now, urgent care and telemedicine
17  physician for the Ohio Department of Rehabilitation
18  and Correction, is that also -- that's not
19  Correctional Corporation; that's your Ohio.  Is that
20  also predominantly hands-on treatment?
21      A.  Yes.
22      Q.  Would you say the percentage is 95 plus?
23      A.  Maybe now 80 percent.
24      Q.  Is that the entity that you work with one

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 65

1   day a week?
2       A.   Well, one day a week plus.  I also -- in
3   addition to my one day as a telemedicine -- excuse
4   me, as an urgent care physician, I've also been asked
5   to assist with administrative duties at that
6   facility; so I put in additional hours beyond that.
7       Q.   What facility is that?
8       A.   The Franklin Medical Center.
9       Q.   All right.  Assistant medical director at
10  the Ohio Department of Rehabilitation and Correction.
11  That's certainly a prison system; is that right?
12      A.   Yes.
13      Q.   As assistant medical director, did you
14  provide hands-on treatment to inmates?
15      A.   Yes.
16      Q.   What percentage of your time?
17      A.   Probably about 15 percent.
18      Q.   So it was -- the majority was
19  administrative?
20      A.   Yes.  Well, depending on what time period
21  we're talking about.
22      Q.   15 percent of the time being spent on
23  actual hands-on care, would that have been an average
24  for the several years that you were affiliated with

Page 66

1   them?
2       A.   Well, when the urgent care opened,
3   September 2010, I was working roughly 20 hours a week
4   at the correctional -- excuse me, at the urgent care.
5       Q.   Okay.
6       A.   So about 20 hours a week of hands-on care
7   during that time until January 2011.
8       Q.   Then you were a staff physician at
9   Wholehealth Management Scotts Inc.
10      A.   Wholehealth Management is a company that
11  provides contracts, wellness care, occupational
12  health, and primary care.  They had a contract --
13  they still have a contract with Scotts Lawn Products
14  in Marysville, Ohio, and Longaberger in Frazeysburg,
15  Ohio, and I've worked on a regular basis at the
16  Scotts facility and on an occasional basis at the
17  Longaberger facility.
18      Q.   So those were not prison systems?
19      A.   That's correct.
20      Q.   I guess maybe some of the employees may
21  have felt that it was a prison.
22      A.   I think Scotts has a pretty positive
23  reputation.
24      Q.   What's Longaberger?

Page 67

1       A.   They make baskets.
2       Q.   Then you were a staff physician at the
3   Ohio Reformatory for Women in Marysville, Ohio, for a
4   couple of months, temporary contract to fill for an
5   unanticipated vacancy.  What did you do there?
6       A.   I worked pretty much full time for a
7   couple of months.  They had -- I believe somebody got
8   ill and had to leave and they were very short on
9   hours.
10      Q.   Was that patient care?
11      A.   Yes.
12      Q.   Jackie Moore and Associates.  I think --
13  did you tell us about that earlier?  Moore and
14  Associates.  That's the one where y'all submitted an
15  RFP to look at the Virginia Department of
16  Corrections?
17      A.   Yes.
18      Q.   Now, on your CV, it says from July of
19  2004 to February 2007.  Are you back doing work with
20  them now?
21      A.   If we -- periodically.  Well, if we get
22  the Virginia project, then I expect that I will be.
23      Q.   Consultant on operational issues and cost
24  containment strategies.  That was not hands-on care,

Page 68

1   was it?
2       A.   No.
3       Q.   Consultant on accreditation and
4   operational issues, Franklin County Jail.  That was
5   not hands-on care, was it?
6       A.   No.
7       Q.   Acting regional medical director and
8   consultant, Central Region, New York.  That wasn't
9   hands-on care, was it?
10      A.   No.
11      Q.   Medical monitor under federal court
12  consent decree with the Northeast Ohio Correctional
13  Center.  What did that involve?
14      A.   Monthly audits of care.
15      Q.   So that was administrative?
16      A.   Yes.  Well, I had to analyze clinical
17  processes.  So it wasn't hands-on care, but it did
18  involve analysis of clinical processes.
19      Q.   Telemedicine consultant from September
20  '99 through February of 2007.  That is the one you
21  talked about, helping facilities get set up with
22  telemedicine programs?
23      A.   Yes.
24      Q.   The medical director of the Ohio

17 (Pages 65 to 68)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 69

1  Department of Rehabilitation and Correction from 1988
2  to September of '99.  Was that hands-on care?
3      A.  Some of it.
4      Q.  How much?
5      A.  It varied.
6      Q.  What was an annual approximation?
7      A.  Probably around 5 percent.
8      Q.  Then you worked in emergency medicine at
9  a couple of different hospitals; is that correct?
10     A.  Yes.
11     Q.  What got you into correctional medicine?
12 It looks like you started your career in emergency
13 medicine; is that right?
14     A.  Yes.
15     Q.  What got you interested in and got you
16 switched over to correctional medicine?
17     A.  In 1986 I was called to a meeting with
18 the clinical director -- excuse me, the medical
19 administrator of the Marion Correctional Institution;
20 and he asked me whether I would provide services to
21 the facility.  They had a physician going on
22 vacation; and under the terms of the consent decree,
23 they had to provide 40 hours a week of coverage.
24     Q.  Physical, on-site coverage?

Page 70

1      A.  Yes.
2      Q.  So you were in a facility all day, every
3  day?
4      A.  No.  Just for -- just for a couple days
5  during the vacation of the physician.
6      Q.  Okay.  And that one introduction to it is
7  what kind of sparked your interest, and you just kind
8  of kept going that way?
9      A.  Well, I filled in a couple of other times
10 over the course of the next year or two.  Then the
11 medical administrator there got promoted to be the
12 chief administrator of the entire department, and he
13 was in need of a medical director and called me to
14 get some advice about recruitment processes and where
15 they should look.  He asked me to interview for it,
16 and I was offered the medical director for the
17 department.
18     Q.  Okay.  What percentage of your time in
19 correctional health care has been spent at state
20 prisons as opposed to local county jails?
21     A.  I would say roughly probably about
22 two-thirds of my time while working with prison
23 systems.
24     Q.  And of the county jails, what percentage

Page 71

1  of the jails have you worked at that had an inmate
2  population of less than 100?
3      A.  I don't believe I've ever provided care
4  at a facility that size.
5      Q.  Based on what we've been talking about
6  this afternoon, most of your facilities from a county
7  jail standpoint you've been at are between 1,500 and
8  2,000 inmates.  So larger jails; is that right?
9      A.  Yes.  The facility that I'm acting
10 medical director at in Kansas is essentially a jail
11 facility.
12     Q.  Is that Fort Leavenworth, Kansas?
13 Leavenworth is a federal facility; is that right?
14     A.  The facility is in Leavenworth, Kansas.
15 It's not the federal facility.
16     Q.  All right.  How large is that one?
17     A.  About 900 is the current population.
18     Q.  Is that the smallest that you've worked
19 with?
20     A.  I've consulted with smaller jails and
21 done accreditation surveys in smaller jails, but
22 that's the smallest that I've provided hands-on care
23 in a jail-type setting.
24     Q.  All right.  Let's talk about your prior

Page 72

1  experience as an expert witness.  We'll go through
2  this list.  If you want to turn to that portion of
3  it, I know there were some things that you wanted to
4  talk about.
5          This list appears to go back to, what,
6  2000?  It looks like the first one you've listed is
7  about the year 2000.  Actually I guess the case is
8  older than that.  It's a 1995 case.  You gave a
9  deposition in July 2000.  That was Hudnall versus
10 U.S. Corrections Corporation; correct?
11     A.  Yes.
12     Q.  All right.  Is that the first time you
13 were hired as an expert witness?
14     A.  No.
15     Q.  Okay.  The first time you gave testimony
16 as an expert witness?
17     A.  Yes.
18     Q.  Does this list include all of the cases
19 that you've given testimony as an expert witness in?
20     A.  Yes.
21     Q.  Okay.
22     A.  Well, except I did testify some as an
23 expert on behalf of the Ohio Department of
24 Corrections; and those cases are not listed here.

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 73

1    Q.  Why not?
2    A.  I didn't have records of the case names
3  and was unfamiliar with the requirement to maintain
4  that.
5    Q.  Do you remember what year that was or
6  what years those were approximately?
7    A.  Some of them would go back to 1993 and
8  1994.
9    Q.  All right.  That's fine.
10    MR. JONES:  The requirement is only for
11  the last four years.
12    Q.  Yes.  The requirement is for four years,
13  so you've given us far more than that.
14    MR. JONES:  And it may not have even been
15  effective at the time you started doing this.
16    THE WITNESS:  I did start deleting off --
17  originally I started deleting off old cases and was
18  asked in a deposition why I did that; and so I
19  decided to put all of the cases back on that I had.
20    Q.  (By Mr. Brown)  So this list of 25 cases,
21  27 cases, there are additional cases.  Do you know
22  how many other cases there are where you were looking
23  at or testifying on behalf of the Ohio Department of
24  Correction?  Do you know how many there may have

Page 74

1  been?
2    A.  There were at least two in federal court,
3  and there were several in the Court of Claims.
4    Q.  Which is a state level court?
5    A.  Yes.
6    Q.  In the Hudnall case, do you know if you
7  were retained by the plaintiff or the defendant?
8    A.  Plaintiff.
9    Q.  What was the nature of the case there?
10  What was the issue that you were looking at?
11    A.  He developed pain in his foot that
12  subsequently turned out to be a sarcoma.
13    Q.  And then Moore versus Case in the Western
14  District of Michigan.  Were you retained by the
15  plaintiff or the defendant?
16    A.  The plaintiff.
17    Q.  Did you give a deposition and testify at
18  trial?
19    A.  Yes.
20    Q.  And what was the issue that you were
21  addressing?
22    A.  I believe it was the care and treatment
23  of his seizures.
24    Q.  Do you know what the outcome of that case

Page 75

1  was?
2    A.  I don't recall.
3    Q.  In Leach versus Luka, that was in
4  Maryland.  You gave a deposition.  Who were you
5  retained by?  Plaintiff or defendant?
6    A.  Defense.
7    Q.  What was the issue that you were
8  addressing?
9    A.  Asthma.
10    Q.  Whether he was receiving proper treatment
11  for his asthmatic condition?
12    A.  Yes.
13    Q.  Okay.  And I guess you offered an opinion
14  that the treatment did meet the standard of care?
15    A.  I believe so, yes.
16    Q.  Norman Long versus J.C. Johnson.  Were
17  you retained by the plaintiff or the defendant?
18    A.  Plaintiff's.  It was a class action case.
19    Q.  Do you know what law firm retained you?
20    A.  I believe that one was Southern Poverty
21  Law Center.
22    Q.  Morris Dees.
23    MR. JONES:  He hung out with Richard
24  Cohen.

Page 76

1    Q.  That big group in Montgomery; is that
2  right?
3    A.  Yes.  I never went to Montgomery, but I
4  suppose that's where they were located.
5    MR. PERRY:  You didn't miss much.
6    MR. BROWN:  No kidding.
7    Q.  Now, Rigunis versus Lee, were you
8  retained by the plaintiff or the defendant?
9    A.  The plaintiff.
10    Q.  What was the issue that you were
11  addressing?
12    A.  I believe the decedent developed
13  transverse myelitis while he was in custody.
14    Q.  What's transverse myelitis?
15    A.  It's an inflammatory process of the
16  spine.
17    Q.  Did he die from it?
18    A.  Yes.
19    Q.  What caused the inflammatory process?  Do
20  you know?
21    A.  I believe it's an inflammatory process of
22  unknown etiology.
23    Q.  How about William Peyton versus Raymond
24  Snyder?  Were you retained by the plaintiff or the

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 77

1  defendant?
2      A.  Defense.
3      Q.  What was the treatment that you were
4  defending?
5      A.  I believe he had some type of cardiac
6  condition.  I don't remember the specifics.
7      Q.  How about Rickey Alexander versus
8  Correctional Services Corporation?
9      A.  Plaintiff.
10      Q.  And what was the care at issue?
11      A.  He developed a very severe throat
12  infection, I believe, and died from sepsis.
13      Q.  What about Paul Zarvis versus Albany
14  County?
15      A.  Defense.
16      Q.  And what was the care you were defending?
17      A.  Drug detox.
18      Q.  What was the allegation?
19      A.  That the defendants were deliberately
20  indifferent about his treatment.
21      Q.  Not helping him withdraw or come down off
22  drugs?
23      A.  Appropriately, yes.
24      Q.  What was the outcome of that case?

Page 78

1      A.  It was a verdict for the defense at
2  trial.
3      Q.  Did you testify at trial?
4      A.  Yes.
5      Q.  Carolyn Wheeler versus Prison Health
6  Services.  Plaintiff or defendant?
7      A.  Defense.
8      Q.  What was the nature of the care you were
9  defending?
10      A.  I don't recall.
11      Q.  It did not go to trial?
12      A.  No, it didn't.
13      Q.  Sheila Proffitt versus Prison Health
14  Services in Tennessee.  Plaintiff or defendant?
15      A.  Plaintiff.
16      Q.  What was the nature of that case?
17      A.  She had a fracture of her femur with an
18  intramedullary rod.  The orthopedic doctor wanted the
19  retaining screw removed because it wasn't healing
20  properly.  They did not approve that, and it went on
21  to a nonunion.
22      Q.  Okay.  The case settled.  Demetrius
23  Williams versus County of Orange in New York.
24  Plaintiff or defendant?

Page 79

1      A.  Defense.
2      Q.  What was the care involved?
3      A.  Mr. Williams developed HIV-related renal
4  failure while he was in custody.
5      Q.  And what was the outcome of that case?
6  It was settled.  I see that.  Okay.  Thompson Pavlik
7  versus City of Shaker Heights.  Plaintiff or
8  defendant?
9      A.  Defense.
10      Q.  What was the care involved?
11      A.  The decedent experienced -- died 23 hours
12  after intake.  She was highly intoxicated when she
13  was taken into custody, and the allegations were that
14  she wasn't provided appropriate detox treatment.
15      Q.  Okay.  That case went to trial; right?
16      A.  Yes.
17      Q.  What was the outcome?
18      A.  It was a verdict for the defense.
19      Q.  And Trisha Wakat versus Montgomery
20  County, Texas.  Plaintiff or defendant?
21      A.  Plaintiff.
22      Q.  What was the nature of the case?
23      A.  Detox from benzodiazepines.
24      Q.  Linda Evans versus Maricopa County.

Page 80

1  Plaintiff or defendant?
2      A.  Plaintiff.
3      Q.  And what was the nature of the care?
4      A.  He developed a perforated viscus while in
5  custody and died shortly after hospitalization.
6      Q.  Do you know what the outcome of that case
7  was?
8      A.  I believe it was settled pretrial.
9      Q.  And then we've got Hawa Abdi Jama versus
10  United States, which was in New Jersey.  Plaintiff or
11  defendant?
12      A.  Defense.
13      Q.  What was the nature of the care?
14      A.  This was a class action case against an
15  INS facility.  The plaintiffs alleged inadequate
16  treatment.
17      Q.  How about Kimberly Grey versus
18  Hillsborough County down in Florida?  Plaintiff or
19  defendant?
20      A.  Defense.
21      Q.  Nature of the care?
22      A.  She experienced complications of
23  pregnancy while in custody.
24      Q.  What happened?  Was it settled?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 81

1    A.  Yes.
2    Q.  Deana Ashby versus Campbell County
3  Wyoming.  Plaintiff or defendant?
4    A.  Plaintiff.
5    Q.  What was the nature of the care?
6    A.  Suicide.
7    Q.  What was the allegation?
8    A.  Inadequate treatment.  He responded yes
9  to several of the inquiries on the intake suicide
10  screen, and he was never seen by a mental health
11  professional and hung himself.
12    Q.  Okay.  Orion Coley versus Wexford Health
13  Sources in Florida.  Plaintiff or defendant?
14    A.  Plaintiff.
15    Q.  And what was the care at issue?
16    A.  I believe it was -- he arrived at their
17  jail with an inflammatory condition of his eye, and
18  they did not continue his eye drops; and he
19  subsequently developed an ulceration of his eye.
20    Q.  Did it result in vision loss?
21    A.  I believe so.  I don't remember all the
22  details.
23    Q.  Was that case settled, I guess?
24    A.  Yes.

Page 82

1    Q.  How about Marilyn Dolliole?  How do you
2  pronounce that?
3    A.  I believe Dolliole.
4    Q.  Okay.  Down in New Orleans.  Plaintiff or
5  defendant?
6    A.  Plaintiff.
7    Q.  And what was the nature of that case?
8    A.  Mr. Dolliole, the decedent, died from
9  hepatic encephalopathy.
10    Q.  How about Jay Olson versus Sherburne
11  County?  Plaintiff or defendant?
12    A.  Plaintiff.
13    Q.  What were the allegations in that case?
14    A.  Inadequate asthma treatment.
15    Q.  Melvin Robinson, Northern District of
16  Georgia.  Tell me about that.  Plaintiff or
17  defendant?
18    A.  Defense.
19    Q.  Who hired you?
20    A.  Who hired me in terms of what?
21    Q.  What law firm?
22    A.  I think Paul Booth.
23    Q.  And what was the --
24    A.  Does that sound right?

Page 83

1    Q.  They are a firm.  They are a firm.
2      What was the nature of the treatment
3  involved in that case?
4    A.  Mr. Robinson was a diabetic.  He arrived
5  at the jail on a regimen involving Lantus.  The jail
6  chose to substitute a different type of insulin, and
7  he developed complications from the treatment.  He
8  also missed several doses of insulin.
9    Q.  Now, did that case -- it did not go to
10  trial, did it?
11    A.  I believe it was dismissed.  Summary
12  judgment.
13    Q.  And Veronica Thomas versus Arizona.
14  Plaintiff or defendant?
15    A.  Plaintiff.
16    Q.  What was the care involved in that case?
17    A.  He had abnormal test results and
18  persistent nausea and vomiting and dehydration and
19  was transferred to another facility, was not seen by
20  a physician for several days, and was transferred out
21  in very unstable condition and died shortly after.
22    Q.  Is that case ongoing?
23    A.  No.
24    Q.  Did it settle?

Page 84

1    A.  I believe so.
2    Q.  How about McCaster versus Ramsey County,
3  Minnesota?  Plaintiff or defendant?
4    A.  Plaintiff.
5    Q.  And what was the care involved in that
6  case?
7    A.  Mr. McCaster developed active
8  tuberculosis, infected approximately 150 other
9  individuals in the jail, resulting in at least three
10  to four additional active cases of tuberculosis.
11    Q.  Is that case still going on?
12    A.  It's scheduled for trial November 27.
13    Q.  Okay.  How about Walker versus Cook
14  County?
15    A.  The decedent in that case --
16    Q.  Plaintiff or defendant?  I'm sorry.
17    A.  Plaintiff.
18    Q.  All right.
19    A.  The decedent entered custody in Cook
20  County, Illinois, with an external fixator device
21  from an arm fracture, developed complications from
22  the -- developed a subsequent infection in the arm,
23  and died from sepsis.
24    Q.  Is that case going to trial?

21 (Pages 81 to 84)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 85

1      A.  It has not gone to trial.
2      Q.  Is it --
3      A.  I don't know what the current status is;
4  but, as far as I know, it's active.
5      Q.  Sears versus Lee.  Plaintiff or
6  defendant?
7      A.  Plaintiff.
8      Q.  What was the care involved in the case?
9      A.  Mr. Sears was struck in the head in a
10  fight, had a depressed skull fracture and an epidural
11  hematoma.  He died shortly after.  He was sent back
12  to his cell and found unconscious, sent to the
13  hospital and died soon after.
14      Q.  Is that case still going on?
15      A.  Settled.
16      Q.  Smith versus Paul Harvey.  Not the Paul
17  Harvey we know and love.
18      A.  I never noticed that.
19      Q.  So tell me the rest of the story.
20  Plaintiff or defendant?
21      A.  Defense.
22      Q.  And what was the care that you were
23  defending?
24      A.  Mr. Smith had a variety of medical

Page 86

1  problems, including pretty significant heart disease
2  and shoulder problems.
3      Q.  Is that case still going on?
4      A.  No.  It was dismissed.  Summary judgment.
5      Q.  Okay.  And then Ramos-Vazquez versus
6  Primecare over in Pennsylvania.  Plaintiff or
7  defendant?
8      A.  Defense.
9      Q.  And what's the nature of that case?
10      A.  Mr. Ramos became psychotic roughly 12
11  days after leaving the correctional facility and
12  started attacking various family members and other
13  individuals and was taken into custody, is currently
14  incarcerated.  He was alleging inadequate psychiatric
15  treatment during his time in custody.
16      Q.  And if he would have received adequate
17  treatment, then he wouldn't have attacked people once
18  he got out?
19      A.  That was his claim, yeah.
20      Q.  Is that case still going on?
21      A.  No.  That case has been settled.
22      Q.  So it looks like -- is this list up to
23  date?  Are there any other cases after this one?
24  Obviously you'll have to add Monica Robinson to this

Page 87

1  at some point in time, but are there any other cases?
2      A.  None other that I've testified at trial
3  or deposition.  I'm scheduled to testify at
4  Mr. McCaster's trial.
5      Q.  Later this month?
6      A.  Well, early next month actually.
7      Q.  That's scheduled for trial November 27?
8      A.  It starts the 27th.  I'm expected to
9  testify around December 3 or 4.
10      Q.  Okay.  So it looks like a fairly good mix
11  of plaintiff and defendant but a little bit heavily
12  weighed usually testifying for the plaintiff's side;
13  is that right?
14      A.  In terms of the cases that I receive,
15  it's approximately equal.
16      Q.  About 50/50?
17      A.  I've had quite a few defense cases that I
18  was never deposed that either were dismissed or were
19  settled.
20      Q.  Okay.  Of all the cases that are listed
21  that we just went through -- I guess I should have
22  asked this question regarding each one.  I'm not
23  going to go back through the list.  Do you recall if
24  any of them involved care being administered at a

Page 88

1  small county jail, a jail with an inmate population
2  of less than a hundred?
3      A.  These cases do not involve care in a
4  small jail, but I have participated in a number of
5  other cases that involved care in very small jails.
6      Q.  But you have consulted on such cases,
7  just where you've not been deposed?
8      A.  Yes.
9      Q.  Of the cases where you've been retained
10  as an expert witness, how often is the inmate male
11  versus female, if you keep track of that statistic?
12      A.  I've never kept track of that statistic.
13      Q.  Any idea?
14      A.  Well, first of all, just for the record,
15  the male versus female rate of incarceration is very
16  highly skewed toward the male population; and I have
17  no idea how that breaks out.
18      Q.  Okay.  Have you ever had any cases where
19  you have been retained as an expert where there was
20  an allegation -- where the allegation was the failure
21  to identify and appropriately treat staph infection?
22      A.  Yes.
23      Q.  What other staph infection cases have you
24  had?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 89

1      A.  I was involved in a class action case
2  against the Gloucester County Jail in Gloucester, New
3  Jersey.  There were numerous cases related to
4  treatment of Methicillin-resistant Staph Aureus
5  infection in the facility.
6      Q.  When was that case?
7      A.  I believe the case settled around 2008.
8      Q.  Do you recall any of the parties to that
9  case other than Gloucester, New Jersey, who was the
10  main plaintiff?
11      A.  I don't recall.
12      Q.  Do you remember who retained you?
13      A.  No.
14      Q.  Were you retained by the plaintiff or the
15  defendant?
16      A.  Plaintiff.
17      Q.  Do you know what the outcome was?
18      A.  Yes.  They settled.
19      Q.  Okay.  Are there any others where the
20  treatment at issue has been the inappropriate or not
21  recognizing and appropriately treating a staph
22  infection?
23      A.  That Launice Walker case.  The decedent
24  died from a Methicillin-resistant Staph Aureus

Page 90

1  infection.
2      Q.  From sepsis?
3      A.  Yes.
4      Q.  Okay.  And that case is ongoing?
5      A.  As far as I know, yes.
6      Q.  And you are testifying on behalf of the
7  plaintiff?
8      A.  Yes.
9      Q.  Any others?
10      A.  I recall being involved in a case
11  involving endocarditis that I believe was related to
12  Methicillin-resistant Staph.  I don't recall what
13  jurisdiction that was, but that case was settled.
14          Actually I'm remembering there was a
15  second case.  There was one case in Maryland that
16  involved endocarditis and a second endocarditis case.
17  I don't recall whether they were MRSA.  Oh, let me
18  correct too.  One of the older cases here also
19  involved a MRSA infection.  I'll get the name here in
20  a moment.
21      Q.  While you're looking for that, at any
22  time you've been identified as an expert, have your
23  opinions ever been excluded from any proceeding?
24      A.  Not that I'm aware of.

