**Certified Copy Transcript**

In the Matter Of:

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.

---

## DEPOSITION OF

## BRUCE A. BAILEY, LPN

*October 09, 2012*

---



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 1

1         IN THE UNITED STATES DISTRICT COURT

2            MIDDLE DISTRICT OF GEORGIA

3               ATHENS DIVISION                CERTIFIED COPY

4

5    MONICA ROBINSON,

6         Plaintiff,

7         vs.                          CIVIL ACTION NO.

                                       3:12-cv-00020-CAR
8    INTEGRATIVE DETENTION HEALTH

9    SERVICES, INC., HART COUNTY,

10   GEORGIA, SHERIFF MIKE

11   CLEVELAND, BRUCE A. BAILEY,

12   LPN, BRIAN EVANS, EMT, MIKE

13   ADAMS, EMT, and ROBERT T.

14   WILLIAMS, M.D.,
          Defendants.

15

16

17              DEPOSITION OF
             BRUCE A. BAILEY, LPN
18             October 9, 2012
                10:05 a.m.

19

20

21             Gordon Law Firm

22            East Howell Street

23          Hartwell, GA  30643-0870

24

25         Thomas R. Carey, CCR-B-1715



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 2

```
 1              APPEARANCES OF COUNSEL:

 2

 3   On behalf of the Plaintiff:

 4        CRAIG T. JONES, Esq.

 5        Page Perry, LLC

 6        1040 Crowne Pointe Parkway

 7        Suite 1050

 8        Atlanta, GA  30038

 9        (770) 673-0047

10        cjones@pageperry.com

11

12   On Behalf Of The Plaintiff:

13        DOUG MCKILLIP, Esq.

14        Doug McKillip, LLP

15        648 South Milledge Avenue

16        Athens, GA  30606

17        (706) 546-6279

18        doug@dougmckillip.com

19

20

21

22

23

24

25
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 3

```
 1            APPEARANCES OF COUNSEL:

 2   On behalf of Defendants IDHS, Inc., Bruce A. Bailey,

 3   Mike Adams:

 4        JEFFREY A. BROWN, Esq.

 5        Brown & Adams, LLC

 6        The Rothschild Building, Suite 400

 7        1214 First Avenue

 8        Columbus, GA  31901

 9        (706) 653-6109

10        (706) 653-9472

11        jbrown@brownadamsllc.com

12

13   On Behalf Of Defendant Robert J. Williams, M.D.:

14        JOHN A. DICKERSON, Esq.

15        McClure, Ramsay, Dickerson & Escoe, LLP

16        36 Falls Road

17        Toccoa, GA  30577

18        (706) 886-3178

19        (706) 886-1150

20        jad@mrdelaw.com

21

22

23

24

25
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 4

```
 1              APPEARANCES OF COUNSEL:

 2    On Behalf Of Defendant Sheriff Mike Cleveland:

 3         ANDREW H. MARSHALL, Esq.

 4         Begnaud & Marshall, LLP

 5         1091-B Founders Boulevard

 6         Athens, GA  30606

 7         (706) 316-1150

 8         (706) 316-1153

 9         dmarshall@athens1867.com

10

11    On Behalf Of Sheriff Mike Cleveland:

12         WALTER J. GORDON, Esq.

13         The Gordon Law Firm

14         415 East Howell Street

15         Hartwell, GA  30643-0870

16         (706) 376-5418

17         (706) 376-5416

18         walter@gordonlawfirm.com

19

20    Also present:  Mike Adams

21

22

23

24

25
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 5

1              INDEX TO EXAMINATION

2   Examination By-Mr.Jones                              7

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 6

```
 1                  DESCRIPTION OF EXHIBITS

 2                                                 Page

 3      EXHIBIT      IDENTIFICATION

 4         1         IDHS Policy And

 5                   Procedure Manual                10

 6         2         IDHS Progress Record            11

 7         3         Transcription (Exhibit Withdrawn)  16

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        MR. JONES:  This will be the deposition of

2   Bruce Bailey taken by the plaintiff for purposes of

3   discovery, cross examination, and all other purposes

4   allowed by law.  The deposition is taken by

5   agreement of counsel and pursuant to Notice, and all

6   objections will be reserved except for those going

7   to the form of the question or the responsiveness of

8   the answer, if that's agreeable.

9        MR. BROWN:  That's agreeable.

10        MR. JONES:  Y'all going to have him read

11   and sign?

12        MR. BROWN:  Yes.

13        MR. JONES:  He can do that in front of any

14   Notary as far as we are concerned.  Let's go ahead

15   and swear in the witness, please.

16             BRUCE A. BAILEY, LPN

17   having been duly sworn, was examined and testified

18   as follows:

19                  EXAMINATION

20   BY-MR.JONES:

21        Q    Mr. Bailey, how are you doing today?

22        A    Doing good.

23        Q    Good.  I'm Craig Jones.  We met before,

24   right?

25        A    Yes, sir.



1      Q    This is my co-counsel Doug McKillip, I

2    don't know if y'all have met, and we represent

3    Monica Robinson, and for the benefit of whoever is

4    reading this thing, you've been deposed before as a

5    representative of IDHS; is that right?

6      A    Yes, sir.

7      Q    And in that deposition I asked you a lot

8    of questions about the company, the way it's

9    organized, the origins of the contract with Hart

10    County and, you know, as well as your own personal

11    and professional background, right?

12      A    Yes, sir.

13      Q    I'm not going to cover all of that ground.

14    Whoever is reading this deposition, if they want

15    that stuff they can go check the 30(b)(6) deposition

16    of IDHS.  All right.

17            Now, you've done this before.  Let's just

18    get right into it.  Did you bring any documents with

19    you today?

20      A    I did not.

21      Q    Did you review any documents to prepare

22    for today?

23      A    I mean, I've gone over professional, the

24    documents that I've read in the past, but other than

25    that, nothing, nothing major.



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 9

```
1        Q    Really, and again, I don't want to know
2   what conversations you had with your lawyer or what
3   your lawyer told you to look at or not to look at.
4   I just want to know, can you just tell me what
5   documents or what types of documents you have
6   reviewed, say, in the past week or two in
7   preparation --
8        A    Back over my -- you call it the 30(b)(6),
9   I guess.  I went back over it.
10       Q    You read the deposition?
11       A    The deposition that I gave for that.
12       Q    Okay.
13       A    And then I've just gone through the chart
14  and medical record, basically, looking at it.
15       Q    You read -- you looked at the chart for
16  Monica?
17       A    Yes.
18       Q    Have you looked at any other medical
19  records for her?
20       A    No, I have not.
21       Q    Did you review your Policy and Procedure
22  Manual?
23       A    I looked over it a couple of times.
24       Q    I guess you're already familiar with it,
25  though, aren't you?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1          A    Yes.

 2          Q    Let me go ahead and put some documents in

 3     front of you that we're going to be referring to

 4     throughout the deposition.  Just go ahead and get

 5     them out of the way, and I'm going to probably jump

 6     around quite a bit.

 7               (Document marked for identification as

 8     Plaintiff's Exhibit 1.)

 9          Q    (By Mr. Jones) First of all, let me show

10     you what's marked as Plaintiff's Exhibit 1, and

11     actually I think this was already Plaintiff's

12     Exhibit 5 to the deposition you testified at before.

13     It's got a sticker at the bottom, Plaintiff's

14     Exhibit 5, 7/19/12, and then for the depositions

15     today and tomorrow this is going to be Plaintiff's

16     Exhibit 1.  Well, we won't need it tomorrow.

17     Deposition today Plaintiff's Exhibit 1.  And I have

18     a few copies, not enough for everybody, but y'all

19     can share.  Maybe I do have enough for everybody.

20     Here is more.  I accidentally made too many.  And

21     next I want to show you --

22               Well, first of all, do you recognize that

23     as being a copy of the IDHS Policy and Procedure

24     Manual?

25          A    Yes.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   Q    I notice the first page of that, it's got
2   signature lines but it's not actually signed.  Do
3   you have access to a copy that is signed?
4   A    I have the original, or should have the
5   original still on file for the, for me and
6   Dr. Williams.  I didn't have the Sheriff sign it.
7   Q    Never had the Sheriff sign it?
8   A    Never had the Sheriff sign it.
9   Q    Do you know if the Sheriff has ever even
10  read it?
11  A    It's at the jail.  He has the opportunity
12  to read it if he needs to.
13  Q    Yeah.  But you didn't require the
14  Sheriff's signature in order for you to put these
15  policies and procedures into force, did you?
16  A    No.
17       (Document marked for identification as
18  Plaintiff's Exhibit 2.)
19  Q    (By Mr. Jones) Let me show you what's
20  marked as Plaintiff's Exhibit 2, and I'm going to
21  represent to you that this is the copy of the chart
22  that your lawyer E-mailed to me the other day
23  because I've seen multiple copies floating around
24  and I didn't know if, what the proper order of the
25  pages was or anything.  But does that look to be a



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   true and accurate copy of your chart?  Or I say

2   "true and accurate," without going through

3   everything in it, does it look like a, it's a copy

4   of the chart that you've maintained on Monica

5   Robinson?

6        A    It does.

7        Q    Okay.  And I don't know that it's

8   important, but in terms of the order of the pages,

9   is that the same way you have it ordered?  You've

10  got like, looks like clinic notes up front, and then

11  you've got medical request forms, and then in the

12  back I think a copy of the medical intake

13  questionnaire.  Is that the same order you keep it

14  in?

15       A    Yeah.  The sick call slips would be in

16  reverse order, reverse chronological order, so you

17  have the most recent on top.

18       Q    And you've got -- the very last thing is

19  actually the intake form -- well, actually, you've

20  got a MAR in there, you got a Medical Administration

21  Form.

22       A    Right.

23       Q    MAR record.  And then the very bottom few

24  pages is the intake questionnaire.

25       A    Right.


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1       Q      So the intake questionnaire, is that the

2   first thing that you put in a file when you open it

3   on an inmate?

4       A      If an inmate comes to sick call, this

5   would be, we would have this on file and we would

6   put it in the record.

7       Q      Okay.  When you get an intake, or your

8   staff, I guess, gets a medical intake questionnaire,

9   do you automatically get it on every inmate or just

10  the ones that you see?

11      A      We get intake sheets on everybody that we

12  know of that gets processed in the jail.  Is it

13  every inmate?  I have no earthly idea on that.  But

14  everybody that comes in, they put an intake sheet

15  usually in the medication box.

16      Q      So there's a box there, but unless y'all

17  have an encounter with an inmate, are you saying

18  that y'all might not have any reason to look at it?

19      A      Oh, it's reviewed.

20      Q      It is reviewed?

21      A      On the next sick call.

22      Q      Oh, so whenever the next -- whenever, say,

23  Brian or Mike comes in for the next sick call, they

24  would look at whatever intakes are in the box?

25      A      Yes.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 14

1    Q     And also look at whatever sick call

2    requests are in the box?

3    A     Yes.

4    Q     And when they review the questionnaires,

5    what are they looking for?

6    A     They look for any medications, any

7    injuries or any type of history on the patient to

8    see if there's anything that we need to follow up

9    on.

10   Q     If you had reviewed the intake

11   questionnaire for Monica Robinson and saw that she

12   had been, you know, recently hospitalized for a

13   Staph infection and had concerns that she might

14   still have the Staph infection and was also

15   complaining of back pain, how would you have

16   responded to that information?

17   A     The inmate would have been asked to fill

18   out a sick call slip, and it's up to them to fill it

19   out or not.

20   Q     I think in this case that's what actually

21   happened.  I think she was seen in clinic the very

22   next day.

23   A     Yes.

24   Q     She came in, you know, in the night, I

25   believe.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 15

```
1        A     Uh-huh.
2        Q     Okay.  So we'll get into the time line
3   later on.  But I think you've testified before in
4   your deposition you never actually personally saw
5   Monica Robinson, did you?
6        A     No.
7        Q     You've never met her at all, have you?
8        A     No.
9        Q     So that Exhibit 2 there is the chart --
10            MR. MARSHALL:  Do you have an extra copy
11  so that I can --
12            MR. JONES:  Yeah, I do.  I'm sorry.  I
13  have the same number that I do of the others.
14       Q     (By Mr. Jones) Now, let me also show
15  you -- did I hand out -- okay.  Here we go.  Now, I
16  have also brought another exhibit that may
17  ultimately end up being authenticated through the
18  witnesses.  I don't know, but I just think it's
19  useful in, you know, at least in my asking my
20  questions and us following along with the testimony.
21            I have a transcription that we prepared of
22  the notes, and we may never try to use this as
23  evidence, but, I mean, I think it's just helpful to
24  refer to side to side with the notes when we're
25  asking about it, and I'm going to show you this.
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1              (Document marked for identification as
 2      Plaintiff's Exhibit 3.)
 3          Q    (By Mr. Jones) This is Plaintiff's Exhibit
 4      3, and I'm going to be, because I'm better at
 5      reading this than I am at reading the handwritten
 6      stuff, I'm going to be reviewing this side by side
 7      with the chart, and any time during the deposition
 8      if we see something that's not correctly
 9      transcribed, you know, what I'm going to have you do
10      is change it, mainly, just change it, initial,
11      whatever, and same thing with Mike and Brian.  And,
12      you know, we may end up with, you know, an accurate
13      transcription, but either way I get something that I
14      can read.  So here's some extra copies of that.
15              MR. DICKERSON:  What's that going to be
16      called?
17              MR. JONES:  We're calling this Exhibit 3.
18              MR. BROWN:  It's the Plaintiff's prepared
19      time line.
20              MR. JONES:  That's correct.
21              MR. BROWN:  I will object to it and put a
22      blanket objection on the grounds that it's -- the
23      record speaks for itself, and the record is the best
24      evidence of what --
25              MR. JONES:  Yeah, and I'm not tendering
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    this into evidence.  I understand that.  Yeah.  And

2    I mean, this is actually not a time line, per se.

3    This is actually a transcription, I believe.  Isn't

4    that right?

