MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.   DEPOSITION OF
BRUCE A. BAILEY, LPN on 10/09/2012                          Page 116

```
1        A    For us and the condition we talked about,
2   it means that she had a positive or a good response
3   bilaterally.
4        Q    I'm sorry, positive means abnormal,
5   doesn't it?
6        A    No, not for us.  Positive means a good
7   response in this documentation.
8        Q    So you're saying positive means negative?
9        A    No.  I'm saying -- positive in Mike's
10  documentation, and the way I would document it, is
11  that we document positives and negatives.  If she
12  would have had a negative Babinski, that would have
13  been a negative sign, or a bad sign, but she had a
14  positive Babinski, which means she curled her toes,
15  so therefore it was a good sign.
16       Q    Are you -- do you know whether that's
17  consistent with the charting conventions that are
18  used elsewhere in the medical profession?
19       A    I know the other medical professions use
20  it in different terminologies.
21       Q    Okay.  So did you talk to Dr. Williams
22  about the results of the Babinski, the findings of
23  the Babinski?
24       A    Yes, I told him that she had a good pulse,
25  motor and sensory to the lower extremities.
```


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 117

1      Q     So you didn't talk to him about whether it
2  was positive or negative, you said it was good?
3      A     It was good, yeah.
4      Q     Okay.  Then is says, "If no markable
5  improvement in patient," what is C/O, what does that
6  mean?
7      A     Complaint of or chief complaint.
8  Complaining of.
9      Q     In other words, if there is no markable
10 improvement in the patient's complaints, you would
11 consider sending her to the doctor?
12     A     Yes, that's what he told me to do.
13     Q     That's what Dr. Williams said?
14     A     Yes.
15     Q     So basically he's going to rely on the
16 patient's complaints and decide whether she goes to
17 the doctor or not?
18     A     The patient's condition.  How she
19 presents.
20     Q     Okay.  What does C/O there mean?
21     A     Complaining of.
22     Q     So you're telling me that after relating
23 information to Dr. Williams that you testified that
24 you communicated to him, that Dr. Williams did not
25 express any interest in having her seen by a doctor



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    at that time?

2        A    Not at that time since it was the --

3    dysuria or the oliguria had only occurred since last

4    night.  He wanted us to follow her.

5        Q    What is that word you just use?

6        A    Oliguria.

7        Q    Okay.  What does that mean?

8        A    It means scanty urine, not peeing.

9        Q    Okay.  That -- would the back pain and the

10   complaining of numbness to the legs, I mean, isn't

11   that a fairly ominous complaint?

12       A    Not with her vital signs the way she

13   presented.

14       Q    What vital signs?  Vital signs is like

15   temperature, blood pressure, heart rate, stuff like

16   that, right?

17       A    Yes.

18       Q    I don't see any of that charted on

19   August the 10th, do you?

20       A    On August the 6th I do.

21       Q    Well, that's four days before.

22       A    Yeah.

23       Q    What about on the 10th?  Is there any

24   vital signs charted on August the 10th?

25       A    No, I do not see them charted on



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309.
404.847.0999
www.DiscoveryLit.com

```
 1    August the 10th.
 2         Q    Where are they charted on August the 6th?
 3         A    The top of the chart, blood pressure,
 4    pulse, respirations.
 5         Q    You're looking at the call sheet?
 6         A    No, I'm looking at the inmate medical
 7    request.
 8         Q    Okay.  That's what I meant.  The --
 9         A    Sick call.
10         Q    -- sick call slip.  That's what you're
11    looking at.  And that's the one for the 6th.  Okay.
12    Did I give away one too many copies of the chart?
13              So it sounds like you had a conversation
14    with Dr. Williams sometime around July the 23rd that
15    was about Monica Robinson whether you used her name
16    or not, right?
17         A    Right.
18         Q    And --
19              MR. DICKERSON:  Well, I object to that.  I
20    think he's testified he did not use her name.
21         Q    (By Mr. Jones) Okay.  And then you had
22    another conversation with Dr. Williams about Monica
23    Robinson on August the 10th, right?
24         A    Yes.
25         Q    And she was seen at 8:30 in the morning.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1    Do you know when the conversation with Dr. Williams
2    would have been?
3         A    Either around lunch time or that afternoon
4    around suppertime.
5         Q    Well, the bottom of the note here says,
6    and this my Mike Adams note, says, "If no markable
7    improvement in patient C/O, consider sending to
8    doctor."
9              That notation there, is that based on what
10   Dr. Williams said, or is that just --
11        A    That would have been what Dr. Williams
12   would have said.  Make her an appointment up there
13   or send her to see me first of the week.
14        Q    What I'm getting at is, if that last
15   little notation there is based upon your
16   conversation with Dr. Williams, would this notation
17   have been added later in the day, or is it possible
18   that your conversation with Dr. Williams actually
19   took place earlier, you know, at the time of the
20   visit?
21        A    Mike may have saw her at 8:30 and
22   didn't -- I called him back -- left a spot and
23   called him back and told him what to do.  He usually
24   spends several hours at the jail when he goes, so --
25        Q    Do you -- in looking at this chart, when
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    did Monica first complain of difficulty walking?
 2         A     First time would probably be on the 10th,
 3    from what I can tell from the notes.
 4         Q     Well, that's the first indication that she
 5    had any trouble walking, or complained of trouble
 6    walking.  Isn't it odd that on the July the 23rd
 7    note at the very bottom of the note that it says,
 8    "patient walked back to her cell without any
 9    trouble."  What's the significant of the observation
10    that she walked back to her cell without any trouble
11    if there had been no issue about her walking?
12         A     We always -- I know I always document
13    gait, coming and going.
14         Q     Okay.
15         A     Especially with a back complaint, how they
16    walk, how their gait presents.
17         Q     The next day after this 8/10 note is 8/11.
18    It says a.m., no time, and it says, "called to check
19    on patient due to concern of mobility and
20    urination."
21         A     Uh-huh.
22         Q     And then there is a -- it says, "spoke,"
23    and then there is a symbol there.  Can you tell me
24    what that means?
25         A     With.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1       Q       Spoke with who?   DO?

2       A       DO.

3       Q       Who is DO?

4       A       Duty officer, I would think.

5       Q       I guess I might ask Mike that.   Duty

6    officer.

7               He said patient had urinated once or twice

8    because she had had her sheet changed.   Okay.   Does

9    that mean she wet the bed?

10      A       I'm not for sure on that.

11      Q       I mean, if there was a bladder-control

12   issue, I mean, would that be something that would

13   heighten your concern?

14      A       If she had not voided by that morning, it

15   would have heightened my concern, but she had gone

16   to the bathroom a couple of times.

17      Q       Where does it say that?

18      A       It says she had urinated --

19      Q       Once or twice?

20      A       -- spoke with DO, urinated once or twice

21   because she had her sheet changed.

22      Q       I thought you meant other than in the bed

23   when you said twice.

24      A       No.

25      Q       So this says initial MA.   So I guess that



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

| | |
|---|---|
| 1 | means you weren't consulted at that time? |
| 2 | A   Not that I know of. |
| 3 | Q   So it says, "called to check on patient." |
| 4 | This means that Mike Adams called the jail and spoke |
| 5 | with whoever answered the phone? |
| 6 | A   Right. |
| 7 | Q   Is that what duty officer means?  What |
| 8 | does that mean to you? |
| 9 | A   It means duty officer to me.  Sergeant in |
| 10 | control or the person on duty. |
| 11 | Q   Okay.  That conversation that you had with |
| 12 | Dr. Williams on August the 10th, was that by phone |
| 13 | or was that in person? |
| 14 | A   No, that was another in-person. |
| 15 | Q   Where did that one take place? |
| 16 | A   At Wills Memorial, I'm sure. |
| 17 | Q   And you also work full-time at Wills |
| 18 | Memorial, right? |
| 19 | A   I did at that time, yes. |
| 20 | Q   Do you know what Emergency Room Monica |
| 21 | Robinson was seen in for the Staph infection before |
| 22 | she came to the jail? |
| 23 | A   No, I do not. |
| 24 | Q   Do you know which one y'all checked with? |
| 25 | A   I do not.  You'd have to ask Mike. |



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

```
 1        Q     He didn't specifically say in the chart?
 2        A     I don't know.
 3              MR. JONES:  You know, we can break anytime
 4    y'all want.
 5        Q     (By Mr. Jones) Going back to the policy
 6    here, Plaintiff's Exhibit 1.  Next there is a policy
 7    on communicable disease precautions and medical
 8    isolation.  We talked a little bit about that
 9    already.
10              Isolation unit would be that cell you
11    talked about.
12        A     Right.
13        Q     What is it called, that -- where you can
14    isolate somebody if they got --
15        A     Isolation cell.
16        Q     Okay.  Then detention officer, medication
17    administration.  The only question I'd have about
18    that is:  The second page of that policy under
19    procedure 9, it says, "If at any time the detention
20    officer questions the orders given by the on-call
21    nurse, they may page the Responsible Health
22    Authority for clarification."
23              Responsible Health Authority, would that
24    be you?
25        A     That would be me.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        Q     This is specifically -- the context here

2    is if the detention officer who's administering the

3    medication has a question, they can call you?

4        A     Yes.

5        Q     The next policy, "Correctional health

6    liaison." It says, "Policy, IDHS does not maintain

7    24-hour on-site nursing services at facility so all

8    detention center personnel are trained in CPR and

9    basic first-aid."

10            Does IDHS provide the CPR and first-aid

11   training for detention officers, or is that done by

12   somebody else?

13       A     If they request it.  They get it in their

14   annual or their POST certified training.  They get

15   it, CPR and first-aid medication administration.

16       Q     To your knowledge does IDHS or your staff,

17   have y'all been provided any --

18       A     Yes, we have provided it.  When we

19   initially came in, we trained everybody.

