IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| **MONICA ROBINSON,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CIVIL ACTION NO.** |
| | * | **3:12-cv-00020-CAR** |
| **INTEGRATIVE DETENTION** | * | |
| **HEALTH SERVICES, INC.,** | * | |
| **HART COUNTY, GEORGIA,** | * | |
| **SHERIFF MIKE CLEVELAND,** | * | |
| **BRUCE A. BAILEY, LPN,** | * | |
| **BRIAN EVANS, EMT,** | * | |
| **MIKE ADAMS, EMT, and** | * | |
| **ROBERT J. WILLIAMS, MD,** | * | |
| | * | |
| **Defendants.** | * | |

### PLAINTIFF'S RESPONSE TO DEFENDANTS IDHS, BAILEY, EVANS AND ADAMS' MOTION FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff, Monica Robinson, and hereby files this brief in opposition to the motion for summary judgment filed by Defendants Integrative Detention Health Services, Inc. (hereafter "IDHS"), Bruce A. Bailey, LPN, and Mike Adams, EMT and in support of Plaintiff's motion to dismiss her claims against Defendant Brian Evans, EMT, showing the Court as follows:

### STATEMENT OF CASE AND OBJECTION TO MOTION

This is a medical malpractice and federal civil rights case arising from the

Defendants' failure to provide adequate medical treatment to a female inmate in the Hart County Jail.  Plaintiff has sued Hart County, its sheriff, the contract medical provider for the jail, employees of the contract medical provider, and their supervising physician under various theories of federal and state law.   All Defendants have moved for summary judgment, but there are genuine issues of material fact as to the claims against all Defendants that preclude judgment as a matter of law. Moreover, the instant motion by the contract medical provider and its employees is procedurally improper because it relies upon unsworn expert disclosures that are inadmissible and should not be considered under Rule 56. Even if the expert reports were admissible, however, they would not negate the existence of a genuine issue of material fact on any element of Plaintiff's claim.

## FACTS

On July 22, 2010 at approximately 1:00 a.m., Monica Robinson, age 30, was booked into the Hart County Jail for failing to comply with the terms of her probation. Upon intake at the Hart County Jail, Monica was asked to answer a series of questions and her answers thereto are recorded on the medical questionnaire. (Milford Dep. Ex. 5, p.1). Specifically, Monica informed the deputy completing the report that her back hurt "real bad" and that she had been suffering a staph infection and did not think it was "all gone." *Id.*  She stated that she was in

pain, and had recently been hospitalized for staph infection.  *Id.*

Three months earlier on April 20, 2010, Monica had been seen in the ER at Ty Cobb Medical Center for a skin infection, prescribed antibiotics, and discharged home.  Monica had filled the prescriptions given to her and taken her medications as directed.  (Robinson Dep. 58:11-13).  On April 24, 2010, Monica had returned to the Ty Cobb ER for progression of skin rash and pain. (Robinson Dep. 58:16–63:10).  This time she was admitted, treated with IV antibiotics, and prescribed oral antibiotics upon discharge on April 29, 2010, and she was told to follow up with a doctor if she did not get better.  (Robinson Dep. 68:5-24).  Monica felt fine from the time she got out of the hospital until approximately a week and a half before her arrest on July 21, 2010, when she began to develop pain from shoulder to hip on the right side of her back.  (Robinson Dep. 75:11–78:10).  In fact, she was planning to return to the emergency room the day she got arrested, and when she told the deputies that she needed medical treatment, they told her that she would receive medical treatment at the jail.  (J. Brown Dep. 26:1-6)).

In addition to telling the booking officer that she needed medical treatment upon her arrival at the Hart County jail, Monica again requested medical treatment within eight hours of being booked in.  (Cleveland Dep., Ex. 1, p. 4 at 9:00 a.m.). The jailer's log indicates that a deputy telephoned a "nurse" (Bruce Bailey) who

instructed that Monica was to see Mike Adams when he came in.  (B. Bailey Dep. 10/9/12 at 153:16-21).  Bruce Bailey was a licensed practical nurse (LPN) and the owner/CEO of IDHS, the company that contracted to provide medical services at the jail.  (*Id.* at 22:22-23:4, 44:2-5).  While Bailey characterizes the paramedics who work under him as "contract employees," there is no dispute that he oversees them and they – like Bailey – are subject to the control of the IDHS medical director, Dr. Williams.  (B. Bailey Dep. 7/19/12 at 22:16-23:17, 59:4-14; B. Bailey Dep. 10/9/12 at 43:20-44:8; Milford Dep. 81:21-83:5).