Page 91

1      Q.  Have you ever been disqualified as an
2  expert witness?
3      A.  Not that I'm aware of.  Okay.  The Rickey
4  Alexander case, I believe that he passed away from a
5  Methicillin-resistant Staph Aureus pneumonia.
6      Q.  What number that was on your list?
7      A.  No. 7.
8      Q.  Okay.  Have your opinions ever been
9  limited in any case where you've been allowed to
10  opine on some things but not allowed to opine on
11  others?
12      A.  In the Zarvis -- in the Pavlik case, by
13  agreement of counsel, I only testified on policy
14  issues because there was also a substance abuse
15  expert in the case.
16      Q.  What number was Pavlik?
17      A.  No. 12.
18      Q.  Okay.  All right.  But that was by an
19  agreement, not by the Court saying you weren't
20  qualified and couldn't offer those opinions?
21      A.  As far as my understanding, it was an
22  agreement, yes.
23      Q.  Okay.  Now, how much of your total
24  professional time do you spend working as an expert

Page 92

1  witness as opposed to providing care and treatment
2  for patients?
3      A.  At the current time, in terms of -- I
4  actually calculated earlier this year because it
5  was a requirement for one of the jurisdictions I was
6  in.  I believe it came out to just over 35 percent.
7      Q.  And that was a calculation earlier in
8  2012?  So you're pretty comfortable it's probably 30
9  to 35 percent of your time now --
10      A.  Yes.
11      Q.  -- that's spent doing expert witness
12  work?  And of that 35 percent, you think the majority
13  of them are for the plaintiff?
14      A.  No.  I think it's about equal.
15      Q.  Okay.  It just happens to be that you've
16  testified more often for the plaintiff in the cases
17  where you've been retained as an expert; is that
18  right?
19      A.  Yes.
20      Q.  All right.  When were you --
21          MR. BROWN:  We're about to get into the
22  care in this case.  Do you want to take a five-minute
23  break?
24          MR. JONES:  Sure.

ARMSTRONG & OKEY, INC., Columbus, Ohio  (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 93

1    (Recess taken.)
2    Q. (By Mr. Brown) You were first contacted
3 in this case fall of 2011?
4    A. That sounds about right.
5    Q. I guess this is probably a good time.
6 Let's see if we can determine what is what. You've
7 got your originals there; is that correct?
8    A. No. This is just a few items here.
9 There is a set of the documents.
10    THE WITNESS: There is a set of the
11 documents, Craig, and we have another set of the
12 documents. We've got several. Do you need a set of
13 these?
14    Q. Dr. Mendel, I think I have your
15 originals. Why don't I give you your originals back.
16 I'm going to take and mark this as Defendant's
17 Exhibit No. 4. This is a copy of the materials, not
18 including the disk that you provided for us at the
19 beginning of your deposition.
20    (EXHIBIT MARKED FOR IDENTIFICATION.)
21    Q. When we were referring to this, Doctor,
22 since the pages aren't numbered, if you'll help
23 acquaint us with that and where you are looking. The
24 question was: When were you first retained or when

Page 94

1 were you first contacted about this case? And I
2 think you're probably going to look back to that
3 February invoice; is that right?
4    A. Yes.
5    Q. And what does that tell you?
6    A. It says the first time that I reviewed
7 any documents in the case was October 21, 2011.
8    Q. And do you know who first contacted you?
9    A. Mr. Jones.
10    Q. Do you know what y'all talked about?
11    A. He called and told me that he had a case
12 that he wanted to discuss with me.
13    Q. Okay. And what was the -- what did that
14 first conversation include? Did he tell you a little
15 bit about the case? What did he tell you?
16    A. He told me about Ms. Robinson's history,
17 that she'd been incarcerated and had subsequently
18 developed an epidural abscess.
19    Q. Did he tell you that she subsequently
20 developed an epidural abscess?
21    A. I don't recall specifically what he told
22 me about that. That was one of the conditions that
23 she was subsequently treated for.
24    Q. Okay. And what else did you y'all talk

Page 95

1 about during that initial conversation?
2    A. I don't recall.
3    Q. Okay. Is that -- did he retain you at
4 that time?
5    A. I believe so.
6    Q. And what were you asked to do?
7    A. I was asked to review the records and
8 provide him with my opinion.
9    Q. And did he subsequently send you some
10 records?
11    A. Yes.
12    Q. Those are the medical records that we
13 talked about an hour and a half ago that you have on
14 the disk that you've provided for us; correct?
15    A. Yes.
16    Q. That included the Hart County Jail
17 medical record or the medical chart from the Hart
18 County Jail; is that right?
19    A. Yes.
20    Q. And that included the medical record from
21 her hospitalization in April of 2010?
22    A. I don't recall whether I got the records,
23 the April hospital records at that time.
24    Q. Okay. So the first set of records was

Page 96

1 just the jail records and what? The discharge
2 summary from Athens Regional Medical Center?
3    A. Yes. And Ty Cobb Hospital.
4    Q. Okay. What did the Ty Cobb Hospital
5 records tell you?
6    A. They discussed -- she was seen in the
7 emergency department, sent there from the jail.
8    Q. All right. Okay. So he sent you the
9 records from her incarceration; the record on August
10 the 11th, 2011, when she was transferred from the
11 jail to the emergency room; and then a discharge
12 summary from the time she spent in Athens Regional
13 Medical Center when she had surgery?
14    A. Yes.
15    Q. That's all the medical records you've
16 reviewed all together in this case, isn't it?
17    A. I believe so.
18    Q. Have you ever worked with Mr. Jones or
19 his law firm before?
20    A. No.
21    Q. Did he tell you how he found you?
22    A. No.
23    Q. Was there any other documentation that
24 you asked for during that initial telephone

24 (Pages 93 to 96)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 97

```
 1    conversation?
 2        A.  Not that I recall.
 3        Q.  All right.  Now, did you receive
 4    everything that you asked him to send you?
 5        A.  Yes.
 6        Q.  Okay.  When did you first form an opinion
 7    in this case?
 8        A.  Probably late October 2011.
 9        Q.  After you had had time to review the
10    records from the jail and the hospital from August
11    the 11th and then from Athens Regional?
12        A.  Yes.
13        Q.  And after you rendered -- we'll talk
14    about the specific opinions in a minute, but what was
15    your initial impression of the case?
16        A.  That the care -- that the care provided
17    to Monica Robinson fell below the applicable standard
18    of care and treatment provided.
19        Q.  And did you communicate that back to
20    Mr. Jones?
21        A.  Yes.
22        Q.  What did you do after that?
23        A.  I believe he -- we prepared an affidavit.
24        Q.  Okay.  Now, from your invoice that you
```

Page 98

```
 1    gave us, it looks like you spent 25 minutes on the
 2    21st of October; about 40 minutes on the 29th day of
 3    October; 35 minutes on October 31.  Is that when you
 4    believe you may have initially formed your opinion
 5    that the care fell below the standard of care?
 6        A.  Most likely.
 7        Q.  Any idea what you would have done between
 8    the November -- do you think that's November 3 and
 9    November 9?
10        A.  I honestly don't know.  If it's
11    important, I can probably -- I might be able to
12    figure it out.
13        Q.  That's fine.  And so do you think then
14    that you had about a two-month period or a
15    month-and-a-half period of time before you started
16    working with Mr. Jones on getting your affidavit
17    together?
18        A.  Yes.
19        Q.  So it looks like the time that you spent
20    in January, on January 4, February 6, and February 7,
21    does that appear to you to have been the time that
22    was involved in drafting, revising, and finalizing
23    the affidavit that you've provided for us?
24        A.  Yes.
```

Page 99

```
 1        Q.  Okay.  And since you signed that
 2    affidavit in February of 2012, the only other
 3    documents that you have reviewed in this case have
 4    been deposition transcripts; is that correct?
 5        A.  No.
 6        Q.  What other documents have you reviewed?
 7        A.  I received a copy of the IDHS jail
 8    protocols.
 9        Q.  When did you get those?
10        A.  Within the past several months.
11        Q.  Okay.  Did you ask for those or were they
12    sent to you?
13        A.  They were sent to me.
14        Q.  What did he ask you to do when he sent
15    you those?
16        A.  He asked me to review them.
17        Q.  And did you do so?
18        A.  Yes.
19        Q.  Did you have any impressions of those
20    policies and procedures?
21        A.  Yes.
22        Q.  Okay.  We'll talk about those in a few
23    minutes.  All right.  You've also looked at
24    depositions?
```

Page 100

```
 1        A.  Yes.
 2        Q.  The ones that we listed earlier?
 3        A.  Yes.
 4        Q.  Anything else?
 5        A.  Not that I recall.
 6        Q.  So the sum total of the medical records
 7    that you've reviewed in this case has been, what, a
 8    hundred pages?  Maybe less?
 9        A.  A little more or a little less.
10    Somewhere in that range.
11        Q.  Okay.  You have not reviewed any records
12    from Hart County Hospital from April of 2010?
13        A.  No.  I don't believe so.
14        Q.  Have you asked for any other medical
15    records that have not been provided to you?
16        A.  No.
17        Q.  Since the execution of the affidavit in
18    February 2012, how many additional times do you think
19    you've actually had communication, telephone calls,
20    with Mr. Jones or anybody else affiliated with the
21    plaintiff's firm?
22        A.  I would say four to five.
23        Q.  Has it mostly been -- well, tell me.
24    What has the substance of those calls been?
```

Lawrence Mendel

Page 101

1    A.  We called to -- he called to discuss some
2  of the upcoming depositions.  I called -- set up a
3  call to clarify some questions that I had.
4    Q.  Questions that you had about what?
5    A.  Clarifying the roles of different
6  individuals and the parties to the suit.
7    Q.  What else have y'all talked about?
8    A.  We talked about arrangements for the
9  deposition.
10   Q.  Is that about it?
11   A.  After the depositions he called me to
12 advise me of some of the new information that had
13 come to light.
14   Q.  And then he later sent you the
15 transcripts?
16   A.  Yes.
17   Q.  Did you and Mr. Jones meet before today?
18   A.  Yes.
19   Q.  When was that?
20   A.  Yesterday.
21   Q.  How long were y'all together?
22   A.  55 minutes.
23   Q.  Give or take a second?
24   A.  That was the amount of time that

Page 102

1  officially we were talking.
2    Q.  That you recorded?
3    MR. JONES:  That's how long you had to
4  pay for parking.
5    Q.  Were you given any additional
6  documentation or materials to review yesterday?
7    A.  No.
8    Q.  Does your affidavit contain the facts as
9  you understand them to be in this case?
10   A.  Most of the facts that I'm aware of.
11 There was some additional information that became
12 available through the deposition process that may not
13 be detailed in the affidavit.
14   Q.  Well, tell me what else you have learned
15 about the case that you would supplement the facts
16 contained in paragraph 8 of your affidavit.  And I
17 think you had paragraph 8 with subparagraphs A
18 through Q.  And if there is other information that we
19 need to add to what your understanding of the facts
20 is, if you could please help us out with that, that
21 would be great.
22   MR. JONES:  I'm going to object to the
23 form on that.  You're asking him what information he
24 would take out of the depositions and put in an

Page 103

1  affidavit?  That's not required anyway to --
2    MR. BROWN:  I'm asking what his
3  understanding of the facts are.  I'm just trying to
4  short circuit so we can get you out of here.
5    MR. JONES:  Do you want him to read all
6  of the depositions?
7    MR. BROWN:  Well, I want him to tell us
8  what is important out of the depositions, whether it
9  was important to him.
10   MR. JONES:  That's fine.  I don't want to
11 argue.  I'll just object for the record.  Again, this
12 is supposed to be a summary.  You might ask him is
13 there anything he would change based upon his review
14 of the documents.
15   MR. BROWN:  Okay.
16   Q.  (By Mr. Brown)  Based on the fact that
17 you've been able to have other follow-up with
18 Mr. Jones and you've been able to review the policies
19 and procedures of IDHS and you've reviewed some
20 deposition transcripts, are there any facts contained
21 in paragraph 8 that are no longer -- as they're
22 stated in paragraph 8 something that you need to
23 correct or something that you need to clarify?
24   A.  Is this a different question?  Are you

Page 104

1  withdrawing the previous question?
2    Q.  No.  I think it's the same question.
3    MR. JONES:  I'll have the same objection.
4  Answer the best you can.  Repeat the question again.
5    MR. BROWN:  Read that back.
6    (Question read.)
7    MR. JONES:  Again, I'll object to the
8  form that he needs to correct or clarify anything.
9  Flat out what he wants to know is:  Is there anything
10 there that you now understand is maybe not the same
11 as it's stated in there?
12   THE WITNESS:  First of all, in Item
13 No. i, the last paragraph, on page 6, I think, just
14 for the record, this became clear from the
15 depositions that Mr. Adams -- if Monica's mother had
16 brought supplies, that Mr. Adams did not know what
17 tests were appropriate to diagnose the type of
18 infection that she was concerned about.
19   Q.  (By Mr. Brown)  Okay.  So that would be
20 in addition to what is there because in Item No. i,
21 you said that if she brought the supplies and paid
22 for the testing, he would draw blood.  And then you
23 would add to that, even though he would do a blood
24 draw, your review of his deposition indicated that he

26  (Pages 101 to 104)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 105

1  was not sure or didn't know what tests would be
2  ordered or what tests would have been necessary. Is
3  that right?
4      A.  Yes.
5      Q.  And what else?
6      A.  Well, in regard to what test would have
7  been ordered, Dr. Williams testified that he felt
8  that the medics would be aware of what tests would be
9  appropriate; but I believe that both of the medics,
10  at least as far as -- Mr. Adams testified that he was
11  not familiar with what tests would have been ordered.
12      Q.  Did Dr. Williams talk about that the
13  medics would know what tests were to be performed or
14  that Bruce Bailey would know what tests were to be
15  performed?
16      A.  On page 57 of his deposition, he said
17  that a medic, I believe in a general term, that a
18  medic would know what tests to run.
19      Q.  All right.  What else?
20      A.  The -- I would add, if I were revising
21  this, also that as of August 7 that she had been in
22  custody for 14 days and that according to the jail
23  policy, she should have had a medical evaluation
24  done; and that would have included a review of

Page 106

1  previous hospitalizations and current medical
2  problems.  That did not occur.
3      Q.  Do you not think that -- had they had a
4  medical review done, would that requirement not have
5  been met when they first met with her on the 23rd of
6  July?
7      A.  No.  That was an intake evaluation.
8      Q.  Okay.
9      A.  I don't believe that they did an
10  evaluation and met the standard for a medical
11  evaluation and that they adequately inquired into the
12  nature of her previous hospitalization.
13      Q.  What else should they have done to more
14  fully or more adequately inquired into her previous
15  hospitalization?
16      A.  They should have gotten clarification of
17  when the date occurred, what treatment she received,
18  and the course of the events that occurred with the
19  hospitalization.
20      Q.  But didn't they ask her on the 23rd when
21  she had been in the hospital, and she told them a
22  week and a half or two weeks ago?
23      A.  That is what I believe is recorded in the
24  records, but I believe they misunderstood when they

Page 107

1  made that inquiry.
2      Q.  What do you think they misunderstood
3  about that?
4      A.  I think that either that -- well, we know
5  that she was in the hospital well before one and a
6  half months before.
7      Q.  Weeks?
8      A.  Or one and a half weeks before the jail
9  intake.  We know that it was in April.
10      Q.  Correct.  Well, if a patient tells you
11  one and a half weeks and -- you read her deposition
12  too, didn't you?
13      A.  Yes.
14      Q.  And she did not disagree that she told
15  them it had been a week and a half prior to her
16  incarceration?
17      MR. JONES:  Objection to form.  She did
18  disagree.
19      MR. BROWN:  She did not disagree.
20      MR. JONES:  She did.
21      MR. BROWN:  Get her deposition and read
22  it.  She did not disagree.
23      MR. JONES:  Object to form.
24      MR. BROWN:  That's fine.

Page 108

1      THE WITNESS:  Is there a question?
2      Q.  (By Mr. Brown)  Yes.  She did not
3  disagree in her deposition.  She said she had no
4  independent recollection, but she had no reason to
5  believe, that if it was written in that record, that
6  she believed she told him that.  So if she told them
7  a week and a half, how were they supposed to have
8  determined it was more than a week and a half prior?
9      MR. JONES:  Object to form.
10      A.  Well, I believe she also told them that
11  when she was discharged from the hospital she was
12  supposed to be on antibiotics.  And I believe if they
13  had gotten an accurate history, it would have been
14  clear to them that she had not just recently
15  completed a course of antibiotics.
16      Q.  How would they have more particularly or
17  more accurately gotten a history other than getting
18  it from the patient herself?  What should they have
19  done differently?
20      A.  I believe that they should have called
21  her treating physician.
22      Q.  You heard them testify -- I'm sorry.  You
23  didn't hear it, but you read that Mike Adams
24  testified that he did call the hospital and asked if

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 109

1 she had been treated there within one and a half or
2 two weeks prior.  Do you recall reading that?
3   A.  Yes.
4   Q.  Was there something more that he should
5 have done?
6   A.  Yes.
7   Q.  What?
8   A.  Well, he said he called the ER.  And I
9 don't know exactly what that means, whether it was
10 some clerk in the ER; but that is not generally where
11 medical records are kept.  So assuming that it's
12 accurate that he did call the ER and asked about one
13 and a half weeks prior and they had no record, I
14 believe he should have done a couple things.
15   First of all, that he should have gone
16 back to Ms. Robinson and told her that the ER did not
17 have any record of her having been there within the
18 past week and a half and asked for clarification.
19 And, two, because she had great concern about the
20 possibility of a recurrent infection, I believe he
21 should have either discussed it with Dr. Williams
22 directly or probably, more appropriately, called her
23 treating physician.
24   Q.  Did she have a treating physician at the

Page 110

1 time?
2   A.  The person that had treated her in the
3 hospital would have been well aware of the
4 circumstances of her hospitalization.  This was --
5 this is a small county so I believe it's more likely
6 than not that Mr. Adams knew the doctor that had
7 treated her previously.
8   Q.  Okay.  Do you know if she had treated
9 with a physician other than when she was actually in
10 the hospital?  Do you know if she had followed up
11 with any other physician?
12   A.  I believe she testified that she hadn't.
13   Q.  Had not?
14   A.  Had not.
15   Q.  Okay.  And -- all right.  Okay.  What was
16 next?  What else would you add to your statement of
17 the facts?
18   A.  I believe this is a typographic error
19 mistake in this affidavit.  It says in the -- it
20 said, "But he also noted that she could only leave
21 with assistance."
22   Q.  I'm sorry.  What paragraph are you
23 looking at?
24   A.  M.  Did you find it?

Page 111

1   Q.  Yes, yes, yes.
2   A.  I believe that he wrote that she could
3 only stand with assistance.  He might have also noted
4 that she left with assistance; but the way this is
5 written, it should probably say could only stand with
6 assistance.
7   Q.  Okay.
8   A.  Which is consistent with her testimony as
9 well.
10   Q.  All right.  Anything else?
11   A.  There were additional -- there were
12 additional information that came out that I would
13 probably supplement in this affidavit.
14   Q.  Okay.  What would you add, or what would
15 you supplement?
16   A.  There was a statement Ms. Robinson --
17 excuse me.  Let me look at the notes here.  There was
18 a statement from a correctional officer that there
19 was nothing they could do.  I don't recall the date
20 or the time that that was made, but I believe that
21 that was significant; and I would -- I would
22 supplement a detail of the specifics of that time and
23 the persons involved in this affidavit.
24   Q.  And how is that important?

Page 112

1   A.  It's important in a number of ways.
2 First of all, the custody officers, I believe, were
3 aware that her condition was declining.
4   Q.  All right.  And that's important why?
5   A.  It verifies the -- that her condition was
6 plainly obvious even to nonmedical trained persons.
7   Q.  All right.  Anything else?
8   A.  It also, I believe, under the contract
9 and under the IDHS policy, Dr. Williams was supposed
10 to have been coming to the jail on a weekly basis or
11 have arrangements to see patients in his office or
12 another location as necessary.  I believe that the --
13 that his failure to regularly visit the jail did
14 deprive the custody officers of an opportunity to be
15 able to confer with him directly.
16   Q.  All right.  What else?  Just so I'm
17 clear, we're still talking about what you would add
18 or change about your understanding of facts of this
19 case?  You mentioned the contract.  Have you also
20 reviewed any contracts in this case?
21   A.  Yes.
22   Q.  That's one other thing.  When did you
23 review a contract, and what contract did you review?
24   A.  There was a contract that was a

28  (Pages 109 to 112)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 113

1   deposition exhibit to Dr. Williams' deposition.
2       Q.   Okay.
3       A.   I reviewed that.
4       Q.   Is that on this disk, or would that be
5   included with his deposition?
6       A.   It should be on that disk as well.
7       Q.   Okay.  All right.  Anything else?
8       A.   I would probably also add comments that a
9   number of the policies of IDHS were not followed.
10      Q.   We'll talk about them in a minute.  I
11  assume you can list the ones that you contend were
12  not followed?
13      A.   Yes.
14      Q.   Okay.  We'll save that for a few minutes
15  from now.  Go ahead.  Anything else?
16      A.   I believe it's subsequently been fairly
17  clear that none of the medics, neither Adams or
18  Bailey, were familiar with the complications or
19  sufficiently familiar with the potential
20  complications of IV drug use to have been making the
21  decisions that they made in this case and that they
22  should have conferred with their supervising
23  physician.
24      Q.   Explain that a little more.

Page 114

1       A.   Well, I already commented one aspect,
2   that Dr. Williams testified that he thought a medic
3   would know what tests to order.  But I don't believe
4   -- well, Mr. Bailey testified -- well, first of all,
5   Mr. Bailey testified that bacteremia was bacteria in
6   the urine, which is incorrect.
7       Q.   What is bacteremia?
8       A.   Bacteremia is the spread of bacteria in
9   the bloodstream, transient bacteria in the
10  bloodstream.
11      Q.   What else?
12      A.   Mr. Bailey did not -- testified that he
13  did not tell Dr. Williams about the IV drug abuse and
14  said, quote, I don't pay any attention to that
15  really.
16      Q.   Why is that important?
17      A.   Because the nature of the type of
18  infection that she had would not necessarily have any
19  external signs; and without a knowledge of the
20  complications of IV drug use, it would not be
21  possible to manage that appropriately and to evaluate
22  any associated complications.
23      Q.   Okay.
24      A.   He also stated, page 160 of his

Page 115

1   deposition, that a blood culture would probably have
2   not been appropriate since she had been on
3   antibiotics and also misstated the appropriate
4   ordering of that test.
5            In fact, she had been on antibiotics but
6   not been on antibiotics for quite some time.  But she
7   was not on antibiotics within the time period that
8   this -- that the pain -- that she first complained
9   about the pain.
10      Q.   How do we know that?
11      A.   Because by the time -- they had not
12  administered any antibiotics to her.
13      Q.   When did she first start complaining of
14  pain?
15      A.   She first start complaining of pain when
16  she was booked; but by the time she was seen and they
17  started discussing tests, even if she had been taking
18  antibiotics the day she was taken into custody, they
19  would have been out of her system by that time.
20      Q.   So if she had been taking antibiotics on
21  the 22nd when she was booked into the jail, it's your
22  testimony that the antibiotics would have been gone
23  from her system by the 23rd when she first talked
24  about pain?