5               MR. MCKILLIP:  Correct.

6               MR. JONES:  And I don't have to give it to

7    you at all, but one of the reasons I'm doing it is

8    because there's a couple of blanks here where we

9    were unable to figure out what things were and this

10   will help me identify those.  I'm looking at the top

11   of second page, for example, that first block.  Now,

12   that's got to be mag citrate, mag intrate; is that

13   right?  Mag citrate, one bottle?  You didn't prepare

14   the notes.  Do you see that up there?

15        A    I do, I see that.

16        Q    Can you read the handwriting?

17        A    Mag citrate.

18        Q    Yeah, that's what --

19        A    One bottle.

20        Q    That's to get things moving in the bowels,

21   right?

22        A    Correct.

23        Q    Okay.  Well, let's -- let me ask you some

24   questions about these exhibits.  I want to start, I

25   think, with Plaintiff's Exhibit 1.  Okay.  And that



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    is the Policy and Procedure Manual.

 2              I asked you before about whether the

 3    Sheriff had signed off on it and you said no.  Did

 4    the Sheriff have anything to do with creating this?

 5         A    No.

 6         Q    How was this adopted?

 7         A    It was adopted through use of the National

 8    Correctional Healthcare Manual and through the

 9    Medical Association of Georgia on Correctional

10    Healthcare, Policy and Procedures.

11         Q    So do you basically go through their model

12    policies or recommended policies and kind of cull,

13    you know, basically select what you thought would be

14    appropriate for IDHS?

15         A    I did.  I went through the national

16    standards, which you'll see annotated at the top of

17    each for that time period, and also through what,

18    Medical Association of Georgia for correctional

19    healthcare required, and formulated the policies and

20    procedures according to what we were capable of

21    doing being in a small county jail.

22         Q    Right.  And all the jails that you service

23    would basically be small county jails, right?

24         A    Yes, sir.

25         Q    And so do you use this same manual for all
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    of the jails that you service, or are there any

2    variations from county to county?

3        A    Variations would only be which hospitals

4    to send them to or which physician's offices to send

5    them to.  That would be the only --

6        Q    But other --

7        A    -- difference there, but the main thing is

8    this.

9        Q    Okay.  So did you basically take a sample

10   policy manual from a small county and just borrow

11   that in totality, or did you actually have to

12   assemble this by going, you know, picking and

13   choosing different policies from a larger group?

14       A    I assembled this using the National

15   Correctional Healthcare Standards and Mag Standards

16   and then customized it for use for my company.

17   Using Dr. Williams as kind of the guide as to is

18   this a current and correct treatment, yes or no, and

19   he would say yes.

20       Q    Okay.  So you did the customization then?

21       A    Yes.

22       Q    You didn't go to, say, a county that

23   already had a policy like this and, you know, borrow

24   that one --

25       A    No.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q    -- essentially?  How much -- you said that
2  you had some input from Dr. Williams on that.  Can
3  you describe that process as far as how much of a
4  role he had in creating this Policy and Procedure
5  Manual?
6      A    Initially when the company was, when I
7  first took over and was starting this process, he
8  had a fair amount of input on what we would use as
9  formulary and what we would use, keep in stock for
10 medications, over-the-counter medications, things
11 likes that.  As the policy and procedures
12 progressed, he would assist with signing medical,
13 dental and psychiatric-type questions to say, okay,
14 if they meet this, then they need to go to
15 psychiatric care, if they meet this, then they need
16 to go a doctor's office, or I need to be notified.
17 So he a pretty good bit of input.
18     Q    So you're talking about like, for example,
19 the specific protocols?
20     A    Yes.
21     Q    Like I think if you turn toward -- see,
22 turning toward the back.  There's a, I think the
23 last one, two, three, four, five, six, seven pages
24 of the exhibit says, "Policy Title:  Medical
25 Treatment Protocols."



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 21

1      A      Yes.

2      Q      Is this what you're talking about where he

3   was integrally involved in?

4      A      Right.  He read through them and said, no,

5   you need to change this to use this cream instead of

6   this, or this pill instead of this, or Tylenol

7   versus Motrin, things like that.

8      Q      Okay.  And so I guess he also developed

9   the formulary as far as the drugs?

10     A      Yes, he helped with that.

11     Q      And what would that be based on, just, I

12  guess, the local availability and cost and things

13  like that or what?

14     A      Just local availability and most commonly

15  used practices.

16     Q      Okay.

17     A      Cost doesn't play into that.

18     Q      Okay.  I guess what was, what was

19  consistent with his practice, too, right?

20     A      Yes.

21     Q      Other than those things, can you think of

22  any other areas where Dr. Williams, you know, made

23  changes or made, you know, recommendations with

24  regard to what should be in the Policy and Procedure

25  Manual?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1       A      Yes.  Initially Dr. Williams was -- did
 2   do, did OB/GYN and Wills Memorial Hospital did
 3   OB/GYN, so we had that incorporated into our policy
 4   and procedures.  Then as he progressed out of it and
 5   Wills Memorial got out of the OB/GYN business, we
 6   kind of -- he helped me rewrite that to where we
 7   could formulate power out, send it out if we need
 8   to.  So we don't take care of OBs and full-term
 9   ladies in the jail.
10       Q      So now that would just be treated like any
11   other specialty as far as someone, if someone was in
12   need of a specialist?
13       A      Yes, they would be sent out.
14       Q      Okay.  And obviously, I guess, if they
15   went into labor, whatever, would be considered an
16   emergency matter?
17       A      Yes.
18       Q      You just take them to the nearest hospital
19   that does --
20       A      That does OB.  Or if it's an emergent
21   delivery, they go to the closest Emergency Room.
22       Q      Okay.  So who -- you're the owner of IDHS,
23   right?
24       A      Yes, sir.
25       Q      You're the only stockholder, right?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 23

1    A    Yes, sir.

2    Q    And you're the -- I don't know the exact

3  title, but the President or CEO of it?

4    A    CEO.

5    Q    CEO.  And who -- so are you the final

6  decision-maker as far as adopting this policy?

7    A    No.

8    Q    Or was that Dr. Williams?

9    A    Me and Dr. Williams.

10    Q    You and Dr. Williams collaboratively?

11    A    Yes.

12    Q    And did anyone -- was there -- were there

13  any other final decision-makers involved in adopting

14  this policy other than you and Dr. Williams?

15    A    We referred, the local dentist, he never

16  saw the policies and procedures, but we asked him

17  what he preferred, and that was it, so -- and mental

18  health is such a hot button, we -- you can't ever

19  keep up with them, so we would just contact them

20  locally and ask them where to send the patients.

21    Q    Okay.  So you -- you didn't base -- you

22  didn't really -- basically as far as the dentistry

23  and the mental health, you just wanted to establish

24  someone to make those referrals to, right?

25    A    Yes.

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q     And then you asked them --

2      A     Asked them if they'd be willing to accept

3  the referrals and where they would like us to send

4  them and how they would like us to send them.

5      Q     But since you weren't actually doing that

6  in house, y'all don't have any protocols as far as

7  how that's actually done, do you?

8      A     No.  It's just we make a dentist

9  appointment with them, or mental health appointment.

10     Q     And so the dentists and the psychologists,

11 they didn't actually sign off on the policies?

12     A     No.

13     Q     They're just basically like specialists

14 that you refer to?

15     A     No.

16     Q     You just refer them out, right?

17     A     Yes.

18     Q     And I know what you were saying, I just

19 want to make sure that you were giving -- you know,

20 since it's a yes or no question for the transcript,

21 I just want to make sure it's clear.

22          So then does this Policy and Procedure

23 Manual, does this cover, does this include all the

24 policies that apply to medical care at the jail, or

25 are there any protocols or standing orders, you



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 25

1    know, tacked up on the wall, anything that was in

2    addition to this?

3        A    We have a sliding-scale insulin that we

4    use that's -- we initially started with one and then

5    we changed to another one, and that's the only one.

6    It's posted on the wall just for general reference

7    for the, for the jailers.

8        Q    In terms of what, just --

9        A    In terms of how to, how much insulin an

10   inmate should take versus letting an inmate take

11   whatever they want.  The jailers have a little sheet

12   that says, you know, if their sugar is this, they're

13   supposed to take this much insulin, so it's just

14   kind of a quick reference for the.

15       Q    When you say "the jailers," you're

16   referring to the supervisors that are authorized to

17   administer medication?

18       A    Right.

19       Q    So it's really kind of a guide to them to

20   make sure that they're doing that properly, correct?

21       A    Yes, sir.

22       Q    In terms of policies, procedures or

23   protocols, would this Policy Manual, Exhibit 1,

24   would this include all the policies and procedures

25   and protocols that apply to medical care at the Hart



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    County Jail?

 2         A     To the best of my knowledge, yes.

 3         Q     Okay.  And these -- are these policies and

 4    procedures in this manual, are they supposed to be

 5    followed by all the medical personnel at the Hart

 6    County Jail?

 7         A     They are.

 8         Q     And I guess by all, basically this is what

 9    IDHS is supposed to follow and its employees, right?

10         A     Yes.

11         Q     I'm going to kind of walk through this

12    just beginning to end and just every couple of pages

13    or so I'm going to have a few questions for you.

14         A     Okay.

15         Q     So for the record, we're looking at

16    Plaintiff's Exhibit 1, and the first page of this

17    says at the top, "Policy Title:  Continuity of Care

18    During Incarceration."  What does that mean,

19    continuity of care during incarceration?

20         A     That's to ensure that any care giver or

21    provider that either prior to or after leaving the

22    jail is allowed access to our records and treatment

23    protocols.

24         Q     Okay.

25         A     Basically so the inmate will not go
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   without care after they leave the jail.

2       Q     Okay.  Does it also have anything to do

3   with continuing care that the patient might already

4   have started before they come to the jail?

5       A     If the inmate presents with medications,

6   then it would be continued.

7       Q     Okay.  But it's basically, the continuity

8   is basically to, both before and after then, right?

9   To ensure that there is no break in the --

10      A     Yes.

11      Q     -- treatment?

12      A     Yes.  If they present with a medical

13  condition and have medications and see the nurse,

14  then we give information about that and we continue

15  the continuity of care, try to keep the continuity

16  of care as close to them as possible.  As close to

17  what the previous physician is doing as possible.

18      Q     And looking under procedures, where it

19  says number 1, the second sentence under number 1

20  says, "medical services will follow up with inmate's

21  personal," it says "personnel," but I guess that

22  means personal, right?  "Medical services will

23  follow up with inmate's personal physician or

24  pharmacies for evidence of medical problems."

25            Actually, I should probably read the whole

**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  thing so it's in context.  It says, "During initial

2  screening or during the first visit to the clinic

3  area the inmate will be asked by the healthcare

4  provider for any pertinent history or medications

5  taken in the past.  Medical services will follow up

6  with the inmate's personal physician or pharmacies

7  for evidence of medical problems."

8          What does that mean?

9      A    If the inmate gives us a medical

10  provider's name or where they get their medications

11  filled, we will contact that, that pharmacy or that

12  physician and ask them if they've been under their

13  care or if they have gotten that medication filled

14  and are currently taking that medication.

15      Q    Okay.  So let's say a patient comes in and

16  says, "I was treated in the hospital recently and I

17  had some medications, I think I might, you know,

18  still have the problem that they treated me for."

19  Would this particular policy, would this require you

20  to follow up with the doctor or have the patient

21  follow up with the doctor to see if the patient

22  needed to continue her treatment?

23          MR. BROWN:  Objection to form.  You can

24  answer.

25          THE WITNESS:  You have to restate your



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 29

1    question.   I'm not sure exactly what you're asking
2    me there on that one.
3        Q    (By Mr. Jones) Well, let me ask it this
4    way.  Would you agree -- would this particular
5    procedure here, the one number 1 that's listed on
6    this page, does this encompass the situation where
7    an inmate presents to the jail with a recent history
8    of a medical problem and recent history of being
9    medicated and the inmate says, "I think I still have
10   a problem," under that scenario would this procedure
11   require you to follow up with her physician?
12       A    If the inmate presented with a medical
13   condition or said that they were on medications and
14   did not bring those medications with them, we would
15   contact either that medical provider and ask them if
16   they had recently been seen, if they gave us that
17   name of that medical provider, or we would contact
18   that pharmacy, if they gave us the name of that
19   pharmacy, and to see if they were currently supposed
20   to be on any medications.
21       Q    Okay.  And what I'm asking here is really
22   the circumstances in this case where the patient,
23   you know, Monica Robinson said that she had been
24   recently treated for a Staph infection, I think she
25   said in the last week and a half, and thought she



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    still had it but she wasn't currently on medication.

 2    I think she had used it all up.  Would it have been

 3    appropriate for there to be any follow up, based

 4    upon this policy, any follow up with her previous

 5    physician, or is that a matter of medical judgment

 6    to be made, you know, once you see them in the

 7    clinic?

 8         A    If she presented with that, the nurse or

 9    the medic would have asked who was the physician and

10    who is the pharmacy that you were using.  If she --

11    if they couldn't give them that information, then we

12    would try to ask them to come up with that

13    information.  And if we called the physician's

14    office and she had not been seen in the last week

15    and a half, then there is no documentation of that.

16    Then she'd have to sign for her records to be

17    released, and -- if we requested anything further

18    than probably last couple of days or couple of

19    weeks.