20       Q     At Hart County?

21       A     At Hart County.

22       Q     Okay.  Then the bottom of that page it

23   says the delivery of training is designed and

24   delivered by qualified personnel assigned by the

25   Clinical Director.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 126

```
 1              Who is the Clinical Director, Dr. Williams
 2    or you?
 3         A    That would be me.  If it's -- if any of
 4    these classes are taught on site, I would have to
 5    approve who teaches them.
 6         Q    Did you do that or did you actually teach
 7    them yourself?
 8         A    I taught them myself.
 9         Q    This was early on when --
10         A    Yes.
11         Q    When you were --
12         A    Then I found out that they got it in basic
13    officer training, so we just eliminated it and said,
14    whatever you need we'll customize to your --
15         Q    So early on, meaning this was during the
16    time when you were providing the service at the jail
17    before you hired the medics?
18         A    Right.
19         Q    To cover Hart?
20         A    I did all the training.
21         Q    Got it.  Next is the medical treatment
22    protocols, and these are the ones that are dated, I
23    think these are dated 5/7.
24         A    5/7.
25         Q    So these are the ones that were actually
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 127

1   in effect at the time, correct?

2        A     Uh-huh.

3        Q     And there is a protocol on qualification

4   on the second page.  Did you say that that one had

5   been changed at some point?

6        A     Yeah, we used -- not necessarily Milk of

7   Magnesia.  We can substitute any over-the-counter

8   type medicine.

9        Q     Like mag citrate?

10       A     Mag citrate, Milk of Magnesia, Metamucil.

11       Q     Did Monica Robinson, in the chart, was it

12  ever charted that she complained of abdominal pain

13  or just of constipation?

14       A     Complained of back pain and constipation

15  is her writing.

16       Q     Okay.  Do you know what can cause

17  constipation and not also cause abdominal pain?

18       A     Yes.

19       Q     What?

20       A     I mean, there's several different medical

21  conditions out there that can cause those.

22       Q     One thing, if it was like a

23  neurological-type condition, that could result in

24  her being constipated without her having pain in her

25  stomach, right?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1        A     Depends on, I guess, where it is.  I can't
2    answer that one.
3        Q     Well, if you got back pain --
4        A     We have -- she had bowel sounds, so you
5    would not -- not lead to believe that to be a
6    neurological-type problem.
7        Q     She had bowel sounds?
8        A     Yes.
9        Q     Okay.  Where it says under number 4, and
10   each of these protocols there will be 1, 2, 3, 4,
11   there will be an assessment, there will be a nursing
12   diagnosis, there will be planning, and then there
13   will be an evaluation.
14             Under constipation, number 4, evaluation
15   says, "schedule clinic if symptoms persist.  Inmate
16   to follow up with medical" -- clinic means be seen
17   by the medic, right?
18       A     The next clinic visit.
19       Q     Right.  And where it says, "inmate to
20   follow up with medical," that means with physician,
21   doesn't it?
22       A     No, inmate follow up with medical at the
23   jail.  They're to fill out a sick call slip.  We
24   can't make them come see us.
25       Q     Okay.  So what this means is that the
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   medic should, or -- the medic should schedule the

2   clinic visit?  I don't understand.

3        A    No, the medic will document that a follow

4   up needs to be done, and then if -- they will put it

5   in the book, say for the next clinic, scheduled

6   clinic day, and then if the inmate does not turn a

7   sick call slip in, we'll ask that inmate if they

8   want to be seen.  If they say no, then we don't see,

9   we can't see them.  But if they turn a sick call

10  slip in, then we know to follow up with them.

11       Q    Yeah.  I guess I'm -- the one before that

12  is throwing me, which is "schedule clinic if

13  symptoms persist."

14       A    We'll tell the inmate to come to the

15  next -- fill out a sick call slip and come see us on

16  the next clinic visit.  And we also make, kind of a

17  note in the book about following up with patients

18  next week if we start somebody on new medicine or do

19  something different.

20       Q    Okay.  So you're saying that schedule

21  clinic and following up with medical means the same

22  thing?

23       A    Schedule clinic, right.  If the inmate

24  needs to come back and see us, they need to come

25  back and see us at the next clinic visit.  If it's a



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    procedure to where we need to follow up with them or

2    we think they need to be seen again, then we'll make

3    a documentation for the next, next clinic visit to

4    follow up with them.  And if they say they don't

5    want to come see us, then we document that they

6    don't want to come see us.

7         Q    So in all of these protocols, the phrase

8    "inmate to follow up with medical," that doesn't --

9    that's what that means?

10        A    It's their choice to follow up with us,

11   not ours.

12        Q    So the protocol doesn't provide for seeing

13   a physician at any point?

14        A    "Call physician if abdominal pain or no

15   bowel sounds," and on the next schedule if it had

16   changed, then they would have contacted the

17   physician.

18        Q    So under this protocol, the physician's

19   only to be notified if there was abdominal pain or

20   if there is no bowel sounds?

21        A    Correct.

22        Q    With regard to constipation?

23        A    Correct.

24        MR. MARSHALL:  About where do you stand

25   thinking --



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1              MR. JONES:  We got a good ways to go.
 2              MR. MARSHALL:  I would vote in favor of
 3    taking a lunch break then.
 4              MR. JONES:  I would, too.  I mean, we can
 5    take it whenever and for however long we want.
 6    Y'all know how late the restaurants are open and how
 7    crowded they are at what time, so --
 8              MR. GORDON:  It's probably as good a time
 9    as any.
10              (Lunch recess 12:36-1:30 p.m.)
11              MR. JONES:  Go back on the record.
12        Q    (By Mr. Jones) We were looking at
13    Plaintiff's Exhibit 1, and in the middle we were
14    talking about in these protocols, protocols that
15    were dated 5/7, and we talked a little bit about the
16    constipation protocol.  I don't see a protocol for
17    back pain, per se, do you?  Is it just the one on
18    minor aches and pains?
19        A    Minor aches and pains.
20        Q    What about serious aches and pains, what
21    do you do with them?
22        A    If symptoms persist or worsen, what we
23    normally -- if it falls outside this format, then we
24    take them to Dr. Williams.
25        Q    Okay.  I'm just wondering, it says, "Minor
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    aches and pains," and I know it's not back specific,

2    it's kind of general, does that have, that

3    nomenclature have any particular significance?

4          A    No.  Could be general body weakness or

5    pains or aches anywhere.

6          Q    Basically it's pain that in your judgment

7    you're able to treat, and if it's more serious than

8    that you would contact the doctor?

9          A    Yes.

10         Q    I didn't see any -- I don't see any

11   protocol on infections, per se, either, at least not

12   Staph infection.  I see something on wounds, I see

13   something on like strep throat, stuff like that.

14   But is there any protocol that specifically deals

15   with a Staph infection?

16         A    Wound care would take care of any presumed

17   wound infections that would be represented as Staph

18   infections.  And then aches and pains would fall

19   under any other generalized stuff.

20         Q    Now, you had mentioned that her vital

21   signs, at least to the extent that we have them, her

22   vital signs never suggested an infection.  What

23   would you expect to see were her vital signs if she

24   had an infection?

25         A    You'd expect to see an elevated



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    temperature or decreased temperature, elevated
 2    pulse, elevated blood pressure, elevated respiratory
 3    rate.
 4         Q    Now, the elevated temperature, that could
 5    just be a low-grade fever, right?
 6         A    Could be a low-grade fever.
 7         Q    Just enough to let you know something is
 8    going on, but not enough to where you'd be worried
 9    about the fever itself, right?
10         A    Yes.
11         Q    And how do you treat a fever?
12         A    Motrin or Tylenol.
13         Q    So Motrin or Tylenol would tend to reduce
14    the temperature, wouldn't it?
15         A    Yes.
16         Q    So would you agree that if someone is
17    taking Motrin or Tylenol and they've just got a
18    low-grade fever, that her temperature may appear to
19    be within normal limits?
20         A    I cannot speculate on that.
21         Q    You wouldn't agree that Tylenol and Motrin
22    can --
23         A    It depends on the last dose.
24         Q    -- lower an elevated temperature?
25         A    Depends on the last dose, when the last
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    dose was given and how soon the temperature was

2    taken after that.

3         Q    Well, I notice on the 23rd y'all gave her

4    Tylenol, 1,000 milligrams a day, right?

5         A    Twice a day.

6         Q    Twice a day.  So is that 1,000 milligrams

7    twice a day?

8         A    Thousand milligrams twice a day for ten

9    days.

10        Q    So that means 2,000 a day or --

11        A    No.

12        Q    -- 500 times two?

13        A    That means a total, 1,500, times two,

14   twice a day for ten days.

15        Q    Okay.  And at some point wasn't it also

16   learned that she was buying Tylenol at the Jail

17   Store Call on top of what she was getting from the

18   staff, I think August the 6th?

19        A    It says she had bought some on Store Call.

20        Q    So if she's taking more Tylenol than she

21   should be, that's certainly something that could

22   lower her temperature, isn't it?

23        A    Once again, I'd have to know the last

24   dose.

25        Q    Well, I'm just asking if it's possible



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1      that if you have an elevated temperature and you
 2      take Tylenol --
 3           A     It does not always lower your temperature.
 4           Q     You're not going to admit that it can
 5      lower your temperature?
 6           A     It possibly can, but not always.
 7           Q     I understand.  I didn't ask you about
 8      always.  I said can it?
 9           A     It possibly can.
10           Q     I mean, that's why, one reason you give
11      people Tylenol is to lower their temperature, right?
12           A     To reduce the fever, yes, see if it works.
13           Q     And y'all did give her Tylenol, right?
14           A     We gave her Tylenol for aches and pains,
15      for minor body aches and pains.  Never did she
16      present with a fever for us to give her Tylenol.
17           Q     Well, is it possible that since you didn't
18      chart the temperature some days that maybe she did
19      have a fever some days and you gave it for that?
20           A     No.
21                 MR. BROWN:  Object to the form.  I think
22      that misstates the actual chart.
23                 MR. JONES:  Yeah, the actual chart says
24      they took her temperature, what, one day or was it
25      two days?
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1          MR. BROWN:   No, the actual chart indicates

2     she was given Tylenol on the 23rd and the it was

3     changed to a different medication.

4          MR. JONES:   Changed to Motrin the 24th,

5     wasn't it?

6          MR. BROWN:   No.

7          MR. JONES:   Ultram.

8     Q     (By Mr. Jones) Why was the temperature --

9     why was the medication changed to Ultram?  You were

10    consulted by Mike about that?

11    A     Yes.  Because she was crying and saying

12    that the Tylenol was not helping, so we contacted

13    Dr. Williams, he said you can bump her up to Ultram

14    if you need to.

15    Q     Do you know if Ultram would also lower

16    temperature?

17    A     I do not know.

18    Q     Is it an antiinflammatory or do you know?

19    A     The class of drug is -- I think it's an

20    antiinflammatory.  I'm not sure on that.  I'd have

21    to look it up again.

22    Q     And if you look at the MAR in the chart,

23    it actually, doesn't it indicate that she stayed on

24    the Tylenol while she was taking the Ultram?

25    A     It does.



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 137

1    Q    She actually -- they gave her Tylenol all

2    the way up until what date?

3    A    Looks like the 3rd.

4    Q    August the 3rd?

5    A    Uh-huh.

6    Q    So this is -- the jail staff would have

7    given her Tylenol up until August the 3rd, right?

8    A    Yes.

9    Q    And then she stated on August 6th that she

10   was buying Tylenol with her own money and taking

11   that, right?

12   A    Yes, that's what the record says.

13   Q    Okay.  As of August the 6th, if she wasn't

14   on Tylenol anymore, what was she getting then for

15   the back pain, the Ultram still?

16   A    She got a dose -- on the 5th she got two

17   doses, and on the 6th it looks like she got an a.m.

18   dose.

19   Q    And then you started it on, started her on

20   Flexeril, the muscle relaxer, right?

21   A    Yes, on the 6th.

22   Q    Then this MAR indicates that she's

23   getting -- what was she being given, what was she

24   given from the 6th to the 10th?

25   A    On the 6th to the 10th?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 138

1   Q    Yes.  And I'd rather you look at the MAR

2   because that will show what was actually

3   administered.

4        A    She was getting stool softener on the 6th,

5   7th, 8th and 9th, and on the 7th and 9th she took

6   two, two doses twice a day, or a dose twice a day, I

7   should say.  And on the 6th she got one dose of

8   Motrin, which was stopped by Brian, and she got the

9   Ultram.

10       Q    Okay.  And was that the 6th through the

11  10th you told us about?

12       A    That was the 6th, and then on the 8th, 9th

13  and 10th she got two doses of Flexeril, one in the

14  a.m., one in the p.m. for those three days.

15       Q    The muscle relaxer, that would be for back

16  pain, right, assuming that it was, say, something

17  related to a muscle spasm or something like that,

18  right?

19       A    Yes.  She complained of lumbar back pain.

20       Q    If it's not a musculoskeletal-type

21  condition, the Ultram is not going to help eliminate

22  back pain, is it?

23       A    That's what Dr. Williams chose to give her

24  for her complaint of lumbar back pain.

25       Q    Dr. Williams didn't see her, but Dr.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  Williams said that would do it?

2      A    Because of her history of how she

3  presented with being thrown into a couch and having

4  trauma related to the lumbar area of her spine, that

5  we should try Flexeril, and if that didn't work,

6  we'd go to Soma.

7      Q    Did Dr. Williams express any concern to

8  you about the history of Staph?

9      A    No, not at that time.  He asked if she had

10  open sores, but we said no, not that we could see.

11      Q    Did he ever say anything about the blood

12  work?

13      A    No.

14      Q    You had told Mike that, you know, if

15  Monica's mom would bring in the tubes and stuff,

16  that y'all would draw the blood, right?

17      A    Yes.

18      Q    Did you ever tell that to Dr. Williams?

19      A    Yes, I told him that.

20      Q    What did he say about that?

21      A    He said that would be fine.

22      Q    Did you talk about what the blood work

23  might or might not indicate?

24      A    No, we did not talk about what -- if he

25  would even order the blood, he didn't -- we didn't



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   talk about that.  I just said that we gave the

2   option to the mother, told her if she wanted to

3   bring us the materials in that we do not keep in the

4   jail, that we'd draw blood for the patient and he

5   said that's fine.

6       Q    Did you tell Dr. Williams about her

7   history of drug abuse?

8       A    I did not know that.

9       Q    Isn't that in the chart, though?

10      A    It's in the chart, but I didn't tell him.

11  I mean, I don't pay any attention to that really.

12      Q    But from a medical standpoint, wouldn't it

13  matter, I mean, wouldn't it cause you to --

14      A    I mean, on our first conversation I'm sure

15  I probably did say that she had a history of drug

16  use, but, I mean, this was like a couple of days

17  later, I think, or the next day, and I probably

18  didn't even say anything to him about it.

19      Q    How many times --

20      A    I probably said the same girl I talked to

21  you about yesterday, her mom said she wanted to draw

22  labs, is that okay, because she works in the lab at

23  the hospital?  And he said, yeah, that's fine.

24      Q    So you're saying you actually talked to

25  Dr. Williams the 23rd and 24th, because before you



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    had just told me about the 23rd, and I think
2    August the 10th?
3         A    Let's see --
4         Q    Did I not cover all the conversations you
5    had with Dr. Williams, or are you just now thinking,
6    you're now remembering others that are coming back
7    to you?
8         A    Yeah, I had to talk to him that morning,
9    because -- it was either that night, the 23rd, or
10   the 24th because that's when the Ultram came into
11   play.  So it would have had to have probably been on
12   the 24th.
13        Q    And I noticed on this minor aches and
14   pains protocol it says, "Planning, Acetaminophen,
15   buffered aspirin or Motrin."  Now, y'all prescribed
16   Tylenol, I mean, that's not specifically mentioned,
17   but, I mean, that's over the counter, right?
18        A    Acetaminophen is Tylenol.
19        Q    It is.  Okay.  I'm sorry.  Acetaminophen
20   is Tylenol.  So it's 500 milligrams.  How do you get
21   from 500 to 2,000 under the protocol?
22        A    One to two tablets twice a day, that would
23   be 2,000.
24        Q    Okay.  So where it says, "500 milligrams
25   one or two tablets twice a day PRN," that would



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

specifically allow you to give up to, say -- that means -- that's the same thing as saying 1,000 to 2,000 --
A Yes.
Q -- when you do the math? And I went to Law School because I don't do math.
All right. We keep going through -- oh, we mentioned there's no Staph infection protocol. If you had a suspicion that an inmate had a Staph infection, what would you have done?
A What type --
Q If the protocol doesn't address it, what did you do if you suspect that an inmate has a Staph infection?
A What type of Staph infection?
Q The type that Monica ultimately had?
A I don't know what type she had.
Q Well, what are the universe of possibilities, then, what -- give me some examples.
A Most of the Staph infections we see in jail are open sores, open wounds, commonly community acquired type Staph infections. We usually culture those or treat them appropriately.
Q And I don't see a -- that would be then, what you just described would be under the wounds