Since Mike Adams was not scheduled to be there until July 23**,** and since Monica continued to complain about her pain, a jailer placed another call to Bruce Bailey, who instructed the jail staff by phone to give Monica four Motrin and two Benadryl and told them that "she needs to see the nurse." (Cleveland Dep. Ex. 1, 7/22/10 at 9:26-9:46 pm).  At approximately 1:00 p.m. on July 23, 2010, Monica saw Mike Adams for the first time.  (Cleveland Dep. Ex. 1, 7/23/10 at 1:41pm). Mike Adams is not a nurse, but a paramedic.  (Adams Dep. 8:19–9:1).   Monica was never seen by a nurse – let alone a doctor – at any time during her three-week stay at the jail.  (B. Bailey Dep. 10/9/10 at 15:2-6; Dr. Williams Dep. 5:5-8).  In fact, the nurse in charge of medical care at the jail – Bruce Bailey – has not seen inmates at the jail in three or four years, and the doctor supervising Bailey and the

paramedics – Dr. Robert Williams – has never been to the jail despite the fact that he has been the supervising physician there for over a decade.  (B. Bailey Dep. 10/9/12 at 58:11-59:9, 68:6-8, 74:11-23; Milford Dep. 14:22-15:4, 16:23-17:8; Williams Dep. 13:13-15:22, 33:18-34:12, 63:1-16).

Despite the fact that neither Nurse Bailey nor Dr. Williams were seeing inmates at the jail, the contract between IDHS and the county – as well as the bid proposal leading up to the contract and the IDHS policies for the jail – all specified that there would be around-the-clock physician and nursing coverage. The bid proposal outlined "24 hour nursing consultation with on site nursing visits when needed" and "2 on site clinic sessions per week, managed by a registered nurse under the supervision of the physician."  (Cleveland Dep. Ex. 2, p. 1).  Bailey was an LPN, however, not a "registered nurse" or RN, and it is not possible for a physician to manage and supervise nurses and paramedics without being physically present on a periodic basis.  (Mendel Dep. 206:13-213:13, 242:9-244:15, 251:7-14, 255:7-19).    The contract itself promised that "IDHS shall provide on a regular basis all professional medical and related health care… [including] nursing care, regular physician care …. and other services when deemed medically necessary."  (Cleveland Dep. Ex. 3, p. 1).  The IDHS Policy and Procedure Manual for the Hart County jail states that "health assessments by nurses are done within 24 hours of

incarceration and physical exam by the contract physician or licensed nurse are done by the 14th day." (B. Bailey Dep. 10/9/12 Ex. 1, p. *20 of 77 and 172:23-173:16).  That would require that either Dr. Williams or Bruce Bailey be present at least every 14 days, if not daily.   The policy manual also required that "the physician of record is a local physician" who "will make weekly visits or see inmates in his/her office," stating that "the physician hours may vary but will be consulted weekly to ensure the highest level of care is being provided to the inmate population." (*Id.* at Ex. 1, *43 and *53 of 77).  Another section of the manual says that the physician will review records during "monthly" visits.  (*Id.* at Ex. 1, *6 of 77 and 74:11-13).  Finally, the policy manual states that "the physician of record does on-site monitoring of health services rendered by providers … on a routine basis."  (*Id.* at Ex. 1, *6 of 77 and 67:10-19).   In reality, the only physician of record that IDHS ever had was Dr. Williams, and he never came to the jail at all – let alone weekly, monthly or routinely.   It is against that backdrop of medical service – or the illusion thereof – that Monica Robinson was denied access to a physician for three weeks.

When paramedic Mike Adams first saw Monica Robinson at the jail on July 23, 2010, he had access to the medical questionnaire completed by Monica 36 hours earlier, indicating that Monica had had a staph infection and did not think it

was all gone. (Adams Dep. 55:10–25).   Adams' notes from the July 23 examination indicate that Monica told him she was recently hospitalized "due to staph infection," and the "staph was causing her shoulder to hurt and wanted to go to ED."  Monica also "admitted to having a history of drug use including meth." (B. Bailey Dep. 10/9/12 Ex. 1, p.1)  Adams testified that he would not send her to the emergency department based on her complaint that staph was making her shoulder hurt.   (Adams Dep. 24:12-25:8).   Instead, he prescribed 1000 mg of Tylenol twice a day.  (B. Bailey Dep. 10/9/12 Ex. 2, p. 1).   Mike Adams testified that Bruce Bailey agreed with him "just to give Tylenol." (Adams Dep. 27:12-17).