Page 116

1       A.   Or by the time she was first seen by a
2   medic on the 24th.
3       Q.   She was first seen by a medic on the
4   23rd.
5       A.   Right, but then the subsequent discussion
6   was --
7       Q.   About the blood draw, you're talking
8   about?
9       A.   Yes.
10      Q.   So the antibiotics would have been
11  eliminated from her system in that two-day period of
12  time?
13      A.   Yes.
14      Q.   Is that right?
15      A.   Yes.  Besides there are other tests that
16  could have been ordered, and I believe Dr. Williams
17  mentioned a couple other tests that he would have
18  considered ordering under the circumstances.
19      Q.   All right.  What else you got?
20      A.   I would have provided some details of the
21  system that was in place in the jail.
22      Q.   Such as?
23      A.   The fact that the medics reported
24  primarily to an LPN and not to Dr. Williams directly.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 117

1    Q.  Okay.  Is that problematic?
2    A.  That deviates from usual practice that
3  I'm familiar with.
4    Q.  Okay.  What is the usual practice that
5  you're familiar with?
6    A.  Under my training and experience, a medic
7  is supposed to be the eyes and ears of a physician,
8  not the eyes and ears of a nurse, that their training
9  is based under the assumption that they're going to
10  be supervised by a physician, evaluated by a
11  physician, credentialed and evaluated by a physician.
12    Q.  So it's your testimony or your opinion
13  then that Mike Adams and Brian Evans should have
14  reported on Monica Robinson straight to Dr. Williams
15  as opposed to Bruce Bailey?
16    A.  Yes, especially as her condition did not
17  respond to the initial treatment.
18    Q.  All right.  Anything else?
19    MR. JONES:  For the record he's walking
20  through his notes.  He wants to know whether he
21  should continue to go through it.  As long as it's
22  responsive to your question, he should.
23    Q.  Right now the question was just your
24  understanding of the facts of the case.  As I kind of

Page 118

1  take it, you're starting to get into some of the
2  things that you think are potentially problematic for
3  my client or some of the other defendants in this
4  case.
5    If we're ready to move into that phase, is
6  there anything else about the factual basis of the
7  case, your understanding of the factual basis of the
8  case, that you think is important for our discussion
9  today to the extent you haven't already told me,
10  No. 1, or, No. 2, that it's not included in the
11  affidavit that you provided in February of 2012?
12    A.  In terms of the actual clinical course
13  and the specifics of her treatment within the jail,
14  there is one other set of circumstances that I
15  believe was not detailed that I was not aware of
16  before Monica Robinson's deposition, and that is the
17  history of vomiting that she -- that occurred.  Also
18  she clarified there was mention of numbness.  I
19  believe it's listed here.
20    And I assumed, but I didn't have facts to
21  support it, but I assumed that she had some previous
22  experience with an epidural since she compared her
23  numbness to an epidural.  And, in fact, she testified
24  at her deposition that she had received an epidural.

Page 119

1    Q.  Okay.  Anything else that you need to --
2  that you would add as part of your understanding of
3  the factual basis of the case?  And there may be a
4  few other things that come out as we're talking about
5  your opinions.
6    A.  Not that I'm aware of at this time, as
7  long as we have the option to go back to it.
8    Q.  Absolutely.  You can go back to refer to
9  anything.  I want to learn everything that I possibly
10  can today from you.
11    Before I move into your opinions, did you
12  review any pleadings in this case?
13    A.  Not that I recall.
14    Q.  Have you reviewed any discovery
15  responses, interrogatory responses, or things of that
16  nature?
17    A.  No.
18    Q.  Have you done any outside research,
19  researching of medical treatises, things of that
20  nature, in forming your opinions in this case?
21    A.  I did.  I think I already mentioned
22  previously that I reviewed the rules of the Georgia
23  EMS Board.
24    Q.  Okay.  And where did you get those?

Page 120

1    A.  From the Internet.  Directly from the
2  Georgia EMS site.
3    Q.  Okay.  Did you print those?
4    A.  I cut and pasted some sections of that in
5  the documents that we have here.
6    Q.  Do you think, as we're talking about some
7  of the documents, you'll remember where they are?  If
8  so, you don't have to point them out right now.
9    A.  It's right here.
10    Q.  Which document are you looking at?
11    A.  Notes for discussion, starting toward the
12  bottom of the first page continuing on to the next
13  page.
14    Q.  Was this the EMS scope of practice?  Is
15  that what you're talking about?
16    A.  Yes.
17    Q.  Okay.  Notes for discussion, Robinson
18  depo?
19    A.  Yes.
20    Q.  Okay.  That's what that's called.  At the
21  bottom of the page where you said, "Georgia EMS
22  Board"?
23    A.  Yes.
24    Q.  Just wanted to make sure.

30 (Pages 117 to 120)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 121

1    A.  For the record that quote is taken right
2  from the web site as it existed within the past
3  several months when I reviewed it.
4    Q.  All right.  That's the only portion of
5  the EMS procedures that you have referred to?
6    A.  Yes.
7    Q.  Okay.  As we sit here today, have you
8  formed all of the opinions that you have to date in
9  this case?
10    A.  I'm not sure.
11    Q.  Have you formed all of them?
12    A.  I'm not sure what your question refers
13  to.
14    Q.  Are you ready to talk about your
15  opinions?
16    A.  Yes.
17    Q.  Okay.  Do you have any opinions that you
18  want to talk about today other than those that are
19  listed in the affidavit that you submitted or that
20  you signed on February -- or in February of 2012?
21  And for the record, I'm looking at paragraph No. 9;
22  and I'm looking at paragraph No. 10.
23        And paragraph No. 9 sets forth three
24  specific opinions that seem to be addressing the care

Page 122

1  provided to Monica Robinson by IDHS affiliated
2  providers, and paragraph No. 10 appears to me to be
3  addressing Dr. Williams.
4    A.  Repeat the question.
5    Q.  Can you read it back?
6        (Question read.)
7    A.  Actually it appears that the wording in
8  the affidavit covers the extent of my opinions at
9  this time.
10    Q.  As we're talking about your opinions, I'm
11  making an assumption -- and it may be an incorrect
12  assumption, but will you be referring to certain of
13  the typewritten sheets that you gave to us earlier
14  this afternoon?
15    A.  Yes.
16    Q.  So your broad general opinions against
17  IDHS are in paragraph 9 a, b, and c; but you will be
18  able to discuss them in greater detail by referring
19  to some of the materials that you brought with you
20  today; is that right?
21    A.  Yes.
22        MR. JONES:  That was a good question.  I
23  liked that one.
24        MR. BROWN:  I'm learning.

Page 123

1        MR. PERRY:  Can you put a gold star in
2  the transcript next to that question?
3    Q.  (By Mr. Brown)  All right.  Looking at
4  your opinions, and I'm going to just read from
5  paragraph No. 9, the first opinion that I am looking
6  at, you say that IDHS medical providers fell below
7  the standard of care as follows:
8        "a) by failing to recognize ominous signs
9  and symptoms of a serious and potentially
10  catastrophic condition."
11        All right.  So let's talk about that
12  opinion first.  Who specifically with IDHS does this
13  opinion refer to?  Does it refer to Bruce Bailey?
14  Mike Adams?
15    A.  Bruce Bailey and Mike Adams.
16    Q.  Let me ask you this:  Do you have any
17  opinions as to whether Brian Evans failed to meet the
18  standard of care on the two days that he provided
19  care and treatment to Ms. Robinson?
20    A.  Could I take a break to confer with
21  Mr. Jones --
22    Q.  Well --
23    A.  -- briefly?
24    Q.  I mean, if --

Page 124

1        MR. JONES:  Or you can look at your
2  notes.
3    Q.  If you think that Brian Evans' care and
4  treatment met the standard of care, then I don't have
5  to ask you any more questions about Brian Evans
6  today; and I can just ask Mr. Jones to drop Mr. Evans
7  from the lawsuit.
8    A.  I believe that Mr. Evans' care
9  essentially met the standard of care.
10    Q.  When you say "essentially," I've got to
11  be clear now.  You know, Don Henley wrote a song that
12  said, "The lawyers dwell on small details."  And so
13  did Brian Evans meet the standard of care?  He saw
14  her on August the 3rd and August the 6th, 2010.
15    A.  Well, I think he failed to check her
16  temperature.  I didn't get the specific date, but I
17  don't think that that would have altered the
18  subsequent outcome in the case or that it would have
19  provided information that would change the course of
20  treatment.  So I -- I don't believe he failed to meet
21  the prevailing standard of care.
22    Q.  You think that he did not because he
23  should have taken her temperature?
24    A.  No.  He should have taken her

Page 125

1  temperature, but I don't think it was a material
2  breach to the outcome. So I think his interaction
3  and his subsequent treatment decisions were
4  consistent with the standard of care other than at
5  that point, and I don't think that his failure to
6  take the temperature changed it. Even if he had
7  taken the temperature, I don't think it would have
8  terribly changed the course.
9           MR. JONES: Let me object to the answer
10  as nonresponsive. I think you're answering two
11  different questions too, but the question is not
12  would it have made any difference in and of itself?
13  The question is: Did you feel that anything he did
14  was beneath or outside the standard of care? And
15  that's my objection.
16           MR. BROWN: All right.
17       Q. (By Mr. Brown) Technically he should
18  have taken a temperature, in your opinion, on one or
19  two of the days he saw her?
20       A. Yes.
21       Q. But on both of those days, you recall his
22  testimony that he felt her and that her skin was warm
23  and that it was not hot, that it wasn't cold; she
24  wasn't clammy and that based on his touching her

Page 126

1  skin, he felt that her temperature was within a
2  normal range. Now, I know that's not using a
3  thermometer or taking it by some mechanical means.
4  So that is what the technical failure is on his part;
5  right?
6       A. Yes.
7       Q. But not taking the temperature did not
8  have any effect on her outcome in this case?
9       A. I don't believe so.
10           MR. BROWN: I asked you about it before.
11  We'll renew it again, but I think Brian Evans should
12  be dropped.
13           MR. JONES: We'll talk about that later.
14           MR. BROWN: All right.
15           MR. JONES: You're asking him about the
16  standard of care; and he's saying, I don't think he
17  met the standard of care, but I don't think it made
18  any difference. And that's not responsive to your
19  question.
20           MR. BROWN: Well, then I asked a
21  difficult question.
22           MR. JONES: The question would be: His
23  deviation from the standard of care, however slight,
24  you know, was it a cause?

Page 127

1           MR. BROWN: I don't think I used that
2  exact wording; but I think I asked, did that have any
3  impact on her outcome? He said, no, it didn't.
4  We'll talk about it more later.
5           MR. JONES: That's a different question.
6  That was what the concern was before.
7       Q. (By Mr. Brown) That's it about Brian
8  Evans, that one little bit?
9       A. Yes.
10       Q. If it is, we don't have to talk about
11  Brian Evans any more today. He's a super nice guy,
12  and I enjoyed working with him; and I think you'd
13  enjoy meeting him. But we don't have to talk about
14  him any more this afternoon if that's all you've got
15  to say.
16           All right. The rest of your opinions to
17  the extent they concern IDHS are geared toward the
18  treatment that Mike Adams provided and the
19  interaction that Bruce Bailey had with regard to
20  Ms. Robinson's care; is that correct?
21       A. Yes.
22       Q. All right. So do they also apply to
23  Dr. Williams?
24       A. Yes.

Page 128

1       Q. Okay. Now, tell me, what is the basis
2  for your opinion that they failed to recognize the
3  ominous signs and symptoms of a serious, potentially
4  catastrophic condition?
5       A. Well, the first time that they
6  deviated -- I need the timeline.
7       Q. If I can stop you one second, whenever
8  you refer to any of the documents that you have in
9  front of you, could you please just tell us where we
10  are so that we can all follow along on the same sheet
11  of music with you?
12       A. Just for the record, I was looking for
13  the timeline so that I did not misspeak about the
14  specific dates.
15       Q. Which timeline is that?
16       A. The one that Mr. Jones prepared and that
17  I provided. I believe it's been used in other
18  depositions.
19           MR. BROWN: I don't think we have a copy
20  of that. That was not -- I don't think we have that.
21           MR. JONES: There's not a copy included
22  in this?
23           MR. BROWN: No, sir.
24           THE WITNESS: I believe there may be an

Page 129

1    electronic copy.
2         MR. JONES: It's on the disk.
3         MR. BROWN: Can we take two seconds and
4    make a copy of that?
5         Q. (By Mr. Brown) Well, I'll tell you what.
6    The timeline is on the disk.  You tell us what you're
7    looking at; and if we need to, we'll take a break and
8    you can pass that around and let us look at it.
9         A.  Actually it would probably be best if I
10   just work from the original record.
11        Q.  Okay.
12        A.  Instead of referring to the timeline
13   there.
14        Q.  While you're doing that, can I take a
15   peak at the timeline?
16        A.  Yes.
17        Q.  Is this one that you prepared?
18        A.  No.
19        Q.  This was given to you by Mr. Jones'
20   office?
21        A.  Yes.
22        MR. BROWN: Now, attached to this
23   timeline was also a small little sheet that says,
24   "Documents received." We didn't get a copy of this

Page 130

1    before either.
2         MR. JONES: That's what he was looking
3    for earlier when he said, I made a list of
4    everything; and he was looking trying to find it.
5         MR. BROWN: We'll need to get a copy of
6    this.
7         THE WITNESS: I believe there's an
8    eletronic copy of that on the disk as well.
9         MR. JONES: We'll copy all of those.
10        MR. BROWN: Well, just before we leave
11   today, we might pull the disk --
12        MR. MARSHALL: I'd rather go ahead and
13   get copies of these documents right now, if we can.
14        MR. BROWN: All right.
15        (Recess taken.)
16        MR. PERRY: All right.
17        MR. BROWN: Where were we when I left for
18   a second?
19        MR. PERRY: We were going into the
20   timeline or the records.
21        MR. MARSHALL: He was explaining the
22   first opinion, I think.
23        MR. BROWN: Yes.
24        Q.  (By Mr. Brown) All right.  Let's talk

Page 131

1    about that first opinion, and I said whenever you
2    were referring to something that you need to just
3    please tell us where you are so we can follow along.
4         A.  The first opinion was specifically --
5         Q.  -- that they had not recognized the
6    ominous signs and symptoms of a serious and
7    potentially catastrophic condition.
8         A.  Okay.  Well, first of all -- and you were
9    asking?
10        Q.  What is the basis for that opinion?
11        A.  Okay.  Well, first of all, she reported
12   to them that she had had a previous intravenous staph
13   infection and that she had symptoms similar to that
14   and was concerned that the infection was returning.
15   I think that's reflected on the medical
16   questionnaire.  That's reflected on the encounter on
17   July 23.  I believe there was also an encounter on
18   the 24th or at least a communication with the mother.
19        Q.  All right.  What else?
20        A.  And then she started developing numbness
21   on August 6 -- excuse me, not numbness.  She started
22   developing increasing pain.  And then on August 10,
23   she had a couple very ominous signs.
24        Q.  Which were what?

Page 132

1         A.  She complained of numbness that felt like
2    an epidural.  She complained of -- she complained of
3    no urination.  She could not walk without assistance.
4         Q.  Could not walk without assistance?
5         A.  Right.
6         Q.  Okay.
7         A.  She had numbness, urinary retention, and
8    could not walk without assistance.
9         Q.  And so the ominous signs then that you're
10   referring to are that she told them that she had had
11   a previous staph infection for which she received IV
12   antibiotics and that she later began to experience
13   the numbness, lack of urination, and could not walk
14   without assistance?
15        A.  That she had a previous staph infection
16   and she started having pain similar to that
17   infection.
18        Q.  All right.  And that she thought that the
19   staph had come back?
20        A.  Yes.
21        Q.  All right.  And these are signs and
22   symptoms of what condition?
23        A.  Of a disseminated blood-borne staph
24   infection as far as the -- most likely a localized

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 133

1  abscess from the pain that she was having in her
2  shoulder initially.  And then subsequently the
3  urinary retention, the weakness, and the numbness, I
4  believe, were all associated with the pressure from
5  the epidural abscess that she was later determined to
6  have.
7      Q.  All right.  What should they have done
8  differently to have met the standard of care?  In
9  other words, what did the standard of care require of
10  them?
11     A.  Well, first of all, Mr. Adams testified
12  that she told them the name of a physician; and I
13  believe that he should have conferred with that
14  physician.
15     Q.  Was that Dr. Walker?
16     A.  I believe Dr. Walker was her primary care
17  physician, but that was not the physician that
18  treated her in the hospital.  I don't recall who
19  treated her in the hospital.
20     Q.  You're looking at the notation of July 23
21  when Mike Adams first saw her; is that right?
22     A.  His deposition, on page 28, he said he
23  had the name of her primary care doctor but didn't
24  call.

Page 134

1      Q.  Which is noted on a piece of paper as
2  being Dr. Walker?
3      A.  It could be, yes.
4      Q.  On the medical records themselves, it
5  indicates Dr. Walker in handwriting down at the very
6  bottom of the page.  Do you know how long it had been
7  since Monica had been seen by Dr. Walker?
8      A.  No, I do not.
9      Q.  Do you know if she had seen Dr. Walker at
10 any point in time in calendar year 2010?
11     A.  No, I do not.
12     Q.  Do you know if she had seen Dr. Walker at
13 any point in time in calendar year 2009?
14     A.  No, I do not.
15     Q.  Have you asked for Dr. Walker's records?
16     A.  No.
17     Q.  Okay.  If she had not been seen by
18 Dr. Walker and if Mike Adams had called to check with
19 Dr. Walker, I guess he would have found that she had
20 not been seen.  Would that have impacted your opinion
21 at all?
22     A.  Yes.
23     Q.  How would that impact your opinion?
24     A.  Then he would not have had helpful

Page 135

1  information.  The alternative, and the usual course
2  for an medic, would be to discuss it with the
3  supervising physician; and that also did not occur.
4      Q.  Well, wait a minute.  I'm not back away
5  from how your opinion would be different if he had
6  called Dr. Walker.  If he had called Dr. Walker and
7  Dr. Walker said, "I hadn't seen her," I asked if that
8  would change your opinion.  You said, "Yes."
9      A.  Well, possibly, if he was familiar with
10 her hospitalization and that she had had been on IV
11 Vancomycin.  I don't know what he would have said.
12 The fact that -- the simple fact that he hadn't seen
13 her would not necessarily change my opinion.
14     Q.  All right.  Well, what else should Mike
15 Adams have done with regard to following up with her
16 prior caregiver?
17     A.  He should have conferred with the
18 physician to decide whether this was a serious
19 condition that warranted further testing.
20     Q.  Okay.  And earlier you said that it was
21 not sufficient that he called the hospital to find
22 out if she had been seen there within the last week
23 and a half; and when he found out that she had not
24 been seen within a week and a half, he should done

Page 136

1  more investigation with her; is that right?
2      A.  Well, he specifically testified that he
3  had called the ER.  I'm not familiar with the
4  hospital to know whether the medical records are
5  located in the ER, but that would not be an official
6  source of inquiry to determine whether she'd been
7  hospitalized.
8      Q.  If he called someone in the ER that he
9  knew and someone in the ER had access to a computer
10 system that allowed them to determine whether she had
11 been a patient at that hospital, whether in the
12 emergency department or actually in the hospital
13 itself, and he had learned that she had not been,
14 would that have been sufficient for you?
15     A.  If he asked -- if he asked to check
16 whether she had been hospitalized for a staph
17 condition, yes.
18     Q.  Okay.  So if his testimony was such that
19 he had called someone in the ER and said, "Has Monica
20 been in the hospital," not just limited to the ER,
21 "for the last week and a half or two weeks, for any
22 reason" --
23     A.  Well, let me back up.  Let me back up.
24 The -- again, the standard of care, I believe, is for

Page 137

1  a medic to confer with a physician.  That's the way
2  medics are trained to work and to operate.  And so
3  the fact that he was able to get some kind of
4  informal information from the hospital I don't
5  believe met the standard of care.
6      Q.  Because you say he should have conferred
7  with a physician, meaning Dr. Williams or the
8  physician at the hospital who may have provided care
9  for her?
10      A.  Yes.
11      Q.  The latter?
12      A.  Yes.  Either.
13      Q.  Either one of them?
14      A.  As I said, the standard that's reigning
15  and the legal basis for a medic is to work as the
16  eyes and ears of a physician; and his failure to
17  confer with a physician about a potentially
18  life-threatening problem I feel fell below the
19  standard of care.
20      Q.  All right.  So let me see if I can
21  understand how this applies.  If Mike testified that
22  he did call the hospital and spoke with someone in
23  the emergency department and asked if Monica had been
24  a patient, whether it was in the ER or in the

Page 138

1  inpatient portion of the hospital, and if he had been
2  told, no, she had not, then what should he have done?
3  How could he have followed up with the physician in
4  the hospital if he had been told by someone that she
5  had not been a patient there?
6      A.  Because she told him the name of the
7  physician.  She told him the name of her physician.
8      Q.  Dr. Walker?
9      A.  Yeah.
10      Q.  Okay.  So then if he had called the
11  hospital and the hospital said, no, she hadn't been a
12  patient there, then is it your testimony that the
13  standard of care required him to call Dr. Walker to
14  say, "Dr. Walker, have you treated Monica for a staph
15  infection in the last week and a half?  She tells me
16  she's been treated within the last week and a half
17  for a staph infection"?
18      A.  Well, first of all, let's back up.  The
19  initial intake, she said that she had been
20  hospitalized and then subsequently put in a sick hall
21  request that she was having symptoms.  So I don't
22  think calling somebody at the emergency department
23  met the applicable standard.
24      I think that he needed to confer with a

Page 139

1  physician to see what questions needed to be asked
2  and what testing or treatment should have been done.
3      Q.  All right.  But my question is:  How is
4  he supposed to talk to the doctor if she tells him
5  that I was in -- and here's her intake questionnaire
6  that she filled out at the time of booking.  She said
7  that her back hurts real bad.  Stated she had staph
8  infection about a week ago.  Don't think it's all
9  gone.
10      Then she saw Mike Adams on the 23rd of
11  July; and during the history and physical, she said,
12  "I was in the hospital a week and a half ago for
13  staph infection."  Staph infection of arm.  Hospital
14  one and a half weeks ago.  Back pain times two weeks
15  after being pushed into a sofa.  And then in the
16  discussion notes, I believe he again said that she
17  reported to him that she'd been in the hospital about
18  a week and a half ago.
19      So if the patient tells him, "I was in the
20  hospital about a week and a half ago for staph
21  infection," and he calls someone at the hospital who
22  confirms that she had not been a patient at that
23  hospital within the last week and a half, how was he
24  supposed to know what physician to call?