20         Q    And if Mike Adams or Brian Evans had seen

21    this patient in the clinic, that's what you would

22    have, how you would have expected them to handle it?

23         A    Yes, they would have, they would have

24    tried to get the physician's name that she saw a

25    week and a half ago that diagnosed her with Staph,
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    or the pharmacy where she was getting medicines
 2    filled and they would have just called them and
 3    asked them if she'd been seen.  If they couldn't get
 4    a physician's name or pharmacy's name, then they
 5    couldn't go anywhere until she gave it to them.
 6         Q    Do you know if they, in fact, did that,
 7    Mike and Brian?
 8         A    I do not know, in fact, that they did
 9    that, but I feel confident they would have.
10         Q    If they would have done that, is that
11    something they should have charted?
12         A    Not necessarily.  If there's no medical
13    records, there's no need to chart.
14         Q    Would you look at the first entry in the
15    chart and see if there's any indication of whether
16    that was done?
17         A    No, there was no evidence of them, no
18    documentation of them calling, but it says that she
19    was seen -- that she had been in an altercation for,
20    two weeks ago.  Had pain for two weeks.
21         Q    Did you see after that where it said,
22    "patient stated she was hospitalized approximately
23    one and half weeks ago due to a Staph infection."
24    Do you see that entry?
25         A    Yes, I saw that.
```



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q     And it's just she felt like the Staph was

2   causing her shoulder to hurt and wanted to go to ED?

3      A     Yes, I saw that.  And if she would have

4   been hospitalized one and a half weeks ago, Mike or

5   Brian would have called and just asked if she had

6   been a patient.  And if they had said no, then they

7   probably wouldn't even have documented anything

8   about it.

9      Q     I see.  So ED, does that mean Emergency

10  Department?

11     A     Emergency Department.

12     Q     Same thing as Emergency Room?

13     A     Right.  If she was seen in the Emergency

14  Room.

15     Q     The date of this is 7/23/10, isn't it?

16     A     Yes, sir.

17     Q     And if you look at the very last page of

18  this chart, that's, or maybe the second to last

19  page, the medical intake questionnaire, they

20  actually -- she actually in there, that would have

21  been done the same day actually some hours earlier

22  that day, wouldn't it?

23     A     Yes, when she got booked in.

24     Q     Okay.  And she indicated there that she

25  had been recently hospitalized for Staph infection,



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   didn't she?

2       A    Has the inmate recently been hospitalized?

3   She's got yes documented there, but on the special

4   notes it just states, "that her back hurts real bad.

5   Stated she had Staph infection about a week ago,

6   don't think it's all gone."

7       Q    Okay.  So that's what it says in the

8   questionnaire and then, of course, once she got to

9   the clinic she sold them she had been hospitalized,

10  or at least that's what was entered in the notes,

11  right?

12      A    She was hospitalized approximately one and

13  a half weeks ago.

14      Q    Due to Staph infection?

15      A    Due to Staph infection.

16      Q    And then if you look at the chart,

17  Plaintiff's Exhibit 2, the very next day, it says

18  7/24.  Doesn't have a time, does it?

19      A    No.

20      Q    Is that unusual to not have a time?

21      A    I would look at the sick call slip.

22      Q    Okay.  Plus whatever time they came in?

23      A    Yes.  And plus this was; this was not an

24  actual visit, I don't think.  This was a follow-up

25  note that Mike wrote because her mother had



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    approached him.

2         Q     Okay.  Can you read that note for us?

3         A     "Patient followed up with at her mother's

4    request.  Mother stated she was concerned that she

5    was getting Staph infection again and she was crying

6    during visit.  Patient stated she was still hurting

7    and that nothing had really changed since yesterday.

8    No change was noted.  Treatment started, Ultram 50

9    milligrams B.I.D.  I will tell her mother that since

10   she worked works in a lab, that if patient consents

11   and she furnishes supplies that I will be glad to

12   draw blood for her to check."

13        Q     If it was medically indicated to do lab

14   work, I mean, why would, why would he ask the

15   patient's mother to take care of that?

16             MR. BROWN:  Objection to form.

17        Q     (By Mr. Jones) Isn't that something that

18   IDHS should set up and have the County pay for?

19        A     There is no mention of who would pay for

20   this in here, and the County would be responsible,

21   but the -- we do not keep blood tubes and blood

22   culture bottles at the jail, so we would have had to

23   get them brought in.

24        Q     What would be the reason for drawing

25   blood?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        A        That was her mother's request.

2        Q        Well, I understand you didn't write this,

3    right?

4        A        Yes, sir.

5        Q        But your initials are on it, right,

6    "MA/BB?"

7        A        Yes, sir.

8        Q        Why does it say BB?

9        A        Because Mike called and talked to me about

10   it, and I agreed with him that if she wanted us to

11   draw blood and the patient consented to it, that

12   would be fine, they could draw blood.

13       Q        So you're saying it was the mother's idea

14   for y'all to draw blood?

15       A        Yes, at her mother's request.  Mother

16   stated she was concerned that she was getting Staph.

17       Q        Okay.  I understand what it says here, and

18   I guess we can interpret that different ways.  I

19   read it as saying patient was followed up with at

20   her mother's request, but I don't see written down

21   here that the mother requested the blood work.

22            Is that your specific recollection of the

23   phone call, that the mother wanted to have the blood

24   work done?

25            MR. BROWN:  Object to the form.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1          Q     (By Mr. Jones)  Or is that just what you're
2    reading into the note?  Let me clean that up.
3              Do you have a specific recollection on the
4    phone conversation that the mother was said to be
5    requesting blood work, or is that just the way
6    you're interpreting this note here?
7          A     I have recollection of Mike contacting me
8    that day and asking me that, and telling me that he
9    had had a conversation with the mother and that he
10   had followed up with Monica, and the mother had
11   asked if we could do lab work on her, and Mike said
12   he'd have to check me with.  And I told him that
13   would be fine.  If she brought the material over,
14   we'd be glad to draw it as long as the patient
15   consented to it.
16         Q     Do you know whether the patient consented
17   to it?
18         A     No.
19         Q     Do you know whether it was ever done?
20         A     No, the mother never brought the material
21   over.
22         Q     Okay.  What would the purpose of doing the
23   blood work be?
24         A     At this point in time for us medically,
25   there would have been no reason to do blood work for



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1    her at that point in time.
2         Q    Well, then why would you agree to do it if
3    she brought the stuff over if there was no medical
4    reason for it?
5         A    To appease the mother.
6         Q    I mean, what would the blood work indicate
7    if it were done?
8              MR. BROWN:  Objection to form.
9         Q    (By Mr. Jones) I mean, what would it tell
10   you about Monica's condition?
11        A    We didn't do it, so I don't know what it
12   would tell me.
13        Q    I mean --
14        A    I don't have any lab results in front of
15   me.
16        Q    Do you know whether -- I mean, depending
17   on what the results are, I mean, would it tell you
18   whether she still had a Staph infection or not?
19             MR. BROWN:  Well, I don't know -- what do
20   you mean by blood work?
21        Q    (By Mr. Jones) Well, what kind of blood
22   work was to be, was being discussed?
23        A    I don't know that.  Mike just mentioned
24   blood work, so --
25        Q    Well, my understanding is that y'all were
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   going to have the blood work done if she brought in

2   the tubes.

3       A    Yes, because we do not keep the vials and

4   tubes and blood culture bottles and things like that

5   at the jail, so we'd have to get them brought in.

6       Q    So where would -- had that been done,

7   where would you have had the lab work done?

8       A    Hart County Hospital.

9       Q    And what would you expect them to test

10  for?

11      A    Dr. Williams was not ordering it, so I

12  don't know.  I don't know what they would check for.

13      Q    Well, had the blood work been done, had

14  the sample been collected, would you have asked

15  Dr. Williams what he wanted done with it?

16      A    Yes, I would have asked Dr. Williams what

17  lab work he wanted.

18      Q    You wouldn't just send it to the hospital

19  and say do whatever?

20      A    No, not at that point in time.

21      Q    Okay.  I mean, what -- wouldn't the blood

22  work tell you if -- I mean, isn't there a blood test

23  to be done to determine whether somebody has a Staph

24  infection?

25      A    I'm sure there is a test that can be



DISCOVERY
LITIGATION SERVICES
Court Reporting ● Videography ● Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   performed for that, but at this point in time the
2   patient did not present with signs or symptoms that
3   led us to believe that there was a systemic Staph
4   infection.
5        Q    If you did have that concern, would you
6   agree that you would not only have a concern for
7   that patient but also for other patients as well as
8   staff, staff meaning personnel?
9        A    I don't understand the question there.
10       Q    Let's say if she had MSRA, for example,
11  that's something you probably don't want to set
12  loose in your jail, is it?
13       A    MRSA is just methicillin-resistant Staph
14  Aureus.  It's just a resistant strain of Staph.
15  It's quite common in jails.
16       Q    Okay.  Is there certain precautions you
17  would take to isolate that patient from the rest of
18  the population if it were determined that she had
19  it?
20       A    If there were open sores.
21       Q    Okay.  Would you isolate her at the jail
22  or would you send her to the hospital to be, you
23  know, so that she would be taken care of there?
24       A    If she had open sores, we would culture
25  the wounds and treat her appropriately with



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   antibiotics and isolate her at the jail.

2       Q    How would you physically isolate her at

3   the jail?  Is there a bed, an infirmary, or how

4   would you do that?

5       A    They have an isolation room.

6       Q    They have an isolation room?

7       A    Uh-huh.

8       Q    And basically if an inmate was being

9   isolated for medical reasons they could be kept

10  there?

11      A    They could.

12      Q    You testified before that you would

13  expect, based upon the history that was given in the

14  initial visit on the 23rd, you would expect the

15  medic or -- what do you call them, by the way?

16  Nurses?  Medics?

17      A    Medics.  They're not nurses, they're

18  medics.

19      Q    Okay.  You would expect the medic to,

20  under the circumstances I asked you to assume, you

21  would expect them to make a phone call to try to

22  ascertain, you know, whether she had been treated at

23  the hospital with the doctor?

24      A    Probably.

25      Q    Would you agree that had the medics not



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   done that on the initial visit, that certainly the

2   next day when the mother comes in expressing these

3   concerns that it would certainly be incumbent upon

4   you to do it at that point?

5        A    I feel pretty confident that the medics

6   would have called on the 23rd and asked if she had

7   been seen in the Emergency Department in the last

8   week and a half or two weeks.

9        Q    Okay.  And do you know when it says here

10  in the note, I realize you didn't write the note,

11  but I also know you were in a conversation with the

12  person who did, where it says here, "mother stated

13  she was concerned that she was getting Staph

14  infection again and she was crying during visit," do

15  you know if, who was crying, was that the mother or

16  was that Monica?

17       A    I do not know.

18       Q    Do you know whether Monica's mother

19  actually came down to the jail and talked to the

20  medic or did she call on the phone?

21       A    I am not for certain on that.  I think it

22  was a meeting that she bumped into him at the

23  hospital while he was there and made a reference to

24  it there.

25       Q    That was Mike Adams?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        A      Mike, I think so.

2        Q      And I guess I'll at some point today get

3    to ask him questions.

4        A      You'd have to ask him for clarification on

5    that.

6        Q      Okay.  Next, let me go back to the Policy

7    and Procedure Manual, Exhibit 1.  The next page

8    after the page we were just looking at after the

9    continuity of care policy, there is a page on head

10   injury instructions.  I'm going to skip over that

11   one.  And then I'm going to go to the next page, and

12   these aren't numbered, so I'm having to kind of do a

13   lot more explanation than normal.  I probably should

14   have Bates Numbered them.

15             Anyway, the next one is, "Policy Title:

16   Health Services Certifications and Training."  And

17   where it says policy at the top, it says, the second

18   sentence of that says, "The facility physician

19   systemically determines healthcare personnel

20   requirements in order to provide inmate access to

21   healthcare staff and services."  Who would the

22   facility physician be?

23       A      The Medical Director would be

24   Dr. Williams.

25       Q      Do you know whether he did this,



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1   systematically determines healthcare personnel

2   requirements, or is that something you did as the

3   President of the company?

4        A    He is advised of every employee and their

5   certifications and training, approves them.

6        Q    Okay.  So he approves -- he basically has

7   to concur with you that someone is qualified?

8        A    Yes, sir.

9        Q    And in doing that he also understands what

10  level of oversight is required for someone with that

11  level of training?

12       A    Yes, sir.

13            MR. DICKERSON:  Well, I object to the form

14  of that question, but you can go ahead.

15       Q    (By Mr. Jones) I would assume, though,

16  that y'all have discussions about whether someone is

17  a nurse, a paramedic, an EMT and what protocols are

18  appropriate for each level of licensure, right?

19       A    Yes, sir.

20       Q    When you put this Policy and Procedure

21  Manual together originally, were you contemplating

22  that you would have medics rather than nurses in the

23  jail?

24       A    I've always used medics.

25       Q    Okay.  And you yourself are a nurse?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1          A     And a paramedic.

 2          Q     At the time you were an LPN, right?

 3          A     Yes, finishing up my RN program.

 4          Q     But at the time you were an LPN?

 5          A     LPN, yes.

 6          Q     And you provided oversight to the medics,

 7    correct?

 8          A     Yes.

 9          Q     And Dr. Williams in turn provided

10    oversight to you, correct?

11          A     Yes.

12          Q     Now, I'm going to ask you what some of the

13    terminology is.  Okay.  Under word procedures it

14    says health authorities.  It says, "Health

15    authorities, including physicians, dentists and

16    psychologists meet all state and federal licensure

17    certifications or registration requirements," and

18    then it talks about the Clinical Director and the

19    facility administrator.

20                Let me ask you who some of these people

21    are.  We know the physician is Dr. Williams, right?

22          A     Yes.

23          Q     Who is the on-call dentist?  Would it be

24    fair to call him an on-call dentist, just somebody

25    you can refer to --
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A      A local dentist.

2      Q      The local dentist?

3      A      Yes.

4      Q      Okay.  Who -- is that someone that changes

5  from time to time, just --

6      A      It could.

7      Q      Okay.  So basically at any given point in

8  time you have a dentist that has agreed to take

9  referrals, is that fair to say?

10     A      Yes.

11     Q      Okay.  And then the same with

12  psychologists?

13     A      Yes.

14     Q      So their names really aren't important for

15  purposes of this case since they didn't provide, you

16  know, this was not a dental case or a psychology

17  case, right?

18     A      Right.

19     Q      But do you at this present time have a

20  dentist and psychologist that you can refer people

21  to if need be?

22     A      We do.

23     Q      And you did back in 2010 as well?

24     A      (Witness nodding head).

25     Q      Okay.  The Clinical Director, is that the



1    same thing as the physician, or is that somebody

2    else?

3         A    Clinical Director would fall under my

4    position, my duties.

5         Q    "The Clinical Director maintains

6    verification of current credentials on file."  Do

7    you do that?

8         A    Yes, we keep copies of all certifications

9    and credentials.

10        Q    Where do you keep those?

11        A    In our office.

12        Q    Where is your office?

13        A    In Washington, Georgia.

14        Q    Is that in your house?

15        A    Yes.

16        Q    Okay.  So you're the Clinical Director.

17   Who is the facility administrator?

18        A    Whoever the jail puts.

19        Q    Okay.  So the facility administrator is

20   not an IDHS position?

21        A    No.

22        Q    This is basically just kind of like you're

23   liaison with the county, is that what you mean?

24        A    Yes.

25        Q    Okay.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A      Usually the jail administrator or whoever

2   the Sheriff deems as the facility administrator for

3   the jail.

4      Q      And actually, to read that in context, the

5   sentence before that says, "Services provided by

6   contract meet all state and federal regulations.

7   The facility administrator maintains verification of

8   current contracts in file."

9              Is that referring to any contracts between

10   the County and medical providers?

11      A      Right.

12      Q      Okay.  So the facility administrator is

13   not responsible for keeping up with any of the IDHS

14   policies and procedures or anything like that?

15      A      No.

16      Q      Next page talks about, this policy,

17   administrative meetings, says, "IDHS will schedule a

18   quarterly administrative meeting for each detention

19   facility."  Do y'all do that?

20      A      We do -- we initially did those in-person

21   meetings with, between me and the jail

22   administrator, and it basically turned into just a

23   phone system once a month, or once every couple of

24   months we call and make contact.  Me and

25   Dr. Williams still meet regularly to follow up,



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    but --

2         Q     This is a -- this is specifically talking

3    about a quarterly administrative meeting, and I

4    think there's some other staff meeting that get

5    referred to later on.

6              Do y'all basically just kind of combine

7    all those meetings together?

8         A     We do.

9         Q     Okay.  And do you actually have a

10   formally-scheduled meeting, or is it just one of

11   these things that you do when you're communicating

12   with them anyway?

13        A     We have formally set up meetings, but if

14   we communicate by phone during the month, then we

15   can write that up as a meeting.

16        Q     Okay.  And it says here, "The Responsible

17   Health Authority, RHA, will coordinate to meet with

18   the jail administrator, Sheriff and/or the

19   designated representatives."

20              Who is the RHA, Responsible Health

21   Authority?

22        A     That would be me.

23        Q     That would be you?

24        A     Uh-huh.

25        Q     And we also know that the, from the



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    previous policy we looked at, you're the Clinical

2    Director.  How come you have so many different

3    titles in here?  Is that just because the policies

4    are borrowed from different places and they use

5    different terms interchangeably, or --

6         A    Well, no, we -- we use -- the -- that

7    Responsible Health Authority is technically the

8    company, Integrative Detention Health Services.

9         Q    Okay.  I got it.

10        A    If -- this is set to where if another

11   company came in they could possibly use these, too,

12   so they --

13        Q    I see.

14        A    -- could use somebody other than us.

15        Q    So the Responsible Health Authority would

16   be the company as a whole then?

17        A    Yes.

18        Q    And because you're the President of that,

19   that would, it would fall upon you to perform these

20   responsibilities?

21        A    Right, the CEO.

22        Q    Okay.  So Responsible Health Authority

23   means that you make the decisions with regard to the

24   health issues in the jail, medical issues?

25        A    Medical issues in the jail.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1          Q       Okay.  Well, when it says you'll

2    coordinate to meet with the jail administrator,

3    Sheriff and other designated representative, who is

4    typically the person that you meet with when you do

5    these quarterly administrative meetings?

6          A       Usually I talk with Bobby -- Bobby Milford

7    at this point in time.  He is the jail

8    administrator, so --

9          Q       Right.  He's the Captain?

10         A       -- we talk with on the phone.

11         Q       In charge of the jail.

12         A       Yes.

13         Q       At least in charge, he would be in charge

14   of the detention staff at the jail?

15         A       Yes.

16         Q       You're in charge of the medical staff,

17   right?

18         A       Yes.

19         Q       Is the Sheriff -- it says the jail

20   administrator, Sheriff and/or their designated

21   representative, so I take that to mean that any one

22   of those people would suffice, is that how you

23   interpret it?

24         A       Yes, sir, any one.

25         Q       So typically you meet with Bobby Milford?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A    We usually talk, yes, sir.

2      Q    Is he the one that got you the contract to

3   begin with?

4      A    No, sir.

5      Q    Or was that somebody else?

6      A    No, sir.

7      Q    I forgot.  How is it that you found out

8   about this?  I know you testified to it before, but

9   refresh my memory.

10      A    Blake Thompson was the EMS Director at

11   Wilkes County.  He told me that Hart County might be

12   looking for somebody, I came up here, called the

13   Sheriff and met with the Sheriff.

14      Q    That was back in 2001, around there?

15      A    Around that time.  I don't remember dates.

16      Q    So for purposes of these meetings, has

17   there ever been a designated representative other

18   than the jail administrator or Sheriff?

19      A    No.

20      Q    It says, "These meetings are designed for

21   a means for the improvement of current services or

22   delivery procedures, to discuss current issues or

23   concerns and review the CQI process and all

24   statistics gathered over the previous quarter."

25          Okay.  That's a bunch of stuff there.

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1    What is the CQI process?
2         A     Continuous quality improvement.  Oversight
3    of the charting.
4         Q     How is that done?
5         A     I review medical records, usually
6    10 percent on a monthly basis.
7         Q     Usually 10 percent?
8         A     10 percent.
9         Q     So basically you just randomly select some
10   records and review those?
11        A     Reviews those.
12        Q     So you don't review all of the records?
13        A     Not all of the records.
14        Q     Okay.  I take it that the medics in the
15   jail, I mean, they're the ones preparing the
16   records, right?
17        A     Yes.
18        Q     So they -- they've reviewed them, or at
19   least, they either created them or reviewed, right?
20        A     Yes.  They either wrote them or have gone
21   through them and looked at them.
22        Q     But you personally, as part of the CQI
23   process you personally review 10 percent, give or
24   take?
25        A     Give or take.
```