```
 1    protocol?

 2        A    Wounds.

 3        Q    Okay.   Had the Emergency Room at whatever

 4    hospital you say was contacted, had they confirmed

 5    that she had been a recent patient for Staph

 6    infection?

 7        A    To my understanding, not in the last two

 8    weeks she had not been.

 9        Q    Right.   But if she had confirmed that,

10    what would the plan have been, would that have been

11    an automatic --

12        A    We would have requested medical records

13    from the facility for the time period that she

14    stated she had been a patient there, and we'd let

15    Dr. Williams know what they said.

16        Q    That's what I'm getting at, would Dr.

17    Williams review those records?

18        A    No, I would have gotten them and I would

19    have went over them with him, and we'd have gone

20    from there and see if she was treated effectively.

21        Q    So if you had -- so if she had been

22    treated at the hospital, and if the hospital had

23    verified that fact, it would have meant Dr. Williams

24    would have been involved?

25        A    If there would have been medical records
```



1  for the week and a half to two weeks that she would

2  have been seen at the hospital, that she would have

3  told Mike where she had been seen and he would have

4  verified those records, we would have requested

5  medical records.  The length of how long it takes to

6  get medical records is sometimes delayed through the

7  medical records process, but he would have been

8  notified immediately.

9       Q    And I know that this note says that she

10 was hospitalized possibly one and a half weeks ago,

11 and I know you didn't like the note, but do you

12 remember any conversation specifically about how

13 long it had been since she'd been in the hospital,

14 or since she'd last taken medication?

15      A    Mike had told me that she had been

16 hospitalized, or she stated she had been

17 hospitalized one and a half to two weeks ago.  And I

18 asked him if he'd follow up with the hospital.

19      Q    Is it possible that she actually said it

20 would have been longer than that, but that she'd run

21 out of her medication in the last week and a half or

22 two weeks?

23      A    According to her in-processing sheet, she

24 was seen a week ago, and according to Mike's records

25 when he talked to her, it was one and a half weeks



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   ago, and she had had pain for two weeks, and has not
 2   been seen by a doctor for it after being pushed into
 3   a chair, or a couch, in the lumbar area.
 4        Q    So she said she'd last been seen a week
 5   ago, I mean, that's what the note said?
 6        A    That's what the note said, yes.
 7        Q    But it doesn't specifically say whether
 8   that was the hospitalization or whether that was
 9   something else?
10        A    No.  In Mike's note it says that she had
11   been hospitalized -- "patient stated she was
12   hospitalized approximately one and a half weeks ago
13   due to Staph infection."
14        Q    What did she say in the medical intake
15   questionnaire?
16        A    Said that her back hurts real bad, states
17   she had Staph infection about a week ago, don't
18   think it's all gone.
19        Q    That doesn't specifically say hospital
20   there, though?
21        A    No, but in Mike's documentation it does.
22        Q    There was a -- I notice on August the 7th
23   there was another medication change where you gave
24   her Flexeril?
25        A    I don't see it on the progress note.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q     I'm sorry, August the -- on the MAR when
 2   they started administering it.  I think it's on --
 3   it was started on the 6th is when it's in the note.
 4        A     Okay.
 5        Q     August 6th, "Started Flexeril, 10
 6   milligrams, BID."  And then it looks like they
 7   started giving it to her on the 7th.  I'm sorry.
 8        A     Yes.  It would have taken us time to get
 9   it from the pharmacy.
10        Q     Okay.  Now, Flexeril is something -- and
11   that's something you would also have to get Dr.
12   Williams' okay on?
13        A     Yes.
14        Q     Okay.  So does that mean you talked to Dr.
15   Williams sometime on the 6th or 7th as well?
16        A     No.  On the -- the day I talked to him
17   about the Ultram, he said that if the Ultram didn't
18   work and we thought it was muscular to go ahead with
19   Flexeril, and if that didn't help try Soma.
20        Q     So you're saying that the conversation
21   that you had with him on, I guess it was -- what
22   day?  On July the 24th?
23        A     Right.
24        Q     That the same day that he told you about
25   the Ultram, that he went ahead and gave you
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   authorization for Flexeril if needed?
 2          A     If needed.
 3          Q     Okay.  And you specifically remember that
 4   being in connection with a conversation about
 5   Ultram, the same day as that?
 6          A     Yes.  And we always use them together for
 7   back pain, muscle spasms.
 8          Q     Okay.  And we know that the Ultram was
 9   started on the 24th, right?
10          A     Yes.
11          Q     So we know that had to be a separate
12   conversation from the conversation you had with him
13   on the 23rd, right?  In other words, you're
14   certain --
15          A     No.  On my conversations, I said it was
16   either the 23rd or 24th.  I couldn't remember which
17   one.  But that I do remember talking to him in the
18   hallway.  On this -- on this, I would not have
19   talked to him until the 24th because of the -- the
20   Tylenol didn't work.  So then we swapped it to
21   Ultram, so it had to be the 24th when I talked to
22   him.
23          Q     Okay.  In other words, you're certain that
24   you had a conversation with Dr. Williams on the 23rd
25   and a conversation with Dr. Williams on the 24th?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A     No, I'm sure -- I'm certain my

 2   conversation would have had to have been on the 24th

 3   due to the Ultram being ordered.  On Tylenol being

 4   ordered, I would not have had to talk to him about

 5   that.

 6        Q     Okay.  So all the information from the,

 7   that's noted on the 23rd that you say you told Dr.

 8   Williams about, you told him that on the 24th, is

 9   that what you're saying?

10        A     I don't believe I had seen him, remember I

11   said I talked to him on the 23rd, so --

12        Q     Well, that was how I interpreted your

13   testimony because you were talking about -- I asked

14   you about the note on the 23rd, and asked you if you

15   communicated certain information from that note?

16        A     Yes, it was communicated on the 24th, when

17   I got the approval for the upgrade in medication.

18        Q     Okay.  So the information that you, that

19   was obtained from Monica on the 23rd got

20   communicated to Dr. Williams on the 24th?

21        A     On the 24th, yes, sir.

22        Q     And the next conversation with Dr.

23   Williams about Monica was on August the 10th, that's

24   the one you testified about before?

25        A     Yes.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q     You've only had two conversations with him
 2   about her care during the time that she was an
 3   inmate, right?
 4        A     Right.  Yes, because I checked with him to
 5   make sure if he still wanted me to start the Soma.
 6        Q     Okay.  The next policy in Exhibit 1 after
 7   these protocols is the access to diagnostic
 8   equipment services.  And it says, "The detention
 9   center provides inmate access to diagnostic services
10   as deemed necessary by medical services."  Medical
11   services is you?
12        A     Yes.
13        Q     And that means IDHS, right?
14        A     IDHS, or if we have to send them out if we
15   don't have that piece of equipment or if we don't
16   have that testing.
17        Q     Okay.  What I'm getting at is, where it
18   says here, "As deemed necessary by medical
19   services," does that mean deemed necessary by you,
20   deemed necessary by Dr. Williams, or deemed
21   necessary by somebody else?
22        A     By Dr. Williams.
23        Q     Okay.  Dr. Williams.
24        A     Uh-huh.
25        Q     So Dr. Williams would have had to approve
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1    sending an inmate out for X-rays or labs or

2    something like that?

3         A    Right.  We have to get an order from him

4    before we can do it.

5         Q    And would you have had to get an order

6    from him to draw blood and put it into the tubes if

7    Monica's mother had brought it in?

8         A    No, she was going to get the -- to my

9    understanding she was going to run them herself.

10   It's not -- we told her we could call him and ask

11   him, but we can't guarantee that he would do

12   anything.  But we would draw the blood if she

13   brought the equipment and the inmate approved it.

14        Q    And I thought that if you did draw the

15   blood that you would ask him what tests he wanted

16   run, right?

17        A    Yes, if he approved it.

18        Q    Okay.  And if he didn't approve it, then

19   it would be whatever Monica's mom --

20        A    Monica's mom wanted.

21        Q    Or the lab wanted?

22        A    Yes.  If Monica agreed with us drawing the

23   blood, we'd draw the blood and hand it to her mom.

24   We'd label it and hand it to her mom.

25        Q    Do you know where she worked?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A     No, I do not.

 2        Q     Do you know what she did there?

 3        A     At that time I didn't.

 4        Q     Do you know if she had -- what do you know

 5   now, though?

 6        A     I know now that she worked in the

 7   laboratory.

 8        Q     Do you know what kind of work she did,

 9   what kind of training she had?

10        A     No.

11        Q     Do you know if she's actually a lab tech

12   or if she --

13        A     I have no earthy idea.

14        Q     Okay.  Under lab -- under procedures here,

15   number 1, it says, "Laboratory.  The contracted lab

16   has a representative available seven days a week, 24

17   hours a day for emergencies.  Routine labs are drawn

18   Monday through Friday."  What is the contracted lab

19   that you're referring to here?

20        A     The hospital within the county, or the

21   hospital they prefer to use, or lab they prefer to

22   use.

23        Q     So do you know who that would have been in

24   Hart County or who it would have been --

25        A     We had agreements with Hart County
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 152

1   Hospital at that time.

2        Q    So the next policy is called health

3   assessment.  It says, "Health appraisal data for

4   each inmate is collected in order to properly

5   classify inmates, promote awareness of and respond

6   to medical conditions and maintain adequate records

7   for each inmate's health status."  And then it talks

8   about the procedures.  Okay.  There's a preliminary

9   health screening.  When is that done?

10       A    The initial health screening is done when

11  they're booked in, at the time of booking.

12       Q    Is that what the intake questionnaire is?

13       A    It is.

14       Q    And that health screening is not done by a

15  medical person, is it?

16       A    It's done by the booking officer.

17       Q    But you guys, whenever the next clinic

18  hours is, whoever the medic is on call, they review

19  the intake questionnaires in the box?

20       A    If the intake questionnaire is in the box,

21  they review it.

22       Q    Okay.  Based upon the history that was

23  obtained in Monica Robinson's intake questionnaire,

24  and we've referred to it several times now, the

25  complaint about having had a Staph infection, about



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   thinking she might have still had a Staph infection

2   and the complaint of back pain, is that one that you

3   would have wanted the detention officer to notify

4   you of immediately, or is that one that you would

5   just want to review in due course as it was put in

6   the box?

7        A    No, if they flagged a recent

8   hospitalization, then they would have probably

9   called me that night.

10       Q    Do you think they should have flagged it?

11  Is that something you would expect them to flag?

12       A    Yes.  If somebody comes in complaining of

13  pain, being in an altercation, they're going to call

14  the nurse on call that night.

15       Q    Do you know if they did?

16       A    I would assume they did.  Yes, I'm sure

17  they called me, because I think was on call that

18  night.

19       Q    And the fact is, that they, that she was

20  seen the very next day, right?

21       A    Yes, she was treated the next day.

22       Q    Under preliminary health screening it

23  says, part A is where it says the admitting officer

24  conducts the screening, that's what we just talked

25  about, the booking officer.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1              Then part B it says, "After admission the
2    nurse on duty is notified and a physical assessment
3    and brief medical history is completed within the
4    first 24 hours of incarceration as deemed
5    necessary."
6              Does that mean that every inmate gets seen
7    by the nurse on duty within 24 hours?
8        A    No, just the ones that have an immediate
9    medical condition that we need to take care of.
10       Q    So if you didn't have a clinic the next
11   day you would have wanted Monica to be seen within
12   24 hours anyway by a medic, right?
13       A    Yes.  Somebody would have gone in to see
14   her.
15       Q    We've been through this before, but nurse
16   on duty doesn't mean nurse?
17       A    Nurse, no.
18       Q    And then this says what the initial
19   screening, this is initial screening by the nurse,
20   right, on the part B?
21       A    No.  Ask them the current illnesses and
22   health problems.
23       Q    "Inquire into current illnesses and health
24   problems, including venereal diseases, infectious
25   diseases, dental problems, mental health problems,
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 155

1    use of alcohol and other drugs, types of drugs used,
2    frequency used, date or time of use, history of any
3    problems that may have occurred after ceasing use,