Meanwhile Monica spoke with her mother, Jean Little, who was so concerned about the possibility that Monica had a staph infection that she and her husband, Dwayne Little, went to the jail and spoke with Mike Adams on July 24, 2010.  Jean specifically requested that Mike Adams follow up with Monica about it, and after briefly re-examining her, Adams told Jean and Dwayne her there was nothing wrong with Monica – she was just coming off drugs.  (S.J. Little Dep. 54:11, 99:2–101:22; J.D. Little Dep. 26:1).

According to Dr. Williams, "if she's an IV drug abuser… there's several tests we need to run.  I would do blood cultures… HIV…CBC…that would be the minimum I would do" to determine whether there was any infection. (Williams

Dep. 57:9-22). Dr. Williams also testified that a paramedic like Mike Adams or an LPN like Bruce Bailey would know that such tests needed to be run. (*Id*. at 57:23-25).  But rather than having Monica see a doctor – or sending her to the emergency room as she had requested – Adams told Monica's mother that he would draw her blood if she brought supplies from the hospital where she worked and paid for the testing.  (Adams Dep. 39:7-19).  Jean responded "I can't do that" because it was against protocol, and she could not go "under the table" and take supplies from the hospital to give to him.   (S.J. Little Dep. 105:5 –106:16).  Bruce Bailey's explanation is that "we do not keep blood tubes and blood culture equipment at the jail" – which would have been reason itself to send her to a doctor – although the IDHS policy manual stated that "the basic equipment kept within the medical service office includes: Blood Drawing Equipment." (Bailey Dep. 10/9/12 Ex. 1, *49 of 77 and 34:21-22).

Also on July 24, Monica complained that the Tylenol was not helping her pain, so Bruce Bailey – who had been in communication with Mike Adams – called Dr. Williams, who prescribed Ultram, 50 mg twice a day, to be taken in addition to the Tylenol.  (B. Bailey Dep. 10/9/12 136:11-25 and Ex. 2, p.1).

The next time Monica saw Mike Adams was on July 30, 2010, Monica again saw Mike Adams and stated that she now had back pain and was constipated.  (*Id*.

at Ex 2, p. 2).  On August 3, 2010, she saw another paramedic, Brian Evans, who noted that she was making the same complaints as her July 30, 2010 visit, with the additional complaint of nausea and vomiting. *Id.* Evans noted that her abdomen was distended and prescribed a stool softener.  *Id.*  He also discontinued the Tylenol and started her on 8 Motrin per day.  *Id.* On August 6, 2010, Monica saw Brian Evans again and was still suffering with back pain and had developed "tightness" of her back. (Robinson Dep. 153:21-23, 153:2-8).  Evans saw no obvious signs of trauma related to the back and noted that Monica had been seen for the same complaints earlier. (B. Bailey Dep. 10/9/12 at Ex 2, p. 2).  Evans told Monica to discontinue physical activity and started her on <u>Flexeril</u> 2 times per day. (*Id.* at Ex 2, p. 2).  Monica had still had not been seen by a doctor or nurse, but in order to prescribe Flexeril – or the Ultram previously prescribed – it was necessary to ask Dr. Williams. (*Id*. at 102:20-105:13).

By August 10, 2010, Monica had deteriorated to the point that she had to be helped to the medical station with back pain, numbness of the legs, and inability to walk or urinate. (*Id.* at Ex 2, p. 3).  Despite the fact that she could not walk without assistance, Mike Adams noted good movement and sensation in both feet.  *Id.*  He also noted that her abdomen did not appear any larger than the first time that he saw her on July 23, even though the other paramedic, Brian Evans, had indicated

that her abdomen was distended when he saw her on August 6.  *Id.* Adams noted that Monica was barely able to walk and required assistance to leave, and that if there was no marked improvement in her condition they should "consider" sending her to a doctor.  *Id.*  When asked what that meant, Adams testified he would have sent her to a doctor within a "day or two."  (Adams Dep. 61:3-24).