Page 140

1      A.  Well, he should start by calling the
2  physician, his supervising physician, Dr. Williams.
3      Q.  All right.  And what should he have told
4  Dr. Williams?
5      A.  He should have told Dr. Williams that I
6  have a patient here that was previously treated that
7  has a history of IV drug abuse and that had been
8  treated in the hospital for a blood-borne infection
9  and that she has symptoms that she feels are similar
10  to what she had when she was in the hospital.
11      Q.  All right.  If Mike Adams had done that,
12  would his treatment have met the standard of care on
13  the 23rd of July?
14      A.  Yes.
15      Q.  Okay.  And then whatever -- what would
16  Dr. Williams or what should have Dr. Williams done at
17  that point in time?
18      A.  I believe Dr. Williams probably should
19  have talked to the patient directly to clarify the
20  history and probably ordered some lab tests to see
21  whether there was any evidence suggesting an ongoing
22  infection.
23      Q.  Okay.  All right.  What is the -- is that
24  everything about the interaction on the 23rd of July?

35 (Pages 137 to 140)

Page 141

1    A.  Yes.
2    Q.  Okay.  We're also going on to -- and I
3  guess by this discussion, and just correct me if I'm
4  wrong, by this discussion, as we talk about it on a
5  day-by-day basis, are you essentially talking about
6  all three of your opinions, a, b, and c?  I mean, if
7  you are, then we don't have to replow this field
8  three times.
9    A.  Yes.
10    Q.  All right.  And I'll try to take it that
11  way and see if I can make it less confusing for us.
12  Before we leave the 23rd, before we leave the July 23
13  encounter, what -- strike that.
14        How did Mike Adams fail to properly
15  perform an examination on Ms. Robinson on the 23rd?
16    A.  I think his exam on the 23rd was
17  sufficient.
18    Q.  So it met the standard of care?
19    A.  Other than his failure to take her
20  temperature.
21    Q.  On the 23rd Mike Adams took her
22  temperature, and it was recorded as 97.2 degrees?
23    A.  I was just looking for that.  I thought
24  it would be on the progress note.  It must be in a

Page 142

1  different location.
2    Q.  It would be on the face sheet.
3    A.  Well, then I withdraw my comment.
4    Q.  Okay.  If the record indicates that her
5  temperature was 97.2 degrees on the 23rd, then he --
6    A.  Yes, he did.  That's correct.
7    Q.  All right.  So his examination was okay;
8  and then by failing to refer her to a medical doctor
9  or to an emergency room for an appropriate workup,
10  have we discussed that aspect already when you said
11  he should have called Dr. Williams after he had
12  called the hospital and couldn't confirm the fact
13  whether she had been a patient there?
14    A.  Yes.
15    Q.  Was there anything else about the care on
16  July 23 that needs to be talked about that did not
17  meet the standard of care in your opinion?
18    A.  No.
19    Q.  Okay.  Let's move to the 24th.  Now, on
20  the 24th, what is your understanding of what happened
21  with Ms. Robinson?
22    A.  That Ms. Robinson's mother called the
23  jail and that Mr. Adams met with Monica Robinson
24  again.

Page 143

1    Q.  Okay.  And when he met with her on the
2  23rd -- I'm sorry, on the 24th, he notes that Monica
3  was followed up with at the mother's request.  Mother
4  stated she was concerned that she was getting staph
5  infection again and that she was crying during the
6  visit.  Patient stated that she was still hurting and
7  that nothing had really changed since yesterday and
8  that no change was noted.
9        They started Ultram on that particular
10  date, and he told Monica's mother that since she
11  works in the lab at the hospital and if the patient
12  consents and if the mother brought the supplies, he
13  would be glad to draw the blood for the mother to
14  check.  It indicates he discussed this with Bruce
15  Bailey.
16        What are your criticisms of the care
17  rendered on the 24th?
18    A.  Well, first of all, the mother is giving
19  independent corroboration that her daughter was in
20  the hospital.  She's not asking for anything other
21  than an assessment, an objective assessment, of
22  whether this problem, whether this pain is related to
23  a recurrence of the infection.
24    Q.  Okay.

Page 144

1    A.  So, again, now we have two independent
2  reports working, two independent sources of the
3  information, plus the fact that I believe that he
4  knew Monica's mother and was familiar that she worked
5  in the hospital.  So essentially I believe that this
6  provides corroboration that she had been in the
7  hospital even if he got faulty information from the
8  ER or didn't believe the information that she was
9  providing.
10    Q.  Or even if the patient had given
11  inaccurate information the prior day?
12    A.  Correct.
13    Q.  Because we've said before we know Monica
14  was hospitalized but we actually know it was about
15  three months before as opposed to a week and a half?
16    A.  Yes.
17    Q.  Does that make any difference to you that
18  she had been hospitalized three months prior as
19  opposed to a week and a half?
20    A.  It think it provides some confusion.
21    Q.  Confusion how?  I'm easily confused.
22    A.  Well, in terms of the dates, the dates,
23  what was written and when.  I think it's pretty clear
24  from her deposition that when she was talking about

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 145

1   the week and a half, that's when -- she was referring
2   to the time frame that the symptoms started. I think
3   from hearing her deposition that she had no confusion
4   about the month that she was in the hospital or the
5   time frame.
6        Q.  But in her deposition, do you not recall
7   reading --
8        MR. JONES:  Don't make me object to that
9   again. You asked her about it five times. You took
10  one thing out of context, and then you're going to
11  ask with that method again.
12       MR. BROWN:  Whether it was taken out of
13  context will be for somebody else to decide. I don't
14  think it was taken out of context at all. I mean, I
15  asked the question of Monica, "Monica, was Mike
16  writing notes while you were physically in the exam
17  room with him?" And she said, "Yes, he was."
18       And I said, "If Mike wrote down that this
19  was a week and a half before, do you doubt or do you
20  contend that you didn't tell him a week before? Do
21  you have any reason to believe that this is not what
22  you told him?" She said, "No. I don't have any
23  reason to believe that." She thought that he had
24  correctly written down what she told him.

Page 146

1        MR. JONES:  I'll just object to the form.
2   You can answer the question.
3        Q.  (By Mr. Brown)  So what confusion about
4   the time frame?
5        A.  Well, I mean, obviously there was some
6   confusion at some point. She was in the hospital in
7   April. The records said a week and a half. It's
8   apparent that Adams did not understand that. Now,
9   whether it was because of something she said or how
10  he asked the questions or what he wrote down, I don't
11  know.
12       But the fact is on the 24th, he sat down
13  specifically with her to ask about this infection
14  because her mother basically called the jail. And,
15  as far as I understand, he wasn't even scheduled to
16  be at the jail that day.
17       Q.  Correct.
18       A.  So he came in specifically for that. So
19  in that situation, it's appropriate for him to sit
20  down and just go back to square one. When were you
21  in the hospital? What were you treated for? Who
22  treated you? What was the outcome? Who can I call
23  to get more information?
24       And if he had called the ER on the day

Page 147

1   before, then -- if he had called the ER on the day
2   before, he should have asked Monica, "Why did the ER
3   tell me that they didn't have any record of you being
4   there," and clarified.
5        Q.  Okay.
6        A.  If he called the ER on the 24th, then --
7   you know, we have two people saying that she had been
8   in the hospital. There's no reason for her to lie
9   about that. There's nothing that she's asking for.
10  There's no secondary gain issues that I can see.
11       You know, again, he should have gone back
12  to square one. What happened to you? Where did it
13  happen? When did it happen? Who treated you? And
14  then pick up the phone and call Dr. Williams or her
15  treating physician from the hospital and say, "I have
16  this woman here who tells me she was in the hospital.
17  I'm getting information from the hospital saying she
18  wasn't there, but she swore that she had an infection
19  and that she has similar symptoms to what she had
20  back in April," or whatever she told him. I mean,
21  whatever date.
22       Q.  Did you agree with Mike Adams' testimony
23  they would not have given him any more information
24  other then confirming whether she had been a patient

Page 148

1   due to HIPAA requirements?
2        A.  Well, if that's the case, again, if he
3   had called medical records, instead of the ER, first
4   of all, there's HIPAA waivers for incarcerated
5   individuals. He does not need -- even if she wasn't
6   incarcerated, under HIPAA there is no consent
7   required for continuity of care; so this would be a
8   continuity of care issue.
9        But, again, he didn't ask her to sign a
10  release either. I'm sure she would have been happy
11  to sign a release, and he could have gotten whatever
12  information he wanted.
13       Now, that said, even if she had refused to
14  sign a consent, the fact is there are multiple
15  exclusions in HIPAA law; and the people in medical
16  records would most likely know that for somebody
17  that's incarcerated.
18       Q.  I take issue with that. I don't think
19  people in medical records have any idea what HIPAA
20  means other than to say, "We're not complying with
21  your request, Mr. Lawyer. Bring us a Court order."
22  But that's a story for another day.
23       A.  Yes.
24       MR. JONES:  Well, you're not a doctor or

37 (Pages 145 to 148)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 149

1  a paramedic or the county coroner.
2       MR. BROWN: Well, that's correct. But
3  even according to Mike Adams' testimony, Mike said
4  that, look, under HIPAA that hospital wouldn't tell
5  me anything until I had a waiver from the patient.
6       THE WITNESS: Then he should have asked
7  for a signed waiver, which is the standard of care.
8       MR. BROWN: Okay.
9       THE WITNESS: Their own policy says to
10  inquire at intake and inquire in the medical
11  evaluation about recent hospitalizations, and I think
12  that one and a half weeks or April would certainly
13  qualify for that.
14       Q. (By Mr. Brown) If he had gotten a signed
15  waiver from Monica allowing him access to her medical
16  records, how long do you think -- or according to the
17  standard of care, how long should it have taken him
18  to have gotten them from the hospital to be able to
19  review them?
20       A. If he faxed a release over to medical
21  records, then they would have been able to tell him
22  on the phone the discharge diagnosis and her treating
23  physician and confirmed that she had been
24  hospitalized.

Page 150

1       Q. All right.
2       A. He wouldn't have full records until, you
3  know, who knows when.
4       Q. All right. But if he had gotten a waiver
5  on the 24th, faxed it, they could have said, yes, she
6  was seen by Dr. Smith or Dr. Jones and this is what
7  the problem was?
8       A. Yes.
9       Q. Okay. And then once he learned that
10  information, what should Mike have done?
11       A. Again, you know, call his supervising
12  physician or the treating physician from the hospital
13  or sent her to the ER.
14       Q. Why should she need to be sent to the ER
15  on the 24th?
16       A. Well, she asked to go to the ER; and
17  under IDHS policy, it said that no reasonable request
18  for care will be denied.
19       Q. All right. And your interpreting that to
20  mean if an inmate says, "I don't feel good. Can I
21  please go to the ER," that's a reasonable request and
22  they should be sent to the ER?
23       A. No.
24       Q. Explain that a little better.

Page 151

1       A. I was leaving that as a third option.
2  You asked what he could do. And under the policy and
3  if he'd been able to confirm that she did have a
4  previous infection and that she had been treated with
5  intravenous antibiotics, that was certainly an option
6  that he had.
7       Q. Okay.
8       A. So if he couldn't reach -- he couldn't
9  reach his supervising physician or couldn't get ahold
10  of her physician, he always had that option.
11       Q. Okay.
12       A. That was what she asked for in the first
13  place.
14       Q. If he had talked with Dr. Williams or
15  Dr. Whoever, what do you think that physician would
16  have or should have done?
17       A. I believe that in the absence of
18  specific -- I don't believe that she was reporting
19  significant fever. She was reporting localized pain.
20  So if I had been the person receiving the call and
21  knew of a patient that was an IV drug user that was
22  complaining of pain that felt like from a similar
23  infection, I would have ordered some blood tests.
24       Q. Okay. What tests?

Page 152

1       A. I would have ordered a CBC, a sed rate.
2       Q. A who?
3       A. A sed rate. S-E-D. R-A-T-E.
4       Q. Okay.
5       A. And that's probably the extent of it, if
6  she was afebrile, which she was on the 23rd.
7       Q. Okay. What would a CBC and a sed rate
8  have shown?
9       A. I believe, more likely than not, that a
10  CBC or a sed rate ordered and drawn on the 23rd or
11  the 24th would have shown an increased white count
12  and an increased sedimentation rate.
13       Q. What is an increased -- I know what an
14  increased white blood count means to us, but what
15  does an increased sedimentation rate mean?
16       A. It's an indication of systemic
17  inflammation. It's nonspecific.
18       Q. All right. And if they had ordered those
19  tests and if the CBC and the sed rate had been
20  performed and they had shown an increase in the white
21  blood count, what would the standard of care have
22  required?
23       A. I believe at that point she would have
24  been -- should have been referred to a physician for

38 (Pages 149 to 152)

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 153

1   further evaluation.
2       Q.   All right.  So on the 24th, if Mike Adams
3   had done more inquiry after having spoken with Monica
4   and Monica's mom and if he had called the hospital
5   and then if he had called Dr. Williams or the other
6   physician who might have been involved, would he have
7   met the standard of care?
8       A.   Yes.
9       Q.   Okay.  And was there anything about the
10  examination that he did on the 24th that did not meet
11  the standard of care?
12      A.   He did not examine her -- he didn't ask
13  about how she got the infection.  He didn't examine
14  her injection sites to see if there was any evidence
15  of infection.
16      Q.   He had done so the day prior and had not
17  found any, but would the standard have required him
18  to look at it again on the 24th?
19      MR. JONES:  I'll object to form.
20      A.   I don't see that he specifically looked
21  at IV drug injection sites on the 23rd.
22      Q.   I believe he testified that his
23  examination would have included that as a general.  I
24  agree with you that I don't believe it's written that

Page 154

1   he specifically did or specifically did not review
2   injection sites.
3       MR. JONES:  Object to the form.  But if
4   you want to ask it as a hypothetical, you can.
5       A.   As far as the history, as far as what he
6   did or didn't do on the 24th, again, he didn't
7   clarify the history of when she was hospitalized.  He
8   didn't clarify the history of when the pain started.
9   He didn't clarify the treatment that she had received
10  in the hospital and the length of hospitalization.
11  And I don't see that he checked a temperature on the
12  24th or examined the sites that she was injecting
13  drugs, had been injecting drugs.
14      Q.   Okay.  So then you do have that criticism
15  of his examination or lack of examination, in your
16  opinion, on the 24th; right?
17      A.   Yes.
18      Q.   Okay.  What about 7/24?  Do you have --
19      A.   I believe we've covered everything else.
20      Q.   All right.  You agree that Mike Adams
21  next saw her on July 30?
22      A.   Yes.
23      Q.   What are your criticisms of Mike's
24  treatment --

Page 155

1       (Discussion held off the record.)
2       A.   None.
3       Q.   All right.  No criticisms on the 30th?
4       A.   That's correct.
5       Q.   The physical examination was fine?
6   Nothing at all?
7       A.   Right.  He stated that her arm and
8   shoulder were feeling better.  The complaint was
9   about constipation, and I don't have any criticism.
10      Q.   All right.  So then we go to Brian Evans.
11  He gets into the lineup for the next two visits; and
12  if we've previously said that you didn't have any
13  problems with Brian's conduct, other than not taking
14  a temperature, is there anything else about the
15  3rd and the 6th of August that we need to discuss?
16      A.   No.
17      Q.   Then we move along to August the 10th.
18  I'm going to take it that you might have a problem
19  with what transpired on August the 10th?
20      A.   Yes.
21      Q.   Okay.  Go ahead.
22      A.   Okay.  Anytime -- well, I believe I've
23  already covered it pretty much; but I'll reiterate.
24  The fact that she was unable to urinate, I believe

Page 156

1   with or without the back pain, was an indication for
2   her to be sent to somebody that could at least, at
3   the very least, catheterize her.  We know now it was
4   urinary retention; but he got a history of inability
5   to urinate, which could also be acute renal failure.
6       Q.   Okay.
7       A.   The complaint of back pain with numbness
8   to the legs, I believe, warranted a physician
9   referral.  She should have been seen that day or
10  within 24 hours for that complaint.  Then combined
11  with the numbness plus the inability to walk plus the
12  inability to urinate, she should have been sent to
13  the hospital at that point.
14      Q.   Well, when you said about the numbness,
15  if she had just had complained of numbness alone,
16  being seen by someone that day or within 24 hours --
17      A.   Right.  Just for the numbness alone.
18      Q.   But when you add to the numbness, the
19  needing assistance to walk, the inability to urinate,
20  are you still okay if she had been seen within 24
21  hours --
22      A.   No.
23      Q.   -- or does that step it up a notch?
24      A.   That steps it up a notch.

Lawrence Mendel

Page 157

1    Q.  Okay.  So when you add all three
2  together, then what should have happened?
3    A.  She should have been sent to the
4  emergency department or at the very least picked up
5  the phone and conferred with Dr. Williams.
6    Q.  Now, on the 10th, he called Bruce Bailey.
7  And when he called Bruce Bailey, Bruce testified that
8  he spoke with Dr. Williams.  Does that help Mike
9  Adams at all?
10    A.  No.
11    Q.  Why not?
12    A.  Because Bruce -- because Bruce Bailey
13  used a system that I feel did not meet the standard
14  of care.  He did not use patient names.  So any
15  previous complaints about the patient, he would not
16  be able to associate those with them.  Bruce Bailey
17  testified that he wasn't -- let me see the exact
18  wording he used.
19    He said, "I don't pay any attention to
20  that really," talking about IV drug use.  So he
21  wouldn't necessarily have made the association.
22    Also Bruce Bailey, I don't believe was
23  qualified to be making any decisions and would not
24  know what was important.  So I don't know exactly

Page 158

1  what he relayed to Dr. Williams, but he said that
2  numbness was not an ominous sign because of the
3  normal vital signs.
4    Q.  Okay.
5    A.  So --
6    Q.  Now, if the record indicates that Bruce
7  had verbatim said what Mike told him, would his
8  communication to Dr. Williams have met the standard
9  of care?
10    A.  Would whose communication?
11    Q.  Bruce's.
12    A.  If he told him specifically what?
13    Q.  Exactly what Mike told him.  And Mike
14  testified that when he would call and talk to Bruce,
15  he would present the patient essentially by reading
16  his narrative notes.
17    A.  Okay.  So repeat the question.  This is
18  with regard to who --
19    Q.  Bruce.
20    A.  -- specifically?
21    Q.  With regard to Bruce.  If on the 10th
22  Mike Adams called Bruce and presented the patient to
23  Bruce by repeating what is written in his narrative
24  notes and if Bruce relayed that information to

Page 159

1  Dr. Williams, would it then have been appropriate for
2  Mike to have reported it to Bruce and for Bruce to
3  have reported it to Dr. Williams?
4    A.  Well, I don't believe -- again, I don't
5  believe it's appropriate to have a medic reporting to
6  an LPN.  The medics are trained to be the eyes and
7  ears of a physician.  So I believe under the system
8  that was set up, it was reasonable for Mike Adams to
9  communicate with Bailey.
10    But, first of all, Bailey said that he
11  made notes.  We haven't seen these notes that he
12  kept, so we don't know how much of this information
13  he wrote down.  We know this note wasn't faxed to
14  Bruce Bailey, and we know this note was not faxed to
15  Dr. Williams.  So what information -- we don't know
16  exactly what information Dr. Williams got from Bruce
17  Bailey.
18    Q.  Okay.
19    A.  So I -- I don't believe that the
20  communication, as it occurred, met the standard of
21  care.
22    Q.  Regardless of what may or may not have
23  been said?
24    A.  Yes.

Page 160

1    Q.  Because it can't be substantiated what
2  may or may not have been said?
3    A.  Well, not only that, we know from Bruce
4  Bailey's testimony that he said, quote, I don't pay
5  much attention to IV drug use, so he wasn't
6  necessarily concerned about the big issue.  He didn't
7  really understand.  He said that he wasn't concerned
8  that numbness was an ominous sign.  He said that a
9  positive Babinski means normal.
10    I mean, there are a lot of other aspects
11  of this communication.  I don't think he was
12  qualified to be the intermediary between Mike Adams
13  and Dr. Williams or Bruce Bailey -- excuse me.  I
14  don't believe he was qualified to be the intermediary
15  filtering information between Mike Adams and the
16  supervising physician.
17    Q.  That communication should have been
18  directly from Mike Adams to Dr. Williams?
19    A.  Yes.
20    Q.  And if Mike had done that, then Mike
21  would have met the standard of care?
22    A.  Possibly.  I mean, the fact is that he --
23  I think his common sense should have told him that
24  this woman needs to go to the hospital.  She can't

40  (Pages 157 to 160)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 161

1   stand without assistance. I think the officers had
2   enough common sense to see that.
3        Q.   Should the officers have called 911?
4        A.   They weren't really authorized to do
5   that.
6        Q.   Why not?
7        A.   I suppose they could have talked to their
8   supervisor, but I assume that they would have had to
9   get approval from their supervisor to call 911.
10        Q.   Okay.
11        A.   They knew that she was sick, but they
12   didn't necessarily know it was a medical emergency.
13        Q.   Okay. All right. What else about August
14   the 10th? Mike should have either called
15   Dr. Williams or should have used his common sense and
16   experience to have referred her directly to the
17   hospital. Was his examination of her sufficient on
18   the 10th?
19        A.   I don't believe he appropriately assessed
20   her for muscle strength. He noted that she had the
21   ability to raise both feet but did not check for
22   muscle groups. The fact that she could move her feet
23   doesn't mean that the strength is normal, and
24   obviously he knew -- that he charted that she was

Page 162

1   unable to walk.
2        Q.   Without assistance?
3        A.   Without assistance. I mean, that's an
4   indication that she's got some weakness right there.
5        Q.   But when she was sitting in an exam
6   chair, if you'll recall from his testimony, she sat
7   in a chair and that she was able to raise both legs
8   out in front of her without assistance. So she was
9   able to raise her legs off the floor and hold them
10   out without needing any assistance. Is that not an
11   adequate measure of muscle strength in the lower
12   extremities?
13        A.   No. It's necessary to actually push
14   against the muscle group and compare other muscle
15   groups. It's possible that her thigh muscle strength
16   was completely normal but her weakness was actually
17   in another part. It could have been in the hip area
18   or another part that made her unable to walk. And
19   it's also not the standard of care --
20        Q.   Now, let's be clear here. It's not an
21   inability to walk. There's nowhere in this record
22   where --
23        A.   Inability to walk without assistance.
24        Q.   Okay. But just so we're clear --

Page 163

1        A.   That's an indication of weakness.
2        Q.   I understand that, but there's no
3   indication in this record anywhere on the 10th that
4   said she was unable to ambulate; correct?
5        A.   Correct.
6        Q.   All right. But you understood that she
7   needed assistance when she was walking?
8        A.   Yes.
9        Q.   So the straight leg raise alone was not
10   enough to measure muscle strength because it could
11   have been in her hamstrings; it could have been in
12   her calves or in her hips?
13        A.   And she still could have had weakness.
14   It doesn't mean the strength is normal.
15        Q.   Okay. And how do you measure quadriceps
16   strength by other muscle groups? I don't understand
17   that.
18        A.   You push down against the leg.
19        Q.   But then you compare it to what other
20   muscle groups?
21        A.   Well, you push down on both sides. You
22   pick up the hip and push down against it. You push
23   the feet. You push down the feet, pull up against
24   the feet, and compare both sides.