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q      You would also review anything else that

2      they specifically asked you to review?

3      A      Specifically asked me to, yes.

4      Q      You don't make it a point to review all

5      the medical records for all the inmates, do you?

6      A      No.  I would never have any free time.

7      Q      Okay.  What statistics are gathered when

8      it says, "statistics gathered over the previous

9      quarter."

10     A      Initially when we started this, we would

11     get, tell them how many inmates were seen monthly,

12     how many were sent out, how many went to the

13     dentist, how many went to mental health, how many

14     were sent to the Emergency Room, and basically we

15     kind of go over formularies, medication and things

16     like that, so --

17     Q      You said initially.  Y'all don't do that

18     anymore?

19     A      We now put it on their bill every month.

20     We since altered the format of the billing to where

21     it's actually included on their bill.  It shows how

22     many went to sick call, how many went to -- how many

23     inmates were seen, how many inmates were sent out.

24     Q      Because you basically, you've got to

25     itemize it to the bill anyway, right?

**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        A     Technically I don't, but I do for, just

2   for benefits of covering monthly statistics for

3   them, to help them.

4        Q     Right.  I guess what I meant to say is,

5   you get a base right of I think of $2,000 a month to

6   cover certain things?

7        A     It's $2,500 now, but yes.

8        Q     It's $2,500 now.  When did it go up

9   because I don't remember in the deposition, the

10  30(b)(6) I don't remember that coming up.

11       A     I don't remember the year.  It was -- when

12  Jerry Shaw was getting ready to leave I had been --

13  they were working on their new contract, and I had

14  been in negotiation with him telling him that since

15  the inmate population, we're starting to see more

16  inmates and having more time come out that we'd have

17  to probably up the bill a little bit versus upping

18  it a lot later on, and he advised me to go ahead, if

19  he got approval for that, so --

20       Q     Who is Jerry Shaw?

21       A     He was the jail administrator at that

22  time.

23       Q     What contract are you talking about the

24  re-upping in?

25       A     We were just negotiating a price on the



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    original contract where he had signed.

2        Q    Well, what -- is there another -- was

3    there another contract, or was there an addendum or

4    anything that --

5        A    No.

6        Q    So y'all basically had a handshake deal to

7    raise the price and there was nothing in writing?

8        A    Nothing in writing from us.  It was -- the

9    cost of price is just set as a base cost.  It's --

10   even though the $500 was set into the cost, it still

11   would have been billed out by overtime use and hours

12   by Mike and Brian, so --

13       Q    Do you know if, what the approval process

14   was with the County for the price increase?

15       A    No, I do not.

16       Q    I mean, do you know whether that's

17   something that the Commissioners had to approve?

18       A    I do not.

19       Q    Okay.  So as I understand it, the billing,

20   you've got a flat rate, a base rate which is

21   presently 2,500 a month, right?

22       A    Yes.

23       Q    That covers a certain number of clinic

24   hours?

25       A    Certain number of clinic hours.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1          Q       And then any clinic hours above that get
 2   billed at a certain rate, any call-ins above that
 3   get billed at a certain rate?
 4          A       Yes.
 5          Q       And then, of course, as far as bills for
 6   other providers, that would be billed directly by
 7   those providers, right?
 8          A       Yes.  They do have a pharmacy charge for
 9   over-the-counter medicines that we get at a reduced
10   rate that we add on to their bill.
11          Q       But the bill is almost never exactly
12   $2,500, right?
13          A       No.
14          Q       There's always some overage?
15          A       There's usually some overage.
16          Q       And so in order to justify that, I mean,
17   on your bill you do have to show what the number is
18   based on, right?
19          A       Right, yes.
20          Q       So since you're doing that, you basically
21   use that as a means for reporting the statistics
22   that have been gathered over the previous quarter?
23          A       I guess you could say that.
24          Q       Except you do that on a, I guess you do it
25   on a monthly basis?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        A       Monthly basis.

2        Q       So do y'all really talk about the stats at

3    these administrative meetings, or is it just kind of

4    where --

5        A       We usually talk about the number of

6    inmates seen.   You know, we'll talk about that.   And

7    I always ask them if, to make sure that, you know,

8    they're getting their forms back that's attached to

9    the sick call slip so that they may follow up with

10   recouping costs and things like that.

11       Q       It says these meetings are designed for a

12   means for the improvement of current services or

13   delivery procedures, to discuss current issues or

14   concerns, and then the other things we just talked

15   about.

16           Do y'all make any kind of record or

17   Minutes of these meetings?

18       A       I do not, no.   I do have just generalized

19   topics that we've talked about over the months, but,

20   I mean, there is no formulated, we sat down and met

21   today and did this, this, this and this.   I write

22   notes down on concerns and things that maybe Bobby

23   called me or I called Bobby about.

24       Q       So what about, do you actually prepare a

25   written agenda or do you just know what you're going

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    to talk about?

2        A    If I call Bobby, I usually have a, usually

3    have an agenda or a topic that I'm covering with

4    him.

5        Q    So generally these conversation take place

6    by phone, right?

7        A    By phone, yes.

8        Q    How long would they typically last?

9        A    Usually 15, 20, 30 minutes.  Usually not

10   very long.

11       Q    If Bobby Milford testified that he didn't

12   think you'd actually been to the jail in the last

13   three or four years, would that be correct?  Do you

14   do most of your business by phone rather than in

15   person?

16            MR. BROWN:  Objection, form.

17       Q    (By Mr. Jones) Let me rephrase the

18   question.  Would you disagree with his statement

19   that, you know, you haven't been to the jail, or he

20   hasn't seen you at the jail for the last three or

21   four years?

22       A    I've been to the jail a couple times

23   since, in the last three or four years, but yes,

24   most of my meetings are handled by talking on the

25   phone.  But I have been to the jail a couple of



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    times.

2         Q    The couple of times you've been to the

3    jail in the last three or four years, was that just,

4    say, to cover for a medical personnel that was out?

5         A    Either somebody who was out or I brought

6    supplies and equipment.

7         Q    So you'd be dropping off some supplies

8    that were needed?

9         A    Yes.

10        Q    Just in discussing current issues or

11   concerns and means for improvement of current

12   services and delivery procedures, tell me what y'all

13   talked about in your conversation, your

14   administrative meeting via telephone in relation to

15   Monica Robinson.

16             MR. BROWN:  Wait a minute.  Hold on.

17   Objection to form of the question.  That question,

18   to me, sounds like you're trying to get into some

19   type of peer review or quality assurance, and if you

20   are he's not answering that because you're not

21   entitled to that.