4    present -- or past and present treatment or
5    hospitalization for mental disturbance or suicide,
6    possibility of pregnancy, other health problems
7    designated by the responsible physician."
8             What does that mean, other health problems
9    designated by the responsible physician?
10       A     Just anything that would fall out of
11   normal for us.  And Dr. Williams usually just gives
12   us a broad overcast.  If we think he needs to be
13   called, he needs to be called.
14       Q     So if y'all had called him and he had said
15   that he wanted to know something, that's what that
16   refers to?
17       A     Yes.  Anything -- if we had a current
18   outbreak of TB, he'd want to know more about the
19   night sweats, coughing, things like that.
20       Q     Then you've got observation of behavior,
21   one of the things you're looking for is needle
22   marks.  Do you know whether they looked for any on
23   Monica?
24       A     I couldn't answer that.
25       Q     But it says, "Trauma, markings, bruises,


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   lesions, jaundice, rashes, infestation, needles
 2   marks or other indications of drug abuse."  Do you
 3   know whether there were any manifestations, any
 4   indications of drug abuse with Monica the fact that
 5   she told y'all that she had used drugs?
 6        A    Not that I'm aware of.
 7        Q    Okay.  Then number 3, "Medical disposition
 8   of inmate to general population."  This basically
 9   just means whether they go in the general population
10   or whether they need to go somewhere else?
11        A    Right.
12        Q    For emergency treatment?
13        A    Right.
14        Q    Or other treatment?
15        A    Correct.
16        Q    Next, a medical exam, it says, "Each" --
17   well, before we get into medical exam, what we just
18   talked about, which is this kind of initial,
19   preliminary health screening by the nurse on duty in
20   the first clinic, if an inmate needs to be seen,
21   what we just read under part B?
22        A    Yes.
23        Q    Okay.  It doesn't say anything about the
24   medic or, as they say here, the nurse on duty doing
25   an exam on the inmate, does it?
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 157

1    A    You mean the first 24 hours?

2    Q    Yes.

3    A    Other than just an observation -- if it's

4  deemed necessary that this patient needs to be seen

5  within 24 hours, then the nurse would come in and do

6  an assessment on the patient.

7    Q    Let's say like on the 23rd when Monica

8  first presented to the clinic, that would have been

9  this, you know, this would have been the physical

10  assessment and brief medical history?

11    A    Yes.

12    Q    It says here what the initial screening

13  consists of, but it doesn't say what the assessment

14  consists of.  What would have been done -- what

15  should have been done on the 23rd in the way of a

16  physical exam?

17    A    She would have had her level of conscious,

18  airway, breathing, pulses, CRTs, capillary refill,

19  skin temps, colors, any neck veins, distention,

20  trachea, abdomen, bladder, bowel, distal pulses,

21  musculoskeletal and a survey for any deformities,

22  contusions, abrasions, lacerations or others and any

23  past surgeries.  And then also in comments, steps

24  where they would put the -- or up above they put

25  past medical history, any allergies, any



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  medications, if they smoke, last bowel movement,

2  last menstrual period.  And any further comments

3  down below.

4       Q    Should that be done on each visit or just

5  initially?

6       A    It's done on each visit, but if -- that's

7  how we keep the record of the inmate being seen.

8  But that's our whole -- we check the patient.

9       Q    Are you saying that you check them every

10  time whether you chart it or not?

11       A    We do those -- if they're checked, then

12  they've been charted.  If it's not pertaining to

13  their chief complaint, then they may skip over that.

14  But it just depends on what their chief complaint

15  is.  If they come in with constipation, you'll

16  probably see abdomen and bladder and bowel habits,

17  more so then with the airway breathing, circulation,

18  pulses, all that is constantly going to be checked.

19       Q    And you wouldn't necessarily check

20  temperature if the complaint was constipation?

21       A    Not necessarily.

22       Q    You wouldn't necessarily?

23       A    If they're warm to the touch or hot to the

24  touch, then they'd check temperature.  If not, if

25  they're normal skin temperature, they probably



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   wouldn't.

2       Q    And the same thing with back pain, you

3   wouldn't normally check temperature?

4       A    Not normally.

5       Q    If they say, you know, Staph infection,

6   you probably would, right?

7       A    Everybody lives with Staph.  I mean, Staph

8   is just a creature that's on all of us.  It's on our

9   skin, it's in our mouth, it's everywhere, so --

10  everybody has a different terminology of Staph.  So

11  normally if they had said they had a Staph

12  infection, you would have probably evaluated

13  temperature.

14      Q    Infection is the word?

15      A    Infection, yes.  Staph lives on you

16  constantly.  It's whether it gets in your blood

17  stream or your urine as to when it becomes an

18  infection.

19      Q    If you heard the word -- if the complaint

20  is infection, or there's a history of infection or

21  the concern was possible infection, you'd probably

22  going to check the temperature, right?

23      A    Probably, yes.

24      Q    You should check the temperature, right?

25      A    Yes.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1       Q     What about doing a blood culture, is that

2    something you would do?

3       A     Not necessarily.

4       Q     But it could be done, couldn't it?

5       A     If the physician ordered it.  And since

6    she'd just been treated with antibiotics, according

7    do her, her week and half ago being treated in the

8    hospital with that, a blood culture would probably

9    not have been appropriate for that time.

10      Q     Then number 2, "Medical exams, each inmate

11   who exceeds 14 days receives a medical examination

12   within 14 days of admission or at the next clinic

13   date."

14            So in this case, Monica had sick call, she

15   had sick call requests, she had -- she had medical

16   exams based upon her complaints?

17      A     That's right.

18      Q     But had she presented -- had she had no

19   complaints, had she had no unusual history, and she

20   was there for 14 days, does this mean that after 14

21   days or the next visit after that she would have had

22   an exam anyway?

23      A     That we would have looked at her, yes,

24   checked her out.

25      Q     So if she came in and had nothing wrong



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    with her or had no complaints at all, once she had
 2    been there two weeks y'all would have given her a
 3    full exam anyway?
 4         A     She would have filled out a -- we've got a
 5    health inmate history, self-administer form that she
 6    would have filled out, and it would given us an idea
 7    of, kind of what her past medical history is, what
 8    we need to look for.  And then we could have brought
 9    her in, we would have sat her down, went over it
10    with her, asked her if she was having any problems,
11    done a brief history and physical on her, and just
12    checked her to see if she needed a PPD or anything
13    like that.
14         Q     PPD?
15         A     Uh-huh.
16         Q     What's that?
17         A     Skin test for tuberculosis.
18         Q     All right.  Next is the -- we can skip on
19    past the rest of that policy.  Then we skip over the
20    oral care.  Next is health education and promotion.
21    Health education, promotion, one of the procedures
22    says, "During the initial screening -- or during the
23    first visit to the clinic area the inmate will be
24    asked by the health care provider for any pertinent
25    history or medications taken in the past."
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1          Should the nurse, or should the medic,

2     rather, on duty, Mike, should he have asked

3     specifically what medication they had put her on at

4     the hospital?

5          A     He would have probably asked.  Most of the

6     time they don't know if they're -- and there's a

7     spot for him to actually write it down.  And he

8     wrote down on 7/23, "none," and he asked about meds

9     and she said, "none."

10         Q     But that's what she's on at the time,

11    right?

12         A     At the time, yes, when she come in.

13         Q     But I'm talking about before when she said

14    she had been -- and you acknowledge that, you know,

15    she reported that she'd been on antibiotics, you

16    know, she had been treated at the hospital

17    previously?

18         A     Right.

19         Q     Would you have expected him to ask

20    specifically what antibiotic if she knew?

21         A     Not necessarily.

22         Q     So just antibiotics?

23         A     I would hope that the hospital would have

24    assured that she had enough medication that the

25    problem was taken care of before they started her.


**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1          Q     Sure.  And if you verified with the

2     hospital that she was on it, and if you determined

3     that she needed more, you would want to know what

4     she had been on, I guess?

5          A     Yes.  If she had came in and she said, you

6     know, I was taking medicine and it ran out, or I was

7     taking medicine and I left it at home, you know,

8     it's on my dresser, they didn't give me time to get

9     it, then we would contact the pharmacy or contact

10    the hospital and see what she's on, and we'd start

11    her back on it if it was not a, the course that was

12    completed yet.

13         Q     And then next it says, "Medical services,"

14    does that mean IPNA -- not IPNA.  IDHS.  IPNA is

15    Inman Park Neighborhood Association.  Sorry about

16    that.  IDHS.  All right.  "Medical services will

17    follow up with inmate's personal physician or

18    pharmacies for evidence of medical problems."  What

19    does that mean?

20         A     If they come in stating that they had a

21    current medical condition, like high blood pressure,

22    cardiac issues, Staph infection, and they haven't

23    finished their treatment, or they need their

24    medicines, then we'll verify with the physician's

25    office or pharmacy before we let Dr. Williams know



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 164

1    that this is a current medicine that they're taking.

2         Q    All right.   The next policy is inmate

3    exercise.   The next one is use of tobacco products.

4    I thought this was interesting.   It says, "IDHS will

5    ensure that all areas of the detention facility

6    remain smoke free.   Inmates are not allowed tobacco

7    products while incarcerated at this facility.   All

8    areas of the detention facility are smoke free."

9              So y'all have a policy that there's no

10   smoking, period, in the jail, right?

11        A    That's what we prefer, yes.

12        Q    Does that apply to the staff as well?

13        A    I don't govern the staff.

14        Q    It says, "Medical services does not allow

15   smoking in any portion of the facility," so that

16   only means the inmates?

17        A    That only means that we tell the Sheriff

18   and chief jailer and jail administrator that we

19   prefer they don't smoke, because it's bad for health

20   reasons.

21        Q    For health reasons?

22        A    For health reasons.

23        Q    Right.   And that's the entire facility,

24   not just --

25        A    Yes.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1          Q      Then next is ETOH, medical procedures,
2    this is for people that have alcoholism issues.
3    Specimen collection, skip over all of that.  Medical
4    and other research, skip over that.  Special medical
5    procedures, you mentioned something about that
6    before, but I don't remember what the context was.
7    Was there something in here that related to this
8    particular patient?
9          A      Just that she had been using drugs and
10   that we would monitor her for withdrawal-type
11   symptoms.
12         Q      Right.  If she had been on them when she
13   came in as far as withdrawal?
14         A      Yeah, that just covers that.
15         Q      Then there's stuff about -- this looks
16   like some dental stuff here, extractions and oral
17   surgery procedures.  Employee health screenings.
18   Then there's one called medical program objectives.
19   Let me just ask you a couple of things here.  It
20   says, "All detention center inmates are entitled to
21   health care comparable to that available to citizens
22   in the surrounding community."  What does that mean?
23         A      Most inmates don't actually seek care out
24   in the street, so when they come in here we try to
25   give them as close to, as appropriate as medical
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    access as they would have on the street.  So they

 2    have the opportunity to fill out a sick call slip

 3    and come see us twice a week if they want to or --

 4    and we don't force them to come see us, though.

 5         Q    Sure.  Then it says under procedures

 6    number 1, "Medical care of facilities delivered

 7    under the general directive from facility

 8    administrator, physician of record, and specified

 9    direction of the health services supervisor through

10    the use of trained licensed nurses."

11            We talked about who these different people

12    are, but I'll have a question about what is meant by

13    specified direction of the health services

14    supervisor.  You're the health services supervisor,

15    right?

16         A    Yes.

17         Q    What is specified direction by you mean?

18         A    If say an inmate fell on yard call and

19    needed an X-ray or he needed to be seen, we advise

20    the jail administration, and they select whether the

21    patient should go local or whether the patient

22    should go see Dr. Williams or come to Wills ER or go