On the morning of August 11, 2010, Mike Adams called in and was told that Monica had urinated on herself on the evening of August 10.    (Cleveland Dep. Ex. 1, 8/11/10 at 11:42 a.m.; B. Bailey Dep. Ex 2, p. 3).  He simply told the jail personnel to continue to monitor her, and she still was not seen by a nurse or doctor despite having the ominous symptoms of urinary incontinence, numbness in the legs, and inability to walk.  (Bailey Dep. Ex 2, p. 3).

At approximately 6:30 p.m. on the evening of August 11, two women who were visiting the jail to minister to female inmates – Barbara Nice and Kim Bailey – found Monica's cellmates crying because nobody would help her.  (Nice Dep. 34:25 – 35:9; K. Bailey Depo. 48:1-23).  Ms. Nice and Ms. Bailey went to Monica, who was "complaining about not being able to feel her legs, not being able to get up and go to the bathroom by herself.  And I could not get past the color of her skin," which was gray "kind of like duct tape."  (K. Bailey Dep. 39:6-17).  Ms. Nice asked the jailers to call 911, but they told her that the medical staff was

already aware of the situation, so she left the jail and called both of Monica's parents to tell them she needed to get to the ER. (Nice Dep. 36:21-44:13). The subsequent sequence of events is not clear, but at some point Bruce Bailey was notified, and he asked Mike Adams to go to the jail, but Adams never made it because he was called en route and told by jail personnel that Monica had been taken to the hospital by ambulance. (Adams Dep. 72:18–73:15). According to an entry that evening in the jailer's log, "Medical Staff would not come check Monica Robinson, we are taking her to Hart Co Hospital." (Cleveland Dep. Ex. 1, 8/11/10 at 8:26 p.m.). Sheriff Cleveland testified that the "detention officers had contacted the health service" [IDHS] who said they would "see what they could do." "But the Chief Deputy felt like if she was in the floor in pain, that we didn't need to wait," and the jailers called an ambulance without waiting for IDHS to respond. (*Id*. at 23:2-24).

Monica was taken to the Hart County Hospital that night and immediately transferred to Athens Regional Medical Center for surgery. Dr. Bryan Barnes, the neurosurgeon who treated Monica at Athens Regional, made a diagnosis of epidural abscess with spinal cord compression and performed acute surgery to prevent her from being permanently paraplegic. (Barnes Dep. 14:14-15:17).

Plaintiff's standard of care expert, Dr. Lawrence Mendel, has provided an

affidavit in which he testifies that

> …[T]he care provided to Monica Robinson by the IDHS medical providers staffing the Hart County jail fell below the standard of care applicable to the circumstances and conditions then existing as follows:  a) by failing to recognize ominous signs and symptoms of a serious and potentially catastrophic condition; b) by failing to properly perform an examination upon Ms. Robinson; and c) by failing to refer her to a medical doctor or to the emergency room for an appropriate workup.

(Doc. 41-1, ¶9).

Plaintiff's causation expert, a neurosurgeon named Dr. James Vascik, has testified that Monica would have had a significantly better outcome had she been treated earlier – before the onset of neurological deficits on August 10. (Vascik Dep. Ex. 2 at *7 of 17 [Doc. 72, p. 11] and 75:15-22, 79:4-13, 84:3-91:7).  In his Rule 26 expert report – which is admissible because he testified about it in his deposition – Dr. Vascik concluded as follows:

> The type of complaints mentioned by this patient with her history of Methicillin-resistant Staphylococcus aureus and no treatment despite her complaints until she loses bladder control and could not stand up on August 11, 2010 shows this patient was essentially abandoned and was not treated within standard of care.  **Had this patient been diagnosed in July or as late as August 9, 2010, she would have had a diagnosis and treatment done surgically and in all medical probability would have not become paraplegic.**

(Id. at Ex. 2, *7 of 17 [Doc. 72, p. 11]) (emphasis added).