Page 164

1        Q.   Okay. All right.
2        A.   And you also compare upper extremities
3   too. If you have a suspicion that the patient is
4   deliberately acting like they're weak, you compare
5   other groups to see how hard they push against you.
6        Q.   Well, you don't think that Mike was
7   assuming that she was malingering or making any of
8   this up, do you?
9        A.   I don't know. I have to consider that as
10   a possibility, the fact that he sat down and wrote
11   that she couldn't walk without assistance but didn't
12   send her to the hospital. So, you know, to me
13   obviously that's an abnormal finding.
14            And the fact that he didn't send her to
15   the hospital and also didn't deal with the urinary
16   aspect, to me, I mean, that's one possible
17   explanation. I don't know for a fact what was going
18   through his head.
19        Q.   Okay. All right. Now, how about the
20   Babinski test? Have you got any criticisms of that?
21        A.   Well, charting a positive Babinski is an
22   abnormal finding.
23        Q.   But you heard his testimony?
24        A.   Yes.

41 (Pages 161 to 164)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 165

1    Q.  You heard his testimony and you heard the
2  testimony of both Bruce Bailey and Brian Evans, all
3  of whom said that in the paramedic world positive is
4  a good thing?
5    A.  I saw that explanation.  But the way that
6  it's charted here, this is a medical note.  As a
7  primary care provider in a jail setting, that's an
8  abnormal finding.
9    Q.  But when he's categorizing it and when
10  he's explaining it, the appropriate response to a
11  Babinski is for the toes to do what?
12    A.  Go down.
13    Q.  And isn't that exactly what Mike Adams
14  testified to?
15    A.  No.  He said it went up like it was
16  supposed to.
17    Q.  Down.  Her response was exactly what it
18  should have been.
19    A.  Well, okay.  The most common response to
20  a Babinski is a withdraw response.  When you do that
21  on the bottom of somebody's feet, they pull away.
22  That's the most common response, but an abnormal
23  response to Babinski is up without the withdraw
24  response.

Page 166

1    So, I mean, the fact is if I'm a physician
2  and I get a call and they tell me somebody has a
3  positive Babinski, they can't walk without assistance
4  and they can't urinate, that patient needs to go to
5  the ER.
6    Q.  But if he did the Babinski, charted it as
7  a positive but he later described it as being the
8  appropriate response for somebody to have, then
9  that's a negative Babinski; correct?
10    A.  It's possible that he charted it in a
11  manner that -- you know, I think it's more likely
12  than not on August 10 she had a positive Babinski,
13  which is an abnormal finding.
14    Q.  So then you think Mike was lying in his
15  deposition?
16    A.  No.  I think he misunderstood what the
17  interpretation of that was.  I don't think that
18  that's -- that that's a test that medics do commonly.
19  You have to take somebody's shoes and socks off to do
20  that.  So if you're in the field, you're not
21  generally going to take someone's shoes and socks off
22  to do that test.  I think that that's the way he
23  understood from his training, but I believe it's more
24  likely than not that she did have a positive Babinski

Page 167

1  on August 10.
2    Q.  All right.  So you believe that Mike's
3  charting, although he thought that it was the
4  appropriate response, you're not really paying any
5  attention to what the words are on the piece of
6  paper.  What you believe --
7    A.  The words on the piece of paper says it's
8  a positive Babinski.
9    Q.  Taking that aside, because he's explained
10  in his deposition that what he meant by positive was
11  it was the appropriate finding.  So let's take him at
12  his word, and you said you don't think he was
13  misrepresenting intentionally --
14    A.  No.  I don't think so.
15    Q.  -- in his deposition testimony.  So if we
16  take as true that Mike felt on the 10th of August
17  that what she responded and how she responded when he
18  did the Babinski was the right thing, then your
19  thought process is that Mike didn't have the
20  appropriate qualifications to administer a Babinski
21  and when he did so, he didn't understand how to
22  interpret that her response was actually an abnormal
23  response as opposed to a normal response.  Is that
24  what your testimony is?

Page 168

1    A.  That's a very likely explanation, yes.
2    Q.  And so then in light of the Babinski and
3  inability to urinate and inability to ambulate
4  without assistance, she should have been sent
5  straight to the hospital or at least Dr. Williams
6  should have been telephoned by Mike?
7    A.  Right.  Or Bruce Bailey should have come
8  in.  Bruce Bailey was trained as a nurse, and he
9  should have come into the jail and cathed her to find
10  out what was going on.  Was this urinary retention?
11  And you can tell by the urinary volume.  Or was this
12  acute renal failure?
13    But the inability to urinate for 24 hours,
14  you know, is -- urinated once a day for the past two
15  days but nothing last night, that in and of itself,
16  even without any other complaint, was a reason that
17  she should have been referred to another provider;
18  and that didn't occur, or either Bailey, who was
19  certainly qualified as an LPN, should have come into
20  the hospital and cath her -- I mean, into the jail
21  and cath her or send her to the local ER and cath her
22  or send her to Dr. Williams' office and cath her and
23  get some blood work to find out why the heck she's
24  not urinating even without any of this other history.

42  (Pages 165 to 168)

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 169

1    Q.  When Monica came into the facility and
2  she stated that two weeks before her admission she
3  had gotten into a fight with her then husband and he
4  had thrown her into a couch and that she was having
5  discomfort, pain in her lumbar area, would it have
6  been appropriate for -- was it appropriate for them
7  to attribute the back pain to a known traumatic event
8  that she reported to them?
9    A.  What time period again?
10   Q.  Two weeks before.
11   A.  Okay.
12     MR. JONES:  I'm going to object.
13     MR. BROWN:  We were talking about Mike
14  Adams and Bruce Bailey because he has no criticisms
15  of Brian Evans.  And, again, I think you need to drop
16  Brian Evans.
17     THE WITNESS:  I don't believe -- well,
18  what was the question again?
19     MR. JONES:  I'll drop all three of them
20  if you'll stipulate the agency.
21     MR. BROWN:  We'll talk about the
22  stipulation again.  The stipulation aside, Brian
23  Evans has no business in the lawsuit.  The doctor
24  just said that.  We'll talk about that later.

Page 170

1      MR. JONES:  If I didn't name him, then
2  somebody else would.
3      MR. BROWN:  I know.  We'll talk about it
4  more after.  But the horse has spoken here; and
5  straight from the horse's mouth, he says there ain't
6  nothing wrong with the treatment that he did.  So I
7  think Brian should be gone, and then they can all
8  gripe and complain about Mike and Bruce all they
9  want.
10     We'll talk about it more.  Let's talk with
11  Dr. Mendel so y'all can go home.  Now you've
12  successfully gotten me off my train of thought.
13   Q.  (By Mr. Brown)  When Monica came to the
14  facility and she reports on the 23rd and on the 22nd
15  that two weeks before she had gotten into a fight
16  with her then husband, he threw her into a couch and
17  that she had been having back pain since that time,
18  was it appropriate for them to believe that her pain
19  was musculoskeletal in origin?
20   A.  It was a possible consideration of the
21  cause of pain, yes.
22   Q.  So it was appropriate for them to think
23  that that was the cause of the pain?  She was saying
24  the pain was in her lumbar spine; she had been thrown

Page 171

1  against a couch and had been hurting for two weeks.
2    A.  Well, they didn't really clarify what
3  pain she had, what date it occurred, and whether the
4  pain had changed.  Generally, if she had sustained
5  the injury that she was complaining about on the
6  23rd two weeks before, we would have expected it to
7  be much better within two weeks.
8    Q.  Do you know if Monica had been seen by
9  any other medical care providers in the two-week
10  period before she was incarcerated?
11   A.  I don't believe she had, but that type of
12  pain would generally get better just over time.  And,
13  again, she stated that she thought that the pain was
14  caused by a recurrent staph infection.
15   Q.  She talked about staph infection in her
16  shoulder?
17   A.  Right.
18   Q.  She said specifically on the 23rd that
19  she felt like that the pain in her back was from her
20  being pushed into a couch by her husband.  She later
21  said that she thought the pain in her back was
22  because of the mattress that she was sleeping on at
23  the jail.  So she gave two different accounts; and
24  she flat out said, "I believe it's muscular."

Page 172

1    So isn't a health care provider entitled
2  to give any deference to what the patients tells
3  them?
4    A.  Well, he could have certainly been
5  attributing it to that; but the fact that even if
6  that was the cause, by the time that she starts
7  having these other symptoms on the 10th, there's
8  still indication for her to go to the hospital,
9  whatever the cause, whether it was from that, whether
10  it was from a car accident she forgot to mention.
11     Whatever the cause, these other
12  complaints -- well, first of all, the urination, of
13  and by itself, even without the other complaints, was
14  something that they had an obligation to deal with;
15  and they didn't.
16   Q.  Well, how about the fact that Mike said,
17  "Let's monitor her very closely.  If there's not a
18  marked improvement in her condition, we'll
19  considering sending her to a doctor"?  So he was
20  going down the right track; right?
21   A.  No.  He needed --
22   Q.  Well, I --
23   A.  When she says -- when she says she hadn't
24  urinated for 24 hours, they needed to find out what's

43  (Pages 169 to 172)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 173

1    going on then and there.
2         Q.   Okay.  I understand.
3         A.   If she's got acute renal failure, it's
4    not appropriate to wait for a little while.
5         Q.   Well, wait a minute.
6         A.   If she's got urinary --
7         MR. JONES:  Let him finish.
8         Q.   On the 10th she says she has urinated
9    once a day for the last two days but nothing last
10   night and nothing this morning.  She was seen at 8:30
11   in the morning.  So based on her own testimony or her
12   own representations to Mike on the 10th of August,
13   she had -- you ready?
14        A.   Yeah.
15        Q.   Do you need to take that?
16        A.   No.  It's not a call.  I set up a phone
17   call for 6 p.m. with the mistaken understanding we
18   might be done by then.  Go ahead.
19        Q.   She had urinated once a day for the last
20   two days, so indicating that what she told Mike was
21   that she had been able to urinate for at least two
22   days prior; she had not urinated last night; she had
23   not urinated this morning.  All right.  Mike said --
24   so by the time he saw her, it had not been 24 hours

Page 174

1    since she had last urinated, according to her.
2         So at that point in time, Mike had done
3    his physical examination.  And I know you have
4    criticisms of his leg raising and his other
5    examination that he did.  But he says, "If she has
6    not had marked improvement, we'll consider sending
7    her to a doctor."
8         So if, as the record indicates, she had,
9    in fact, urinated within 12 or 18 hours before, then
10   was it okay for him to say, "Let's monitor her
11   closely; and if she doesn't show improvement, then
12   we'll send her to a doctor"?
13        A.   No.
14        Q.   Okay.  Why is that?
15        A.   Well, first of all, as I said, one of the
16   possibilities is acute renal failure.  The other
17   possibility, the other primary possibility, would be
18   urinary retention.  He needs to make a determination
19   which is the case.  If he doesn't know how to do
20   that, he needs to send her to somebody that can.
21        Q.   Well, you said within 24 hours; but then
22   the record is not consistent with what you said.
23        A.   No, no, no, no.  I said 24 hours for the
24   numbness, not for the urinary.  The urinary needs to

Page 175

1    be done that day.  Either Bailey needs to come in and
2    cath her --
3         Q.   No.  That's not my question.
4         A.   Okay.
5         Q.   That's not my question.  I know what
6    you're talking about, numbness and being able to see
7    her within 24 hours.  But I think you said earlier --
8    and correct me if I'm wrong; I know Craig will.
9    Didn't you say that if she had not been able to
10   urinate within the 24 hours, like she said, then he
11   immediately should have sent her -- had somebody cath
12   her or get to the bottom of why she was retaining
13   urine, whether it was renal failure or whatever the
14   problem may have been?  And then I just added that
15   the record indicates that she had been able to
16   urinate within, according to her own representation
17   to Mike, the day before.  It was not until last night
18   or this morning that she had not been able to
19   urinate, which is a shorter period of time.
20        MR. JONES:  Object to form.
21        A.   It said nothing -- 8:30 on the morning of
22   the 10th, it says, "Nothing last night or this
23   morning."
24        Q.   Yes.  So that's -- you know, depending on

Page 176

1    how she defined "last night" -- and I don't remember
2    what we asked her.
3         MR. JONES:  She also said once a day
4    before that.  There's 24 hours in a day, and it
5    hadn't got up to the next 24 hours yet.  That's all
6    I'm objecting to.
7         MR. BROWN:  Okay.
8         Q.   (By Mr. Brown) Let's just assume that
9    she had been able to urinate within 18 hours before,
10   12 hours before, then is it still insufficient by
11   virtue of the fact it says, "I can't urinate this
12   morning"?  Is that what should have sent her directly
13   to the doctor?
14        A.   Well, she's saying that she's having
15   declining urine output that's going back even
16   irregular the day before.
17        Q.   Okay.  What can cause declining urine
18   output?
19        A.   Well, a lot of things.
20        Q.   Okay.
21        A.   But in this setting, I don't believe he
22   was familiar with the differential.  And, again, he
23   should have picked up the phone and called the
24   supervising physician.  But I believe that he should

Page 177

1  have ordered testing that morning to determine what
2  was going on with her urinary output.
3      Q.  If she had just come in and said, "I
4  haven't been able to urinate as much as I usually
5  can.  I peed last night, but I haven't been able to
6  this morning," would he have been okay by continuing
7  to monitor her at that point in time?
8      A.  Well, that's not what he wrote.
9      Q.  I said, "If."
10     A.  Repeat the hypothetical again.
11     Q.  If on the morning of the 10th she had
12 come in and had said words to the effect of, "I was
13 able to urinate last night, but I have not been able
14 to urinate this morning," would his conduct in
15 saying, "Well, let's monitor her," would that have
16 been appropriate?
17     A.  Yes.
18     Q.  Okay.  So where we get to the point of
19 being inappropriate is the fact that it had been
20 sometime the day before since she had last urinated?
21 Is that a yes?
22     A.  Yes.
23     Q.  Okay.  Any other criticisms about the
24 10th specifically?

Page 178

1      A.  Well, I think the lack of urine output,
2  he should have also specifically evaluated to see
3  whether she was dehydrated.
4      Q.  How do you check to see if someone is
5  dehydrated?
6      A.  You can evaluate mucous membranes.  You
7  can check heart rate and blood pressure.
8      Q.  What if on the 10th her pulse was normal,
9  capillary refill time was normal?  Does that help us
10 at all?
11     A.  I think he still should have specifically
12 examined her to see whether dehydration was a
13 possibility.
14     Q.  Okay.  And in doing so, we should have
15 documented vital signs, which I give you that there
16 are not documented vital signs on the 10th.  Is that
17 correct?
18     A.  Yes.
19     Q.  All right.  What else?
20     A.  I think that pretty much covers the 10th.
21     Q.  And that's the last time she was seen?
22     A.  Well, I'm sorry.  There was one more
23 issue on the 10th.  Later that day there's a note
24 here that it sounds like he's describing that she was

Page 179

1  incontinent.  I'm sorry.  That's on the 11th.  I take
2  that back.
3      Q.  We'll go to the 11th in one second.  All
4  right.  So on the 10th, we know that Mike did not see
5  her; but he called that morning to check on the
6  patient and he was told that she had urinated once or
7  twice because she had to have her sheet changed.  And
8  Mike said to continue to follow her and follow the
9  plan.  What's wrong with that telephone call,
10 checking on her on the 11th?
11     A.  There's nothing wrong with calling, but
12 my understanding was the reason that she -- that she
13 urinated on the sheet was because she couldn't sit
14 up.  She couldn't get up to the bathroom by then.
15     Q.  Okay.  Is there any indication that he
16 was told why or what had caused her to soil her
17 sheet?
18     A.  No.  But I think it's pretty abnormal for
19 somebody of her age to all of a sudden become
20 incontinent of urine.
21     Q.  But if she's incontinent of urine, that
22 means she's able to urinate.  Is there a difference
23 between -- does that change anything about the urine
24 retention?

Page 180

1      A.  Yes.  I mean, if she's urinating, either
2  she's overflowing -- the bladder is getting so full
3  it doesn't even stay in anymore or she's -- it's
4  another -- it's an abnormal sign that she's lost
5  control of her bladder function.
6      Q.  All right.  Why do you think she had lost
7  control of her bladder function?
8      A.  Because of nerve pressure on her spine.
9      Q.  Where was the nerve pressure on her
10 spine?
11     A.  I don't remember the level.
12     Q.  Okay.  Where would there need to be nerve
13 pressure on the spine to cause her not to be able to
14 urinate?
15     A.  Well, traditionally it would be down in
16 the cauda equina, which was not where her infection
17 was.
18     Q.  The cauda equina is where?  In the
19 sacrum?
20     A.  Much farther down, yes.
21     Q.  And that's where the nerves are that
22 actually run to and control the bowel and bladder; is
23 that right?
24     A.  Correct.

Lawrence Mendel

Page 181

1    Q.  All right.  So typically that's what it
2  would be.  So what explanation do you have -- and if
3  this is outside of the scope of what you were
4  retained for, tell me and I'll talk to a different
5  expert about it.  But what then is the cause for her
6  to not have bladder function?
7    A.  I don't know the physiologic reason for
8  it, but she reported it; and I believe that her
9  history is pretty consistent with urinary retention,
10  the way she described that she had to make herself
11  urinate.
12    Q.  All right.  So when Mike was told that
13  she had soiled or had to change the sheet, what --
14    A.  Let me back up to the 10th too.
15    Q.  Okay.
16    A.  I think if he was qualified to evaluate
17  this condition, he would have known that that was the
18  differential to look at and would have known to try
19  to palpate to assess her bladder size.  That's
20  something that can be done as part of a physical
21  exam.
22    Q.  Should have palpated?
23    A.  Well, it's something that if he knew what
24  the differential was that he could have helped

Page 182

1  assess.
2    Q.  Okay.  All right.  So then we go to the
3  11th when he is told that she had urinated once or
4  twice and that she had to have her sheet changed.
5  What should Mike have done?  You've said when she was
6  unable to hold it and had an accident --
7    A.  I think he should have asked, why is her
8  sheet having to be changed?
9    Q.  All right.  And depending on what he had
10  been told, what else would you have expected him or
11  what would the standard of care have expected of him
12  or required of him?
13    A.  Well, I think if he had asked -- it's my
14  understanding that she could no longer walk to the
15  bathroom at that point.
16    Q.  And if he had been told that, then what
17  would the standard of care have required?
18    A.  Sending her out to the hospital.
19    Q.  Okay.  You don't have any other comment
20  about the 11th?  It's a pretty brief encounter.
21    A.  No.
22    Q.  Okay.  Do you have any other opinions
23  about what transpired on the afternoon and into the
24  evening of the 11th?  There's one more notation that

Page 183

1  a phone call was made to Bruce Bailey in the
2  afternoon after Ms. Robinson was looked at by Barbara
3  Nice and Kim Bailey.
4    By the way, you haven't read Barbara
5  Nice's deposition or Kim Bailey's, have you?
6    A.  No, no.  I don't see any other entry.  I
7  see an entry.  It looks like it says -- it just says,
8  "p.m.," on the 11th.
9    Q.  8:11 p.m.  It says, "Notified by Bruce
10  Bailey to go to the jail and check on patient due to
11  concerns.  While he was en route to the jail, he was
12  notified that 911 had been called, that EMS was en
13  route so he went back home."
14    You don't have any criticism of that, do
15  you?
16    A.  No.
17    Q.  Do you have any opinions or comments
18  about Bruce's response when he was called by Captain
19  Milford?
20    A.  No.
21    Q.  He was told, "Let me see what I can do,"
22  and he testified that he called Mike.  You're okay
23  with that?
24    A.  Yes.

Page 184

1    MR. BROWN:  Okay.  Let's take another
2  short break, and then I've got some specific things
3  to talk about.
4    (Recess taken.)
5    Q.  (By Mr. Brown)  Dr. Mendel, let's go
6  ahead and get started back.  Maybe we can kind of
7  speed through a pretty good bit of what I have
8  remaining.  I just want to make sure that there are
9  no other opinions that you do or don't have or that
10  you may have that I don't explore a little bit this
11  afternoon, now going into the evening; and I
12  apologize for the length of time.
13    Do you plan to offer any opinions as to
14  causation, as to what caused her to have the surgery,
15  as to --
16    A.  I don't believe so.
17    MR. JONES:  We've not retained him for
18  that purpose, but I sense the hesitation may be that
19  some of his opinions may spill over into that; but
20  that's not his purpose.
21    Q.  Do you know the condition that caused her
22  to actually wind up going to the hospital?
23    A.  My understanding is that she had an
24  epidural abscess with spinal osteomyelitis.

46  (Pages 181 to 184)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 185

1    Q.  Do you know how long it had been present?
2    A.  No, I do not.
3    Q.  Are you deferring to the neurosurgical
4  expert that they have identified to talk about those
5  issues?
6    A.  Yes.
7    Q.  You don't plan to offer any of those
8  opinions at trial?
9    A.  No.
10   MR. JONES:  In answering the questions to
11  why is it important to do this, why is it important
12  to do that, well, because A might happen or B might
13  happen, obviously it's implicit, you know, in some of
14  the questions; but I'm not offering him as a
15  causation expert.  That's not to say that it
16  doesn't -- the answers to some of your questions
17  don't require him to go part way into that.
18   Q.  (By Mr. Brown)  I think I understand
19  that, I mean, because it's your opinion that she
20  definitely should have been referred out on the 10th?
21   A.  Yes.
22   Q.  It is your opinion that on the 23rd or
23  the 24th different communication should have been had
24  between Mike Adams and someone different?  Instead of

Page 186

1  talking to Bruce Bailey, Mike Adams should have
2  spoken to Dr. Williams, should have spoken to a
3  treating physician and either sent her to the
4  physician for an examination or potentially have sent
5  her to an outside source?
6    A.  Or got an order for lab tests or
7  diagnostic studies.
8    Q.  Okay.  So on the 23rd and 24th, sending
9  her out of the facility to the ER really doesn't
10  appear to be indicated; is that right?
11   A.  That was one of his options but --
12   Q.  That was the lowest on the totem pole.  I
13  think you said if he couldn't get in touch with
14  Dr. Williams or the other treating physician, then he
15  could have sent her to the emergency room for a
16  workup?
17   A.  Yes.
18   Q.  But when we went to August the 10th, that
19  is the date when you say, "Look.  She should have
20  been sent"?
21   A.  Yes.
22   Q.  Just because of the urine alone?
23   A.  Yes.
24   Q.  The inability to urinate?

Page 187

1    A.  If it was just the urine, there's other
2  ways they could have dealt with that.
3    Q.  But when you look at inability or the
4  lowered urine output, the numbness that felt like an
5  epidural, the inability to ambulate without
6  assistance, those three things together to you
7  indicate that, look, she should have gone somewhere?
8    A.  Yes.
9    Q.  Okay.  So that is the -- so in your
10  opinion, August the 10th is the date when she had to
11  be sent to another physician?
12   A.  Yes.
13   MR. JONES:  Object to form.
14   Q.  Are you going to be offering any opinions
15  as to how her outcome may have been different or may
16  have been changed if she had been sent --
17   A.  No.
18   Q.  Okay.  And no opinions as to how the
19  outcome would have changed had she been referred to
20  someone earlier than she was?
21   A.  No.
22   Q.  Do you plan to offer any opinions about
23  what an ER physician or another physician would have
24  done that would have changed the outcome?

Page 188

1    A.  On what date or in what setting?
2    Q.  Any one of those three dates.
3    A.  You mean if she had been sent out on the
4  23rd or sent out on the 24th or sent out on the 10th?
5    Q.  Yes.
6    A.  No.  I believe a neurosurgeon will handle
7  that.  Well, I could testify what an ER physician
8  more likely than not would have done on the 23rd or
9  24th.
10   Q.  What would they have done on the 23rd or
11  24th?
12   A.  I believe that they would have evaluated
13  her injection sites where she was injecting drugs and
14  would have ordered blood tests to determine whether
15  there was likely signs of an infection.  They may
16  have ordered more than what I mentioned previously
17  but would have ordered some diagnostic studies,
18  depending on their physical findings, might have
19  ordered some imaging.
20       It depends what their findings were,
21  depending on whether they heard a heart murmur, which
22  is also possible.  They could have ordered an
23  echocardiogram, which she ended up having when she
24  was in the hospital previously.