22             MR. JONES:  Well, I'm asking about

23   administrative issues.  So you're asserting a

24   peer-review objection to that?

25             MR. BROWN:  If you're asking about



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 60

1   anything that he and Bobby Milford talked about with

2   regard to Monica Robinson, if it touched on

3   reviewing, talking about the circumstances other

4   than the phone call, "Hey, we're going to send her

5   to the hospital," the who, what and where I don't

6   believe is peer review, but if it was under the

7   basis that they're talking to, talking a means for

8   the improvement of current services or delivery

9   procedures, I think that would fall under peer

10  review or quality assurance, and I think that's

11  removed from the scope of discovery.

12          MR. JONES:  Well, I don't think any

13  conversation with somebody who is not a medical

14  provider -- I mean, I don't think a conversation

15  with a public official is going to constitute a peer

16  review.

17          MR. BROWN:  I'm still going to assert it

18  and I'm going to tell him not to answer that.

19          MR. JONES:  You're going to instruct him

20  not to answer that?

21          MR. BROWN:  I am.

22          MR. JONES:  Where do you draw the line on

23  your objection?  You're saying we can talk about

24  who, what or where, but we can't talk about

25  recommendations for improvement.  Is that what


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    you're saying?
 2              MR. BROWN:  Yes.
 3              MR. JONES:  All right.  Well, let --
 4              MR. BROWN:  I mean, in other words, there
 5    are obviously things that Bobby Milford testified
 6    to, and I know you're going to ask Bruce questions
 7    about conversation or telephone calls that were
 8    made, say, on August the 11th.  Those are not within
 9    that, I don't believe, so -- because that's dealing
10    with the current situation at hand at that
11    particular moment.  But I think if you're looking at
12    this policy, and if you're talking about things that
13    are falling in this policy, if you're getting into
14    things that talk about improvement of current
15    services or delivery procedures or to discuss
16    current issues or concerns, to the extent they
17    involve Monica Robinson's treatment, then I think it
18    falls under that quality-assurance and peer-review
19    protection.
20              MR. JONES:  Okay.  I'm just trying to make
21    a record here.  Let me just -- let me break it down
22    into a couple of questions and then you can just --
23    you know, you can say same objection.  I mean, I
24    don't want to clutter it up too much, but I just
25    want to make sure I preserve the issue.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1          MR. BROWN:  Very well.

2      Q     (By Mr. Jones) Mr. Bailey, did you have --

3   in the context of these administrative, these

4   quarterly administrative meetings with the jail

5   administrator Bobby Milford, did the subject of

6   Monica Robinson's treatment come up in any of your

7   discussions about current issues and concerns and

8   the improvement of current services or delivery

9   procedures?

10         MR. BROWN:  Okay.  Just based on my

11  understanding of the protection that you are not

12  entitled to know whether it occurred at all, and

13  you're not entitled to know what the outcomes of

14  that were.

15         Now, if you want to go ahead and write

16  those down, I'll talk with Bruce about them during a

17  break and we may be able to circumvent it and get it

18  resolved today, but as it stands right now I'm just

19  going to instruct him not to answer.

20         MR. JONES:  Okay.  And by the same --

21  okay.  I'm going to ask this question as well.

22      Q     (By Mr. Jones) And that is -- and again,

23  I'm limiting this to the scope of these

24  administrative meetings.  During the course of these

25  administrative meetings were there any discussions



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    of means for the improvement of current services or

2    delivery procedures that were precipitated by what

3    happened with Monica Robinson?

4           MR. BROWN:  Let me think.  Are you asking,

5    then, about her review of the administration of a

6    service across the board that is not in any way,

7    shape, form or fashion related to the actual care

8    and treatment that was delivered to Monica Robinson?

9    I don't know how you draw that line.

10          MR. JONES:  I don't either.

11          MR. BROWN:  If you're talking about a

12   change that would be applied across the board, maybe

13   under circumstances X, Y and Z we should do

14   alternate one or alternate two.  If they would not

15   have had that conversation but for the fact that

16   Monica was an inmate and the fact that Monica

17   received care and treatment from them, I'm not sure

18   how to really differentiate that.

19          I mean, did y'all have any conversations

20   like that, number one.  I'll let you answer that.

21   After Monica's ordeal did you have any type of

22   conversations with Bobby Milford that were not

23   specifically targeted, targeting your treatment, or

24   IDHS's treatment of Monica Robinson?

25          THE WITNESS:  About the specific



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 64

```
 1    underlying --
 2                MR. BROWN:  Let's take a break.
 3                MR. JONES:  Okay.
 4                (Recess 11:10-11:18 a.m.)
 5                MR. BROWN:  Back on the record.  The
 6    response to both of your questions is in the
 7    negative.  I still think that under the peer review
 8    you're not even entitled to that, but I'll short
 9    circuit it for today.  Just subject to my objection,
10    the answer is no, there were no such meetings.
11         Q    (By Mr. Jones) Dr. Williams, does he ever
12    participate in these administrative meetings?
13         A    He sees the Minutes, or talks to me over
14    the topics that are covered.
15         Q    What Minutes?  You told me you don't
16    keep --
17         A    The notes that I jot down from month to
18    month of things that have happened in the jail or
19    conditions that we've had or if we're seeing more
20    MSRA, things like that.
21         Q    So where do you keep these Minutes or
22    notes or whatever you jot down?
23         A    They're at my office.
24         Q    Can you make copies of those for your
25    lawyer?  I'm going to ask him to produce them to me.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A      Which -- how much do you need?  Which

2  months do you --

3      Q      I need to figure that out, but how far

4  back do you have them?

5      A      Probably got them to at least '02 or '03,

6  but -- Wilkes County and things, but I don't --

7      Q      Yeah, I mean, I'll think about what I

8  think is a relevant time frame, and I'll do it.  But

9  I mean, what are we talking about?  Are we talking

10  about a manila folder that they're all in?  Are you

11  talking about, you know, four file drawers?  How

12  voluminous are we talking about?

13      A      No, no, no.  Actually, I think they're

14  actually wrote up in a three-ring binder.  I just

15  got them clipped in three-ring binders.

16      Q      And it will be up your lawyer to decide

17  whether he agrees with me or not, but I may just,

18  you know, request a copy of the whole binder or ask

19  to inspect it.  What we may do is set up a time to

20  come over there and look at that and look at the

21  chart and maybe some other things that we want to

22  examine and then we can ask you to copy what we

23  want.

24      A      Okay.

25      Q.      So these administrative meetings that are



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    supposed to be on a quarterly basis that you

2    typically do by phone, Dr. Williams doesn't

3    personally participate in those, does he?

4        A    No.

5        Q    Do you have an understanding as a medical

6    professional as to what peer review is?

7        A    Yes.

8        Q    What is it?

9        A    Peer review is basic oversight of

10   conditions that may have presented during a

11   patient's visit or stay during a hospitalization or

12   during a treatment plan that is reviewed by other

13   peers of same quality or higher that is kept on file

14   for training issues, training purposes and also M

15   and Ms, things like that.

16       Q    Does IDHS have a peer-review process?

17       A    We do.

18       Q    And is there a policy anywhere in this

19   manual that explains that process?

20       A    Our CQI is our peer review.

21       Q    Where does it say CQI?  Is there a

22   policy -- when you say "CQI," is there a specific

23   policy other than this administrative meeting policy

24   that talks about CQI?

25       A    Monitoring of Medical Services, Continuous



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    Quality Care.
 2         Q     Where is that?
 3         A     That's the next page.
 4         Q     The next one.  Got it.
 5               So when you say -- this actually says,
 6    "Monitoring Medical Services, Continuous Quality
 7    Care."  Is that -- I don't see CQI in here, but
 8    you're saying that that's what this is?
 9         A     Same thing, yes.
10         Q     Okay.  And how does -- I guess we'll just
11    go through this policy here.  It says at the top of
12    the page, "Policy, in order to assure internal
13    quality of health care in the detention facility the
14    physician of record does on-site monitoring of
15    health services rendered by providers including
16    physicians and dentists on a routine basis."
17               How does -- the physician of record would
18    be Dr. Williams, right?
19         A     Physician of record.
20         Q     Okay.  So on-site monitoring would
21    actually mean going on site, wouldn't it?
22         A     Initially this policy was set up for, if
23    they want to use a local physician to be their
24    Medical Director, that would give the physician of
25    record the on-site capability of coming on site.
```

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    Due to Dr. Williams' schedule he's not able to come

 2    on site, but all issues and charts are brought to

 3    him for further review.

 4         Q    Well, this policy then has really never

 5    reflected what Dr. Williams' practice was, is it, I

 6    mean, because he's been your Medical Director ever

 7    since you've had the contract?

 8         A    He's the company Medical Director, yes.

 9         Q    Company Medical Director.  He's also --

10    that makes him the Medical Director for the jail

11    too, doesn't it?

12         A    If the County wants him to be the

13    physician of record, that's who we appoint.

14         Q    But they --

15         A    They have the option to do that, to

16    appoint somebody local if they want to.

17         Q    But they haven't done that?

18         A    They haven't don that.

19         Q    They deferred to you on all of that?

20         A    Yes.

21         Q    And basically on all medical decisions,

22    right?

23         A    Yes.

24         Q    So you're basically saying then, correct

25    me if I'm wrong, but would you agree that Dr.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 69

1    Williams as physician of record does not do on-site

2    monitoring of health services?

3          A     No, not in Hart County.

4          Q     How does he do it if he doesn't do it on

5    site?

6          A     All charts are brought to him that are

7    needed to be reviewed or monitored.

8          Q     What do you mean all charts?  What do you

9    mean?

10         A     If we have a CQI process or a peer review

11   that needs to be done, the chart is collected by

12   myself and taken to Dr. Williams.

13         Q     Okay.  And as I understand it, you

14   would -- if I asked if that was done in the case of

15   Monica Robinson, your lawyer would object to me even

16   knowing if the process took place?

17              MR. BROWN:  Correct.

18              MR. MARSHALL:  As will I.

19              MR. JONES:  Okay.  Well, then I will not

20   ask that.

21              MR. BROWN:  Can that be my response for

22   the rest of the day?

23              MR. JONES:  Well, actually, let me make a

24   record just so I have the question out there.

25         Q     (By Mr. Jones) Was there a -- and he's



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    going to object, so don't answer.  Okay.

2              MR. JONES:  Trying to be professional,

3    Guys.

4         Q    (By Mr. Jones) All right.  Mr. Bailey, was

5    there a peer review conducted of the care of Monica

6    Robinson?

7              MR. BROWN:  And I will object to the form

8    and instruct the witness not to answer.

9              MR. JONES:  Okay.

10        Q    (By Mr. Jones) Now, as far as, where it

11   says, "a routine basis," what does that mean?

12        A    Whatever we designate as routine.

13        Q    Okay.

14        A    I usually do chart reviews every couple of

15   months, so that would be our routine.

16        Q    I mean, does routine mean whenever

17   something bad happens, or does it mean just

18   periodically whether something bad happens or not?

19        A    No, periodically whether something bad

20   happens, something good happens, I always review

21   charts, or go through charts.

22        Q    Well, you say that you will randomly

23   review 10 percent; is that right?

24        A    Roughly 10 percent.

25        Q    Actually, I added a word there that we



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 71

1  haven't talked about before.  Is it a random
2  selection, or do you just say, "I want to see this
3  particular inmate's chart," and it kind of averages
4  out to about 10 percent?
5      A    It's a random selection.
6      Q    So for CQI, what you're trying to do is
7  just kind of get a cross section and see that the
8  procedures are being properly followed?
9      A    Yes.
10     Q    And have you found that they are being
11 properly followed?
12     A    Yes.
13     Q    And as we sit here right now, and I'm not
14 asking about the findings of a formal peer-review
15 process or anything like that, but I'm asking you as
16 a fact witness and a defendant in this case, do you
17 believe that the care, that the services that were
18 provided by your staff, Brian Evans and Mike Adams,
19 to Monica Robinson, do you believe that at all times
20 they were consistent with the requirements of this
21 Policy and Procedure Manual?
22     A    Yes, at all times they were within regards
23 to the way the patient presented with her vital
24 signs and her chief complaint, they were consistent
25 with the Policy and Procedure Manual.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q    And just so you know, I'm not asking

2    specifically asking about standard and care and all

3    of that.  I'm not trying to make you an expert.

4    What I'm asking you is:  You've already testified

5    that the policy, that the IDHS employees are

6    required to follow this Policy and Procedure Manual.

7    What I'm asking you is:  Did they follow this manual

8    and act in accordance with your policies and

9    procedures at all times in connection with their

10   care of Monica Robinson, or are there any times that

11   you feel they may have departed from the policies,

12   you know, whether it was, you know, medically

13   appropriate or not?

14         MR. BROWN:  I'll object to the form.

15   Compound question.

16   Q    (By Mr. Jones) I'm asking about whether

17   they followed the policies.  Is that your testimony

18   that they did?

19   A    Yes, the medical treatment protocols and

20   policies they followed.

21   Q    And these medical policies and protocols

22   are the medical policies for the Hart County Jail?

23   A    The medical treatment policy and

24   procedures.

25   Q    Now, we're still looking here at the, what



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    you refer to as the CQI.  What does CQI stand for?

 2         A     Continuous quality improvement.

 3         Q     And is that any different than continuous

 4    quality care?

 5         A     It's been given several names.  You may

 6    see CQC, you may see CQI, you may see PI,

 7    performance improvement.  You may see a wide

 8    variety.  Every facility uses something different.

 9    I try to use CQ, C or CQI in my policies and

10    procedures.