23    to Hart County Hospital or local physician here.  We

24    just set the appointments up for them.  So we

25    supervise where they go, it's just under their
```



```
 1    direction as to which way we send them.

 2         Q    Under who's direction?

 3         A    Under the jail facility administrators.

 4    And if they don't have the jail staff to send them

 5    to Dr. Williams' office or to Wills, then we'll send

 6    them to a local physician, and we'll try to set that

 7    up for them.

 8         Q    So Dr. Williams makes a medical decision

 9    as far as whether they need to be seen or not?

10         A    Yes.  He would make the decision, or if,

11    say, the jail administrator calls and says I want

12    this guy to be seen, okay, do you want him to go to

13    Dr. Williams' office or do you want him to go to

14    Wills, you want him to go to a local office?  They

15    make that decision.  And we just help set up the

16    appointments and supervise the inmate getting there.

17         Q    So you coordinate the logistics of getting

18    the inmate to wherever they need to go?

19         A    Just getting the appointment.  They have

20    to coordinate the guards, the transportation, all

21    that.  We just coordinate where they're going to.

22    And try to have it set up so it's an ease of getting

23    in and getting out without hassle.

24         Q    But as far as what treatment they're to

25    get or what tests they get or whatever medical
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 168

1   decisions need to be made, that's made by IDHS, not

2   by the jail administrator?

3      A    No, it can be made by the jail

4   administrator, too.  If the jail administrator wants

5   somebody to be seen, he just calls us and we say,

6   okay, we'll get him out.

7      Q    But you determine the terms of -- you're

8   basically in charge of the medical aspect?

9      A    I just help them decide or make

10   arrangements to make it a east of access for the

11   jailer and the inmate so they don't have to go

12   somewhere and sit for four hours and risk an escape

13   or something like that.  I try to get them in and

14   out as quickly as possible.

15      Q    But whatever happens to the inmate is

16   basically determined by your medical protocols here

17   in terms of treatment?

18      A    No.  Treatment would be determined by the

19   physician that saw that patient.

20      Q    Right.

21      A    Yes.  If it's a local physician, it would

22   be a local physician making that determination, not

23   us.

24      Q    Right.  I guess what I'm getting at is,

25   the jail administrator doesn't get involved in



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    making medical decisions about what treatments

2    somebody needs or doesn't need?

3         A    He has the opportunity, the jail

4    administrator or the Sheriff or any of the admin

5    staff have the opportunity to send the patient at

6    any time wherever they want to without notifying us.

7         Q    Is this a new policy that y'all adopted

8    during the lunch break?

9         A    No.

10        Q    I didn't hear that this morning.

11        A    That's entitled in the contract.  They can

12   send them wherever they want to.

13        Q    Where does it say that?

14        A    They just call us for, to make

15   arrangements if we want to send somebody somewhere.

16        Q    Okay.  Then, let's see, under number 3 --

17             MR. BROWN:  That was a nice dig, by the

18   way.

19             MR. JONES:  Well, it wouldn't be a dig at

20   you.

21             MR. BROWN:  Except I ate lunch with him.

22        Q    (By Mr. Jones) Let's see, number 3, "No

23   health care personnel or officer or other employee

24   ever summarily or arbitrarily denies an inmate

25   reasonable requests for medical services."  What



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    does that mean?

2         A     That we will not refuse to see anyone that

3    puts in a sick call slip.

4         Q     When it says, "Or officer," is that

5    talking about a detention officer?

6         A     Detention officer.

7         Q     So what authority do you have to make

8    policy over detention officers?

9         A     I don't have any authority to do that.  I

10   would just hope that in their best judgment they

11   would allow all sick call slips to be turned in

12   appropriately.

13        Q     Is it your expectation that when it comes

14   to medical matters that the detention officers are

15   going to comply with this policy?

16        A     Yes.

17        Q     And is that because the Sheriff and the

18   jail administration has basically entrusted IDHS to

19   make the policies relating to the medical --

20        A     Yes, we've informed the jailers that any

21   time they fill out a sick call slip just make sure

22   they put in our box so we get it.  Don't circumvent

23   the system or anything like that, just put it in

24   there and let us decide what's going on with their

25   treatment.

**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1       Q      Like if a jailer, say, thinks that an

2  inmate is faking or they don't believe the

3  complaint, it's basically not their call to make?

4       A      True.

5       Q      Y'all make that assessment, right?

6       A      Yes.

7       Q      Now, you of course never had any, never

8  laid your eyes or hands on Monica as far as

9  providing hands-on care, right?

10      A      Right.

11      Q      So you have to rely upon the medics that

12 are there on the ground?

13      A      Yes.

14      Q      Did either of the medics, did either Mike

15 Adams or Brian Evans ever tell you that they thought

16 she was malingering or that she was magnifying her

17 symptoms or anything like that?

18      A      No.

19      Q      Did they ever tell you they thought she

20 was drug seeking?

21      A      No.

22      Q      That's always a suspicion, though, isn't

23 it, if somebody has a history of drug use?

24      A      Not necessarily.

25      Q      If they're asking for antibiotics,


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   probably not.  If they're asking for narcotics,

 2   maybe?

 3        A     She never once asked for any narcotic,

 4   though.

 5        Q     She never asked for it?

 6        A     No.

 7        Q     She just complained of the pain?

 8        A     Right.

 9        Q     She didn't try to direct the type of

10   medications she got?

11        A     No.

12        Q     Didn't she say she wanted something

13   stronger than Tylenol?

14        A     No.  She said the Tylenol wasn't working

15   for her, but she did have back pain for two weeks,

16   so --

17        Q     So as far as you could tell she was a

18   compliant patient, you know, she didn't try to give

19   any problems?

20        A     As far as I could tell, yes.

21        Q     No problems were reported to you?

22        A     Right.

23        Q     Number 7, I'm skipping down to just ask

24   you a couple of things.  "Health assessments by

25   nurses are done within 24 hours of incarceration,
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    and physical exam by the contract physician or
 2    licensed nurse are done by the 14th day."  Again,
 3    this is referring to this schedule that we talked
 4    about before, right?  You got the initial screening?
 5         A    Right.
 6         Q    And then if somebody's been there 14 days,
 7    then they get an assessment?
 8         A    Right.  Get an assessment, right.
 9         Q    It says here, "Contract physician or
10    licensed nurse," but y'all don't use a physician or
11    a licensed nurse --
12         A    If they present with a health assessment
13    form that needed to be evaluated by a physician,
14    then we would, once again, ask the jail, do you want
15    to send them local, do you want to send them to Dr.
16    Williams' office, and we do that.
17         Q    Would you have preferred that Monica
18    Robinson be assessed by a physician once you saw her
19    intake?
20         A    At that point in time, no.
21         Q    I mean, obviously hindsight is 20/20,
22    right, in terms of --
23         A    Her presenting facts that she was having
24    lumbar pain versus where her true abscess was, we
25    would have probably -- no.  She didn't present with
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.          DEPOSITION OF
BRUCE A. BAILEY, LPN on 10/09/2012                                              Page 174

1   anything that we would have treated any different at

2   that time I don't think.

3        Q    Other than the history and you couldn't

4   find, you couldn't get verification of --

5        A    We couldn't get verification of where she

6   was.

7        Q    During the time frame that she said she

8   was being hospitalized?

9        A    Right, the one and a half to two weeks,

10  right.

11       Q    Under number 1, which we covered before,

12  it says that the medical care is through the use of

13  trained licensed nurses.  The fact that it says,

14  "Trained licensed nurses" instead of just nurses in

15  a generic sense, doesn't this policy really require

16  you to use nurses, like LPNs or RNs?

17       A    No.  Mike and Brian consult me on every

18  patient, every sick call.

19       Q    So you are the trained, licensed nurse?

20       A    I am a trained licensed nurse, yes.

21       Q    But you're relying upon the paramedics at

22  the scene to do the actual examination?

23       A    My paramedics are critical care

24  paramedics, and they have more training than most

25  Licensed Practical Nurses or RNs do in the field of



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    emergency care and treatment, so, yes.
 2        Q    So you rely on them to do the exam and
 3    they rely on you to provide, to assist them with the
 4    assessment?
 5        A    Yes.  If there's anything that they might
 6    have missed or that I think they need to go back
 7    over, they will immediately do that.
 8        Q    And if you think it's something that's
 9    serious or potentially life threatening, whatever,
10    you could call Dr. Williams?
11        A    Yes.  And if they think it's serious or
12    life threatening, I believe them, and I call Dr.
13    Williams.
14        Q    They can call Dr. Williams?
15        A    They can call Dr. Williams, yes.  If I'm
16    not available, yes.
17             MR. BROWN:  Y'all try to stop talking over
18    each other.
19        Q    (By Mr. Jones) Then number 8, it says, "A
20    physician health review is conducted monthly."  What
21    does that mean?
22        A    Just that we go over any issues that have
23    come up for any of the inmates and review those.  If
24    we're seeing -- if we've had several patients with a
25    Staph infection or several patients with
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  uncontrolled hypertension, we'll talk with Dr.

2  Williams and see if maybe we need to change their

3  medication regime or if we need to maybe check the

4  medicine itself to see if it's working effectively.

5      Q     I take it this is independent from these

6  monthly meetings that, administrative meetings that

7  were in some of the earlier policies that Dr.

8  Williams doesn't participate in, right?

9      A     They're all just kind of grouped in

10  together.  We'll just mention them together and see

11  if there's anything specific he wanted done.

12      Q     But I thought he didn't participate in

13  these meetings?

14      A     He doesn't participate in the on-site

15  meetings, but I call him with all physician health

16  reviews.

17      Q     Okay.  When it's -- when it talks about

18  physician health review here, is this really kind of

19  people that are like chronic patients?

20      A     Patients that fall outside the normal of

21  what our policies and procedures fall into, or

22  patients that have chronic conditions that we're not

23  for sure exactly how to treat it or where to go from

24  there, and then he makes a referral to specialists

25  or outside physicians if we need to.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 177

1      Q    And this part of the treatment process,

2  this is not part of peer-review process, right?

3      A    Yeah, this is part of just treatment, if

4  we get anything outside the normal.

5      Q    Does the -- these monthly physician

6  reviews, do they fall a certain time of the month,

7  or does it just kind of work out to an average of

8  once a month?

9      A    Oh, no, it's probably more than once a

10  month.  It's probably every couple of weeks we're

11  calling him about issues, so --

12      Q    You mentioned two conversations with Dr.

13  Williams about Monica Williams.  I know one of

14  them -- Monica Robinson.  I know one of them was in

15  the hospital over at Wills, right, and I think the

16  other one -- was the other one at the hospital as

17  well?

18      A    Both of them were at Wills.

19      Q    Okay.  Did any of these physician health

20  reviews that are supposed to be conducted monthly,

21  did her treatment come up during any of those?

22      A    No.

23      Q    Do you know if there was one during the

24  time that she was a patient?  She was there from, I

25  think the 23rd of July through the 11th of August?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A     I'm sure probably the middle of July and
 2   probably within the first two weeks of August we
 3   talked about health reviews.
 4        Q     Okay.  But you didn't talk about her as
 5   one of these patients?
 6        A     No.
 7        Q     Okay.  Then the next policy is called
 8   staff meetings.  It mentions the CQI process.  We
 9   talked about that earlier.  That's your peer-review
10   process, right?
11        A     Yes.
12        Q     "Procedures, the monthly staff meeting
13   will be held on the first Friday of the first full
14   week of every month unless rescheduled by the RHA."
15   RHA again is the Responsible Health Authority?
16        A     Yes.
17        Q     That's IDHS?
18        A     Yes.
19        Q     The monthly staff meeting, who attends the
20   monthly staff meeting?  Is this the IDHS staff or is
21   this -- oh, it says here at the top, "Monthly staff
22   meeting for all health care providers working within
23   the detention facility."  So that's just Brian and
24   Mike, isn't it?
25        A     Yes.  Then I have other ones at Wilkes
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 179