In his deposition, Dr. Vascik testified that if blood cultures had been taken when Monica was first incarcerated, "I think the cultures would have been positive

and if that's the case, then obviously a search would have ensued in hospital for the

source of that infection." (*Id*. at 65:19-66:5).  He also testified that

> …[H]ad the patient had an x-ray of her thoracic spine … signs of
> bony destruction, swelling of the bone, edema of the bone, changes in
> end plate that would have indicated to a neurosurgeon or radiologist
> that there was something going on with the bone, would have
> ultimately led to an MRI scan, a diagnosis of osteomyeletis, possibly
> an epidural abscess at that point, but certainly the osteo, and led to her
> treatment sooner than was ultimately given.

(Id. at 71:12-23).  Even if she had required surgery to remove the infected bone,

> Had that been obtained, the film that is or any kind of film, and
> surgery been done earlier, it [sic] would have treated this patient
> earlier lessening the time she required to regain her neurologic
> function.  She wouldn't have required hospitalization in a rehab unit,
> used a walker up until several months ago, and difficulty with bladder
> control.

(*Id*. at 71:24-72:5).   While "on the 23rd [of July] I believe she could have required

some form of bone removal or corpectomy …. the further you go back, the better

the chance … that surgery could be avoided."  (Id. at 81:5-12). "…[I]t depends on

when it's caught as to whether you avoid all surgery and just treat them with

antibiotics or you have to do the surgery."  (*Id*. at 75:20-22). "If you had an MRI

scan from July 23 and I looked at the integrity of the bone … [and] if saw …

vertical margins, then I think there would be a chance to try and treat this with

antibiotics."  (*Id*. at 79:5-13).  Of course, no MRI exists from July 23 because

Defendants did not have Monica evaluated by a physician until August 11, after

she had been unable to walk for two days.  But either way – with or without surgery – the sum total of Dr. Vascik's testimony is that Monica's outcome would have been better had the infection been treated before she suffered any paraplegia.

Dr. Vascik's opinions are supported by the treating neurosurgeon, Dr. Barnes:  "I will say this very clearly, that the majority of cases of osteomyelitis that I am asked to consult on are treated without surgery."  (Barnes Dep. 21:21-24).

> Q.   I think you testified before that the majority of the patients you saw … could be treated with antibiotics only.  [H]ow would you generalize about the majority  of  those  patients  as compared with Monica's condition?
>
> A.   The majority of the patients, the infection is detected before it fulminates and turns into an abscess. When you get an infection in the spine that turns into an abscess, it's relatively uncontrolled and at a late stage, at an advanced stage. If you can determine that the vertebrae are infected before this abscess forms, you can usually treat it with antibiotics and the patient will do well.

(*Id.* at 47:14-48:3).

> Q.   And I believe you testified that three weeks before you saw her that it was more likely than not that the osteomyelitis would have …shown up radiographically?
>
> A.   With a reasonable degree of certainty, based on her history and based on the radiographic findings at the time of admission, yes --
>
> Q.   Okay.
>
> A.   -- I would agree with that.
>
> Q.   And if she didn't have any neurological deficits until around August the 10th, are you able to form an opinion as to whether it's more likely than not that she would have needed surgery had you seen her three  weeks earlier?

> A.    I can't form that opinion, because there are certain instances when people can need surgery at an early stage of osteomyelitis. I've definitely seen that happen.  So  I  couldn't answer that question.
>
> **Q.    Could you testify about -- with a reasonable degree of medical probability about the most likely scenario?**
>
> **A.    Statistically -- again, I'll fall back on my observation that most people with osteomyelitis are treated without surgery. And so statistically speaking, yes, it's true. It would be more likely that she would be treated without surgery in July of 2010 than with surgery.**

(*Id*. at 48:13-49:16) (emphasis added).  Dr. Barnes gave Monica a 22% permanent impairment rating, which he described as "significant."  (*Id*. at 52:19-53:1).

## LEGAL ARGUMENT

### A.    A jury can find that all IDHS Defendants violated the standard of care

Dr. Mendel's affidavit alone is sufficient to create a genuine issue of material fact as to whether IDHS and its agents violated the standard of care. (Doc. 41-1, ¶9).  He opines that IDHS and its staff deviated from the standard of care "a) by failing to recognize ominous signs and symptoms of a serious and potentially catastrophic condition; b) by failing to properly perform an examination upon Ms. Robinson; and c) by failing to refer her to a medical doctor or to the emergency room for an appropriate workup." *Id. (see also* Mendel Dep. 121:14-122:21).  In his deposition, Dr. Mendel provided specific examples of how the deviations occurred, including but not limited to:

1) the failure to obtain an accurate history of the recent hospitalization for staph infection that was reported by Monica and confirmed by her mother (Mendel Dep. 105:20-106:2, 106:13-110:7, 135:14-140:22, 143:18-144:9, 146:12-150:18);

2) the failure to take blood cultures (*id.* at 104:12-105:18, 151:14-153:8);

3) the failure to confer with the supervising physician (*id.* at 116:23-117:17, 137:14-19, 156:7-160:19, 172:16-177:2, 224:3-17, 256:21-257:11);

4) the failure to have her evaluated by a physician (*id.* at 156:7-160:19, 172:16-177:2, 224:3-17);

5) the failure to perform a proper assessment of muscle strength (*id.* at 161:13-168:24);

6) the failure to send her to the hospital for the sudden onset of urinary incontinence (*id.* at 182:2-18, 186:18-187:8);

7) the lack of training and protocol for treating IV drug users (*id.* at 113:16-115:4, 198:5-200:10, 249:3-250:16);

8) the lack of onsite physician visits (*id.* at 201:11-203:8, 256:16-20); and

9) the failure to follow their own policies and protocols (*id.* at 113:8-13, 203:9-212:10).

Clearly this testimony gives rise to a jury question on the issue of Defendants' medical negligence.

**B.**   <u>**Plaintiff nonetheless desires to dismiss her claims against Brian Evans**</u>

Dr. Mendel's affidavit testimony is broad enough to encompass all of the IHDS personnel responsible for Monica's care, including Brian Evans.  (Doc. 41-1).  Dr. Mendel also testified that it was a deviation from the standard of care for Evans to not take Monica's temperature on an exam that he conducted, but Mendel doubted that single deviation "terribly changed the course."  (Mendel Dep. 124:8-125:8).  Accordingly, Plaintiff has filed a motion to dismiss her claim against Brian Evans without prejudice.  Since the original chart in this case is now missing – despite Bruce Bailey's testimony that he was keeping it at his office "for security reasons" – Plaintiff is unwilling to dismiss any IDHS employee with prejudice in the event that it turns out the chart has been altered or spoliated, and additional information about Evans comes to light at trial that could be the basis for reinstating a claim against him in the event the case must be retried. (Bailey Dep. 10/9/12 at 93:22-94:4; Bailey Dep. 1/31/13 at 9:24-10:10, 74:10-112:3).

**C.**   <u>**A jury can find that IDHS's negligence proximately caused Monica Robinson's spinal cord compression and permanent injury**</u>

Where the question of proximate cause in a medical negligence case is beyond the ken of laypersons, that issue can be resolved only by expert medical testimony sufficient to show there was a reasonable probability that the negligence caused the injury.  *Pilzer v. Jones,* 242 Ga. App. 198, 529 S.E.2d 205 (2000). It is

not necessary for an expert to use the magic words "reasonable degree of medical certainty," but it must be clear that the expert testimony is based upon more than mere chance or speculation. *Anthony v. Chambless,* 231 Ga. App. 657, 500 S.E.2d 402 (1998). The required level of proof by expert testimony, which is reasonable degree of medical probability, "has no greater meaning than a **preponderance of the evidence**." *Estate of Patterson v. Fulton-DeKalb Hosp. Authority***,** 233 Ga.App. 706, 708, 505 S.E.2d 232, 234 (1998) (emphasis added).

The question of whether expert testimony satisfies the reasonable probability standard goes to the jury under the legal principles cited in Zwiren *v. Thompson*, 276 Ga. 498, 578 S.E.2d 862 (2003), in which the Supreme Court recommended that the following jury charge be given verbatim in medical malpractice cases:

> In order for the plaintiff to show that the defendant's alleged negligence was the proximate cause of the plaintiff's injury, the plaintiff must present expert medical testimony. An expert's opinion on the issue of whether the defendant's alleged negligence caused the plaintiff's injury cannot be based on speculation or possibility. It must be based on reasonable medical probability or reasonable medical certainty. If you find that the expert's testimony regarding causation is not based on reasonable medical probability or reasonable medical certainty, then the plaintiff has not proven that the plaintiff's injury was proximately caused by the defendant's alleged negligence, and you would return a verdict for the defendant.

*Zwiren v. Thompson***,** 276 Ga. 498, 503-04, 578 S.E.2d 862, 867 (2003).