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 189

1     Q.  And an echocardiogram in response to a
2  heart murmur would have been looking for what?
3     A.  If she had -- she had concern of
4  recurrent staph infection; and in the face of IV drug
5  use, the big concern would be looking for
6  endocarditis.
7     Q.  Is that's what is called vegetation in
8  the heart or something?
9     A.  Yes.
10    Q.  Or in the valves, I guess?
11    A.  Yes.
12    Q.  But if they had done that and if any of
13  this had shown up, what other treatment or what the
14  next step would have been, that's outside of your
15  bailiwick; is that right?
16    A.  Yes.
17    Q.  Do you plan to offer any opinions as to
18  when she began to suffer from osteomyelitis?
19    A.  No.
20    Q.  Any opinions as to when she began to
21  suffer from discitis?
22    A.  No.
23    Q.  Any opinions as to when the epidural
24  abscess began to form?

Page 190

1     A.  No.
2     Q.  Do you plan to offer any opinions as to
3  whether she could have been treated without surgery
4  if she had been referred to a physician earlier?
5     A.  I think it's more likely than not, but I
6  don't expect to testify to that.
7     Q.  Okay.  So you're not going to say if she
8  had started receiving this treatment on this date,
9  then she wouldn't have had the problems and she
10  wouldn't have had the surgery?  You're not going to
11  offer that testimony?
12       MR. JONES: Objection.  Asked and
13  answered.
14    A.  No.  That's correct.
15    Q.  What are some of the signs and symptoms
16  of the accompanying staph infection?
17    A.  Of what part of the body?
18    Q.  Any part of the body.
19    Q.  Any part of the body?
20    Q.  Do you know where she had staph
21  infection?
22    A.  I think she had staph infection probably
23  in her arm.  I know that she also had an epidural
24  staph infection; and she had osteomyelitis, which I

Page 191

1  suspect was also staph.
2     Q.  And what would be the signs and symptoms
3  accompanying that osteomyelitis staph infection or
4  the abscess staph infection?
5     A.  Pain, malaise, possibly fever, possibly
6  chills, possibly tachycardia.
7     Q.  Okay.  Any effect on blood pressure?
8     A.  The blood pressure can be affected if
9  there's enough interference with spinal function.
10    Q.  It would have affected it in what way?
11  Elevated?
12    A.  If she had overwhelming staph infection,
13  she could have had sepsis; so that would cause low
14  blood pressure.
15    Q.  Okay.
16    A.  If she -- in cases where there's
17  effectively paraplegia, you can get abnormal
18  autonomic function.  That can cause very high blood
19  pressures.  I don't believe that her spinal
20  impingement got to the point where it likely would
21  have affected her blood pressure from what I
22  understand from the history.
23    Q.  Okay.
24    A.  It was not mentioned in the discharge

Page 192

1  summary, but I did not review all the hospital
2  records.
3     Q.  When you talk about pain, would you
4  expect to have someone experiencing pain at the site
5  of the infection?
6     A.  Yes, assuming that that site has some
7  type of direct innervation.  There's a lot of parts
8  of the body that don't have direct innervation, like
9  the abdomen.  You could have an abscess here but
10  actually not necessarily experience pain right at
11  that location because depending on the -- there's a
12  lot of areas of the body that don't have direct
13  innervation tied to that location.
14    Q.  But if she had an abscess that was
15  ultimately found on the thoracic spine, you would
16  have expected pain associated with that to have been
17  in the thoracic area; is that right?
18    A.  Primarily, yes.
19    Q.  What about some of the signs and symptoms
20  of osteomyelitis?
21    A.  Well, depending on -- osteomyelitis of
22  what part of the body?
23    Q.  Of the thoracic spine.
24    A.  The same.

48  (Pages 189 to 192)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 193

1    Q.  Same general symptoms?
2    A.  Yes.
3    Q.  As they would have been for staph
4  infection?
5    A.  Yes.
6    Q.  And the same holds true of discitis too;
7  right?
8    A.  Yes.
9    Q.  And from the records that we have
10  reviewed, that you have reviewed, it doesn't indicate
11  that she ever complained of pain in the thoracic
12  spine; she complained of lumbar pain; is that right?
13    A.  Well, my recollection was that it was not
14  specifically discussed lumbar versus thoracic.  It
15  just says back pain.
16    Q.  But you recall Mike said that he asked
17  her on the 23rd --
18    A.  At that time it was shoulder pain.
19    Q.  Well, pushed into couch.  Lumbar area is
20  tender to palpation or to patient when palpated.  So
21  on the first encounter, he noted lumbar pain.  Then
22  he testified that it remained consistent.  In his
23  narrative notes on the 23rd, "Lumbar area is tender
24  when palpated."

Page 194

1    A.  Where are you?  Lumbar area.  Okay.  I
2  see it.  So what's your question?
3    Q.  I don't know.  She didn't complain of
4  pain in the thoracic area according to what the notes
5  or the record indicates; correct?
6    A.  On the 23rd, no.
7    Q.  Okay.  And the only other notation of
8  back pain was Brian Evans on the 6th, I think, and
9  you didn't have any problem with Brian except that he
10  didn't take her temperature; correct?
11    A.  Yes.
12    Q.  All right.  Do you have -- the blood
13  pressures on Monica throughout her course were within
14  normal limits, at least the days that they were
15  measured; correct?  On the 2nd it was 110/74, which
16  is within normal limits, isn't it?
17    A.  Yes.
18    Q.  On the 3rd it was 118/70, which is within
19  normal limits, isn't it?
20    A.  Yes.
21    Q.  On the 6th it was 110/70, which is within
22  normal limits, isn't it?
23    A.  Yes.
24    Q.  Now, we know there's not a documented

Page 195

1  blood pressure on the 10th; and I think you have
2  previously said that he would like to have seen some
3  vital signs recorded on the 10th; right?
4    A.  Yes.
5    Q.  But her blood pressures that are recorded
6  are not low?
7    A.  That's correct.
8    Q.  In fact, those are pretty dang good,
9  aren't they?
10    A.  Yes.
11    Q.  No indication of tachycardia.  The vital
12  signs that were recorded indicate that her pulse rate
13  was at or below 90 beats per minute.  So she was not
14  tachycardic, was she?
15    A.  That's correct.
16    Q.  Okay.  All right.  Earlier you said that
17  you had reviewed the policies and procedures.  Do you
18  have any opinion or any criticism of the policies and
19  procedures of IDHS?
20    A.  Well, my first criticism is that they
21  didn't have a protocol for back pain.
22    Q.  All right.  Is that then below the
23  standard of care?  Does the standard of care require
24  a specific back pain protocol?

Page 196

1    A.  No.
2    Q.  So it's a criticism, but it's not a
3  deviation?
4    A.  Well, the thing is I think that
5  especially when you're -- I believe that's a common
6  complaint in the jail and that it's very important to
7  provide jail staff with notification for what
8  evaluation is indicated and what conditions warrant
9  physician referral.
10    Q.  All right.  So you would like to see --
11  because they're in an institutional setting, you
12  would like to see protocols there for the caregivers;
13  but is it a deviation from the standard of care to
14  not have a specific back pain protocol in the
15  policies and procedures?  I think they measured this
16  under general -- I can't remember what the testimony
17  was; but there were two protocols that this fell
18  under, that they said they would look at back pain
19  under two specific protocols.  One of them was
20  general pain.
21         MR. JONES:  Minor pain, I think.
22         MR. BROWN:  I can't remember the
23  specifics.
24    Q.  (By Mr. Brown)  Is that not adequate?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 197

1      A.  I personally don't feel it's adequate,
2  but I can't say that it's below the standard of care
3  not to have it.
4      Q.  Okay.
5      A.  Especially since you're substituting
6  somebody as a primary assessor other than a
7  physician.
8      Q.  All right.  Now, any other criticisms of
9  the policies and procedures?
10      A.  Yes.  Let's see.  Also they said in the
11  intake and also in the medical assessment that the
12  patient should be evaluated for drug use and IV drug
13  use, but there's no protocol that indicates
14  specifically what they should have asked and what
15  they should have assessed.
16      Q.  What would you expect them to ask?
17      A.  What drugs has she used?  When did she
18  last use them?  How long had she been using them?
19  Had she had any problems withdrawing from them?  Had
20  she had any complications because of them?
21      Q.  Well, on the 23rd, when Mike talked with
22  her, she said that she was an IV drug user, primarily
23  methamphetamine.  The patient admitted to having a
24  history of drug use, including meth.  I don't

Page 198

1  remember if somewhere in there she had said how long
2  ago she had last used meth.
3         Is that not adequate inquiry as to drug
4  use?
5      A.  Well, I don't think there was adequate
6  training of the staff to identify and assess for
7  problems of IV drug use.
8      Q.  All right.  Is that a deviation from the
9  standard of care, and would that have impacted her
10  outcome in this case?
11      A.  I believe so.
12      Q.  You think it would?
13      A.  Yeah.  I believe it's a deviation from
14  the standard of care.  The extent of complications of
15  IV drug users seen in a jail setting are not well
16  known to providers, nurses, medics, even some
17  physicians.  And the awareness of those conditions is
18  critical to appropriate assessment of patients that
19  disproportionately will end up in a jail setting
20  because of drug use.
21         We know that Bruce Bailey testified that
22  he didn't -- "I don't pay attention to that really,"
23  about IV drug use.  So I think with appropriate
24  training and a protocol, she would have got an

Page 199

1  appropriate assessment much earlier.
2      Q.  "An appropriate assessment" meaning?
3      A.  For her concern about a recurrent --
4  about a possible infection.
5      Q.  All right.  And so the extent of the
6  protocol should have been what?  Asking what she
7  took, when she last took it, how long she had been
8  taking it, when she had had any problems associated
9  with using drugs.  And what else was there?
10      A.  Looking for complications because of IV
11  drug use and, specifically, looking at injection
12  sites.
13      Q.  So you think that if they had done any of
14  that, they probably would have referred her out maybe
15  sooner; and some additional workup could have been
16  done?
17      A.  I think they would have tested her for
18  the possibility of infection, like we discussed
19  previously.  And if, in fact, the infection was
20  present on July 23 and 24, which I believe it was,
21  then it would have been treated much earlier.
22      Q.  Even if it had been treated earlier, you
23  don't know if that would have affected the outcome,
24  do you?

Page 200

1         MR. JONES:  Objection.  Asked and
2  answered.
3      A.  I believe I already testified that it's
4  more likely than not it would have, but I'm not going
5  to testify to that because we have a neurosurgeon
6  involved.
7      Q.  Okay.  Well, do you think that it would
8  affected her outcome if she had received treatment on
9  the 23rd or 24th?
10      A.  Yes.
11         MR. JONES:  Objection.  Asked and
12  answered.
13      Q.  How so?
14      A.  I believe that with early identification
15  of infection, if, in fact, she did have a recurrent
16  staph infection on July 23 that it would have been,
17  more likely than not, treated without complications.
18  But, again, I'm not -- I'm not planning to testify
19  with regard to that at trial.
20      Q.  Okay.  What other criticisms of the
21  policies and procedures?
22      A.  It says that inmates are entitled to
23  health care comparable to that available to citizens
24  in the surrounding community.  I don't think citizens

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 201

1  in the surrounding community go to see a medic when
2  they have a primary care problem, back pain, or a
3  concern about infection.
4       I don't think in the surrounding
5  communities medics confer with LPNs. We've kind of
6  talked about that.
7       Q. In any of the facilities where you have
8  ever worked, have you ever seen critical care
9  paramedics work as caregivers?
10      A. Yes.
11      Q. So it's not inappropriate to staff that
12 clinic with critical care paramedics at all, was it?
13      A. No.
14      Q. Then --
15      A. With appropriate supervision.
16      Q. So then your opinion is not that they
17 shouldn't have been in the clinic; your problem is
18 that they should have had different supervision?
19      A. Yes. And credentialing.
20      Q. All right. What was the extent of their
21 credentialing?
22      A. Well, according to the EMS board in
23 Georgia, emergency medical personnel are permitted to
24 perform only those skills listed under their

Page 202

1  licensure level and only once they have been trained
2  on those skills and credentialed to perform those
3  skills by the agency medical director.
4       Q. Do we know whether they were not
5  credentialed by the agency medical director?
6       A. I don't think he evaluated their
7  performance or their ability to assess various
8  medical conditions on an in-person basis. He said
9  he'd never been to the jail.
10      Q. So credentialing them would have included
11 more than ensuring that they had the qualifications
12 and the training and the licensure that they were
13 reported to have had. Credentialing, in your
14 opinion, would go further than that?
15      A. Well, I believe it would include an
16 on-site -- periodic on-site assessment of skills and
17 equipment.
18      Q. Okay.
19      A. She testified that she was examined in a
20 chair. And, you know, I think that if you're
21 observing somebody's care, you observe that -- it's
22 not appropriate to examine abdominal pain sitting in
23 a chair.
24      Q. Okay. Do you know if there was an exam

Page 203

1  table available for them?
2       A. No, I do not.
3       Q. So in your opinion, to have appropriately
4  credentialed them would have required physical
5  observation and actual evaluation of their specific
6  skills; right?
7       A. And periodic reassessment and revision of
8  the protocols and policies.
9       Q. All right. What other criticisms of the
10 policies and procedures?
11      A. Well, the policy says that they will
12 receive treatment by qualified licensed nurses and is
13 practiced within the limits of applicable laws and
14 regulations. I don't think there's much confusion
15 that they never had a nurse in the jail other than
16 when Mr. Bailey was working there.
17      They had medics and not nurses. The
18 contract said that they would provide nurses.
19      Q. Where does the contract say they should
20 have had nurses? The contract doesn't say anything
21 about nurses, does it?
22      A. It's my understanding that the jail was
23 presented with these -- with these protocols as an
24 indication of their plan to provide care and that

Page 204

1  that --
2       Q. The jail was presented with what
3  protocols?
4       A. The IDHS protocols.
5       Q. The policies and procedures of the
6  protocol manual?
7       A. Yes.
8       Q. It's your understanding that that was
9  presented by IDHS to the jail when?
10      A. When they bid initially on the contract.
11      Q. Where did you get that information?
12      A. That was just the impression I got.
13      Q. Where did you get that impression? Did
14 somebody tell you that, or is this just something
15 that you read?
16      A. I don't recall where I got that. It
17 could be wrong.
18      Q. Okay.
19      A. But I don't have the source for that. I
20 do know that the protocol says that the treatment
21 will be by qualified licensed nurses.
22      Q. What protocol specifically are you
23 looking at?
24      A. The IDHS protocol.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 205

1    Q.  Can you tell me which one in particular?
2    A.  What page?
3    Q.  Yes, sir.
4    A.  Well, I'm looking for it.  Do you want to
5    go on to the next question?
6    Q.  Sure.  Sure.  I'm just writing down a
7    note or two.
8        But the contract itself says, "IDHS shall
9    provide licensed, certified, and/or registered
10   medical and support personnel reasonably necessary
11   for the rendering of health care services as
12   described in this agreement."
13       That doesn't specifically say that it
14   would be a nurse, does it?
15   A.  May I?
16   Q.  Yes.  Look at Article II, Personnel.  I
17   believe this contract is part of an exhibit.  I think
18   you said it was to Dr. Williams' deposition where you
19   looked at it.
20       Did I read that correctly?
21   A.  Yes.
22   Q.  And under the circumstances, you don't
23   have any problem with medics staffing the clinic.  So
24   a medic would qualify as appropriately licensed

Page 206

1    medical personnel; correct?
2    A.  Correct.
3    Q.  All right.  Now, if you see a specific
4    policy number that specifically says nurses, I'd like
5    for you to point that out.  While you're continuing
6    to look for that, do you have any other observations
7    or criticisms of the policies and procedures?
8    A.  Well, in this particular case, it says
9    that the initial screening is done to identify acute
10   or chronic medical problems with proper referral or
11   disposition as needed.  We've already covered that.
12   Q.  Okay.
13   A.  The next point, the physician health
14   review is conducted monthly.  I think it's reasonable
15   for -- that some of those could be done by charts off
16   site but not every month for ten years.
17   Q.  How does that affect this case?
18   A.  Again, the failure to come on site to
19   assess the skills and training and knowledge of the
20   medics, I think, in a couple ways, first of all,
21   deprives her of a chance -- I believe that
22   Dr. Williams, more likely than not, would have
23   identified that there were some gaps in the knowledge
24   of the medics with regard to IV drug use.

Page 207

1        And also his on-site presence, if he was
2    there periodically, I don't think that the custody
3    officers when they were -- when there was a complaint
4    about her medical condition, I believe they would
5    have no hesitation to pick up the phone to call
6    Dr. Williams; so I believe she would have probably
7    gotten care sooner.
8    Q.  Say that again.
9    A.  I believe that when the complaints were
10   received by the correctional officers and they said
11   there was, quote, nothing they could do.
12   Q.  Okay --
13       MR. JONES:  Go ahead.  Keep going.
14   A.  -- that if Dr. Williams had come to the
15   jail on a regular basis that they would have known
16   him and would have no hesitation to pick up the phone
17   to call him.
18   Q.  Okay.  So --
19   A.  In other words, I don't -- I think his
20   failure to come to the jail on a regular basis, which
21   is indicated in the IDHS protocols, caused a delay in
22   her care.  The medics indicated that they were not
23   familiar and were not used to calling him.  The
24   custody staff was not familiar with Dr. Williams and

Page 208

1    did not know how to reach him, as far as my
2    understanding.
3    Q.  All right.  So it's your opinion then if
4    he had had a presence at the jail, when people say,
5    "Hey, Dr. Williams.  How you doing today," then when
6    they got a phone call or when the staff, non-IDHS
7    people, but the jail staff would have said, you know,
8    "This woman really feels bad," they would have been
9    more comfortable calling him directly.  Is that what
10   you're saying?
11   A.  Yes.
12   Q.  Okay.  And by the same token, Mike Adams
13   would have been more comfortable calling Dr. Williams
14   directly instead of going through Bruce Bailey, if
15   Dr. Williams had had any presence or a regular
16   presence at the jail at all?
17   A.  Yes.
18   Q.  Okay.  And that because he didn't have
19   the presence, Mike didn't call him, jail staff didn't
20   call him; and that's what caused the delay in her
21   receiving treatment?
22   A.  That contributed to the delay, yes.
23   Q.  Okay.  What else?
24   A.  The to -- the physician will make weekly

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 209

1  visits or see patients in his office. Again, failure
2  to make weekly visits, first of all, violated -- they
3  said entitled to health care comparable to that
4  available to citizens in the surrounding community.
5  Most physicians that sign on as a medical director at
6  least come to the jail periodically.
7      Q.  Okay. Well, that affected her treatment
8  as you discussed above?
9      A.  Yes.
10     Q.  All right. What else?
11     A.  The physician will monitor care and
12  direct the care of inmates. I think we've already
13  covered that. We covered the health assessment.
14  Done within 14 days.
15     Q.  The health assessment needs to be done by
16  whom?
17     A.  Well, here it says by the contract
18  physician or licensed nurse. So they didn't have a
19  licensed nurse that came to the facility or a
20  contract physician.
21     Q.  Okay. So then who should have done the
22  medical assessment within the 14 days?
23     A.  Well, I guess the medics should have done
24  it; but their own policy that they put out said it

Page 210

1  would be by a specifically contracted physician or a
2  licensed nurse.
3      Q.  Okay. Was Bruce not a licensed nurse?
4      A.  Yes, he was.
5      Q.  If Bruce had come into the facility and
6  done an assessment, then would they have met that
7  policy?
8      A.  Yes.
9      Q.  Okay. And you don't think what the
10  medics did during that first 14 days, you don't think
11  that any of that satisfied that requirement that
12  there be a health assessment within the first 14
13  days?
14          MR. JONES: Asked and answered.
15     A.  No, I don't. They were responding to
16  specific medical complaints. That's sick call.
17  That's not a comprehensive assessment, and I already
18  discussed some of the things that they would have
19  looked at from a health assessment.
20     Q.  Anything else?
21     A.  Just this under the staffing. JC7, it
22  says, "The physician will monitor services and direct
23  the care of inmates as he feels needed to obtain the
24  best level of care for the inmate."

Page 211

1      So I don't think that, you know, this
2  having a system where they call an LPN, I think
3  monitor means directly communicating with the people
4  who are actually doing the assessment and will be
5  consulted weekly to ensure the highest level of care
6  is being provided to the inmate population.
7      Q.  Is it your position that that policy
8  requires that a physician monitor the health status
9  of each inmate or just those inmates who are
10  currently being treated for something?
11     A.  It says, "monitor services and direct
12  care of inmates," that specifically need physician
13  intervention.
14     Q.  All right. Do you think that affected
15  her ultimate outcome?
16     A.  Yes.
17     Q.  All right. What else?
18     A.  Under their Policy JE7 and JE9, triaging
19  of complaints, it says, "The physician comes to the
20  facility weekly to examine those patients who require
21  attention." And as far as I understand, that never
22  occurred over a ten-year period.
23     Q.  It didn't occur with regard to Monica?
24     A.  That's correct.

Page 212

1      Q.  All right. What else?
2      A.  I think that's it with the --
3      Q.  -- policies and procedures?
4      A.  Yes.
5      Q.  You've already said you don't have a
6  problem with IDHS using paramedics to staff the
7  clinic; you just think that they should have been
8  credentialed better; correct?
9      A.  Should have been credentialed and
10  supervised and reporting directly to the physician.
11          MR. JONES: When you get to another
12  stopping point, let's take a break.
13          MR. BROWN: Go ahead.
14          (Recess taken.)
15     Q.  (By Mr. Brown) Do you have any
16  criticisms of the sick call system used at the Hart
17  County Jail?
18     A.  Again, not to beat a dead horse; but the
19  failure of the medics to report to the supervising
20  physician.
21     Q.  I understand that, but I'm talking
22  about -- forgive me.
23     A.  You mean the frequency?
24     Q.  Yes. The manner in which an inmate goes

53 (Pages 209 to 212)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

## Page 213

1   about getting seen at a clinic, one of the clinics,
2   by the medic?
3       A.   No.  That seemed pretty standard.
4       Q.   Okay.  All right.  And you are -- I think
5   we've discussed all your criticisms of the structure
6   or the manner in which the health care is
7   administered by IDHS to inmates.  Paramedics are okay
8   if these guys had been better credentialed, more
9   closely monitored, and if they had reported directly
10  to Dr. Williams.  You don't like the fact that they
11  reported to Bruce Bailey.  Have you told me
12  everything about that opinion?
13      A.   Yes.
14      Q.   And you've told me the criticism that you
15  had of the way that Bruce Bailey may or may not have
16  presented patients to Dr. Williams?
17      A.   Yes.
18      Q.   Okay.  Do you have any criticisms of the
19  manner in which IDHS charted patient encounters?  Was
20  their method of charting okay?
21      A.   I think there should have been a
22  diagnosis.
23      Q.   Can a paramedic or a nurse make a
24  diagnosis?