11         Q     We don't see the words peer review in and

12    of themselves in here, do we?  I guess we either do

13    or don't, but to your knowledge --

14         A     To my knowledge I don't see peer review.

15         Q     Okay.  Now, we're looking at the

16    procedures here.  It says, number 1, integrate --

17    "IDHS submits a monthly statistical report to the

18    facility administrator which indicates the number of

19    inmates receiving medical services by category of

20    care."

21              This monthly statistical report that's

22    contemplated here, is that the same thing that was

23    talked about in the, that would be reviewed in

24    administrative meetings where it says statistically

25    gathered over the previous quarter?
```



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

 1        A    Yes.

 2        Q    So basically what the -- the idea of the

 3   administrative meetings is that you would just look

 4   at the statistics which are reported on a monthly

 5   basis, but you would review them over the last

 6   quarter?

 7        A    Of the last quarter, correct.

 8        Q    As I understand your testimony, the way

 9   they are reported is through the billing?

10        A    Through the billing.

11        Q    Got it.  The next line says, "The

12   physician reviews health records and pharmaceutical

13   practices at the time of his monthly visits."

14             Dr. Williams doesn't make monthly visits,

15   does he?

16        A    No, not at the jail.  I bring the charts

17   to him.

18        Q    Dr. Williams has never visited the Hart

19   County Jail to your knowledge, has he?

20        A    I cannot answer that.  I don't know.

21        Q    Well, if he said he'd never been there,

22   you wouldn't have any reason to disagree with him?

23        A    No.

24        Q    So when you adopted this policy, did

25   Dr. Williams give you any input as to whether he



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    would be able to make monthly visits?

 2         A    No.  This was initially set up for the

 3    Wilkes County Jail and just transferred over with

 4    the, when the revision in 5/07, it was just

 5    transferred over.

 6         Q    But Dr. Williams signed off on this

 7    whether he --

 8         A    Yes.

 9         Q    -- read that or not, right?

10         A    Yes.

11         Q    Do you remember any discussion with

12    Dr. Williams about whether he ever would make visits

13    to the jail?

14         A    We initially talked about it, but he would

15    have wanted more resources and more funds than the

16    County -- there is no way I could have afforded

17    that.

18         Q    In other words, y'all are paying him

19    $1,000 a month to be Medical Director?

20         A    Yes.

21         Q    And if you're going to have to pay him to

22    actually come to the jail, you have to pay him more

23    than that?

24         A    Pay him a lot more, yes.

25         Q    Okay.  Did Bobby Milford at any point, and
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   I'm not talking about during a peer-review
 2   procedure, I just want to know at any point in any
 3   conversation you ever had with him, Bobby Milford
 4   ever tell you that he thought it would be good if
 5   y'all could have a nurse at the jail every day?
 6        A    No, not to my recollection.
 7        Q    Okay.  Did Bobby Milford ever say anything
 8   to you about how he thought it would be good if
 9   y'all could have a local doctor available rather
10   than Dr. Williams, who I think is, what, 50 miles
11   away?
12        A    No, not to my recollection.
13        Q    It also goes on to say under Procedures,
14   number 1, it says, "facility is inspected
15   semi-annually for health and environmental
16   conditions by the County Health Department."
17             Do you know if the County Health
18   Department does inspect the jail?
19        A    I do not know.
20        Q    And then it says, "The findings of this
21   authority are, one, basic information for the
22   physician of record review."  So if you don't know
23   whether the Health Department inspects the jail, you
24   wouldn't know whether the physician reviews those
25   inspections, would you?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1          A      Right.

2          Q      Then number 2, it says, "The facility

3    physician meets monthly with the facility

4    administrator and the contract health services

5    supervisor to review medical services of the

6    detention facility and report on the health care

7    delivery system and health environment.  Minutes are

8    kept and serve as monthly reports."

9                 The facility physician, again, is

10   Dr. Williams, right?

11         A      Yes.

12         Q      But you said he doesn't participate in

13   these quarterly calls that you have with the

14   facility administrator.  I take it he doesn't meet

15   monthly with the facility administrative either,

16   does he?

17         A      He meets monthly with -- we talk monthly

18   about the care and services rendered at all jails.

19         Q      You and he have.  The facility

20   administrator would be Captain Milford, wouldn't it?

21         A      If that's who they designated, yes.

22         Q      But -- Dr. Williams doesn't ever meet

23   monthly or otherwise with Doctor, with Captain

24   Milford, does he?

25         A      No.


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q     Dr. Williams has never met Captain Milford

2    or anybody else that works for the Hart County

3    Sheriff, has he?

4      A     Yes, he has.

5      Q     He has?

6      A     Yes.

7      Q     Who has he met?

8      A     I'm not for sure, but he's had several

9    encounters with different jailers and different

10   employees coming to his office or to the jail.

11     Q     I got it.

12     A     Or to the Emergency Room.

13     Q     I got it.  So if an inmate was brought to

14   him or if he saw one at the hospital, then there

15   would be a, there would be a detention officer

16   escorting the inmate?

17     A     Yes, sir.

18     Q     Thank you.  Got it.  What about -- do you

19   know anything about Minutes kept as monthly reports,

20   or is this the Minutes you're referring to --

21     A     These are my monthly Minutes, for all

22   jails.  They incorporate all jails.

23     Q     Okay.  So the conversations that you have

24   on the phone with Bobby Milford, they cover both the

25   quarterly and the monthly requirement under these



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    policies?

2        A    They cover a wide variety of topics.

3        Q    Would you say you do them on a monthly

4    basis or quarterly basis or something different?

5        A    Bobby would probably be more quarterly if

6    we averaged it out.

7        Q    Okay.

8        A    Little less than quarterly, but we'll say

9    quarterly.

10       Q    Who do you -- it says here, "facility

11   physician meets monthly with the facility

12   administrator," okay.  We know Dr. Williams is not

13   meeting the facility administrator, right?

14       A    For purposes of CQ, continuous quality

15   care, no, he does not.

16       Q    And you're not meeting with the facility

17   administrator on a monthly basis because you just

18   said it was a quarterly basis, right?

19       A    Right.  We averaged it out, yes.

20       Q    So would you agree then that this

21   particular procedure is not being followed?

22       A    No.  If there are issues that come up

23   during the month, they have the ability to contact

24   me at any given time, so -- we set it up originally

25   as monthly, but it can contacted at any time.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  Weekly if they wanted me to.

2       Q     The Minutes that are referred to here --

3             MR. JONES:  Can you get some water or

4  something.  I'll take a break, I'll stop.

5             (Off-the-record discussion)

6       Q     (By Mr. Jones) The Minutes -- now it's

7  contagious, I got it.  The Minutes that are referred

8  to here in these procedures, would that be the same

9  notes in the three-ring binder you told us about

10 before?

11      A     Yes.

12      Q     You don't have any other Minutes or notes

13 or records of meetings other than those?

14      A     Just those.

15      Q     And are they typically handwritten or is

16 it something you print off a computer?

17      A     Typically handwritten.

18      Q     Okay.  And then going down, skipping down

19 to -- let's go to number 3.  "Due to the small size

20 of the facility infection control meetings are

21 incorporated into the monthly medical meeting."

22            Is MSRA or Staph, is that one of the

23 issues that gets discussed in those meetings, or is

24 that more like communicable diseases?

25      A     We talk of a variety.  I'm sure Staph and



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    MSRA has been spoken about multiple times, but just

2    a variety of what we're seeing in the different

3    jails.

4        Q    Have you talked in these meetings about

5    being aggressive in detecting and diagnosing MSRA?

6        A    MSRA is just an acronym for

7    methicillin-resistant Staph Aureus.  It's not a

8    condition.  It's just a diagnosis that is resistant

9    to using certain medications on.  Staph infections,

10    we do talk about being aggressive with Staph

11    infection.

12        Q    I mean, that's something you want to catch

13    as early as possible, right?

14        A    A Staph infection?

15        Q    Yes.

16        A    Yes.

17        Q    I mean, theoretically it could cause

18    somebody to lose a limb, right?

19        A    It do.

20        Q    Or even become paralyzed, right?

21        A    I don't know about that, but --

22        Q    You don't -- you never heard of a spinal

23    infection causing paralysis, full or partial?

24        A    No, I have not.  Never read any literature

25    on that.



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     Q    You ever heard of an infection, Staph

2  infection causing death?

3     A    Yes.

4     Q    So is it your testimony you don't think

5  it's foreseeable that a Staph infection could lead

6  to a spinal abscess?

7     A    I have --

8        MR. BROWN:  Objection, form.  You can

9  answer if you know.

10       THE WITNESS:  I have no -- I'm not a

11  neurosurgeon or anything like that, I don't know.  I

12  know that we use a flow sheet that's -- or not a

13  flow sheet, but recommendations that are set by the

14  national standards that we look at vital signs and

15  presenting factors and go off that.  If they don't

16  meet the, fall into the sepsis protocol for that,

17  then we just monitor.

18     Q    (By Mr. Jones) So you look at the NIH

19  guidelines?  What guidelines are you talking about?

20     A    Use, basically NIH or vital signs.  They

21  look at the vital signs and how a patient presents.

22     Q    I mean, you can -- there's a Website you

23  can just Google it and it tells you, right?

24     A    Right.

25     Q    Do you know what the Website is called?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A     I do not, no.
 2        Q     But basically the Website, it basically
 3   lists all the medical protocols for all different
 4   types --
 5        A     I've never looked at that.
 6        Q     I'm sorry.  Not medical protocols, but red
 7   flags, right?  That basically, things to look for?
 8        A     Never looked at that.  I use what common
 9   hospitals use.
10        Q     What is that?
11        A     It's just, we look at pulse rate, vital
12   signs, blood pressure, respiratory rate,
13   temperature, blood pressure.
14        Q     But I'm talking about on-line sources that
15   you would consult like Medline or whatever.
16        A     I don't use on-line sources for that.  I
17   consult the physician.
18        Q     Okay.  So you call Dr. Williams if you
19   need to know?
20        A     If the vital signs fall within that range,
21   I'll call Dr. Williams and he'll make a
22   determination.
23        Q     So in order to know if the vital signs
24   fall within that range, that would depend upon what
25   vital signs were taken during exam, right?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1        A     Yes.

2        Q     Then number 4 says, "annually."  Annually

3   means once a year, right?

4        A     Yes.

5        Q     "The facility physician, dentist and

6   psychologist review appropriate policies, procedures

7   and programs in the health care delivery system and

8   make revisions as necessary."

9              This would be part of the peer review

10  you're talking about, right?

11       A     Policy and procedures and peer review.

12       Q     Reviewing appropriate policies, procedures

13  and programs and make revisions as necessary?

14       A     Yes.

15       Q     Okay.  "The physician, dentist,

16  psychologist, nursing supervisor, facility

17  administrator and Sheriff sign a document which

18  indicates that they have done this annual review."

19             Can you produce any document signed by the

20  Sheriff?

21       A     No, that's up to their, their call if they

22  want to sign or not.

23       Q     So can you -- is there a document that

24  exists somewhere, whether you produce it or not,

25  that indicates that you've done this annual review?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1       A     There is just documentation that we review

 2   yearly, and if there's changes, then we revise them

 3   appropriately.

 4       Q     I mean -- and I'm looking at -- we're

 5   looking at policies here that require certain things

 6   to be, certain meeting to be done monthly,

 7   quarterly, annual reviews.  I mean, do you actually

 8   have separate times set on the calendar to do all of

 9   those things, or do you just work it all into just

10   your regular interactions with the jail staff, with

11   Captain Milford?

12       A     And which one are you talking about?

13       Q     Well, I'd asked before about the others.

14   So as far as the annual review, is that just

15   something that gets worked into your regular

16   interactions, or do you actually schedule an annual

17   review?

18       A     End of December we give, Dr. Williams gets

19   the policy and procedures, he reviews them, and we

20   call the facility administrator and ask him if he

21   needs any changes made or if there's anything that

22   needs to be changed.  And usually by the end of

23   January we have those put out, revisions made and

24   put out if there need to be.

25       Q     Looking at the Policy and Procedure Manual
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 86

1    we have here, which I believe is supposed to be the

2    one that was in effect at the time that Monica

3    Robinson was there back in July and August of 2010,

4    all the dates I see at the bottom, they either say

5    5/7 or 10/4.

6         A    Right.

7         Q    Is that right?

8         A    Yes.

9         Q    So have there been any revisions to this

10   Policy Manual since May of '07?

11        A    Yes.

12        Q    What's been revised since then?

13        A    I'd have to review the Policy and

14   Procedure Manual.  I can't recall every revision

15   we've made.

16        Q    Have they been -- the revisions you're

17   talking about, were they made after 2010 or are you

18   talking about between 2007 and 2010 but not included

19   in here?

20        A    I'd have to go back and look at the

21   current Policy and Procedure Manual.

22        Q    Okay.  The part we were looking at before,

23   the medical -- you know, earlier I asked you about

24   the medical treatment protocols that are at the very

25   end.  The last date on those says REV 10/4.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A     10/4.
 2        Q     So would that mean that these medical
 3   protocols had not been reviewed, had not been
 4   revised between 2004 and 2010?
 5        A     No, there is -- in this copy here there is
 6   five -- May of 2007 was the last revision.
 7        Q     So there was actually another, is there
 8   another copy of medical treatment protocols in here?
 9        A     Yes.
10        Q     I thought I'd seen it twice.  I see that
11   now.
12              There's another one that says -- well,
13   this one says 10/4 also.  Where's the one you're
14   talking about?  I don't know if it's intentional or
15   not, but it looks like we got about three copies of
16   the protocols in here.  And I don't know --
17        A     Medical treatment protocols, yes.
18        Q     Okay.  That's toward the beginning?
19        A     Yes.
20        Q     Let me go back a little further and see.
21        A     We revised 5/07 along with --
22        Q     Okay.  I see it now.  Medical treatment
23   protocols.  It's probably about one, two, three,
24   four five, six pages beyond where we've been talking
25   about.  But this one is dated 5/07.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A       Uh-huh.

2      Q       So you believe that these medical

3   treatment protocols that are in here, are these the

4   ones that are still in effect today?

5      A       I would have to check the 2011, see if we

6   changed anything for 2011/2012.  I can't recall off

7   the top of my head, so --

8              MR. JONES:  Drew, do we know -- I mean,

9   how was it determined that these were the ones in

10  effect at the time?

11             MR. MARSHALL:  This is an IDHS policy.

12             THE WITNESS:  Yes, these were the ones

13  that were in effect during that time.

14     Q       (By Mr. Jones) Okay.  So they were, in

15  fact, the ones that were in effect?

16     A       Yes.

17     Q       So without getting into what the attorneys

18  and you talked about or anything, were you

19  responsible for, you know, getting these documents

20  together so that what was produced would be, you

21  know, what was in effect at the time?

22     A       Yes.

23     Q       Okay.  And as far as there being like

24  multiple copies of the previous protocols that are

25  dated 10/4, do you know, is that just a, that's a



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 89

```
 1    copying error?