```
1    County.
2         Q    So do you do -- do they have a meeting
3    themselves or do you call them on the phone or how
4    does that work?
5         A    We call them on the phone.  We initially
6    started meeting once a month, and then it just got
7    to be too much for all of us with our work
8    schedules, so we just call each other on the phone.
9         Q    So we've got these monthly staff meetings.
10   We've got the, what we just talked about, the
11   physician health reviews.  We've got these quarterly
12   administrative meetings.  Isn't there also another
13   monthly meeting too somewhere that we talked about?
14   How much of y'all's base monthly payment gets taken
15   out by these meetings, phone calls?
16        A    I don't have an answer to that.
17        Q    Do you really have them?
18        A    Yes, we talk constantly.
19        Q    I understand you talk constantly.  You'd
20   probably be talking constantly whether y'all were
21   supposed to have a meeting or not, right?
22        A    Yes.
23        Q    So, I mean, you basically -- I mean, do
24   you really have the meetings or do you just kind of
25   integrate that into conversations you're having
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH; et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 180

1   anyway?

2       A    Most of the time we integrate it into

3   conversations that we're already having, but we do

4   set aside time occasionally to meet and actually go

5   over issues that come up.

6       Q    Let's see, I'm trying to find the next --

7   where did we leave off?  Staff meetings, topics to

8   be covered are -- first of all, it says, "Will start

9   at 8 o'clock," that's what the policy says, is that

10  what y'all do?

11      A    Initially when we started it was 8 o'clock

12  in the morning.  That's when everybody, right when

13  they come on and go off shift.

14      Q    But y'all don't do that anymore?

15      A    No, we just talk on the phone now.

16      Q    And then "B, topics to be covered are last

17  month's statistics, any related problems with

18  delivery of care and CQI issues the previous month."

19  That's peer review, right?

20      A    Peer review.

21      Q    I guess I'm not allowed to ask you about

22  that.

23          "C, the educational topic will be assigned

24  by the RHA and be covered at the meeting."  I'm

25  guessing that's not peer review, that's just talking



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    about whatever --
 2         A    Right.
 3         Q    -- the hot issue is, if there's a lot of
 4    flu going around or whatever?
 5         A    It's flu, it's pneumonia, new medications,
 6    things like that.
 7         Q    So basically this is what you talk about.
 8    Is there any record made of that, or to the extent
 9    it exists, would it be in the note, the three-ring
10    binder there?
11         A    No.
12         Q    So is this more or less just kind of an
13    off-the-cuff discussion or are you like actually
14    sharing literature or things like that?
15         A    No.  We do a lot of literature sharing
16    just through our daily use, daily work.  But we do
17    mostly just off the cuff of what's going on in the
18    jail, how it's happening.  Initially, we kept
19    records for a long time, and then basically just got
20    away and just made it easier just to talk on the
21    telephone or communicate via E-mail on new topics
22    and things like that.
23         Q    And we haven't talked about E-mail yet,
24    but do you retain your E-mails from that time
25    period?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    A     No, I do not.

2    Q     How often do you delete your E-mails?

3    A     Whenever G-mail -- G-mail deletes them.   I

4    don't control that.

5    Q     What do you mean G-mail deletes them?

6    A     I have a G-mail account, so I don't know

7    when it deletes.

8    Q     You're saying that old E-mails eventually

9    get deleted, or they get re-deleted after you've

10   deleted them?

11   A     Yes.

12   Q     So you try to keep your in-box fairly

13   clean?

14   A     No, I've probably got thousands of

15   messages in there.

16   Q     Okay.  And then -- but if you want to

17   delete them, they go into a deleted --

18   A     A deleted folder.

19   Q     Does G-mail delete the deleted folder?

20   A     I'm not sure on that.

21   Q     Does it delete the in-box?

22   A     Only -- oh, I don't know.  It wouldn't

23   delete the in-box unless I deleted something I don't

24   guess, so --

25   Q     You can, of course, save an E-mail you



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    want to save as a document?

 2          A    Yes.

 3          Q    And I guess, do you save E-mails that

 4    relate to particular patients?

 5          A    No, we don't.  We do very little

 6    documentation of transferring patient records via

 7    E-mail.  We just don't do that.

 8          Q    That's because you've got a hard copy

 9    chart and it's kept at the jail?

10          A    At the jail.  We don't have scanners and

11    access to scanners and things like that.

12          Q    Was there any communications with Mike or

13    Brian or Dr. Williams, were there any communications

14    between you and anybody for that matter about Monica

15    Robinson during the time that she was a patient at

16    the jail?

17          A    No.

18          Q    So the communications that you do by

19    E-mail would just be regarding phone conferences and

20    things like that, meetings?

21          A    Phone conferences.

22          Q    Scheduling?

23          A    I may send him forms or he may run out of

24    a form or used the last one, I may shoot him a form.

25    Let's see, I may shoot him a test for a provider
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    course or something like that, just something that,

2    you know, he has access to.

3         Q     How about physicians orders or scripts,

4    does Dr. Williams E-mail those?

5         A     He has the capability, but we don't.

6         Q     I guess a prescription he can just E-mail

7    directly to a pharmacy?

8         A     Yes.

9         Q     Has he ever E-mailed you anything about

10   Monica Robinson?

11        A     No.

12        Q     Do you have -- so let me make sure I

13   understand.  You don't have any E-mails from the

14   time period of July or August 2010 that would relate

15   in any way to Monica Robinson?

16        A     None.

17        Q     Then finally, under these procedures, the

18   staff meetings, it says, "The RHA," that's, again,

19   that's you guys, the Responsible Health Authority,

20   "will take notes and ensure a formulated report is

21   issued to the physician if not present and placed in

22   the monthly meeting folder for review by employees

23   not present."  Would this be in that binder you

24   mentioned?

25        A     No, this would not be.  It would be under



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    the topics under the, probably the medic, or the
2    monthly staff meetings.  But under staff meetings
3    for the employees, it would just kind of be listed
4    in there general.
5         Q    What's the difference between these
6    monthly meetings and the monthly staff meetings?
7         A    The monthly staff meeting is between me
8    and Dr. Williams, and if the Sheriff or Bobby or one
9    of them want to participate, they can.
10        Q    I thought, though, that you told me the
11   ones you were talking about before were the phone
12   calls between you and Bobby Milford?
13        A    Right.
14        Q    But my understanding is Dr. Williams never
15   participated in those?
16        A    He doesn't.  I call him after talking to
17   Bobby if there's any complaints or conditions, and
18   then I talk to him about those, and then we
19   reiterate back to Bobby what our concerns were, or
20   how we corrected that problem if there was a
21   problem.
22        Q    Okay.  So basically Dr. Williams doesn't
23   participate in those calls, but if there's something
24   he needs to be apprized of you let him know?
25        A    I let him know, yes.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1       Q       Then there's the policy on visitor

2    accidents that you've mentioned before.  There's a

3    grievance mechanism for health complaints.

4       A       Yes.

5       Q       That's not the sick call request forms, is

6    it?

7       A       No.

8       Q       This is something different?

9       A       It's something created by the jail

10   themselves.

11      Q       So basically you just -- the jail has a,

12   you know, they have a grievance -- I think it's

13   required to basically, they have grievance forms

14   that inmates can fill out if they got a complaint

15   about anything, right?

16      A       Yes.

17      Q       And what you're basically saying here is

18   that that applies to medical issues as well?

19      A       Yes, they can complain about medical as

20   well.

21      Q       Right.  And if they complained about

22   medical, it says it's referred to IDHS Clinical

23   Director for follow up, right?

24      A       Yes.

25      Q       They complain about the food, it goes to



DISCOVERY
LITIGATION·SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    the jail administrator.  If they complain about the
2    medical care, it goes to you, right?
3         A     It should come to me.
4         Q     Yeah.  You're the Clinical Director,
5    right?
6         A     It should go -- probably the jail
7    administrator would get it and then he would call me
8    about it.
9         Q     I guess all the inmate grievance forms go
10   to the jail administration and then they will divvy
11   them out to whoever they need to go to?
12        A     I would think so.
13        Q     Then you've got the health screening
14   trustees, then you've got staffing levels.  The
15   Clinical Director, again, that's you, right?
16        A     Yes.
17        Q     It says, "The Clinical Director is
18   assigned to each detention facility to ensure the
19   quality of service being delivered at the facility.
20   The Clinical Director reports directly to the CEO of
21   IDHS."  So you report to yourself, right?
22        A     I do.
23        Q     But I guess this contemplates that you
24   might eventually be big enough to where you would
25   have somebody else?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A      Actually at one time I was big enough

2   where every jail had -- every jail but Hart Wilkes

3   had their own Clinical Director, and they reported

4   to me.

5      Q      So that would be just be one of the medics

6   or nurses that you would designate?

7      A      Yes.

8      Q      But with Hart County, that is you?

9      A      That's me.

10     Q      Okay.  And so you're the Clinical Director

11  for the Hart County jail.  Are you also now the

12  Clinical Director for the other jails, too?

13     A      I only have two jails at this time.

14     Q      Wilkes?

15     A      Hart and Wilkes.

16     Q      And Wilkes.

17     A      I'm Clinical Director for both.

18     Q      This says that you work approximately 10

19  to 20 hours per pay period to ensure that all areas

20  of care are being appropriately provided and

21  delivered, and you also act as the liaison officer

22  for the detention facility, right?

23     A      Yes.

24     Q      So is that correct, you work about 10 to

25  20 hours per week in that capacity, or is it hard to



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 189

1  break it up?

2     A     Depending on all the jails, between Wilkes

3  and Hart, it's probably about that much.

4     Q     So that's 10 to 20 total and not per day?

5     A     Probably 20 to 30 total, yeah, for both

6  jails.

7     Q     And what is the pay period -- it says,

8  "Per pay period," is that two weeks, a month?

9     A     We're paid once a month.

10    Q     Once a month.  So it's -- do you pay your

11  staff once a month, too, or is that just how often

12  y'all get paid by the county?

13    A     Pay our staff once a month.

14    Q     Okay.  You get paid once a month.  So when

15  you said 10 to 20 hours per pay period, or 20 to 30

16  between both jails, you're talking about for the

17  month?