Viewed in the light most favorable to Plaintiffs, the totality of the testimony

of Dr. Vascik and Dr. Barnes is that there is a reasonable medical probability that proper treatment would have improved Monica's outcome. (See discussion on pp. 13-15 herein).  That is a sufficient basis for a jury to find by a preponderance of the evidence that Monica Robinson was injured by reason of the negligence of Defendants.  *See Lee v. Satilla Health Services, Inc.*, 220 Ga. App. 885, 888, 470 S.E.2d 461, 463 (1996) (causation established by doctor's "overwhelming testimony that in his experience and that of his colleagues, proper diagnosis and treatment can change the patient's course and outcome").

**D.** **Defendant cannot rely upon unsworn expert reports which, even if admissible, would only create a factual dispute for the jury**

Defendants have improperly relied upon unsworn expert reports that should either be stricken or not considered on summary judgment.  *See Carr v. Tatangelo*, 338 F.3d 1259, 1273 (11th Cir. 2003) (affirming ruling by Judge Fitzpatrick that unattested expert report had no probative value and would not be considered in ruling on summary judgment motions); compare *In re Mentor Corp. ObTape Transobturator Sling Products Liab. Litig.*, 711 F. Supp. 2d 1348, 1368 (M.D. Ga. 2010) (reports admitted where experts were examined about their reports and verified the opinions therein during a deposition).  Unlike Plaintiff's experts, Defendants experts were not deposed and have offered no testimony under oath.  But even if Defendants were permitted to cure this defect, their experts opinions

would not negate the genuine issue of material fact that exist when the record as a whole – including the testimony of Plaintiff's experts – is viewed in the light most favorable to Plaintiff as the non-moving party, for the reasons already discussed.

**E.**     **The evidence is sufficient to supports an award of punitive damages**

Punitive damages may be assessed under Georgia law "where there is an "entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. §51-12-5.1(b).  The same conduct that would rise to the level of deliberate indifference for purposes of Plaintiff's federal civil rights claim against Hart County – which is based on the decisions made by IDHS as the county's final decision-maker with respect to inmate medical care – would also meet the definition of "conscious indifference to consequences."  (See Plaintiff's Response to Defendants Hart County and Sheriff Cleveland's Motion for Summary Judgment filed herewith). In any event, reasonable jurors could find that IDHS's conduct fell so far below the standard of care as to be tantamount to no care at all, or an abandonment of the patient as suggested by one expert.  (Vascik Dep. Ex. 2 at *7 of 17 [Doc. 72, p. 11]).

## CONCLUSION

Plaintiff requests that Defendants' motion for summary judgment be denied and that Plaintiff be permitted to dismiss Defendant Evans without prejudice.

Respectfully submitted this 26th day of April, 2013.

PAGE PERRY, LLC

*/s/ Craig T. Jones*
CRAIG T. JONES
GA Bar No. 399476
Attorney for Plaintiff

1040 Crown Pointe Parkway
Suite 1050
Atlanta, GA  30338
(770) 673-0047
cjones@pageperry.com

*/s/ Douglas C. McKillip*
DOUGLAS C. MCKILLIP
Ga. Bar No. 495422
Attorney for Plaintiff

THE MCKILLIP LAW FIRM, LLC
648 South Milledge Avenue
Athens, GA  30605
(706) 546-6279
doug@dougmckillip.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this day, I served the foregoing **PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT WILLIAMS' MOTION FOR SUMMARY JUDGMENT** upon opposing counsel via the Court's electronic filing system to the following:

> Andrew H. Marshall, Esq.
> Begnaud & Marshall LLP
> P.O. Box 8085
> 1091-B Founder's Boulevard
> Athens, Georgia 30603-8085
>
> Walter J. Gordon, Esq.
> Gordon Law Firm
> P.O. Box 870
> Hartwell, Georgia 30643
>
> Jeffrey A. Brown, Esq.
> Brown and Adams, LLC
> P.O. Box 139
> Columbus, Georgia 31901
>
> John A. Dickerson, Esq.
> McClure, Ramsay, Dickerson & Escoe, LLP
> P.O. Drawer 1408
> Toccoa, Georgia 30577

This 26th day of April, 2013.

*/s/ Craig T. Jones*
_____
CRAIG T. JONES
Ga. Bar No. 399476