## Page 214

1       A.   There's some dispute about whether a
2   nurse can.  I don't know whether a medic can make a
3   diagnosis.
4       Q.   Wouldn't a diagnosis more appropriately
5   come from a physician?
6       A.   Most likely, yes.
7       Q.   So I guess --
8       A.   But my point is:  There wasn't a
9   diagnosis.
10      Q.   Okay.  So should there have been a
11  diagnosis received from Dr. Williams or some
12  physician that would be incorporated into their
13  chart?
14      A.   That's what I'm used to seeing from
15  medical encounters in a jail.
16      Q.   Does a patient have an obligation to
17  follow the orders of his or her physician?
18      A.   To some degree, yes.
19      Q.   What are the limitations on that?
20      A.   Well, I mean, there's innumerable.
21  Sometimes they could be confused about the
22  instructions.  They may not be able to do them.  They
23  may have side effects.  I mean, there's -- that's
24  kind of a general question.

## Page 215

1       Q.   Then assuming that a patient is released
2   from the hospital and is told, follow up with so and
3   so in two weeks, you would expect that to be done;
4   right?
5       A.   Well, some of those types of orders are
6   just kind of routine.  My understanding in this
7   particular case is I believe she testified that she
8   was told, "If necessary."
9       Q.   But the record clearly doesn't say, "If
10  necessary."  The record clearly says, "Follow up with
11  Dr. Walker in one to two weeks"?
12      A.   Uh-huh.
13      Q.   You haven't seen that, though, have you?
14  Well, I don't know.  I think you have.  I think when
15  we went back and got your note, it says, "Hospital
16  records from Ty Cobb Healthcare System, dated
17  April 24, 2010 through April 29, 2010."
18          Now, how much of that did you review?
19      A.   Just the discharge summary and the ER
20  record.
21      Q.   Okay.
22      A.   It's possible it said that.
23      Q.   Okay.  Defendant's Exhibit No. 3.
24  "DISCHARGE FOLLOW UP:  With Dr. Walker in one to two

## Page 216

1   weeks."
2          Now, that doesn't say, if needed, PRN,
3   anything like that?  That is a direction from this
4   physician that says to follow up with Dr. Walker in
5   one to two weeks?
6       A.   That's correct.
7       Q.   You would expect a patient to follow up
8   with -- that is a reasonable instruction, isn't it?
9       A.   Yes.
10      Q.   You have a patient who's been in the
11  hospital receiving IV antibiotics for staph
12  infection.  It is certainly reasonable for her to
13  follow up with a physician within one to two weeks
14  after she was released, isn't it?
15      A.   It's not unreasonable.
16      Q.   And there are times when a patient
17  failing to follow the reasonable orders of a
18  physician, there are times that that can have an
19  adverse effect on your outcome; isn't that right?
20      A.   Yes.
21          MR. BROWN:  I'm giving you your asked and
22  answered.
23      Q.   (By Mr. Brown)  No opinion as to how long
24  the epidural abscess had been present when Monica

54  (Pages 213 to 216)

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 217

1 Robinson presented to the jail on July 22, 2010?
2    A. I don't know for a fact she had an
3 epidural abscess on July 23.
4    Q. 22.
5    A. On July 22. I know she had an epidural
6 abscess --
7    Q. On the 11th?
8    A. -- on the 11th. And I suspect she also
9 had it on the 10th.
10    Q. Do you have any opinion then as to when
11 the epidural abscess began to form?
12    A. No.
13    Q. You would defer to someone else; is that
14 right?
15    A. Yes.
16    Q. Okay. We've talked about what you -- if
17 a patient who has been treated with IV antibiotics
18 for a staph infection and if that patient is told
19 that she must stop using IV drugs and if she
20 continues using IV drugs, does that have -- does that
21 increase the chance that she would have a recurrence
22 of the infection, continuing to use IV drugs?
23    A. Yes.
24    Q. Do you have an opinion as to any

Page 218

1 percentage? I mean, if a person continues, is it
2 going to make them --
3    A. No.
4    Q. -- 80 percent?
5    A. No.
6    Q. 10 percent? We've talked about -- you're
7 not going to talk about when the osteomyelitis formed
8 or what the extent of it was at any point in time?
9    A. I think you've asked me that a couple
10 times.
11    MR. JONES: Are we covering new ground
12 here?
13    MR. BROWN: That indicates that I may be
14 through so you should be happy that I'm covering
15 these few little blips.
16    A. I just want to add a comment.
17    Q. Please do.
18    A. You asked me earlier if they had called
19 Dr. Walker even though he hadn't seen her. He did
20 get a copy of this discharge summary according to the
21 document here on page 2.
22    Q. Okay. So following that line of logic
23 then, if they had called Dr. Walker, then he would
24 have expected Dr. Walker to have said, "Well, I

Page 219

1 haven't seen her; but I do know that I got a
2 discharge summary and I do know that she was treated
3 with IV antibiotics for a staph infection"? Is that
4 where you're going with that?
5    A. Well, it would certainly make it a little
6 more likely that he might have remembered it.
7    Q. Have you looked at Dr. Walker's office
8 chart to see if he did, in fact, get a copy of that
9 discharge order?
10    A. No, I have not.
11    MR. JONES: Or whether they gave the
12 discharge order to Monica.
13    MR. BROWN: Talk to the hospital, Buddy.
14    MR. JONES: Do you have a copy of an
15 order, or you just have a summary that got dictated?
16    MR. BROWN: She testified that she was
17 told.
18    MR. JONES: Right. As needed.
19    MR. BROWN: I don't have the order with
20 me; but I'm sure if it's there, it's at the office.
21    MR. JONES: I haven't seen a written
22 order to go back and see a doctor that doesn't know
23 about her in two weeks. The other part is: If you
24 have pain in two weeks, don't bother us. Call

Page 220

1 Dr. Walker.
2    MR. BROWN: Again, talk to the hospital.
3    Q. (By Mr. Brown) Are there any opinions
4 that you have formed or that you plan to offer in the
5 trial of this case that we have not talked about this
6 afternoon? Now the ball is in your court.
7    A. Not with regard to Bruce Bailey, Mike
8 Adams, Evans, or IDHS.
9    Q. But you do have some with regard to
10 somebody else that I'm not going to ask you about?
11    A. Potentially, yes.
12    Q. All right.
13    A. Although we may have covered all of
14 those.
15    Q. But Bruce Bailey, Mike Adams, Brian
16 Evans, and IDHS, you and I have talked about
17 everything that you plan to testify about in the
18 trial of this matter?
19    A. Yes.
20    Q. And you may review other depositions, and
21 you may form other opinions; is that right?
22    A. Yes.
23    Q. And if you do so, will you let Mr. Jones
24 know so he can let us know so we can get back

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 221

1    together with you and explore those?
2        A.  Certainly.  I'll do it by Skype.
3        Q.  All right.  At the current time, as we
4    sit here today, do you plan to do any other work in
5    this case?
6        A.  Not that I'm aware of, but I should
7    confer with Mr. Jones.
8            MR. JONES:  He plans to testify at trial.
9        Q.  Other than that.  But no more research,
10   no more digging, no more things of that nature that
11   you plan to do?
12       A.  No.
13       Q.  All right.
14       A.  Well, I expect that I will review any
15   defense expert reports.
16       Q.  Certainly.  Okay.
17       A.  And may have additional opinions based --
18       Q.  Based on the review of their testimony?
19       A.  Based on information from that.
20       Q.  Then we can employ Skype or FaceTime.
21           Now, have you ever worked -- have you
22   ever served as a medical director for a company
23   similar to what IDHS does?
24       A.  No.  I have written requests for

Page 222

1    proposals for private medical services for a number
2    of entities.
3        Q.  What does that mean to me?
4        A.  Well, for various companies that provide
5    services to correctional facilities.  I wrote the bid
6    criteria.  I've written the bid criteria for a number
7    of different facilities.
8        Q.  So somebody like IDHS might come to you
9    and say, "Hey.  Will you help us write an RFP and
10   tell us what we need to do"?
11       A.  Or actually the opposite side.  The
12   County would say --
13       Q.  The County would tell you --
14       A.  -- "We want somebody to provide health
15   services.  What needs to be included in our health
16   services"?
17       Q.  You then draft the request for a proposal
18   to which proposals are made?
19       A.  Right.
20       Q.  Okay.
21       A.  And I've also been hired, worked in
22   various capacities to monitor compliance with the
23   contracts.  I was a contract monitor in Mobile
24   County, Alabama, for approximately a year and a half

Page 223

1    and also Will County, Illinois.  I was hired by the
2    City of Youngstown to monitor compliance with the
3    contract at the Northern Ohio Correctional Center.
4            I've worked with Tarrant County, Texas,
5    for a six-month period in developing/updating their
6    policies and working on compliance and helped them
7    meet state accreditation.
8        Q.  Okay.  Do you have -- are you okay with
9    the medications that were used in the treatment of
10   Monica Robinson's back pain?  Are you okay with the
11   use of Ultram, Flexeril, and the Soma based on the
12   fact that she reported having been thrown against a
13   couch and they were looking at it as being muscular?
14       A.  Well, as I said, I would have preferred
15   to see a diagnosis.  I think if you're going to
16   prescribe prescription medicine that you need to have
17   a diagnosis, and the medication needs to be
18   consistent with that diagnosis.  But their impression
19   appears to have been musculoskeletal back pain, and
20   those medications are consistent with that diagnosis.
21   That's what I believe they testified their impression
22   was.
23       Q.  And you're okay with the treatment that
24   she received for her complaints of constipation?

Page 224

1        A.  Yes.
2        Q.  Okay.
3        A.  I will say, though, before, you know,
4    when she wasn't responding to the pain, that would be
5    another indication for her to have seen a physician.
6    If the physician were making weekly visits, that
7    would be the type of patient that would have been
8    referred to a physician sooner.
9        Q.  How long would -- how soon would you have
10   expected her to have been seen -- or want to see or
11   be seen by a physician if she had not responded to
12   the medications that were being prescribed?
13       A.  I believe, depending on what the schedule
14   was, after the second change in medication dosage,
15   her -- when her pain was not responding to the
16   measures, I believe that a physician evaluation would
17   have been warranted at that point.
18       Q.  Okay.  Are you talking about when she was
19   changed from Ultram to Flexeril or from Flexeril to
20   Soma?
21       A.  Well, honestly, I think that when she did
22   not respond to the Flexeril and the treatment had
23   been provided, that that would have been, again, an
24   indication for a physician evaluation.  And if a

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 225

1  physician had been regularly providing services, I
2  believe that she would have been referred at that
3  point.
4      Q.  Okay.  And I think that brings us back to
5  the August the 10th date anyway; is that right?
6      A.  As it turns out, yes.
7      Q.  We've talked about everything you have to
8  say about the Babinski test.  I don't think we need
9  to beat that horse any more.
10      MR. JONES:  Can I have just an objection
11  to any question that starts with, I think I've
12  already asked you about such and such?
13      MR. BROWN:  I'm not going to say that
14  again.  I'm just trying to keep there from being an
15  awkward moment of silence.
16      MR. JONES:  Give somebody else a turn.
17      MR. BROWN:  I'm about to.
18      MR. JONES:  If you forget a question,
19  then you can pretend you have a question in response
20  to something they asked.
21      MR. PERRY:  Let's let him finish.  He may
22  save me a few questions.
23      MR. BROWN:  Don't go running off.
24      THE WITNESS:  I'm just going to stand up.

Page 226

1  I'm not going anywhere.
2      Q.  (By Mr. Brown)  What effect would
3  continued meth use have had on Monica's symptoms or
4  her pain if she had continued using meth between her
5  April hospitalization and her July incarceration?
6  Would meth mask some of the discomfort and some of
7  the problems that she was having?
8      A.  Well, meth -- she said that the meth
9  helped the pain.  It certainly is not generally
10  prescribed as a pain therapy.
11      Q.  I would assume that.
12      MR. PERRY:  Is it ever prescribed?  I've
13  got some clients that may want to know about that.
14      THE WITNESS:  Well, there's kind of a
15  legal version called Provigil.  It's not exactly
16  meth, but it might as well be.  Basically you can
17  stay up for 24 hours.  They give it to fighter pilots
18  for long missions.
19      But it's certainly not known.  I don't
20  know what the pattern would have been with regard to
21  the pain.  I honestly can't answer that.  Certainly
22  the euphoria associated with meth certainly would
23  have masked the pain from time to time.  She
24  testified to that.

Page 227

1      MR. BROWN:  Doctor, I don't think I have
2  anything else for now.  Thank you.
3      MR. JONES:  Are you sure?
4      MR. MARSHALL:  Do we have a copy of that
5  that we can mark as an exhibit?
6      MR. BROWN:  That is already a part of the
7  main exhibit.  When I made the copies of those, I
8  included those in Defendant's Exhibit No. 3; but I'm
9  going to have to remark this as Defendant's Exhibit
10  No. 4 because I had another 3 already.  I'm sorry.
11      (EXHIBIT MARKED FOR IDENTIFICATION.)
12      MR. JONES:  That's a list of what's on
13  the disk anyway.
14      MR. BROWN:  Correct.
15      MR. MARSHALL:  I don't need that.  I just
16  wanted to find a particular document here.  That
17  didn't include the supplemental stuff, did it?
18      MR. BROWN:  It's right here.  All I need
19  to do is insert it in here.
20      MR. MARSHALL:  All right.
21          - - -
22          EXAMINATION
23  By Mr. Marshall:
24      Q.  Dr. Mendel, we met several hours ago.

Page 228

1  I'm not sure I pointed out to you that I'm the
2  attorney for Sheriff Cleveland and Hart County.  I
3  wanted to show you Defendant's Exhibit 4 and
4  specifically the document that deals with the
5  documents that you've received, that listing of
6  documents that you've received.  Do you have that in
7  front of you?
8      A.  Yes.
9      Q.  I think you mentioned that you did
10  receive a few pages of Sheila Roper's deposition;
11  correct?
12      A.  Yes.
13      Q.  What did that have to do with -- what was
14  the subject matter covered in those few pages?  Do
15  you recall?
16      A.  I did not have a chance to review those.
17  I got those on the afternoon of -- Tuesday afternoon,
18  and I did not have a chance -- I did look at a few
19  pages, and I believe the gist of it was that she had
20  observed that Monica Robinson was having difficulty
21  ambulating.
22      Q.  But that was not something that you
23  specifically asked for; correct?
24      A.  Correct.

57 (Pages 225 to 228)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 229

1    Q.  Is the few pages -- if we wanted to know
2  exactly which pages were sent, is that going to be on
3  the disk of materials that you've provided today?
4    A.  No.  I prepared the disk before I got
5  those depositions.
6    Q.  All right.
7    A.  And do -- I don't -- my understanding at
8  this point is --
9       THE WITNESS:  Let's go off the record for
10  a second.
11       (Discussion held off the record.)
12       MR. MARSHALL:  Let's go back on the
13  record.
14    Q.  (By Mr. Marshall)  Craig has mentioned he
15  sent you a few pages here and there.
16       MR. JONES:  No.  I sent the entire
17  transcripts.
18       MR. MARSHALL:  Oh, you sent the entire
19  transcripts?
20       MR. JONES:  We tabbed a few pages.
21    Q.  (By Mr. Marshall)  I'm just wondering why
22  those weren't listed on this.
23    A.  Those weren't listed because I received
24  them after I prepared that document.

Page 230

1    Q.  Okay.
2    A.  And I did not review them.  I had an
3  opportunity to read maybe two pages of the three
4  transcripts.
5    Q.  All right.  Well, let me move to another
6  point then.  It appears that you have testified or
7  been deposed, identified as an expert in a lot of
8  federal court cases relative to all the cases that
9  you've handled.  Would that be fair?
10    A.  Yes.
11    Q.  And so you're familiar with the
12  obligations for expert witness disclosures under
13  Rule 26 of the Federal Rules of Civil Procedure;
14  correct?
15    A.  I've read them, yes.
16    Q.  So you know that in your disclosure you
17  were supposed to put in writing a complete statement
18  of all your opinions; correct?
19    A.  Yes.
20    Q.  And so I did not see in your expert
21  witness disclosure anything pertaining to the
22  sheriff, the sheriff's staff, the jail staff, or Hart
23  County.  Was there anything in your expert witness
24  disclosure that was a criticism of any of those

Page 231

1  people or entities?
2       THE WITNESS:  Off the record.
3    Q.  No.  This is on the record.  Was there
4  anything in your expert --
5       MR. JONES:  No.
6    Q.  -- disclosure that dealt with any of
7  those persons or entities?
8    A.  No.
9    Q.  So you weren't asked to address the
10  sheriff, the sheriff's staff, the jail, the County?
11    A.  That's correct.
12    Q.  So you're not going to testify about any
13  of those persons or entities in terms of critiquing
14  their behavior, their response, anything having to do
15  with how they functioned in this context.  Is that
16  fair?
17    A.  Correct.
18       MR. MARSHALL:  In that event, I don't
19  have any other questions.
20             - - -
21             EXAMINATION
22  By Mr. Perry:
23    Q.  Dr. Mendel, I'm Austin Perry, as I
24  introduced myself earlier.  I represent Dr. Williams.

Page 232

1  I'll start out by saying I know we've kind of beat a
2  lot of this stuff to death, but I'm going to try to
3  keep mine as short as I can.  There's just some stuff
4  I need to get through as it specifically relates to
5  Dr. Williams.
6       One thing I've heard you say numerous
7  times through the deposition is that the medical
8  staff, the nurse and the medics, are the eyes and the
9  ears of the physician.  You would agree with that?
10    A.  Certainly medics are trained with that
11  purpose and mind.
12    Q.  Nurses are also trained that way; isn't
13  that correct?
14    A.  To some degree.  They're trained -- a lot
15  of their training is to provide care that's already
16  been ordered by a physician.  But, yes, they do serve
17  as eyes and ears; but their role is a lot less
18  limited than a medic.  A medic, as my understanding,
19  is not allowed to give any prescription medication
20  unless there's a protocol to cover their prescribing.
21    Q.  Okay.  But one's ability to give
22  medication does not affect their ability to be the
23  eyes and ears of the physician; correct?
24    A.  Correct.

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 233

1    Q.  And nurses typically, even in a hospital
2  setting, are the eyes and ears of a physician; isn't
3  that correct?  They document --
4    A.  To some degree, certainly.
5    Q.  -- signs and symptoms in the nurse's
6  notes; isn't that correct?
7    A.  Yes.
8    Q.  And doctors rely on those nurse's notes
9  in the normal course of their practice to help make
10  their decisions about the patients?
11    A.  Yes.
12    Q.  So that's an eyes-and-ears function;
13  isn't that correct?
14    A.  Right.
15    Q.  Okay.
16    A.  But that presumes that they go to the
17  facility to read those notes too.
18    Q.  Right.  But I'm just talking about the
19  information.
20    A.  Okay.
21    Q.  And it's normal for a physician to rely
22  upon the medics and the nurses and that the
23  information they're giving them is accurate; isn't
24  that correct?

Page 234

1    A.  To a certain degree, yes.
2    Q.  To what degree is it not reasonable for
3  them to rely upon the information that's provided to
4  them?
5    A.  When they realize that the people that
6  are making an assessment are not appropriately
7  trained to be making those evaluations.
8    Q.  So your position assumes that the nurse
9  or the medic is not adequately trained to make
10  whatever that assessment is?
11    A.  Well, I'm assuming that -- I mean, the
12  Board, the State of Georgia said that the standard
13  for the supervising physician is to sign off, that
14  the medics are permitted to perform those skills
15  under their licensure but only after they've been
16  trained on those skills and credentialed to perform
17  those skills by the agency medical director.
18    Q.  Okay.  Does that mean that the medical
19  director actually has to do the training of them?
20    A.  No.
21    Q.  So it's reasonable for somebody else to
22  do that training that the medics and the nurses
23  receive?
24    A.  Yes.

Page 235

1    Q.  So if a person who teaches EMS or who
2  teaches medics or teaches nurses trains those
3  individuals on how to do those assessments, there
4  would be no need for the physician to then come in
5  and do the exact same thing, would there?
6    A.  Well, again, the physician is supposed to
7  sign off, credential those medical directors, and
8  also sign off on any medical orders that have been
9  made to make sure there hasn't been a mistake.  I
10  mean, that's the standard of care too.
11    Q.  Okay.  We're getting off base a little
12  bit.  We're still talking about training, not about
13  orders.  So it's reasonable for a physician -- it's
14  perfectly within the standard of care for a physician
15  to rely on somebody else to train these individuals?
16    MR. JONES:  Asked and answered.  Go
17  ahead.
18    A.  Yes.
19    Q.  Okay.  We'll go now to the standard of
20  care violations you've listed in paragraph 10 of your
21  affidavit for Dr. Williams.  It says that he's failed
22  to provide appropriate supervision and oversight for
23  said medical staff.
24    I know we've been through that a lot, but

Page 236

1  what do you -- is there a treatise or a rule or a
2  regulation that you rely upon to reach that decision
3  regarding what his oversight requirements are?
4    A.  Well, first of all, IDHS put out
5  protocols, which I understand Dr. Williams signed off
6  on, that laid out an expectation that he would visit
7  the jail.  I mean, it says weekly; but I think that
8  what I've understood he didn't go there or hadn't
9  been there at all in ten years.
10    Q.  Is the IDHS expectation or policy of
11  weekly, is that, in your opinion, above the industry
12  standard of care or is that consistent with the
13  industry standard of care?
14    A.  It's consistent with the industry
15  standard of care.
16    Q.  Would it be a requirement for
17  Dr. Williams to go to the jail weekly if there were
18  no patients that needed medical supervision?
19    A.  No.
20    Q.  Would it be common in a small rural jail
21  for there to be extended periods of time when no one
22  needs medical supervision?
23    A.  Yes.
24    Q.  Have you gone back and looked through the

Lawrence Mendel

Page 237

1    records of Hart County Jail to determine over the
2    last ten years how many patients actually needed
3    Dr. Williams' supervision during that period of
4    time?
5        A.  I haven't been provided those records.
6        Q.  So you don't know how many patients may
7    or may not have needed weekly visits by
8    Dr. Williams --
9        A.  No, I do not.
10       Q.  -- over the last ten years?  So you can't
11   say sitting here today that Dr. Williams not going to
12   the jail during the ten years had any impact on --
13   you're assuming it had an impact on Ms. Robinson's
14   care; but other than Ms. Robinson, there's nobody
15   else that you know of that may have suffered by that?
16       A.  That's correct.
17       Q.  Did anybody at the jail, any of the jail
18   staff or Mike Adams, say they were prohibited from
19   calling Dr. Williams?
20       A.  No.
21       Q.  So that was an option that was available
22   to them; they just chose not to do that?
23       A.  I had the impression that they didn't
24   really know how to call him.

Page 238

1        Q.  You're assuming from the information; is
2    that correct?  You haven't read anything that --
3        MR. JONES:  You're assuming for the
4    deposition he attended that he's even heard of
5    Dr. Williams.
6        THE WITNESS:  Repeat the question.
7        Q.  (By Mr. Perry)  You do not know that --
8    you haven't read anything that specifically says that
9    they cannot contact Dr. Williams?
10       A.  No.  That's correct.
11       Q.  Okay.  So as you sit here today, those
12   individuals contacting Dr. Williams was an option
13   that was available to them?
14       MR. JONES:  Object to the form.
15       A.  Theoretically, yes.
16       Q.  Okay.  Any opinion you reach about their
17   ability to contact Dr. Williams is not based on any
18   of your medical training, experience, knowledge?
19       A.  Repeat the question.
20       Q.  Any opinion you reach regarding the jail
21   staff or IDHS staff's ability to contact Dr. Williams
22   would not be related to any of your medical training,
23   expertise, or experience, would it?
24       MR. JONES:  Object to the form.