 2        A    That's a copying error that must have

 3    acquired --

 4        Q    It could have been me.  I don't know.

 5        A    I don't know.

 6        Q    There's no reason you would produce -- is

 7    there any reason you would produce a copy that had

 8    both the 10/7 and the 10/4 medical protocols?

 9        A    No reason that I would.

10        Q    I didn't know if maybe one augmented the

11    other, but the 10/7 one is supposed to replace

12    the -- or the 5/7 one is --

13        A    Replace the 10/4.

14        Q    The 10/4 one, right?

15        A    Right.

16        Q    Okay.  Got it.  So we'll ignore the 10/4

17    one then.

18             Then going back to the CQI policy,

19    monitoring of medical services, procedure number 5

20    says, "The facility physician reviews all medical

21    incident reports."

22             That's something Dr. Williams is supposed

23    to do, right?

24        A    Yes.

25        Q    Do you know if he does that?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1       A     Yes.

2       Q     He does?

3       A     Yes.

4       Q     What are medical incident reports?

5       A     Any condition that is reported as an

6  incident, unforeseen incident or an incident that

7  would have occurred during that time period.

8       Q     Would there have been one done relating to

9  Monica Robinson?

10            MR. BROWN:  Object to the form.

11            MR. JONES:  This is a pure -- okay.  Your

12  objection to form.

13            MR. BROWN:  I object to form.  He can

14  answer.

15            THE WITNESS:  Yes.

16      Q     (By Mr. Jones) The question is:  Was there

17  a medical incidents report that related to the

18  treatment of Monica Robinson?

19      A     Yes.

20      Q     Okay.  What is it?  What can you tell me

21  about that?  What did that report consist of?

22      A     Basically just an overview of how she

23  presented, what the treatment plan was, and

24  basically the discharging of the patient to the

25  hospital.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q     Okay.   When was that done in relation to
2    her being in the jail?
3      A     I'd have to pull it up and look.   I don't
4    recollect.
5      Q     Do you know if it was done while she was
6    still there?
7            MR. BROWN:   I'm going to object.   I think
8    we're now -- I think we're not getting into
9    something that I think will be covered under peer
10   review.
11           THE WITNESS:   Peer review.
12     Q     (By Mr. Jones) Is a medical incident
13   report, is there a specific form --
14     A     There is.
15     Q     -- that y'all use for that?
16     A     There is.
17     Q     How many pages is that form?
18     A     Depends on how much they have to write.
19   Usually one and a half to two pages.
20     Q     So basically kind of like a cover page
21   that contains certain information and then
22   additional narrative can be added to it?
23     A     Yes.
24     Q     So just in terms of the basic information
25   that's on the form, how big is that?   Just one page?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1       A       One page.

2       Q       Okay.  And so that page, does it just

3   basically have like the who, what and where, and

4   then there's a narrative added to it that goes into

5   more detail?

6       A       Right.  And then a format where the

7   physician can document on it.

8       Q       Okay.  So who prepares that report?

9       A       I would --

10      Q       In terms of the process, how it works?

11      A       I would, I review the chart, take the

12  documentation from the chart, put it on that, and

13  then present the chart with what my findings were to

14  Dr. Williams, and then whatever his findings were we

15  would attach back to the chart.

16      Q       And then does anyone else get it besides

17  Dr. Williams?

18      A       No, just Dr. Williams and me.

19      Q       Okay.  Then number 6, it says, "IDHS

20  supervisor."  Is that you?

21      A       That would be me.

22      Q       "Reports monthly statistics to the

23  facility administrator."

24              This is what's done through the billing

25  now, the itemized billing, right?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 93

1      A      Right.

2      Q      "The supervisor conducts monthly audits of

3   health records and other medical practices to assess

4   the effectiveness of the medical care system."

5            Is that where you do the random 10 percent

6   cross section?

7      A      Yes.   Random 10 percent, just chart

8   reviews and conversations between the health care

9   providers.

10     Q      How do you go about pulling that

11  10 percent?

12     A      Just a random review.  I walk in, pull two

13  from one day, three from the next day.  I can pull

14  just whatever I want.

15     Q      This is what you do at all the jails,

16  right?

17     A      Yes, at all the jails.

18     Q      But you don't walk in to the Hart County

19  Jail?

20     A      No, they send them to me.  And we review

21  them all.

22     Q      So do you keep all the charts at your

23  office, or is it, you just happen to have Monica's

24  because it's in litigation?

25     A      Any charts that are, that have incident


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    reports written up on them I keep in my office.

 2         Q     Okay.  You keep the original chart or just

 3    the --

 4         A     Original chart for security reasons.

 5         Q     Okay.  So does the staff at the Hart

 6    County Jail, your medical staff, do they randomly

 7    pull 10 percent and send them to you every month, or

 8    do they send you everything and you randomly pull

 9    10 percent?

10         A     It just depends.  Just depends on how

11    they're doing and what they're -- what they want.

12    If they've got any questions, we may cover a certain

13    topic one month and pull 10 percent of all the ones

14    they've seen on that, or -- it just depends.

15         Q     Do you say, "I want 10 percent," or is

16    that just --

17         A     I just give --

18         Q     -- basically ballpark and about what it

19    works out to?

20         A     Just roughly numbers.  Just give them

21    numbers off the annual visits.  Or monthly visits, I

22    mean.

23         Q     So you're getting statistics from them,

24    right?

25         A     Right.
```



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 95

1      Q     And what are you saying to Mike and Brian
2   about what charts you want to review?
3      A     Just ask them if they've had anything that
4   they've seen commonly that month, or going over any
5   reviews that they've had.  You know, if we had more
6   constipation one month, we may talk about that.  Or
7   if they've had more Staph infection, may talk about
8   that.  So cleanliness of the jail, just things like
9   that.  And then I'll, we'll make a determination
10  from there if there's, you know, one specific topic
11  that we need to concentrate on or if there is
12  something that we need to look into.  If not, then
13  we just pull randoms.
14      Q     But they pull them and then you review
15  whatever they send you?
16      A     Right.
17      Q     Then number 7 it says, "There is a monthly
18  IDHS staff meeting, quality assurance meeting," and
19  then it says, Nurses Meeting Minutes are kept and
20  quality assurance and chart audits are reviewed for
21  the month at that time."  Who are the nurses?
22      A     The nurses are employed at the other
23  jails, that would be just an all inclusive for
24  whoever is looking over the charts for that month.
25      Q     How come you don't have any nurses at the



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Hart County jail?

2         A     Never had any nurses apply.

3         Q     What?

4         A     Never had any nurses apply.

5         Q     Okay.  When you first had the contract, I

6    mean, you were an LPN, weren't you?

7         A     Yes.

8         Q     When you first had the contract with Hart

9    County, you would actually go out there yourself,

10   wouldn't you?

11        A     I did.

12        Q     But then when you hired Mike and Brian,

13   they essentially do what you were doing back then,

14   right?

15        A     Yes.

16        Q     So when the County first contracted with

17   IDHS, they were getting a nurse named Bruce Bailey,

18   weren't they?

19        A     Well, the original setup was that I would

20   find nurses or appropriate health care providers to

21   deliver the care.  So until I could find someone up

22   here I started delivering the care.

23        Q     So you delivered the care as a Licensed

24   Practical Nurse and then you found a couple of

25   paramedics to cover that?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1       A       Yes.

2       Q       And did the County -- did anybody at the

3  jail, anybody at the County express any

4  dissatisfaction with the fact that they were getting

5  a nurse and now they're getting paramedics?

6       A       Never.

7       Q       Never?

8       A       Never.

9       Q       Okay.

10      A       Actually they were recommended.

11      Q       Okay.  Because they were local?

12      A       Because they were local and they were well

13  known.

14      Q       And you actually -- it's a bit of a drive

15  for you to go to Hart County, isn't it?

16      A       Not too far.

17      Q       How far?

18      A       Forty-five miles.

19      Q       And then Dr. Williams, he's even further

20  than that, isn't he?

21      A       Yes, sir.

22      Q       But of course he's never been there

23  anyway, has he?

24      A       No, not to my recollection.

25      Q       The next policy says, "Medical incident



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  reporting under the emergency plan."  What is the

2  emergency plan?

3      A    If an emergency actually occurs.

4      Q    Okay.  And it says -- well, this says

5  "policy," and I'm abbreviating here, IDHS completes

6  a medical incident report on all incidents involving

7  employee or inmate injury or medication errors.

8           Is this the same medical incident report

9  you were talking about before, or is this something

10 different?

11     A    It is.  Same one.

12     Q    Okay.  I don't see anything specifically

13 in the policy about the emergency plan, so --

14     A    Any emergency that involves them or us

15 sending somebody in or be being notified about it.

16 If an employee, inmate injury or medication error

17 happens, then that's, falls under the emergency

18 plan.

19     Q    Why is it called the emergency plan?  I

20 just don't understand what the terminology is.

21     A    Because immediate action probably needs to

22 be taken.

23     Q    Is there another medical incident

24 reporting requirement for, say, non-emergencies,

25 say, that just have to do with, you know, I guess,



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    peer review type issues as a separate policy?

 2         A     No.

 3         Q     Other than --

 4         A     Any emergency plan would be peer reviewed,

 5    too, also.

 6         Q     Okay.

 7         A     Even outside incidents.  There is one on,

 8    I think visitor injuries.  At one time we had one

 9    for visited -- if somebody that was visiting the

10    jail was injured and the nurse was there, we could

11    send somebody over or the nurse could follow up with

12    them.

13         Q     So it basically would authorize the nurses

14    to provide emergent care for somebody that happened

15    to be there --

16         A     Right.

17         Q     -- that's neither an inmate nor an

18    employee?

19         A     Right.  Yeah, it's visitor accidents

20    and/or injuries.

21         Q     Okay.  All right.  Thank you.

22               And going back to this medical incident

23    reporting policy, actually there is a procedure here

24    that talks about emergent.  So I missed that a while

25    ago.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        Number 2, it says that the -- and this is

2    the medical incident reporting policy.  It says --

3    it says, "The facility physician is notified

4    immediately if the incident is of an emergent

5    nature."  What does an emergent nature mean?

6        A    Anything that requires emergent care.  If

7    an inmate slip and fell in the shower and hit his

8    head, they would contact the nurse on call, the

9    nurse on call would contact Dr. Williams and

10   Dr. Williams would say, yes, second him to the ER.

11       Q    Does this notification contemplate the

12   intervention by the, or treatment by the physician,

13   or is it simply to let the physician know that

14   there's been an incident and it's been taken care

15   of?  Let me rephrase the question.

16        Would this policy require the physician to

17   be notified immediately if the incident's of an

18   emergency nature even if the physician services were

19   not necessary --

20       A    Yes.

21       Q    -- to provide treatment?

22       A    Yes, he gets notified.

23       Q    So do you know if, whether Dr. Williams

24   was notified at some point regarding an emergent

25   incident involving Monica Robinson?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1          A     Yes, he was notified.

 2          Q     Do you know at what point he was notified?

 3          A     I spoke with Dr. Williams several times

 4    about the patient's care, so I wouldn't know the

 5    exact timing, date.  But it was -- he was notified

 6    that she was sent to the ER.

 7          Q     He was notified that she was sent to the

 8    ER?

 9          A     Yes.  And prior to that we had had several

10    conversations about her.

11          Q     Your testimony is you that had

12    conversation with Dr. Williams before --

13          A     Yes.

14          Q     -- she went to the ER?

15          A     Yes.

16          Q     What can you remember about those

17    conversations?

18          A     On the first conversation we were in the

19    hallway at Wills Memorial in X-ray, he was working

20    there, and I talked to him about Mike who had a lady

21    that had been pushed into a couch, had lower lumbar

22    pain, and we talked about the treatment plan, that

23    we put her on Tylenol.  He said that would be fine.

24    If she's still complaining, you can put her on

25    Flexeril and then bump up to Soma if you need to as
```

**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 102

1    a last resort, and you can use Ultram if you needed

2    to.  And I told him I'd keep him advised of the

3    situation.