18    A     For the month.

19    Q     And then most of the -- the rest of your

20  time, your work time you spend working at the Wills

21  County Hospital?

22    A     Wills Memorial.

23    Q     Wills Memorial?

24    A     And Doctors Hospital in Augusta.

25    Q     I'm sorry, Wills Memorial, is it in Wilkes



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   County?
 2        A     Wilkes County.
 3        Q     But Wills is the name of the hospital.
 4              And do you also work as a paramedic or is
 5   that just a certification you have?
 6        A     I still work as a paramedic occasionally.
 7        Q     So sometimes you also -- so you work as a
 8   paramedic when you're not working at the hospital?
 9        A     Yes.  On the ambulance, yes.
10        Q     So in other words, you were -- so you may
11   do ambulance runs?
12        A     Yes.
13        Q     At night or whatever?
14        A     During the day, at night, whenever.
15        Q     Your shift varies, I guess, at the
16   hospital?
17        A     My shift is -- my shift varies now, yes.
18   During this time period I was Monday through Friday.
19   And we have a good working relationship with EMS, so
20   third-outs I could run -- if I need to get up in the
21   middle of the day and run a call, I could run
22   ambulance calls, so --
23        Q     Okay.  So then you also have to handle the
24   calls from the jails as well?
25        A     Yes.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 191

```
 1        Q     Okay.  So you've got like three jobs,
 2   right?
 3        A     True.
 4        Q     And of course the IDHS is really more than
 5   one job if you consider you've got two jails that
 6   you're running, right?
 7        A     True.
 8        Q     Then B, under staffing physician of
 9   record, that's Dr. Williams, right?
10        A     Yes.
11        Q     He's still the physician of record for
12   both of the jails?
13        A     Physician of record, yes.
14        Q     Do you know if he covers any other jails
15   in addition to the two that you have the contracts
16   on?
17        A     He does.
18        Q     What other jails does he cover?
19        A     Columbia County.
20        Q     Over near Augusta?
21        A     Yes.
22        Q     Does he actually go to Columbia County, or
23   do you know?
24        A     I don't know.
25        Q     This says here, "A physician of record is
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    assigned to each detention facility by the Sheriff

 2    or a detention facility administrator.  The

 3    physician of record is a local physician that will

 4    provide services for the specific detention

 5    facility."

 6              Now, Dr. Williams is not exactly local as

 7    far as Hart County, is he?

 8              MR. BROWN:  Objection.

 9              THE WITNESS:  He's not.

10    Q    (By Mr. Jones) And was he, was Dr.

11    Williams, was he assigned by the Sheriff or the

12    facility administrator or do they just go along with

13    your pick on that?

14    A    They have the option of choosing whoever

15    they wanted to.

16    Q    They didn't choose --

17    A    They didn't choose.

18    Q    They just deferred it --

19    A    They just deferred it to us.

20    Q    Okay.  Deferred to IDHS?

21    A    Yes.

22    Q    And then it says, "The physician will make

23    weekly visits or see inmates in his or her office as

24    deemed necessarily by the health care staff."  And

25    then it lists various services.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    So under this policy here, does this mean

2 that the physician has the option of either making

3 weekly visits to the jail or seeing inmates in his

4 office?

5    A    Yes.  Dr. Williams can come to the jail

6 and see the inmates or he can see them in his office

7 if he prefers to see them in his office in a

8 controlled environment.

9    Q    And that would require the Sheriff's

10 office to bring them to him, wouldn't it?

11    A    If they wanted to take them to see Dr.

12 Williams it would.

13    Q    And if they didn't want do that, then they

14 could take them somewhere else?

15    A    We set them up with a local physician for

16 them to be seen.

17    Q    And if that happened, then you would have

18 to make the arrangements through the doctor?

19    A    Right.  We just call and make an

20 appointment for them and set it up.

21    Q    "C, clinic nurse.  Clinic nurses are

22 assigned, monitored by the Clinical Director and

23 oriented with an assigned nurse for a 90-day

24 period."

25    What is the difference between a clinic



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1    nurse and an assigned nurse?
2         A    An assigned nurse has to be someone that's
3    been with the company more than three years.
4    Initially when we came up, I set up -- we did the
5    clinics for the Hart County jail, and then I took
6    90-day period with Mike and Brian and trained them.
7         Q    So they're paramedics that you trained
8    them to work as nurses?
9         A    Trained them to work as paramedics under
10   their scope of practice.
11        Q    To do what the policy contemplates would
12   be done by nurses, right?
13        A    To perform the roles as medics in the
14   clinic, yes, and talk to me, the nurse.
15        Q    And you're the Clinical Director?
16        A    Yes.
17        Q    And then we've talked before about the
18   dentist and mental health provider?
19        A    Right.
20        Q    In this community that's just somebody you
21   would refer them out to should you determine that
22   there's a need for that?
23        A    Yes.
24        Q    You don't have anybody that's actively
25   involved in the, you know, helping you run the
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    medical services in the jail, right?

2         A    No, not local.

3         Q    And you've got the formulary, this list of

4    medications, prescription medications -- or actually

5    these are OTC medications --

6         A    Over-the-counter meds.

7         Q    -- that are stocked.  Is that all, is just

8    this one page?

9         A    That's the only over-the-counter

10   medication we'll keep in stock at the jail.

11        Q    So I see Ibuprofen, but the Tylenol --

12        A    Acetaminophen.

13        Q    There it is you got me again.  Got me

14   again.

15             Next, basic medical equipment.  Under

16   procedures here, I notice under medical services

17   office you said you're supposed to have

18   blood-drawing equipment, but I don't see --

19        A    We have vacutainers.

20        Q    But you don't have the tubes?

21        A    We have the needles, but we don't have

22   tubes.

23        Q    So do you have to go out and get the tubes

24   every time?

25        A    Yes.  Tubes expire.  They have expiration



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   dates on them.  So the frequency of us drawing

2   blood, they expire before we get to them.  A lot of

3   times we don't check the expiration dates, and by

4   the time you get it to the lab and they say this

5   tube has expired, you can't use it, and you have to

6   come back and redraw blood.  So we just decided we'd

7   just go by the hospital and pick them up.

8        Q    The next policy, this looks like it's

9   redundant, it's one of the health assessments.

10  You've got triaging, and then it says under policy,

11  "Detention center inmates are able to express

12  medical complaints daily for review by qualified

13  medical personnel to ensure appropriate medical

14  attention and enable early detection of illnesses."

15       And I guess it's your testimony that y'all

16  do that, right, that your personnel are qualified?

17       A    Yes.

18       Q    And under these procedures, there's number

19  4.  Again, this talks about a -- this says,

20  "Physician weekly health review."  This one says,

21  "The facility physician comes to the facility each

22  week to examine those inmates who requires

23  attention."

24       How do you reconcile that with the policy

25  that says either they come to the facility or you



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    take them to the physician?

2        A    Initially it was set up to where in Wilkes

3    County where Dr. Williams would come once a week,

4    and then when we branched out and got more counties,

5    we just made the determination he could either come

6    to the jail and see them or we could send them to

7    his office.

8        Q    So that other policy we read a while ago

9    has that flexibility built in, but y'all didn't

10   change the wording of this one, is that what you're

11   saying?

12       A    Right.

13       Q    Are you familiar with the physical layout

14   of the jail in Hart County?

15       A    Yes.

16       Q    I mean, you haven't been there recently,

17   right, but you've been there before?

18       A    Yes, been there multiple times.

19       Q    Is there a -- do you know where they keep

20   the female inmates?

21       A    I do.

22       Q    Can you just kind of describe kind of the

23   general overall configuration of it when you walk

24   in?

25       A    The pod is to your right as you walk in



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    and it's got the windows blacked out.

2         Q    So you can't look in?

3         A    Can't look in.

4         Q    And do you know, do they have -- how do

5    they monitor the female inmates?

6         A    I have no idea.

7         Q    Do they have like female officers that

8    you've noticed that come in?

9         A    They do have female officers on duty.  I

10   don't know if there's one for every shift.

11        Q    You mentioned there was an isolation room,

12   if somebody needed to be isolated for medical

13   reasons, they do could do it there.  Where would

14   that be in relation to --

15        A    They could do it in the dorm itself in one

16   of the rooms, or they could put them in the

17   isolation room that's down the hallway right near --

18   between booking and the jail.

19        Q    When you say in the dorm in one of the

20   rooms, I guess it's what most of us would think is

21   the cell?

22        A    The cell.

23        Q    Put them in the cell and not let anybody

24   else in?

25        A    Yes.



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q      And then the other room, the isolation
 2   room, what is that?
 3        A      It's a room that's between booking and the
 4   jail itself, that's their, we call it the isolation
 5   room.  I don't know what they call it.
 6        Q      Okay.  Where is the medical area?
 7        A      When you come in the door to the right,
 8   it's all the way back on the right.  Kind of the
 9   front of the building.
10        Q      How far would that be, how far of a walk
11   would that be from there to say the women's dorm?
12        A      Probably --
13        Q      Or the women's pod?
14        A      Probably 20, 30 feet.  I'm not sure.
15        Q      I'm looking for over a list of questions,
16   and some of these I think are probably more specific
17   for Mike and Brian.  I'm trying to save some time by
18   skipping over those.
19               Let me just ask you, to the extent of your
20   knowledge -- I mean, I know you've had to basically
21   approve the credentials of the paramedics that work
22   under you, right?
23        A      Yes.
24        Q      So you have some understanding of what
25   their level of expertise is in different areas,
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    right?
 2         A    Yes.
 3         Q    What training do they have -- and if you
 4    need to speak of them separately rather than
 5    collectively, do so.  I'm going to just kind of ask
 6    you collectively, because they're both paramedics,
 7    right?
 8         A    Right.
 9         Q    Are they both cardiac?
10         A    Critical care paramedics.
11         Q    Critical care paramedics.  Got it.
12              What training do critical care paramedics
13    have in evaluating back pain?
14         A    They have a wide variety of training.
15    They have protocols that and classes that teach
16    advanced medical life support, pre-hospital trauma
17    life support, advanced cardiac life support.  And
18    critical care EMT paramedics have a wide variety of
19    training in different -- chief complaints, problems,
20    diagnostic procedures, and also the variations of
21    vital signs that would go along with most of the
22    disease processes that we see.
23         Q    Okay.  What physical exam techniques are
24    used to assess weakness?
25         A    For weakness?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 201

1      Q      Yes.

2      A      It depends on where the weakness is

3   located, I guess.  We do grip-strength tests.  We

4   can do flexibility tests, movement of legs, upper

5   extremities, lower extremities, push against the

6   different extremities.  You could do reflex testing.

7   Babinski test to see if they, that works.

8      Q      Okay.  Is there a way to tell if patients

9   are faking weakness, are there any malingering tests

10  for that?

11     A      I don't understand that.

12     Q      You don't know?

13     A      No.

14     Q      What is a straight leg raising test?

15     A      Straight leg raising test?

16     Q      Yes.

17     A      Where they would be sitting and raise

18  their leg straight up?

19     Q      Okay.  And what does it mean -- what does

20  it tell you?

21     A      They have good motor, motor and movement

22  to their legs.

23     Q      What are some conditions that can cause

24  muscle weakness?

25     A      Laying on a couch too much can cause



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 202

1   muscle weakness.  I mean, there's a wide variety of
2   conditions that can cause that.
3       Q     What about medical conditions?
4       A     If you're thinking about medical
5   conditions, you can take strokes, Bell's Palsy,
6   trauma to the back, trauma to the lower back, trauma
7   to the upper back, C spine.  It just depends on
8   where the trauma was located at.
9       Q     There was some indication of weakness in
10  this case, right?
11      A     I think she stated that, but they didn't
12  see any.
13      Q     What would you -- I'm looking to where
14  it's referenced here.  Let me know if you see it.
15      A     I don't see anything related to that.
16      Q     So the difficulty walking or needing
17  assistance to walk, would that be related to that or
18  is that something else?
19      A     Related to her back pain?
20      Q     Yeah.  Numbness.  The numbness and
21  weakness, does that mean two different things to
22  you?
23      A     Two different things.
24      Q     What would you attribute the difficulty
25  with urination in this case to?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A    It doesn't say she had difficulty.
 2        Q    I guess it was infrequent would be, or
 3   inability to?
 4        A    Unable to walk -- walk or urinate, patient
 5   walked med room with assistance.  States she had
 6   numbness.  Has urinated once a day for past two
 7   days.  That could be dehydration, could be a lot of
 8   medical conditions that could probably mimic that or
 9   cause that.
10        Q    It could also be a spinal cord compromise,
11   right, I mean, that could explain that as well as
12   the numbness in the legs and the back pain?
13        A    It would have to be a lower spinal cord
14   complication that would cause that.
15        Q    Okay.  What training have the paramedics
16   had about the complications of IV drug use?
17        A    I think Mike and Brian have both been
18   through several different classes on meth and IV
19   drug use, and also we talk about that in advanced
20   medical life support on the complications associated
21   with IV drug use, along with ingestion, drug
22   smuggling rectally, things like that.
23        Q    Did you provide any training to either
24   Mike or Brian?
25        A    In the past I have.  In the last --
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 204

1    paramedics are required to have 40 hours of

2    continuing education every year, and critical care

3    paramedics are required to have even more, so we use

4    that as their ongoing training at this point.

5    Whereas nurses are not required to have any ongoing

6    training.

7         Q    Not at all?

8         A    None.  To keep their license, they're not

9    required to have any.

10        Q    So what do you get in the way of training

11   or do you anymore?

12        A    As a nurse?

13        Q    Yes.

14        A    I exceed my limits of training.  I take

15   every advanced course I can.

16        Q    Okay.  Were the paramedics -- the medics

17   that worked in the jail here, Brian and Mike, were

18   they provided any specific guidelines on how to

19   evaluate jail back pain patients?

20        A    Yes.  During their 90-day orientation

21   we're talking about how to palpate the back, how to

22   look and feel for different muscle spasms, knots,

23   things like that.  How to also feel for the spinal

24   processes and to know any step off, anything like

25   that.



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 205