Page 239

1        A.  No.  That's not correct.
2        Q.  That's not correct?
3        A.  I'm sorry.  You said their ability to
4    call?
5        Q.  Yes.
6        A.  Oh, no.  That's correct.
7        Q.  Okay.  Other than making weekly visits
8    and the training that you feel like Dr. Williams
9    should have provided or signed off on, what other
10   items should Dr. Williams have done, in your opinion,
11   to properly supervise the medical staff?
12       A.  Well, I think that he should have
13   insisted that Bailey give him patient names so that
14   he could associate any information that he was
15   getting and combine it.  Sometimes diagnoses don't
16   become apparent until you hear several different
17   pieces of information about a patient.
18           But if you don't know which patient he's
19   necessarily talking about, you may not be able to
20   make a diagnosis.  So that doesn't meet any standard
21   of care as far as I'm concerned.  Every medical
22   system that I've ever been in always used a patient
23   name when you're communicating that to another -- to
24   a provider.

Page 240

1        Q.  So it's your opinion that every time
2    Bruce Bailey went to Dr. Williams with a patient
3    issue, he should given a name?
4        A.  Yes.
5        Q.  Do you think it is necessary for Bruce
6    Bailey or Mike Adams to go to Dr. Williams with every
7    problem that comes into the clinic?
8        A.  No.
9        Q.  Would regular back pain -- or would back
10   pain be an issue that would necessarily require
11   Dr. Williams being notified?  Just general back pain.
12       A.  Well, again, I think he should have
13   provided them with a protocol that dictated
14   specifically which findings that should have caused
15   them to call him.
16       Q.  But you said that's not a deviation from
17   the standard of care to not have that protocol?
18       A.  No, it's not.
19       Q.  Okay.
20       A.  I can't say that it is.
21       Q.  Okay.  So --
22       A.  He also should have assessed the ability
23   of the medics to evaluate back pain.  As I said, it's
24   a very common problem in a correctional setting.

60  (Pages 237 to 240)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 241

1    Q.  Okay.  But would it be a requirement that
2  every patient that complains of back pain that
3  Dr. Williams be notified?
4    A.  No.
5    Q.  So if someone, an inmate, presented to
6  the clinic complaining of lower back pain and said
7  they'd been pushed into a sofa, that's not someone
8  who normally would need Dr. Williams' assistance?
9    A.  Well, I think that any patient that they
10  feel that needs prescription medication is a patient
11  that they should discuss with Dr. Williams to make
12  sure they're not overlooking anything.
13    If it's a simple problem that would be
14  appropriate to treat with an over-the-counter
15  medication, then, no, it's not appropriate.  But if
16  they're asking him for prescription authority and
17  they don't have a protocol that already provides for
18  that authority, then that -- then I believe that is
19  the case that anytime that there is a prescription
20  medication being used that's not already covered by
21  protocol that that is an indication for discussion of
22  the case with the physician.
23    Q.  Would that require Dr. Williams to
24  actually see the patient?

Page 242

1    A.  Not necessarily.
2    Q.  Okay.  So it would not be a deviation
3  from the standard of care for a staff member to call
4  Dr. Williams, give him the information about the
5  patient, and him tell them -- him prescribe a
6  prescription medication for that patient?
7    A.  No.
8    Q.  So what Dr. Williams' involvement in --
9    A.  Let me put a caveat on that.  Assuming
10  that he had assessed that provider's capability and
11  signed off on their credentialing.
12    Q.  Do you know if Dr. Williams ever assessed
13  IDHS staff's ability to examine patients for back
14  pain?
15    A.  I don't -- well, my understanding is he
16  hadn't been to the jail for ten years; and Adams
17  testified that he had never seen him in person.  He
18  testified that he always dealt with him on the phone.
19    Q.  Would it be reasonable or within the
20  standard of care for a physician to have knowledge of
21  the class that a medic went to, and that would be
22  adequate for him to sign off on his credentialing?
23    A.  Well, most family physicians I know don't
24  really work with medics; so they don't really know

Page 243

1  what their training is.
2    Q.  But if they're informed of what training
3  they've received, would that be adequate to make a
4  determination regarding minor aches and pains?
5    A.  For initial approval, yes.  But the
6  protocol, IDHS protocol, also called for
7  participation in monthly meetings and regular on-site
8  visits and regular assessments of adequacy of
9  staffing and training.
10    Q.  And your criticism of that in this case
11  is that Dr. Williams not having a presence limited
12  Mike Adams and the jail staff's ability to feel free
13  to contact Dr. Williams?
14    A.  No.  I said that -- the communication
15  was -- the custody staff didn't feel comfortable.
16  Adams knew how to call him, but he didn't have a
17  regular basis.  I'm saying, all the way back at
18  square one, the system where they call an LPN to
19  describe a medical condition and then the LPN gets
20  the approval for the medication and then a physician
21  doesn't sign off on the order for that medication,
22  that violates the standard of care, No. 1, that the
23  physician -- that a medic is supposed to be the eyes
24  and ears of the physician.  That violates it.

Page 244

1    The fact that he is relaying second-hand
2  information through an LPN and that the LPN doesn't
3  even use the patient name, that violates the
4  standard.  Then the fact that he doesn't sign off on
5  the orders, that violates the standard of care.  Each
6  one of those pieces.
7    And then the failure to come to the jail
8  meant that the response of the custody staff -- the
9  response of the custody staff was that they didn't
10  have an outlet to share their concern about the
11  patient with Dr. Williams themselves because
12  obviously, from my understanding, it sounds like they
13  were certainly aware of her condition and were
14  concerned about it and thought that what Adams chose
15  to do didn't make sense.
16    MR. BROWN:  Objection to the form and to
17  the responsiveness of that answer.
18    Q.  Do you believe the jail personnel should
19  have gone to greater lengths to contact Dr. Williams?
20    A.  I don't know they had --
21    MR. MARSHALL:  Object to the form of the
22  question.
23    A.  -- the ability to -- I don't know that
24  they had a phone number to call Dr. Williams or a

61 (Pages 241 to 244)

Lawrence Mendel

Page 245

1    process.
2        Q.  Do you think they should have called the
3    hospital where he worked to have someone page him?
4        MR. MARSHALL:  Object to the form of the
5    question.
6        A.  I think if they had a concern, they
7    should have discussed it with their supervisor.
8        Q.  And the supervisor should have done
9    something more?
10       MR. MARSHALL:  Object to the form of the
11   question.
12       MR. JONES:  I'll join.  Lack of
13   foundation.
14       A.  I don't know.  I can't really answer
15   that.
16       Q.  Would you agree that someone who uses
17   meth and uses IV drugs, that those drugs would impede
18   their ability to heal from different kinds of
19   illnesses?
20       A.  The meth, per se, would not necessarily
21   impair their ability to heal.  Just the drug itself.
22       Q.  The drug itself would impair their
23   ability to heal?
24       A.  No.  The drug itself would not impair

Page 246

1    their ability to heal.
2        Q.  But the side effects from using drugs
3    would affect their ability to heal from illnesses?
4        A.  It could.
5        Q.  As you stated earlier, those drugs would
6    also mask signs and symptoms of an illness that they
7    may have?
8        A.  Temporarily, yes.
9        Q.  As long as they're on the drug, it would
10   mask the signs and symptoms?
11       A.  Temporarily, yes.
12       Q.  So when you say -- what do you mean by
13   "temporarily"?
14       A.  I'm saying that the drug has a peak
15   effect and then starts to wear off.  If they're in a
16   euphoric state, it would temporarily cause them to
17   ignore pain.
18       Q.  But if they continued to use the drugs,
19   as long as they come off their high, they get high
20   again, as long as they're high, it would continue to
21   mask those signs and symptoms?
22       A.  It certainly could contribute to masking.
23   She said the meth reduced the pain, but it didn't
24   take it away.

Page 247

1        Q.  Would you agree that spinal epidural
2    abscesses are difficult to diagnose?
3        A.  They can be, yes.
4        Q.  And that frequently a diagnosis of those
5    problems are delayed?
6        A.  Certainly can be, yes.  That's one of the
7    reasons that I felt it's important to have a back
8    pain protocol.  There's certain red flags that
9    distinguish a common complaint of back pain from
10   something that is a real problem that definitely
11   needs to be referred to a physician.
12       Q.  Going back do your affidavit, "failing to
13   provide adequate protocols and training to enable
14   said staff to properly perform their duties in
15   accordance with the applicable standard of care."
16       Failing to provide adequate protocols.
17   What specific protocols do you feel that were not
18   provided by Dr. Williams that are deviations from the
19   standard of care?
20       A.  Well, first of all, the standard of care
21   in correctional health care is for an annual review
22   of policies and procedures.  And Dr. Williams, it is
23   evident that he didn't have a copy of them.  He
24   didn't develop them, and he had not revised them in

Page 248

1    ten years.  So that falls below the standard of care.
2    I expect that the -- well, I'll leave it
3    at that.  So in terms of the specific protocols,
4    again, he wasn't regularly attending the meetings on
5    site.  He was calling in.
6        Q.  I understand your testimony.  I don't
7    mean to interrupt you.  I just want to try to cut
8    some of this out.
9        MR. JONES:  He's not asking what
10   protocols Williams violated.  He's asking about what
11   protocols should he have had that he didn't have; is
12   that right?
13       MR. PERRY:  Right.
14       Q.  (By Mr. Perry)  Because you say he failed
15   to provide adequate protocols.  So what protocols did
16   he fail to provide?
17       A.  Failing to provide a back pain protocol,
18   No. 1.
19       Q.  And you agree that that's not a deviation
20   from the standard of care; correct?
21       A.  Yes.
22       Q.  Okay.  So what protocols has he not
23   provided that are a deviation from the standard of
24   care?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Page 249

1    A.  I think assessment of patients with IV
2  drug use.
3    Q.  So failing to have a protocol for
4  assessment of patients with a history of IV drug use
5  is a deviation from the standard of care?
6    A.  In a correctional setting, yes.  Again,
7  these are medics that you're putting into a setting
8  that they're not really trained to work in; and
9  they're encountering IV drug users at a much higher
10  rate than they would normally on a long-term basis.
11    If they go to respond to somebody's house
12  and somebody's got IV drug use and, you know, they're
13  overdosing, that's an acute problem.  But dealing
14  with them on a long-term basis in a jail setting,
15  it's common; it's a serious problem that is much more
16  likely to occur in a correctional setting.
17    Q.  Is there one of these organizations
18  you're a part of that has a model set of protocols
19  that you relied upon to reach that opinion, or is
20  that just based on your experience?
21    A.  That's based on my experience.  Although,
22  I will say that National Commission that promulgates
23  a lot of these standards talks about assessment of
24  drug use and complications.

Page 250

1    Q.  Do they have a protocol that they
2  recommend?
3    A.  I don't believe so.
4    Q.  So they don't actually recommend a
5  protocol; they just talk about the problems
6  associated with IV drug use?
7    A.  Yeah.  They say that it should be part of
8  the medical assessment done within 14 days --
9    Q.  And in this case --
10    A.  -- by personnel that are appropriately
11  trained to assess patients too.  So that would be
12  part of the appropriate training, that if you're
13  training people to work in a correctional setting to
14  do a medical assessment, one of the things you should
15  be training them to do is to assess complications of
16  IV drug use.
17    Q.  Okay.  I want to talk about -- you just
18  kind of skipped over the fact that Dr. Williams
19  should do the annual review of the protocol or the
20  policies and procedures.  What policies and
21  procedures of IDHS do you feel that are not adequate
22  or not within the standard of care?
23    A.  I didn't look at every policy with regard
24  to the standard of care.  I looked at this case in

Page 251

1  particular.
2    Q.  Okay.
3    A.  We've already addressed that I felt there
4  should have been a back pain protocol.
5    Q.  But you agree that a back pain protocol
6  is not a deviation from the standard of care?
7    A.  Right.  But it is the standard of care
8  for him to evaluate and sign off and credential the
9  medics in terms of what they're capable of doing.
10  And if he had observed them on site evaluating back
11  pain, then I think he would have realized that for
12  this particular setting it would make sense.  It
13  would be appropriate for him to develop a back pain
14  protocol.
15    Q.  I understand.  And that is one of the
16  policies and procedures of IDHS that he supervise
17  or be a part of their training; is that correct?
18    A.  Correct.
19    Q.  So that protocol or policy or procedure
20  is within the standard of care; correct?
21    A.  Repeat that.
22    Q.  So the policy and procedure that IDHS has
23  regarding his supervision of their training and
24  credentialing is within the standard of care;

Page 252

1  correct?
2    A.  Yes.
3    Q.  So I guess my real question, what I
4  wanted to get to, is:  Dr. Williams not reviewing the
5  policies and procedures, what effect does that have
6  on this case?
7    A.  I don't know that I can say it had a
8  specific effect in this case.
9    Q.  So you agree -- you feel it's your
10  opinion it's a deviation from the standard of care
11  for him not to review them; is that correct?
12    A.  Yes.
13    Q.  However, in this case, you don't see how
14  that impacted Ms. Robinson's care; is that correct?
15    A.  Not that I can identify, no.
16    Q.  Okay.  Now I'm just looking at the role
17  of Dr. Williams, your note that you created.  I think
18  we've been through the inappropriate supervision,
19  acknowledging.  Is there anything you feel like you
20  need to add about your opinion about his lack of
21  supervision?
22    A.  Yes.  He said that he had not reviewed
23  the records until he became aware of the lawsuit, and
24  I think that also violates the standard of care.

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 253

1  Standard of care is to do a more morbidity review
2  when you have something go wrong with a patient in
3  your custody, to review the care and decide whether
4  policies and training and/or aspects need to be done.
5  So failing to do that creates a scenario where the
6  same mistakes could easily be made again.
7      Q.  Okay.  But you would agree that his
8  failure to do a morbidity review did not have an
9  effect on Ms. Robinson's care?
10     A.  That's correct.
11     Q.  No review of intake paperwork.  Is it
12  your opinion that a physician needs to review the
13  intake paperwork of every inmate that enters a
14  detention center?
15     A.  That's the appropriate way to provide
16  care in a jail setting, yes.
17     Q.  For a physician to review every intake
18  form?
19     A.  Yes.
20     Q.  Okay.  And do you personally review every
21  intake form of every inmate in every jail that you're
22  the director of?
23     A.  I don't currently do it now because I
24  don't work there full time.  But Franklin County, I

Page 254

1  reviewed -- I shared the responsibility and usually
2  went in on a -- we split the responsibility on
3  Saturdays and Sundays to go in and sign off on all
4  the intakes.
5      Q.  Okay.  Is that just your practice, or is
6  that the standard of care in the correctional
7  setting?
8      A.  That's my practice.  I can't say that
9  it's the standard of care.
10     Q.  Okay.  So as you sit here, you cannot say
11  that him failing to review every intake form is a
12  deviation from the standard of care?
13     A.  That's correct.
14     Q.  And I think we've exhausted the failure
15  to evaluate the skills of the medics; is that
16  correct?
17     A.  Yes.
18     Q.  Okay.  Is there anything else you want to
19  add to that?
20     A.  No.
21     Q.  One thing you -- and I think we've
22  discussed this.  This is No. ii, under c.  It says,
23  "Has never trained medics."  Is your criticism of the
24  Dr. Williams that he has not trained specifically the

Page 255

1  medics for IDHS or any medics at all?
2      A.  The IDHS Hart County medics.
3      Q.  Okay.  And you would agree that and
4  you've already testified that it's not necessary that
5  he personally do it, just as long as they do have
6  training; correct?
7      A.  Yes.  But, again, I think, as we've
8  already established, there were significant gaps in
9  Mr. Bailey's knowledge.  And if he had regularly
10  assessed -- if he had regularly assessed the medics,
11  then I believe he would have identified those gaps;
12  and it would have been appropriate for him to provide
13  the training because there were certain aspects that
14  he was familiar with that the medics weren't familiar
15  with.
16         He testified in his deposition that the
17  medics would be familiar with what blood tests to
18  order for an IV infection.  The medics said they
19  didn't know.
20     Q.  Okay.  We just talked about d. i.  It
21  says, "Training designed by a clinical director."  So
22  is it your opinion that the medical director should
23  actually design the training program that the medics
24  go through?

Page 256

1      A.  Yes.
2      Q.  Would it be fine for him to use one
3  that's been implemented by another medical
4  association, group, or entity --
5      A.  Yes.
6      Q.  -- that he didn't specifically --
7      A.  Well, it depends on what that is.
8      Q.  Well, one that is highly recognized.
9      A.  For example?
10     Q.  You give me an example.
11     A.  Well, I don't know what training
12  occurred.  So if he had some other training
13  curriculum that's provided by, say, the Medical
14  Association of Georgia for correctional use, that
15  would certainly be an entity that he could rely upon.
16     Q.  Okay.  We've talked about the failure to
17  make weekly visits.  Failed to monitor care.  Does
18  that just relate to the failure to monitor the care
19  of Ms. Robinson?
20     A.  Yes.
21     Q.  In your opinion what were Dr. Williams'
22  requirements to monitor Ms. Robinson's care?
23     A.  Well, first of all, as I said, I felt
24  that the medics should have reported to him about her

64 (Pages 253 to 256)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 257

1  concern about recurrent staph infection; and then if
2  they had spoken to him and he ordered lab tests, I
3  think he should have followed those results.
4      Q.  So your monitoring requirements are
5  more -- it relates back to your issue of the kind of
6  chain of command by which the patient information got
7  to Dr. Williams?
8      A.  Well, there are two distinct times, as
9  I've said, that they should have interacted with him.
10  The second time was when her back pain got worse.
11      Q.  On August 10?
12      A.  Yes.
13      Q.  Okay.  We've got g.  "Failed to respond
14  to grievance."  What grievance are you referring to?
15      A.  She testified in her deposition that she
16  filled out several grievances.  Now, since I wrote
17  that, it was explained to me possibly that she was
18  referring to the health care -- the sick hall
19  requests.
20          Actually I'm just going to withdraw that.
21  I mean, he wouldn't have anything to do with
22  grievances even if she did file a formal grievance.
23      Q.  Okay.  And we've talked about the failed
24  to provide a protocol for back pain.

Page 258

1      A.  I think so.
2      Q.  You've agreed that's not a deviation from
3  the standard of care?
4      A.  Yes.
5      MR. MARSHALL:  One of these times, he's
6  going to give you a different answer if you keep on
7  asking him.
8      MR. JONES:  Subject to the qualifications
9  he put on the last four questions he's been given
10  that question.
11      THE WITNESS:  Fifth time is a charm.
12      Q.  (By Mr. Perry)  No on-site visits.  I
13  think we've been through that.
14      A.  Yes.
15      Q.  Anything else you want to add to that?
16      A.  No.
17      Q.  Failure to sign off prescription orders.
18  I think we've been through that.  Would you agree?
19      A.  Yes.
20      Q.  It's your position that it's the standard
21  of care that a physician should sign off on every
22  prescription order?
23      A.  That's what hospital standard of care.  I
24  expect that's the standard of care that they use at

Page 259

1  his hospital.
2      Q.  Is that the standard in a correctional
3  setting?
4      A.  Yes.
5      Q.  We've talked about the no protocol review
6  or revision?
7      A.  Yes.
8      Q.  Anything else you want to add to that?
9      A.  No.
10      Q.  Violated the contract and protocol terms.
11  No on-site visits.  You said, "Did not evaluate
12  equipment."  What impact did Dr. Williams' failure to
13  evaluate equipment have on Ms. Robinson's care in
14  this case?
15      A.  Well, first of all, the medics examined
16  her in a chair.  I don't know whether there was or
17  was not an exam table, but it's pretty hard to
18  evaluate bladder size with a patient sitting up.
19  It's basically impossible.  So I think that aspect --
20  I believe she was in -- well, that's the only --
21  that's the only comment on that.
22      Q.  You do not know if there's, as you
23  stated, a table there or not; isn't that correct?
24      A.  That's correct.  But they didn't choose

Page 260

1  to use it, at least on some occasions, if there was
2  one.
3      MR. JONES:  The point is Dr. Williams
4  doesn't know either.
5      MR. PERRY:  I just want to make sure we
6  separate Craig's testimony from Dr. Mendel's
7  testimony.
8      Q.  (By Mr. Perry)  We've been through the
9  inadequate protocols.  I'm not going to ask you those
10  questions again.  I've been admonished.  We went
11  through that.  No morbidity review.  We've been
12  through that.  No policy revisions.  We haven't been
13  through that.
14      MR. JONES:  Yes, we have.
15      A.  Yes, we have.
16      Q.  Is there anything --
17      MR. JONES:  I think your colleague has
18  done a very thorough job covering a lot of your
19  outline.
20      MR. PERRY:  I think he did a very
21  thorough job, and I appreciate it.
22      Q.  (By Mr. Perry)  Is there anything else
23  regarding Dr. Williams' care of Ms. Robinson that you
24  have issue with?

65  (Pages 257 to 260)

8b4ebd01-d66f-464f-a983-d91e98ecb31d

Lawrence Mendel

Page 261

1    A.  Not that I'm aware of.
2       MR. PERRY: I think that's all the
3  questions I have.
4          - - -
5          EXAMINATION
6  By Mr. Brown:
7    Q.  I've got one last question.  Under Mike
8  Adams, under the strength testing, you said,
9  "Standard of care is not merely ability to move
10  extremities but also evaluate gait and strength."
11       Now, you told me about the strength
12  testing that you would have liked to have seen.  That
13  was on the 10th.  Now, you would agree with me that
14  his medical records indicate that he observed her
15  gait and made a chart entry regarding her gait on the
16  23rd and again on the 10th at least; is that right?
17    A.  I do recall him evaluating her gait, yes.
18  But I also recall him charting that the gait was
19  abnormal, and he did not act upon that.
20    Q.  What date was that?  The 10th?
21    A.  The 10th.
22       MR. BROWN:  That's it.  Thank you.
23       MR. JONES:  Thank you.
24    (The deposition was concluded at 8:03 p.m.)

Page 262

1  State of Ohio            :
                   :  SS:
2  County of _____  :
3     I, Lawrence H. Mendel, D.O., do hereby certify
   that I have read the foregoing transcript of my
4  deposition given on Thursday, November 8, 2012; that
   together with the correction page attached hereto
5  noting changes in form or substance, if any, it is
   true and correct.
6
7
            _____
8             Lawrence H. Mendel, D.O.
9     I do hereby certify that the foregoing
   transcript of the deposition of Lawrence H. Mendel,
10  D.O., was submitted to the witness for reading and
   signing; that after he had stated to the undersigned
11  Notary Public that he had read and examined his
   deposition, he signed the same in my presence on the
12  _____ day of _____, 2012.
13
14            _____
             Notary Public
15
16  My commission expires _____, _____.
17          - - -
18
19
20
21
22
23
24

Page 263

1            CERTIFICATE
2  State of Ohio            :
                   :  SS:
3  County of Franklin       :
4     I, Margaret A. Marsh, Notary Public in and for
   the State of Ohio, duly commissioned and qualified,
5  certify that the within named Lawrence H. Mendel,
   D.O., was by me duly sworn to testify to the whole
6  truth in the cause aforesaid; that the testimony was
   taken down by me in stenotypy in the presence of said
7  witness, afterwards transcribed upon a computer; that
   the foregoing is a true and correct transcript of the
8  testimony given by said witness taken at the time and
   place in the foregoing caption specified and
9  completed without adjournment.
10     I certify that I am not a relative, employee,
   or attorney of any of the parties hereto, or of any
11  attorney or counsel employed by the parties, or
   financially interested in the action.
12
      IN WITNESS WHEREOF, I have hereunto set my
13  hand and affixed my seal of office at Columbus, Ohio,
   on this 13th day of November, 2012.
14
15
            Margaret A. Marsh, Registered
16            Professional Reporter and Notary
            Public in and for the
17            State of Ohio.
18  My commission expires June 6, 2017.
19  (MM-61)
20          - - -
21
22
23
24