4        Q    Looking at the chart that's been marked as

5    Exhibit 2, and just kind of viewing that in

6    conjunction with your, the recollection of the

7    conversation you just told us about, can you

8    estimate approximately when in her course of

9    treatment you believe that conversation at Wills

10   Memorial with Dr. Williams took place?

11       A    It should have been the evening of 7/23.

12   It was later that evening, I believe.

13       Q    Is that where you happened to be when Mike

14   Anthony called you, I mean, Mike Adams called you?

15       A    Yes, I was working that day.

16       Q    Okay.  And so Dr. Williams also happened

17   to be there at the hospital?

18       A    Yes.  That evening he came into the

19   hospital and we talked.

20       Q    Did you need to get Dr. Williams'

21   permission to prescribe those drugs, or did you just

22   consult with him because he happened to be there?

23       A    No.  The Tylenol we did not because it's

24   over the counter, but for further care, which we

25   talked about, we wanted to go ahead and see if we



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 103

1    could give her some Ultram or Flexeril if it was

2    muscle spasms, things like that.

3         Q    Were the protocols that were they in place

4    already have allowed you to prescribe her Ultram or

5    Flexeril without getting Dr. Williams' approval?

6         A    No.

7         Q    So your testimony is that under these

8    policies and the protocols contained in those

9    policies, you had to talk to Dr. Williams in order

10   to get permission to prescribe the drugs that were

11   prescribed for --

12        A    Yes, I spoke to Dr. Williams in order to

13   get the Ultram, Flexeril, Soma approved.

14        Q    Okay.  If you had prescribed those

15   medications without getting his express permission,

16   you would have been in violation of the protocols,

17   right?

18        A    I would not do that.

19        Q    I understand that.  But if you had, it

20   would have been a violation of these protocols?

21        A    Yes.

22        Q    And protocols, correct me if I'm wrong,

23   this is a delegation of the physician's authority to

24   you as a mid-level provider, correct?

25             MR. DICKERSON:  I object to the form of



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    that question to the extent that you're asserting

2    protocols may indicate standard of care.  Otherwise

3    go ahead.

4              MR. BROWN:  Same objection.

5        Q    (By Mr. Jones) You can answer the

6    question.  But I'm basically -- I'm not talking

7    about the standard of care, I'm talking about the

8    authority that you had to do it.  Let me just

9    rephrase the question.  It's not that big of a deal.

10             As a nurse, you can prescribe medication

11   if the doctor who is supervising you has issued a

12   protocol or standing order that authorizes you to do

13   it; is that right?

14       A    Yes.

15       Q    In accordance with the protocols?

16       A    Yes.

17       Q    If you are seeking to prescribe

18   medication, or to have medication prescribed for a

19   patient, and the protocols don't provide for that

20   medication, then you would have to talk to the

21   doctor and get his permission to do that?

22       A    Yes.

23       Q    Would you agree, then, that your authority

24   as a nurse in, with regard to what you're, what;

25   whether you can prescribe medications or not, you



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  agree that that comes from the doctor that is

2  supervising you?

3        A     Over-the-counter medications.

4        Q     Okay.

5        A     Yes.  Any prescription medication that we

6  have to call in, we have to get approval from

7  Dr. Williams first.

8        Q     So the protocols don't allow you to do

9  that without getting permission, even if it's

10 something that's on, that is allowed by protocol?

11       A     No, if it's a medication that falls

12 outside the protocol, which Ultram and Flexeril and

13 Soma did, then we have to call and get permission.

14       Q     But there are certain medication within

15 the protocol that are prescription medications that

16 you don't have to get the doctor's approval on

17 because the doctor has already approved them by

18 signing off on the protocols; is that right?

19       A     There are some medications that we are

20 allowed to initiate via protocol.

21       Q     Right.

22       A     Yes.  So mostly under special care,

23 special situations.  Special care and procedures.

24       Q     What does that mean?

25       A     Special medical procedures protocol for



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 106

1    inmates that are alcohol detoxification, allergic

2    reactions, diabetes, chest pain, anticoagulants,

3    anti-abuse, things like that, and they're in here.

4        Q    Okay.  Then looking back at the medical --

5    oh, I'm sorry.  Let me let you continue telling me

6    about conversations that you had with Dr. Williams

7    about Monica Robinson.  I want to ask you about that

8    now because -- none of your conversations with

9    Dr. Williams are charted, are they?

10       A    Just notes that I've taken over the years.

11       Q    Where are the notes that you've taken that

12   document your conversations with Dr. Williams?

13       A    In a spiral notebook at my house.

14       Q    I thought that spiral notebook was just

15   notes of your meetings.  Is that everything?

16       A    No, that's a three-ring binder notebook.

17   I have little spiral flip notebooks that I keep

18   little notes in, jot notes down and stuff when Mike

19   and Brian call me, things that I need to do, things

20   like that.  And I'm not even for sure I still have

21   those on file, but I usually keep, you know, a

22   couple years' worth.

23       Q    So what you're saying is that you have a

24   habit of making notes whenever you talk to either a

25   medic or a physician about a patient at the jail?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 107

1      A      Yes, because my brain does not keep all of

2    those things straight for me.

3      Q      Have you attempted to locate any notes

4    that you may have taken about conversations with

5    Dr. Williams concerning Monica Robinson?

6      A      I have not.  I can pretty much recall

7    those.

8      Q      Have you made an attempt to locate any

9    notes that you've made regarding Monica Robinson?

10     A      There are no specific notes other than

11   just incident reports that I would have kept, so --

12     Q      How about during your phone conversations

13   with Mike Adams and Brian Evans, did you ever, did

14   you make notes, doodles, whatever as you were

15   talking on the phone to them?

16     A      I'm sure I did.

17     Q      Would those be in that notebook, assuming

18   you still have the notebook?

19     A      If I still got it somewhere.  It's just --

20   usually it's just like vital signs, chief complaint.

21   I don't even ask names.  I get age and sex, and then

22   just take vital signs and chief complaints and how

23   they presented.  And then I just present it to

24   Dr. Williams and say, "what do you want us to do?

25   How do we need to handle this one?"



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 108

1    Q    Will you look for the notebook, or

2   notebooks, whatever notes you have relating to this

3   and locate the ones that relate to Monica Robinson

4   and make copies of those for your lawyer?

5    A    I can look for them, but I don't -- like I

6   said, I don't put them down by name or anything like

7   that.  Most of the time it's not even dates and

8   times, I don't think, so -- I don't document that,

9   so --

10    Q    I understand.

11    A    I just know that I flip to the next page

12   and that's the current ones I'm talking about.

13    Q    I understand.  But if -- if Dr. Williams

14   were to testify that he never talked to you, and no

15   one from IDHS ever talked to him about Monica

16   Robinson, any notes you have no matter how basic

17   or --

18    A    But I don't give Dr. Williams names unless

19   he asks, just like I don't take notes unless I ask

20   specifically.

21    Q    So you're saying it's possible that you

22   told him about --

23    A    I give him age, sex, chief complaint,

24   vital signs, how they presented, and get that so

25   he -- we never really associate names unless I have



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    to set up a doctor's appointment with somebody, then

2    I'll give him name and information, but --

3         Q    When you told him about the inmate who

4    said that she had been pushed into a sofa and was

5    complaining of back pain, did you also tell him that

6    that inmate had presented with a history of

7    treatment for a Staph infection?

8         A    I told him that she had stated she had had

9    Staph infection in the past, and that we had checked

10   the ED and there was no record in the last two weeks

11   of her being seen there.

12        Q    Did you check -- you told him that, but

13   who checked with the ED?

14        A    I would think that Mike or one of them had

15   called and checked to back her story up that's on

16   her booking sheet, so --

17        Q    I notice the note says one and a half

18   weeks.

19        A    Right.

20        Q    We happen to know it was a longer period

21   than that.  Do you know if the inquiry of the ED was

22   just limited to that two-week period?

23        A    It's usually -- we usually ask the inmate

24   specifically for dates so we can get medical

25   records, because we have to be specific.  If not,



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   we're going to get tons of stuff.  Usually we ask

2   them for dates or a time frame, from June to July,

3   or, you know, when were you seen.

4        Q    Does the note say -- does it say one and

5   half weeks or one and a half months or can you read

6   it?

7        A    One and a half -- patient stated she was

8   hospitalized approximately one and a half weeks ago

9   due to Staph infection.

10       Q    That's what it says?

11       A    That's Mike's note.  And on her booking

12  intake sheet she said a week ago.

13       Q    Did you ever add any information to any of

14  the chart, anywhere in the chart?

15       A    Me, personally?

16       Q    Yes.

17       A    No.

18       Q    So when Mike Adams put the initials, he

19  would have put your initial, too?

20       A    He did.  Any time they speak to me in

21  reference to a chart or a condition, I tell them to

22  put my initial beside it.  That way we can verify

23  that treatment protocols are followed.

24       Q    If you -- if Dr. Williams had been

25  consulted, would you also require them to put



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    Dr. Williams' initials as well?
 2         A     Not necessarily.  If it goes outside the
 3    normal limits of what we can do, then I will call
 4    them back and say, "no, we can't do that," or, "yes,
 5    we can do this, go ahead and call this in."
 6         Q     Okay.  So tell me what other conversations
 7    you recall having with Dr. Williams about Monica
 8    Robinson.
 9         A     I do remember having another conversation
10    stating that the Flexeril wasn't working, and he
11    said we can go ahead and bump her up to Soma, and
12    then that was probably the last conversation we had
13    about her condition.
14         Q     Approximately when was that?
15         A     That was probably 8/6, 8/10, somewhere
16    right there, yeah, 8/10.  Because when I told him --
17    I called him back told him to stop the Flexeril and
18    start Soma 350 B.I.D.
19         Q     You said you talked to him on August the
20    10th?
21         A     August 9th.  Should be August the 9th and
22    told -- yeah, August the 9th because Mike had -- no,
23    it had to be the 10th, because Mike had called me on
24    the 10th -- it was the 10th.  8/10.  Mike had called
25    me and said that she is still presenting, everything
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   looked okay, she was able to lift her legs up, she

2   was able to put weight on both feet moving in.  And

3   I called Dr. Williams either that day, or saw him

4   that evening, and we called -- and told him to stop

5   the Flexeril, start Soma.

6        Q     Were you -- will you read that note for

7   August the 10th?

8        A     8/10.  "Complaining of back pain, numbness

9   to legs, unable to walk or urinate, patient walked

10  to med room with assistance from one other inmate,

11  she sits in chair without problems.  She states that

12  numbness started yesterday afternoon and is best

13  described as if she had an epidural.  Has urinated

14  once a day for past two days, but nothing last night

15  or this a.m.  Also states Flexeril is not helping.

16  She denies any new injury.  Upon exam of lower

17  extremities, skin warm and dry with good color.  She

18  raises both feet and holds them out for exam.

19  Babinski is positive bilateral.  She has good

20  movement and sensation in both feet.  Abdomen does

21  not appear any larger than the first time I seen

22  her.  She left room with assistance but putting

23  weight on both feet and moving them in short steps.

24  Treatment, DC, discontinue Flexeril, start Soma 350

25  B.I.D.  Continue to monitor patient mobility and



```
 1    urination.  If no markable improvement in patient
 2    complaint, consider sending to doctor."
 3         Q    Under the TX, but after the DC, that's
 4    Flexeril, right?
 5         A    Flexeril.
 6         Q    That's a type.  And this is initialed
 7    MA/DB, right?
 8         A    Yes.
 9         Q    That means that Mike shared this
10    information with you, right?
11         A    Yes.
12         Q    And you talked to Dr. Williams that same
13    day.  Did you share this information with him?
14         A    Yes.
15         Q    Did you tell him that the patient was
16    complaining of back pain?
17         A    Said her back pain had not gotten any
18    better, the Flexeril was not working, and that she
19    had good movement, motor sensation to her lower
20    extremities, and asked him what he wanted us to do.
21         Q    Did you tell Dr. Williams that she was
22    complaining of numbness to the legs?
23         A    I'm not sure.  Probably did, but not sure.
24         Q    And then did you tell Dr. Williams that
25    she was complaining of being unable to walk or
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   urinate?
 2        A    Yes, I told him that.
 3        Q    Did you tell Dr. Williams that she had
 4   walked to the med room with assistance from one
 5   other inmate?
 6        A    Yes, I told him that she used assistance
 7   to get into the med room.
 8        Q    Did you tell him that she sits in a chair
 9   with problem?
10        A    With problems?
11        Q    That's what it says here.  I just wondered
12   if you --
13        A    No, No, I probably didn't say that.
14             MR. BROWN:  Said without.
15             MR. JONES:  Oh, it says without problem?
16        Q    (By Mr. Jones) Is that what it says?  What
17   did it say about her ability to sit?
18        A    "She sits in chair without problems."
19   That an S with a line over it.  That means without
20   problems.
21        Q    Okay.  We'll write -- okay.  That's
22   without problem, so my transcription is wrong on
23   that.
24             Then it says -- did you tell Dr. Williams
25   that Monica had stated that the numbness started
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1    yesterday afternoon and that it felt like she was

2    having an epidural?

3         A    I think I did tell him that.

4         Q    Did you tell her -- you said that you had

5    told Dr. Williams that she complained about not

6    being able to urinate?

7         A    Yes.

8         Q    And the note says that she had urinated

9    once a day for the past two days, but nothing last

10   night or this morning.

11            Did you communicate that specifically to

12   Dr. Williams as far as when she had last urinated

13   and how --

14        A    No, I think I just told him that she had

15   not urinated since last night.

16        Q    Okay.  What is a Babinski?

17        A    Babinski is a neurological check on the

18   plantar portion of the feet.

19        Q    How do you do that?  Do get them to stand

20   on their toes?

21        A    No, you get them to raise their legs, and

22   you take an instrument and run it up the bottom of

23   their foot.

24        Q    Okay.  And when it's positive bilaterally,

25   what does that mean?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com