```
 1        Q       Were they provided any specific guidelines
 2   about the treatment of back pain patients in the
 3   jail?
 4        A       Muscle aches and sprains and common aches
 5   and pains, we take care of that.  We talk about
 6   that.
 7        Q       That would fall under the protocol of
 8   minor aches and pains?
 9        A       Right.  Unless it fell outside of that,
10   then we'd go to Dr. Williams.
11        Q       What's bacteremia?
12        A       Bacteremia is a bacterial infection in the
13   urine.
14        Q       How do you diagnose that?
15        A       There would have to be urine cultures
16   done.
17        Q       Was there any indication you needed to do
18   that in this case if the patient is complaining
19   about urinary --
20        A       No, not at this point in time, because she
21   had on -- on the 10th she said she had voided once
22   since the night before, and then on the 11th they
23   said she went a couple of times, had gone once or
24   twice.  So at that point in time, no.  And I'm sure
25   they would have asked her what was the color of the
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    urine, was it dark, was it clear, what did it smell
 2    like, did is have a foul odor, anything like that.
 3         Q    Are you familiar with a red flags list of
 4    any kind?
 5         A    Pertaining to what condition?
 6         Q    Any condition.  I think I asked you this
 7    already.  Is there -- there's nothing you consult
 8    online that gives you different disease processes?
 9         A    Nothing that I consult online.  I use red
10    flags that we associate with at our facility and
11    Doctors Hospital in Augusta, just red flags that we
12    see there for cardiac, hypertensive, stroke,
13    anything like that, sepsis, any of those fall under
14    those red flags.
15         Q    Would sepsis include something like a
16    spinal infection?
17         A    Could potentially if it was systemic.
18         Q    What are the red flags you would look for
19    for a spinal infection?
20         A    There would be vital sign changes that we
21    would look for, and then also depending upon where
22    the infection was at there would possibly be some
23    type of differentiation of where the pressure was on
24    the nerve plexus.  And to affect the bowels and the
25    bladder would have to be a low lumbar or low sacral.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   Q     Do you believe that your medics were

2   appropriately trained to evaluate back pain?

3   A     I do.

4   Q     Whenever you're reviewing specific medical

5   issues in the jail that you want to focus on, was

6   back pain one of the issues you ever focused on?

7   A     I've reviewed multiple charts on back pain

8   and arm pain, leg pain, things like that.

9   Q     Have you ever reviewed any other case

10  where an inmate had a spinal abscess?

11  A     No, not that I recall.

12  Q     Spinal infection?

13  A     Never.

14  Q     I'm winding down here.  I've just got --

15  do you happen to know who the jail employee was that

16  did the medical intake questionnaire?

17  A     No.  I don't even think I can read their

18  writing.

19        MR. JONES:  Drew, who did you say it was?

20        MR. MARSHALL:  Say that again.

21        MR. JONES:  Who did you say it was, the

22  guy that we determined did the intake questionnaire?

23        MR. MARSHALL:  The name on the report is

24  David Robertson.

25  Q     (By Mr. Jones) Do you see a place on there



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  where he signed?  You're not able to read it?

2      A    No, there's no signature of officer on

3  here.

4      Q    Do you know a supervisor by the name of

5  David Robertson?

6      A    I probably talked to him on the phone.  I

7  don't know him personally.

8      Q    Did you ever talk to any of the detention

9  officers about Monica Robinson by phone or any other

10 way?

11     A    During her incarceration?

12     Q    Yes.

13     A    Yes, multiple times.  I don't recall how

14 many, but they'll be in there.  There are notes, I'm

15 sure.

16     Q    You mean after she was taken to the

17 hospital?

18     A    No, no, before, but during her

19 incarceration.

20     Q    Detention officers?

21     A    Right.

22     Q    You talked to detention officers?

23     A    Yes.  They called me when she was booked,

24 I advised them to give her Motrin, and they called

25 me, I think on the night of the 11th and asked me to



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    send Mike over.  I told them I would.

2         Q     Okay.  Do you remember any conversations

3    where the detention officers between the night she

4    came in and the night that they took her to the

5    hospital, the 11th?

6         A     I can't recall any major ones, no.  I'm

7    sure they were probably documented in their log.

8    Because a lot of times they don't tell me who the

9    inmate is.  They'll just say I've got a so and so

10   and they're complaining of this.  And I'll ask them

11   if their allergic to any medicine.  Then I'll ask a

12   series of questions, depending upon what their chief

13   complaint is, and ask them to tell me what's going

14   on with them and just -- you know, it depends on the

15   questions.

16        Q     We've talked before about how Mike Adams

17   called you on the 23rd when he first saw Monica in

18   the clinic.

19        A     Uh-huh.

20        Q     And he told you about her situation, you

21   know, as you've described.  Are you saying that

22   before that conversation you'd gotten a call from

23   the detention officer?

24        A     I think I was on call on the 23rd and, or

25   the night of the 22nd, morning of the 23rd, and I



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.
BRUCE A. BAILEY, LPN on 10/09/2012

DEPOSITION OF
Page 210

1    think they did call me that night when she got

2    booked in and told me she had been thrown into a

3    couch and was having some lower back pain and that

4    she was upset about being in jail.  And I told her

5    to give her some Motrin and --

6         Q    Did they tell you about her having had a

7    Staph infection?

8         A    No.

9         Q    They didn't tell you that?

10        A    I don't recall that, no.

11        Q    So --

12        A    Just lower back pain and crying.

13        Q    Yeah, it was -- of course, it was on the

14   questionnaire they got seen by Mike Adams the next

15   day?

16        A    Right.

17        Q    But you're saying it wasn't reported to

18   you when they called?

19        A    Not that I recall, no.  I just know the

20   back pain and -- because I think she came in in the

21   middle of night, so they probably woke me up.  I

22   remember the back pain and -- she was crying.  She

23   was visibly upset about being in jail.

24        Q    Did you talk to her on the phone?

25        A    Talk to her?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q     Yes.

 2        A     No.

 3        Q     So they told you she was crying?

 4        A     Told me she was crying, right.

 5        Q     Do you know, was it the booking officer

 6   that called you, or was it --

 7        A     I don't know.  I don't have any

 8   recollection.

 9        Q     Do you know if it was a male or female?

10        A     I don't remember.

11        MR. JONES:  Let me -- you know, we can

12   take a real quick break if you like.  I want to talk

13   to Doug to see if there's anything else I need to

14   ask.  And then if I do, it shouldn't be much and

15   then we'll be ready to start with Mike.

16            (Recess 3:15-3:20 p.m.)

17        MR. JONES:  I don't have any more

18   questions.  And before we go on, I haven't really

19   used Plaintiff's Exhibit 3 the way I contemplated I

20   might, which is by trying to edit it and come up

21   with a, you know, a sensible transcript.  Does

22   anybody have any strong feelings one way or the

23   other about whether I attach it as an exhibit or

24   not?  I mean, I did refer to it even though he

25   didn't really testify from it, or should I just
```


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   retain that and -- because it's not going to be, you
2   know, admissible in and of itself anyway.
3           MR. MARSHALL:  I don't care.
4           MR. BROWN:  I don't have any heartburn one
5   way or the other.
6           MR. JONES:  All right.  I will retain the
7   original Exhibit 3.  If there's any ever any need
8   for it, I'll have it.  Let me get the Court Reporter
9   to go ahead and date it and initial it, and then
10  I'll just hold on to that.  We won't make it a
11  copy -- we won't make it an exhibit to the
12  transcript because we're going to have the original
13  record anyway.  This is just a transcription of the
14  chicken scratch notes that we -- and it turns out
15  the chicken scratch notes were probably more
16  reliable than our attempt to simplify them.
17          MR. BROWN:  Compared to other charts these
18  are not quite as much chicken scratch as we have
19  probably all seen.
20          MR. JONES:  That's because there was no
21  doctor involved in any capacity in creating them.
22          So for the record, I will retain
23      Plaintiff's Exhibit 3, which is just our work
24      product transcription of the notes, and I'll
25      have the Court Reporter attach Exhibits 1 and 2



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1           to the transcripts.  And does anybody else have

2           any questions?  Does Drew have anything?

3                  MR. BROWN:  I think he said no.

4                  MR. JONES:  I think he did, too.  But walk

5      real slow just in case.

6                  MR. BROWN:  I think he's going to stay

7      anyway.

8                  MR. JONES:  We're done then, unless Drew

9      changes his mind when he comes out.  Let's go ahead

10     and switch seats.  You didn't have anything, did

11     you?

12                 MR. MARSHALL:  No.

13                 (Deposition concluded at 3:25 p.m.)

14                 (Signature reserved)

15

16

17

18

19

20

21

22

23

24

25



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1                    CERTIFICATE

 2    STATE OF GEORGIA:

 3    COUNTY OF FULTON:

 4

 5          I hereby certify that the foregoing

 6    transcript was taken down, as stated in the caption,

 7    and the colloquies, questions, and answers were

 8    reduced to typewriting under my direction; that the

 9    transcript is a true and correct record of the

10    evidence given upon said proceeding.

11          I further certify that I am not a relative

12    or employee or attorney of any party, nor am I

13    financially interested in the outcome of this

14    action.

15          This the 13th day of October, 2012.

16

17

18    _____

19          THOMAS R. CAREY, RPR, CCR-B-1715

20

21

22

23

24

25
```



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
· Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MONICA ROBINSON vs. INTEGRATIVE DETENTION HEALTH, et al.          DEPOSITION OF
BRUCE A. BAILEY, LPN on 10/09/2012                                    Page 215

1              DEPOSITION ERRATA SHEET

2    Assignment No.   3102

3    Case Caption:   MONICA ROBINSON

4    vs.   INTEGRATIVE DETENTION HEALTH SERVICES, INC.

5    Witness: BRUCE A. BAILEY, LPN - October 9, 2012

6

7         DECLARATION UNDER PENALTY OF PERJURY

8         I declare under penalty of perjury

9    that I have read the entire transcript of
     my Deposition taken in the captioned matter
10   or the same has been read to me, and
     the same is true and accurate, save and
11   except for changes and/or corrections, if
     any, as indicated by me on the DEPOSITION
12   ERRATA SHEET hereof, with the understanding

13   that I offer these changes as if still under
     oath.
14        Signed on the  7th  day of
     NOVEMBER   , 2011 .

15

16   

17          BRUCE A. BAILEY, LPN

18   Sworn to and subscribed before me this  7  day

19   of November    , 2012 .

20

21   Martha Elizabeth Strother

22   Notary Public

23

24   My commission expires 11/8/2014

25

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com