IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| MONICA ROBINSON, | : |
| | : |
|     Plaintiff, | : |
| v. | : |
| | :    **No. 3:12-CV-20 (CAR)** |
| INTEGRATIVE DETENTION | : |
| HEALTH SERVICES, INC., | : |
| HART COUNTY, GEORGIA, | : |
| SHERIFF MIKE CLEVELAND, | : |
| BRUCE A. BAILEY, LPN, | : |
| BRIAN EVANS, EMT, | : |
| MIKE ADAMS, EMT, and | : |
| ROBERT J. WILLIAMS, MD, | : |
| | : |
|     Defendants. | : |
| _____ | : |

## <u>ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>

Plaintiff Monica Robinson filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging she received inadequate medical care while incarcerated at the Hart County Jail.  Currently before the Court are the following Motions: (1) Defendants Hart County, Georgia and Sheriff Mike Cleveland's Motion for Summary Judgment [Doc. 47], (2) Defendant Robert J. Williams, M.D.'s Motion for Summary Judgment [Doc. 67], and (3) Plaintiff's Motion to Dismiss Sheriff Mike Cleveland as a party to this action without prejudice [Doc. 85].  Having considered the parties' arguments, the record, and the applicable law, the Court hereby **GRANTS in part** and **DENIES in part** Hart County and Sheriff Cleveland's Motion for Summary Judgment [Doc. 47] as more fully

explained herein.   Dr. Williams's Motion for Summary Judgment is **DENIED**. Plaintiff's Motion to Dismiss is **GRANTED in part**, and Sheriff Cleveland is hereby **DISMISSED with prejudice** as a party in this action.

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]   The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact" and that entitles it to a judgment as a matter of law.[2]   If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[3]

The Court must view the facts, and any reasonable inferences drawn from those facts, in the light most favorable to the party opposing the motion.[4]   "The inferences, however, must be supported by the record, and a genuine dispute of material fact

---

[1] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[2] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).
[3] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324-26.
[4] *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010); *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

requires more than 'some metaphysical doubt as to the material facts.'"[5]  In cases where opposing parties tell different versions of the same events, and one is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."[6]  A disputed fact will preclude summary judgment only "if the dispute might affect the outcome of the suit under the governing law."[7] "The court may not resolve any material factual dispute, but must deny the motion and proceed to trial if it finds that such an issue exists."[8]

## BACKGROUND

This civil rights action arises out of the medical treatment provided to Plaintiff while she was incarcerated in the Hart County Jail from July 21, 2010, to August 12, 2010.  The facts viewed in the light most favorable to Plaintiff, the nonmovant, are as follows:

### I.   Contractual Relationship between Hart County and Integrative Detention Health Services, Inc.

At all relevant times herein, Sheriff Mike Cleveland was responsible for maintaining and operating the Hart County Jail (the "jail").[9]  Sheriff Cleveland did not,

---

[5] *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (quoting *Penley*, 605 F.3d at 848).
[6] *Pourmoghani-Esfahani v. Gee*, 625 F.2d 1313, 1315 (11th Cir. 2010) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380) (2007)).
[7] *Id*. (internal quotation marks omitted).
[8] *Envtl. Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.
[9] Declaration of Mike Cleveland ¶ 4 [Doc. 47, Ex. 1].

however, oversee the daily jail operations; rather, Captain Bobby Milford, the jail administrator, supervised jail operations.[10]  Hart County contracted with Integrative Detention Health Services, Inc. ("IDHS") to provide inmate medical care.[11]  IDHS is a corporation, of which Bruce Bailey is the sole shareholder and operator.[12]  Bailey is also employed by IDHS as a licensed practical nurse and paramedic.[13]  In addition, IDHS employs Robert J. Williams, MD, as the medical director and physician of record, as well as Mike Adams and Brian Evans, two critical care paramedics.[14]

Pursuant to the contract, IDHS agreed to "provide on a regular basis all professional medical and related health care and administrative services for the inmates/detainees, regularly scheduled sick call, nursing care, regular physician care, medical records management, administrative support services, and other services when deemed medically necessary."[15]  The bid proposal outlined services including "24 hour nursing consultation with onsite nursing visits when needed" and "2 on site clinic sessions per week, managed by a registered nurse under the supervision of [a] physician."[16]

---

[10] *Id.*

[11] *See generally* Declaration of Lawana Kahn, p. 8 [Doc. 47, Ex. 2].

[12] Bailey Dep. 7/19/2012 8:21-9:2 [Doc. 52] (hereinafter Bailey I Dep.").

[13] *Id.* at 8:17-20, 9:14-17, 18:15-21.

[14] *Id.* at 10:11-18, 58:16-59:3.

[15] Declaration of Lawana Kahn, p. 8 [Doc. 47, Ex. 2].

[16] Cleveland Dep. Ex. 2, p. 1 [Doc. 90].

To provide these services, Bailey, with the aid of Dr. Williams, promulgated the IDHS Policy and Procedure Manual (the "Manual"), detailing the manner in which medical services would be provided.[17]   According to the Manual, "health assessments by nurses are done within 24 hours of incarceration, and physical exam[s] by the contract physician or licensed nurse are done by the 14th day."[18]   In addition, the Manual outlines several supervisory responsibilities of the physician, Dr. Williams.   For example, the Manual requires the "physician of record" to "make weekly visits or see inmates in his/her office[,]" and to perform "onsite monitoring of health services rendered by providers … on a routine basis."[19]

IDHS did not require Sheriff Cleveland's signature to enforce IDHS policies and procedures at the jail.[20]   Indeed, both Sheriff Cleveland and Captain Milford deferred to IDHS to make all policies and procedures regarding the provision of inmate medical care.[21]   Apart from the Manual, the jail does not maintain separate protocols dealing with inmate medical services.[22]

In practice, IDHS developed a three-tiered system to provide medical care to inmates.   First, the paramedics, either Adams or Evans, covered the two weekly clinical

---

[17] Bailey Dep. 10/9/2012 18:6-22:9, Ex. 1 [Doc. 61-63] (hereinafter "Bailey II Dep.").
[18] *Id*. at 172:23-173:2, Ex. 1, p. 20.
[19] *Id*. at 192:22-193:8, Ex. 1, pp. 20.
[20] *Id*. at 10:22-11:16.
[21] Cleveland Dep. 62:13-16 [Doc. 90]; Milford Dep. 73:16-19 [Doc. 53].
[22] Milford Dep. 73:3-74:2 [Doc. 53].

sessions and assessed each patient at the jail.[23]   Next, the paramedics would call and report their assessments to Bailey.[24]   Finally, Bailey would seek input from Dr. Williams.[25]   It is undisputed that Adams and Evans were the only onsite medical personnel during the period of Plaintiff's incarceration, and neither Bailey nor Dr. Williams personally examined her.[26]   In fact, Dr. Williams has never visited the jail in the ten years he has served as medical director, nor has he monitored the paramedics in-person.[27]   Dr. Williams does not even know the names of the IDHS paramedics on staff.[28]   The paramedics are entirely supervised by Bailey.[29]   Bailey, however, has not been to the jail in approximately three to four years.[30]

## II.      Plaintiff Medical History and Incarceration

Prior to her confinement at the jail, Plaintiff was admitted to the Hart County Hospital in April 2010, after presenting with a skin rash and pain in her right arm.[31]   She was diagnosed with an MRSA infection and treated with IV and oral antibiotics.[32] Following discharge from the hospital, she had no recurring symptoms until July when

---

[23] Bailey I Dep. 24:14-16 [Doc. 52].
[24] Adams Dep. 22:24-23:22 [Doc. 54].
[25] Bailey I Dep. 35:1-5 [Doc. 52].
[26] Bailey II Dep. 15:2-6 [Doc. 61]; Williams Dep. 5:6-8 [Doc. 71].
[27] Williams Dep. 63:15-16 [Doc. 71].
[28] *Id.* at 33:18-23.
[29] Bailey II Dep. 44:6-8, 50:16-18  [Doc. 61].
[30] Milford Dep. 15:2-3 [Doc. 53].
[31] First Amended Compl. ¶¶ 13-15 [Doc. 41].
[32] *Id.*

she began feeling pain along the right side of her back.[33]  To combat the pain, Plaintiff resorted to self-medicating with methamphetamine and Tylenol.[34]  Eventually, the pain became so intense, nothing worked to dull it.[35]

Between the late evening of July 21 and early morning of July 22, 2010, Plaintiff was arrested for failing to comply with the terms of her probation and booked into the jail.[36]  As part of the booking process, a jailer asked Plaintiff a series of questions in order to identify any existing medical needs and obtain a brief medical history, and he recorded her responses on a medical questionnaire.[37]  The questionnaire indicated that Plaintiff had recently been hospitalized and was currently experiencing severe back pain.[38]  Under the "Special Notes" portion of the questionnaire, the jailer further noted Plaintiff stated she had a recent history of staph infection, which she did not believe was completely gone.[39]

On the same day, Plaintiff filled out a sick call form, requesting to see medical staff regarding her back and side pain.[40]  Jail staff responded by calling Bailey to inform

---

[33] Robinson Dep. 75:11-78:10 [Doc. 64].

[34] *Id*. at 95:15-96:25.

[35] *Id*. at 96:17-25.

[36] First Amended Compl. ¶¶ 16-17 [Doc. 41]; *see also* Robinson Dep. 33:13-21, 85:15-25, 89:11-90:10 [Doc. 64].

[37] *See* Milford Dep. Ex. 5 [Doc. 53].

[38] *Id*.

[39] *Id*.

[40] *Id*. at Ex. 7, p.1.

him of her complaint.[41]  Bailey instructed the jail staff to give her Motrin and Benadryl and to ensure Adams examined her during clinic hours the following day.[42]

In the early afternoon of July 23, 2010, Adams reviewed the intake medical questionnaire, examined Plaintiff, and took a brief medical history.[43]  At the time, Plaintiff complained of back, right side, and right shoulder pain.[44]  Plaintiff informed Adams about a previous physical altercation and her prior history of drug use.[45]  She also stated she believed her shoulder pain was related to a staph infection and wanted to go to the emergency room.[46]  Adams called the emergency room at the Hart County Hospital to inquire whether Plaintiff had been a patient in the past week and half to two weeks, but received a negative response.[47]

Adams called Bailey to discuss his assessment and to determine the proper course of treatment.[48]  They agreed to treat her pain with Tylenol and to continue to monitor her condition.[49]  Despite her repeated concerns, they did not send Plaintiff to

---

[41] Cleveland Dep., Ex. 1, pp. 4, 6 [Doc. 90]; *see also* Bailey II Dep. 153:15-17 [Doc. 62].
[42] Cleveland Dep. Ex. 1, p. 6 [Doc. 90].
[43] Adams Dep. 18:17-23, 55:10-13 [Doc. 54].
[44] *Id.* at 19:22-24 [Doc. 54] (quoting Bailey II Dep. Ex. 2, p. 1 [Doc. 63]).
[45] Robinson Dep. 108:24-109:2 [Doc. 65].
[46] Adams Dep. 20:4-6 (quoting Bailey II Dep. Ex. 2, p. 1 [Doc. 63]).
[47] *Id.* at 28:21-29:20.
[48] *Id.* at 22:14-24:25, 27:12-19.
[49] *Id.* at 20:19-20 (quoting Bailey II Dep. Ex. 2, p. 1 [Doc. 63]).

8

the emergency room for further diagnosis.[50]  Bailey later relayed this information to Dr. Williams.[51]

At the request of Plaintiff's mother, Adams returned to check on Plaintiff the next day.[52]  Before examining her, Plaintiff's mother spoke with Adams and expressed her concern that Plaintiff was suffering from a recurring staph infection.[53]  After briefly examining Plaintiff, Adams found no change in her condition.[54]  Adams relayed his assessment to Bailey, and Bailey in turn spoke with Dr. Williams.[55]  Because Plaintiff complained the Tylenol alone was not alleviating her pain, Dr. Williams prescribed another pain killer in addition to the Tylenol.[56]

After briefly examining Plaintiff, Adams told Plaintiff's mother there was nothing wrong with her except "she was coming down off the drugs."[57]  Adams conferred with Bailey and told Plaintiff's mother, that if she was concerned about a possible staph infection, he would draw blood so long as she got the supplies from the hospital where she worked.[58]  Plaintiff's mother informed him she could not go "under

---

[50] Adams Dep. 25:1-16 [Doc. 54].
[51] Bailey II Dep. 101:18-102:3 [Doc. 61].
[52] Adams Dep. 40:2-14 [Doc. 54]; S.J. Little Dep. 99:2-6 [Doc. 92].
[53] Adams Dep. 41:16-24 [Doc. 54].
[54] *Id*. at 39:14-15 (quoting Bailey II Dep. Ex 2, p. 1 [Doc. 63])
[55] Bailey II Dep. 136:8-14 [Doc. 62].
[56] *Id*.
[57] S.J. Little Dep. 54:8-11 [Doc. 92].
[58] Adams Dep. 39:16-19 [Doc. 54]; Bailey II Dep. 35:9-12 [Doc. 61]; S.J. Little Dep. 105:18-22 [Doc. 92].

the table" and take supplies from the hospital.[59]  Bailey later testified that IDHS does not keep blood drawing equipment at the jail, even though the Manual requires that IDHS stock the medical service office with "basic equipment" including "blood drawing equipment."[60]  In any event, no IDHS employee ever drew Plaintiff's blood for testing.[61]

Seven days later, on July 30, 2010, Adams examined Plaintiff because she was complaining of back pain and constipation.[62]  She stated her arm and shoulders were feeling better, but her back pain persisted.[63]  Adams gave her Correctol tablets and advised her to drink plenty of water to help the constipation.[64]  Adams otherwise continued the prior prescribed treatment for her back pain.[65]

Four days later, on August 3, 2010, Plaintiff completed another sick call request, continuing to complain of back pain and constipation.[66]  The other paramedic, Evans, gave Plaintiff a dose of magnesium citrate and stool softener and advised her and jail personnel to monitor for a bowel movement.[67]  No action was taken to address her complaints of back pain.

---

[59] S.J. Little Dep. 105:5-106:13-16 [Doc. 92].
[60] Bailey II Dep. 34:21-22, Ex. 1, p. 49 [Docs. 61 & 63].
[61] Adams Dep. 44:2-11 [Doc. 54]; Bailey II Dep. 36:19-20 [Doc. 61].
[62] Adams Dep. 47:22-48:9 [Doc. 54] (quoting Bailey II Dep. Ex 2, p.2 [Doc. 63]).
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *See* Bailey II Dep. Ex. 2, p. 6 [Doc. 63].
[67] Evans Dep. 25:5-14 [Doc. 55] (quoting Bailey II Dep. Ex. 2, p. 2 [Doc. 63]).

Three days later, on August 6, 2010, Plaintiff completed another sick call request, stating her back pain had gotten better, but that she had a "bad spell" the night before with "tightness."[68]   Evans examined her the same day and consulted with Bailey regarding her history of back pain and previous medications.[69]   Bailey then sought Dr. Williams's approval to change her pain medication to Flexeril.[70]

Plaintiff filled out her final sick call request on August 9, 2010, complaining of persistent back pain and numbness in her legs.[71]   Adams examined Plaintiff the following morning and noticed she could not ambulate in or out of the examination room without assistance, though she seemed to have good sensation and movement in both feet.[72]   To check her neurological function, Adams performed a "Babinski test," which required Plaintiff to lift her legs in front of her so Adams could run an instrument along the bottom of each foot.[73]   Adams recorded a "positive" response to the test, meaning the toes curled in response to the sensation.[74]   Adams further noted Plaintiff was having difficulty urinating; she had urinated only twice in the past two days, and had been unable to urinate that morning or the previous evening.[75]   Adams

---

[68] Milford Dep. Ex. 7, p. 3 [Doc. 53].
[69] Evans Dep. 72:24–73:2 [Doc. 55].
[70] Bailey II Dep. 103:7-13 [Doc. 61].
[71] Milford Dep. Ex. 7, p. 4 [Doc. 53].
[72] Adams Dep. 60:11-61:7 [Doc. 54] (quoting Bailey II Dep. Ex. 2, p. 3 [Doc. 63]).
[73] Bailey II Dep. 115:16-24, Ex. 2, p. 8 [Docs. 61 & 63].
[74] Adams Dep. 64:1-6 [Doc. 54].
[75] *Id*. at 60:16-18 (quoting Bailey II Dep. Ex. 2, p. 8 [Doc. 63]).

consulted with Bailey, who then spoke with Dr. Williams.[76]  Bailey later called Adams and told him to change Plaintiff's pain medication.[77]  Dr. Williams instructed that IDHS staff continue to monitor Plaintiff's condition and to consider sending her to a physician if she did not show "markable improvement."[78]

The next day, Plaintiff's condition continued to deteriorate to the point where she could not get up and remained laying on her back.[79]  No IDHS staff was onsite to monitor her; Adams only called to check on her the following morning.[80]  A jailer told him that she had urinated once or twice because she had to have her bed linens changed.[81]  Though the jailer's report suggested that Plaintiff was now entirely immobile, Adams did not follow up with Bailey and made no change to her treatment plan.[82]

At approximately 6:30 pm on August 11, 2010, two women who were visiting the jail found Plaintiff lying helpless on a mattress in her cell.[83]  Plaintiff told the ladies she could not feel her legs and could not even get up and go to the bathroom.[84]  One of the ladies notified jail staff that Plaintiff needed help, but the jailers informed her medical

---

[76] Bailey II Dep. 113:9-14 [Doc. 61].
[77] Bailey II Dep. Ex. 2, p. 3 [Doc. 63].
[78] Bailey II Dep. 112:25, 113:12-117:14, Ex. 2, p. 3 [Docs. 61-63].
[79] Robinson Dep. 189:9-190:4 [Doc. 65].
[80] Adams Dep. 70:11-24 [Doc. 54] (quoting Bailey II Dep. Ex 2, p. 3 [Doc. 63]).
[81] *Id.*
[82] *Id.*
[83] Nice Dep. 37:22-38:3 [Doc. 93]; K. Bailey Dep. 21:2-15 [Doc. 88].
[84] K. Bailey Dep. 39:10-12 [Doc. 88].

staff had already examined Plaintiff, she was fine, and there was nothing they could do.[85]

Around 7:00 pm, Captain Milford received a call from a subordinate apprising him of the situation, and he immediately drove to the jail to check on Plaintiff.[86]  Upon seeing her deteriorating condition, Captain Milford called Bailey.[87]  While waiting on IDHS staff to arrive, Captain Milford decided to call an ambulance himself.[88]  Before the ambulance arrived, a jailer attempted to bring Plaintiff to the booking area to sign a document releasing her from the jail, but she could not walk or even sit up in a chair.[89]  Plaintiff was finally transported to Hart County Hospital and then immediately transferred to Athens Regional Medical Center.[90]

Sheriff Cleveland was not aware of Plaintiff's arrest or subsequent medical needs until a deputy called to inform him she had been transported to the hospital on the evening of August 11th.[91]  Once informed, Sheriff Cleveland contacted Plaintiff's probation officer the next day about dropping Plaintiff's probation revocation warrant.[92] A superior court judge signed an order presented by Plaintiff's probation officer on

---

[85] Nice Dep. 41:22-44:24 [Doc. 93].
[86] Milford Dep. 32:13-15, 43:1-15, Ex. 6 [Doc. 53].
[87] *Id*. at 33:1-5, Ex. 6.
[88] *Id*.; Bailey II Dep. 208:24-209:2 [Doc. 62].
[89] Robinson Dep. 209:10-210:15 [Doc. 66].
[90] Robinson Dep. 212:2-3, 213:25-2 [Doc. 66].
[91] Declaration of Mike Cleveland ¶ 8 [Doc. 47, Ex. 1].
[92] Cleveland Dep. 30:20-31:9 [Doc. 90].

August 12, 2010, releasing Plaintiff from Hart County custody due to her deteriorating medical condition.[93]

That same day, Captain Milford drove to Athens Regional and attempted to have Plaintiff and her parents sign a document releasing her from custody.[94]  Plaintiff's father asked, "Bobby, if I sign these papers, what about your insurance?"[95]  Milford replied, "Don't worry about the insurance. I got the insurance, we got insurance.  We're just going to release her where I haven't got to stay over here with her."[96]  Neither the County nor its insurer covered Plaintiff's medical bills beyond the first day, however, because she was no longer in custody.[97]

At Athens Regional, Plaintiff underwent surgery to treat discitis, osteomyelitis, and a large epidural abscess with spinal cord compression caused by a bacterial infection.[98]  Although the surgery reversed the partial paralysis, Plaintiff's treating physician testified that she still suffers from a significant impairment.[99]  The spinal cord injury has noticeably affected Plaintiff's gait and she cannot walk or stand for long periods of time.[100]  Plaintiff's causation expert, Dr. James Vascik, testified that the

---

[93] Declaration of Phyllis Ayers, p. 4 [Doc. 47, Ex. 3].
[94] Brown Dep. 55:22-57:24 [Doc. 89].
[95] *Id*. at 57:11-13.
[96] *Id*. at 57:15-17.
[97] Hart County and Sheriff Cleveland's Response to Plaintiff's Second Request for Discovery, pp. 73-74 [Doc. 74].
[98] Barnes Dep. 14:12-15:7 [Doc. 58].
[99] *Id*. at 52:19-53:1.
[100] Robinson Dep. 231:6-233:19 [Doc. 66].

disease process ultimately requiring surgery was present when she was first incarcerated.[101]   Dr. Vascik further opined, however, that Plaintiff would have had a much better outcome had she been properly diagnosed and treated prior to the onset of neurological deficits on August 9, 2010.[102]

### III.    Procedural History

On February 10, 2012, Plaintiff filed suit against Defendants Hart County, Sheriff Cleveland, IDHS, Dr. Williams, Bailey, Adams, and Evans, raising several claims arising from Defendants' failure to properly diagnose and treat the infection.    Plaintiff amended her Complaint on January 29, 2013.   In the Amended Complaint, Plaintiff asserted the following claims: professional negligence claims against Bailey, Adams, and Evans (Count 1); a professional negligence claim against Dr. Williams, as the supervising physician and medical director of IDHS (Count 2); a claim against IDHS for its own negligence as well as *respondeat superior* liability for the negligent acts of its agents or employees (Count 3); a federal claim pursuant to 42 U.S.C. § 1983 against Hart County and Sheriff Cleveland (Count 4); and a claim for inmate medical expenses under O.C.G.A. § 42-5-2 against Hart County (Count 5).

Pursuant to a settlement agreement, the Court dismissed IDHS, Bailey, Adams, and Evans from this suit.   As a result, only Counts 2, 4, and 5 against Dr. Williams,

---

[101] Vascik Dep. 75:5-10, 79:16-19 [Doc. 57].
[102] Vascik 84:3-91:7 [Doc. 57].

Sheriff Cleveland, and Hart County remain pending.   Defendants now move for summary judgment on all three claims. Plaintiff filed responses to each respective Motion and a separate Motion to Dismiss Sheriff Cleveland without prejudice.   These Motions are now ripe for review.

## DISCUSSION

### I.   SECTION 1983 CLAIM

In Count 4 of her Amended Complaint, Plaintiff brings a claim against Hart County and Sheriff Cleveland pursuant to 42 U.S.C. § 1983.   Plaintiff alleges these Defendants exhibited deliberate indifference to her serious medical needs through the actions and policies of the County's contract medical services provider, IDHS, in violation of the Eighth and Fourteenth Amendment.

Both Defendants move for summary judgment on this claim, arguing that Plaintiff fails to point to a single policy, custom, or act of the County or IDHS showing deliberate indifference to her medical needs.   Moreover, the County argues it cannot be held liable for any acts or policies of IDHS because IDHS is not the final decision maker for the County with respect to inmate medical care.   In addition, Sheriff Cleveland argues he is entitled to qualified immunity for a claim against him in his individual capacity.

In order to adequately address the merits of Plaintiff's claim, the Court will address the Section 1983 claims against the County and Sheriff Cleveland separately.

**A. Section 1983 Claim against Hart County**

"Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause."[103]   "[T]he standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments."[104]   Thus, decisional law involving both amendments is properly applied to Plaintiff's claims.[105]   A prisoner asserting a constitutional claim for inadequate medical treatment must show an "objectively serious deprivation of medical care by demonstrating (1) an objectively serious medical need that, if left unattended, poses a substantial risk of serious harm, and (2) that the [defendants'] response to that need was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law."[106]

To hold a municipality liable for a denial of medical care under Section 1983, a plaintiff must also prove that an official custom or policy violated her constitutional rights.[107]   A municipality cannot be held liable on a theory of *respondeat superior* simply

---

[103] *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996); *see also Thomas v. Town of Davie*, 847 F.2d 771, 772 (11th Cir. 1988).

[104] *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1024 n. 5 (11th Cir. 2001) (en banc).

[105] *See Cottrell*, 85 F.3d at 1490.

[106] *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) (quotation marks and ellipsis omitted).

[107] *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978).

"because it employs a tortfeasor."[108]   A plaintiff may only prove municipal liability in one of two ways: (1) by identifying "an official policy or a widespread practice or custom that, although not authorized by express municipal policy, is so settled and permanent that it takes on the force of law[,]"[109] or (2) by pointing  "to a single decision made by a municipal official if that municipal official is the final policymaker for the municipality with respect to the subject matter in question."[110]

Plaintiff proceeds under both theories.  The Court finds that Plaintiff has failed to show a genuine issue of material fact as to whether the County had a policy or custom of providing inadequate medical care.   Nevertheless, the Court also finds that Bailey acted as the final policymaker for the County with respect to inmate medical care, and an issue of material fact remains as to whether Bailey's decisions regarding Plaintiff's course of treatment amounted to deliberate indifference.

### 1.   County Policy or Custom of Providing Inadequate Inmate Medical Care

Plaintiff first contends that the County exhibited deliberate indifference to her serious medical needs by maintaining a custom or policy of providing inadequate medical care to inmates at the Hart County Jail.  Plaintiff argues the County allowed IDHS to understaff the jail with paramedics without onsite nurse or physician

---

[108] *Id.* at 691.
[109] *Bunyon v. Burke Cnty.*, 306 F. Supp. 2d 1240, 1250 (S.D. Ga. 2004), *aff'd sub nom.*, *Bunyon v. Burke Cnty., Ga.*, 116 F. App'x 249 (11th Cir. 2004).
[110] *Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989).

monitoring, in violation of its contractual obligations and written protocols.  To hold the County liable under this theory, Plaintiff must demonstrate "(1) that h[er] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."[111]

The Eleventh Circuit has held that "[d]eliberate indifference to serious medical needs may be shown by proving a policy of deficiencies in staffing or procedures such that the [pretrial detainee] is effectively denied access to adequate medical care."[112]  This does not require a plaintiff to show that the particular staffing policy resulted in a prior denial of medical care;[113] however, the plaintiff must provide some evidence showing the municipality had "actual or constructive notice that the [staffing policy] is substantially certain to result in the violation of [one's] constitutional rights."[114]  A policy of not having a physician onsite at the jail alone is not unconstitutional on its face.[115]

---

[111] *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

[112] *Anderson v. City of Atlanta*, 778 F.2d 678, 686 n.12 (11th Cir. 1985).

[113] *Id.* at 686 n.11.

[114] *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 396 (1989).

[115] *See Free v. Granger*, 887 F.2d 1552, 1556 (11th Cir. 1989) ("It is not sufficient, however, to point to the absence of a medical doctor, or of a round-the-clock nurse, and decry the staffing policy as unconstitutional."); *see also Young v. City of Augusta, Ga.*, 59 F.3d 1160, 1171 (11th Cir. 1995) (holding that policy of having nurse onsite and "transporting prisoners to local hospitals when they are in need of medical attention not available at the jail is compatible "with 'the evolving standards of decency that mark the progress of a maturing society.") (internal citation and quotation omitted).

Here, Plaintiff has failed to present evidence showing the County had actual or constructive knowledge that the medical care system at the jail was inadequate.  Even though IDHS arguably failed to comply with its own policies by not providing an onsite physician, the County had no actual or constructive notice that the medical care system at the jail was inadequate.[116]  Nothing in the record shows prior complaints from either jail staff or inmates regarding the quality of care provided.  Plaintiff likewise fails to point to a single prior instance when IDHS's system resulted in the delayed or inadequate medical treatment of herself or another inmate.

While the Court questions the efficacy of a system which allows a doctor to prescribe medication based on third-hand knowledge of symptoms and only a casual medical history, the Court cannot say the system of medical care at the jail is constitutionally deficient.[117]  Therefore, Plaintiff has failed to create a genuine issue of material fact regarding whether the County had an official policy or custom of providing inadequate inmate medical care.[118]

---

[116] See Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986) ("The [plaintiffs] allege that the prison should have met standards derived from model standards for good prison administration. The [plaintiffs] do not argue that these standards are identical to the eighth amendment constitutional standard.").

[117] Accord Keele v. Glynn Cnty., Ga., 938 F. Supp. 2d 1270, 1290 (S.D. Ga. 2013) (holding no showing of deliberate indifference from county's custom of utilizing LPNs and "prison officials with very little, if any, medical training and no ability to evaluate [or treat a detainee's] condition" because no prior constitutional violations).

[118] The parties dispute whether the Court should construe the system of medical care as a County policy or an IDHS policy.  Regardless of how the Court characterizes the medical care system, however, the result is the same because IDHS, as a private entity contracting with the County, is subject to the same standard of liability under Section 1983. See Buckner v. Toro, 116 F.3d 450, 452 (11th Cir. 1997).

20

## 2. The County's Final Policymaker

Under the second theory, Plaintiff seeks to impose liability on the County for the decisions made by IDHS and its final decision maker, Bailey.  As noted above, "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."[119]  Thus, even if Plaintiff has failed to demonstrate a blanket policy or custom regarding the inadequate treatment of inmates, the County may still be held liable for Plaintiff's mistreatment if she can demonstrate that (1) Bailey was the final policymaker for the County with respect to inmate medical treatment at the jail, and (2) his decisions regarding her treatment amounted to deliberate indifference.[120]

Whether an official or entity is the final policymaker is a question of state law reserved for the judge to determine.[121]  Final policymaking authority vested in a municipality may be delegated; however, the Eleventh Circuit has cautioned that final policymaking authority is not delegated, for the purposes of imposing liability under Section 1983, "when the final policymaker delegates decision-making discretion to the subordinate, but retains the power to review the exercise of that discretion."[122]  "In other words, final policymaking authority over a particular subject matter does not vest in an

---

[119] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).
[120] *See Mandel v. Doe*, 888 F.2d 783, 794 (11th Cir. 1989) (finding "[physician's assistant] was the sole and final policymaker with respect to medical affairs at the road prison.").
[121] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123-24 (1988).
[122] *Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1264 (11th Cir. 2010) (internal quotation omitted).

official whose decisions are subject to meaningful administrative review."[123]   The

individual or entity must in fact possess "the authority and responsibility for

establishing <u>final</u> policy with respect to the issue in question."[124]  This final policymaker

must have then made "a deliberate choice to follow a course of action . . . from among

various alternatives," which resulted in the deprivation of the plaintiff's rights.[125]

In this case, Plaintiff argues that the County and the Sheriff delegated the final

policymaking authority regarding inmate medical care to IDHS and thus can be liable

for IDHS decisions.   Plaintiff further contends that, as CEO of IDHS, Bailey was

responsible for making all IDHS decisions with regard to medical issues in the jail and

was in charge of IDHS medical staff, thus making Bailey the final policymaker of IDHS,

and by extension the County, with respect to inmate medical care.  Georgia law vests

final decision making and policymaking authority of inmate medical care to the Sheriff,

as a representative of the County.[126]  The issue in this case is whether the County and

Sheriff delegated this authority to IDHS and Bailey.

In determining whether final policymaking authority has been delegated to a

private entity, the Eleventh Circuit instructs courts to look at the contract between the

---

[123] *Id*. (internal quotation omitted).
[124] *Mandel*, 888 F.2d at 793 (emphasis in original).
[125] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986).
[126] *See* O.C.G.A. § 42-4-4(a)(2) ("It shall be the duty of the sheriff . . . [t]o furnish persons confined in the jail with medical aid . . ."). In providing medical care, the Court finds the Sheriff acts as an arm of the County, not of the state. *See infra* Section I.B.1.

parties outlining their responsibilities.[127]   Under the terms of the contract with the County, IDHS promised to provide all medical services to the inmates at the jail and to provide all corresponding administrative services.   No provision in the contract requires that IDHS report to Sheriff Cleveland, the jail administrator, or any other county official regarding the quality of medical services or the manner in which those services are provided.[128]   Thus, the contract suggests IDHS's decisions were not subject to meaningful administrative review.

The developed custom and practice between IDHS and the County likewise demonstrate that Bailey was vested with the final decision making authority.   As previously noted, Bailey created IDHS's Policy and Procedure Manual governing the manner in which it would provide medical services at the jail.   This Manual includes standard protocols dealing with common health issues as well as administrative issues such as organizational meetings, staffing, and record keeping.   Neither the Sheriff nor any other county official was required to sign off on these policies and procedures before putting them into force.   In fact, both Sheriff Cleveland and Captain Milford testified that they defer to IDHS and Bailey to make all decisions regarding inmate medical care at the jail.   The Sheriff did not maintain any separate policies or

---

[127] *Howell v. Evans*, 922 F.2d 712, 724 (11th Cir. 1991), *vacated pursuant to settlement*, 931 F.2d 711 (11th Cir. 1991), and *opinion reinstated sub nom. Howell v. Burden*, 12 F.3d 190 (11th Cir. 1994).
[128] *Cf. Howell*, 922 F.2d at 725 (finding medical director of private medical services corporation was not final policymaker of the prison facility because contract required that he report to superintendent).

procedures regarding the provision of inmate medical care, and the record is devoid of any evidence showing Bailey's decisions regarding the quality of care was subject to meaningful administrative review.

In all material respects, Bailey was the voice of IDHS.  Although Dr. Williams was the "medical director" on paper, Bailey ran IDHS: he drafted the policies and procedures, trained the paramedics, staffed the jail, and supervised the onsite medical personnel.  Thus, even though, Dr. Williams participated in some treatment decisions, the paramedics reported directly to and received direction only from Bailey.[129]   As mentioned above, Dr. Williams does not even know the paramedics onsite and has never been to the jail to monitor the medical services rendered.  Everything in the record indicates Bailey was the primary contact for jail personnel when medical assistance was needed.

The County attempts to argue that it has not delegated final decision making authority to Bailey because Captain Milford called emergency services on the night Plaintiff was transported to the hospital and has called emergency services before without input from Bailey.  This evidence is insufficient to show that the County has not delegate final decision making authority for two reasons.  First, the County overlooks

---

[129] *See Martino v. Carey*, 563 F. Supp. 984, 989 (D. Or. 1983) (holding that although the outside physician was the "chief medical authority" at the jail, "the nurse [was] essentially the health care system at the jail.").

24

the fact that Captain Milford called Bailey <u>before</u> calling an ambulance.  Second, calling an ambulance in cases of an unexpected emergency is irrelevant to the responsibility of providing routine medical services at the jail.

The Court thus finds that Sheriff Cleveland and the County did in fact delegate final authority with respect to inmate medical care, diagnosis, and treatment to IDHS and Bailey.  When a county delegates final policymaking authority to a private entity regarding inmate medical care, "the county itself remains liable for any constitutional deprivations caused by the policies or customs of the [private entity]."[130]  Municipal liability under this theory is not based on *respondeat superior*, but rather the idea that "[the] acts, policies and customs [of the private entity] become official policy" when the private entity acts as the final decision maker for the municipality.[131]

Therefore, having found that the Sheriff and the County have delegated final authority regarding inmate medical care to Bailey and IDHS, the Court further finds the County may be held liable for IDHS's acts, policies, and customs promulgated by Bailey and IDHS, because these acts are tantamount to official municipal policy.  The Court now turns to the issue of whether Bailey was deliberately indifferent to Plaintiff's serious medical needs.

---

[130] *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985).
[131] *Id.* at 705 n.9.

### 3.  Bailey's Deliberate Indifference

Plaintiff argues Bailey was deliberately indifferent to her serious medical needs in the decisions he made regarding her medical care at the jail.  These decisions included (1) refusing to send her to the ER; (2) refusing to take her complaints of a staph infection seriously; (3) refusing to take blood cultures; (4) refusing to have her seen by qualified medical personnel despite continued symptoms, medication changes, urinary incontinence, numbness in her legs, and an inability to walk; (5) failing to respond to her condition after two days of neurological deficits; and (6) completely denying access to a physician or licensed nurse during her incarceration.

To prevail on her deliberate indifference claim, Plaintiff must show (1) a serious medical need; (2) Bailey's deliberate indifference to that need; and (3) that his indifference caused her injury.[132]  For purposes of this Motion, the County has conceded the first element and does not dispute the severity of Plaintiff's medical need.  The crux of the County's argument is Plaintiff's failure to show deliberate indifference to that need.

To show Bailey's deliberate indifference, Plaintiff must establish "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence."[133]  "Subjective knowledge of the risk requires that "the

---

[132] *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).
[133] *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004).

[individual] . . . both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[134]   Once the plaintiff shows an individual had subjective knowledge of the risk, she must go a step further and show the individual "disregard[ed] that risk by failing to take reasonable measures to abate it."[135]

Plaintiff must then show that Bailey's conduct amounted to more than "mere negligence."   It is clear that deliberate indifference entails more than medical malpractice.[136]   On the other hand, "grossly incompetent" treatment or the decision to take an "easier and less efficacious" course of treatment can constitute deliberate indifference."[137]   Similarly, "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference."[138]   As a general principle, however, "when a prison inmate has received medical care, courts hesitate to find a [constitutional] violation."[139]   "Hesitation does not mean, however, that the course of a physician's treatment of a prison inmate's medical .

---

[134] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

[135] *Id*. at 847.

[136] *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) ("Mere incidents of negligence or malpractice do not rise to the level of constitutional violations.").

[137] *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).

[138] *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (internal quotation omitted) (alteration in original).

[139] *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989); *see also Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.").

. . problems can never manifest the physician's deliberate indifference to the inmate's medical needs."[140]

In this case, there is sufficient evidence to permit a jury to infer Bailey was aware of a substantial risk of harm to Plaintiff.  Bailey was notified three times of the possibility of a staph infection: a jailer notified him after booking Plaintiff that she had a recent history of a staph infection; Plaintiff herself repeated her complaints during the initial clinical visit; and Plaintiff's mother expressed concern the following day. Moreover, Plaintiff's condition continued to deteriorate throughout the course of her incarceration.  She complained about persistent back pain on almost every sick call request, and she eventually exhibited signs of neurological deficits.  Given that three difference sources notified Bailey of this risk, and Plaintiff's condition continued to deteriorate despite prescribed treatment, an issue of triable fact exists as to whether Bailey had subjective knowledge of the risk.

The more difficult question in this case is whether the evidence would permit a jury to conclude that the care received by Plaintiff amounted to deliberate indifference. Case law is clear that Bailey cannot be held liable for failing to properly diagnose Plaintiff's staph infection.  Nevertheless, the Court finds that a triable issue of fact remains as to whether Bailey exhibited deliberate indifference to Plaintiff's serious

---

[140] *Waldrop*, 871 F.2d at 1035.

medical needs in light of her rapidly deteriorating condition and the inefficacy of the treatment he provided.[141]

As a preliminary matter, the Court is troubled by the interaction between IDHS and Plaintiff's mother on July 24, 2010. When Plaintiff's mother expressed her concern about a staph infection, Bailey consented to run blood tests <u>only if</u> Plaintiff's mother would provide the supplies. Although the Manual states IDHS would equip the jail with basic blood drawing equipment, Bailey did not stock the jail with these supplies. Because Plaintiff's mother never obtained the supplies, Bailey did not run the tests to rule out the possibility of a staph infection. A reasonable juror could conclude that Bailey's failure to do the blood test amounted to deliberate indifference in light of Plaintiff's medical history, the mother's express concern, and Plaintiff's severe pain. Moreover, because IDHS did not have the supplies onsite and would have to send Plaintiff out for blood testing, a reasonable juror could also conclude that Bailey's choice not to run the blood tests was driven by a monetary concern, as opposed to a medical judgment that such tests were not medically necessary.

Moreover, a juror may find that Bailey's failure to do the blood testing amounted to deliberate indifference in light of Plaintiff's rapidly deteriorating condition

---

[141]*See McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) ("A jury could infer deliberate indifference from the fact that [the doctor] knew the extent of [the inmate's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [the inmate's] condition.") (internal citation and quotation omitted).

thereafter.[142]   Plaintiff complained of back pain on nearly every sick call request. Instead of inquiring further into the source of her pain or sending her to a physician, Bailey's responded by seeking Dr. Williams's approval to just increase her pain medication. Even when she complained of numbness in her legs and could not walk, IDHS responded with yet another pain medication.  Viewed in the light most favorable to Plaintiff, the chosen course of treatment did not work.  In light of the inefficacy of this treatment, a juror could conclude the treatment was so grossly inadequate as to amount to no treatment at all.

Moreover, expert testimony supports a finding of deliberate indifference in this case.  A plaintiff may establish deliberate indifference by offering testimony of medical experts opining that "the official's actions were so grossly contrary to accepted medical practices as to amount to deliberate indifference."[143]  Plaintiff's expert, Dr. James Vascik, opined that, because no blood cultures or x-rays were taken despite her known history of MRSA, Plaintiff "was essentially abandoned" and received "no real treatment."[144] Dr. Vascik's testimony along with the facts of this case create a genuine issue of material

---

[142] *See Mandel v. Doe,* 888 F.2d 783, 786, 789 (11th Cir. 1989) (finding evidence supported showing of deliberate indifference where plaintiff's mother requested that doctor perform x-ray, doctor said an x-ray was not necessary, even though plaintiff's deteriorating condition suggested his original diagnosis was incorrect).

[143] *Howell v. Evans,* 922 F.2d 712, 720 (11th Cir. 1991), *vacated pursuant to settlement,* 931 F.2d 711 (11th Cir. 1991) and *opinion reinstated sub nom. Howell v. Burden,* 12 F.3d 190 (11th Cir. 1994).

[144] Vascik Dep. Ex. 1, p. 3 [Doc. 57].

fact as to whether Bailey's treatment of Plaintiff was so grossly incompetent as to amount to deliberate indifference.

Finally, a jury could find that Bailey exhibited deliberate indifference by failing to adequately monitor her condition or to ensure staff examined her after the last clinical visit on August 10th.  Despite the directive to monitor her condition, Bailey did not send Adams or Evans to examine her. Nor did he check on her himself.  While the evidence shows Adams called to check on her, no evidence exists that he did so at Bailey's direction or that Bailey required him to report any changes in Plaintiff's condition.[145]  Moreover, there is no indication that Bailey informed jail staff of the need to monitor her closely or to contact IDHS in the event her condition deteriorated. Instead, Bailey allowed Plaintiff's condition to rapidly deteriorate for over 24 hours. Only after two strangers notified jail personnel did Plaintiff even receive medical attention.  For these reasons, and in light of the severity of Plaintiff's symptoms, a genuine issue of material fact remains as to Bailey's failure to follow-up with her condition or to ensure that the paramedics personally examined her constitutes deliberate indifference.

---

[145] On this point, the Court stresses that the County cannot be held liable for any alleged indifference of Adams regarding his decision\not relay the phone to call to Bailey or follow-up with Plaintiff himself. Liability for his actions would be prefaced on a *respondeat superior* theory, which is strictly precluded under *Monell*.

Therefore, the County's Motion for Summary Judgment on Plaintiff's Section 1983 claim is **DENIED**.

**B.  Section 1983 Claim against Sheriff Cleveland**

Plaintiff does not specify whether she sues Sheriff Cleveland in his official capacity, individual capacity, or both.  Therefore, the Court will consider the merits of her Section 1983 claim against him in both capacities.

**1.  Official Capacity Claim**

To the extent Plaintiff raises a claim against Sheriff Cleveland in his official capacity, the law is clear that a suit against a sheriff in his official capacity is, in essence, a suit against the entity for which the sheriff is an officer or agent.[146]  An issue arises, however, as to whether a Georgia sheriff acts as an arm of the County or of the State when providing medical care to inmates.

When determining whether the sheriff acts a state or county official with respect to a particular function, the court must consider four factors: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity."[147] Applying these four factors, every district court that has addressed this issue has held

---

[146] *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978)).

[147] *Manders v. Lee*, 338 F.3d 1304, 1309 (11th Cir. 2003).

that a Georgia sheriff acts an arm of the county when providing inmate medical care.[148] The Court agrees.

Therefore, the claim against Sheriff Cleveland in his official capacity is merely duplicative of Plaintiff's claim against the County directly, and this claim is entitled to dismissal as such.[149]

### 2. Individual Capacity Claim

Sheriff Cleveland argues he is entitled to the protection of qualified immunity for any claim against him in his individual capacity.  Qualified immunity protects public officials from civil liability unless their actions "violate clearly established statutory or constitutional rights of which a reasonable person would have known."[150]  The initial burden is on the public official to show he acted within the realm of his discretionary authority.[151]  Once he discharges that burden, "the burden shifts to the plaintiff to show that the defendant is <u>not</u> entitled to qualified immunity."[152]  To satisfy this burden, a

---

[148] *See, e.g., Young v. Johnson,* 4:06-CV-19, 2008 WL 4816731, at *8 (M.D. Ga. Oct. 30, 2008); *Trammell v. Paxton,* CIV.A. 2:06-CV-193, 2008 WL 7514367, at *15 (N.D. Ga. Sept. 29, 2008), *aff'd,* 322 F. App'x 907 (11th Cir. 2009); *Hooks v. Brogdon,* 2007 WL 2904009, at *2 (M.D. Ga. Sept. 29, 2007); *Dukes v. Georgia,* 428 F. Supp. 2d 1298, 1321-22 (N.D. Ga. 2006), *aff'd sub nom., Dukes v. Georgia,* 212 F. App'x 916 (11th Cir. 2006); *Green v. Glynn Cnty.,* CIV.A. CV201-52, 2006 WL 156873, at *3 (S.D. Ga. Jan. 19, 2006).

[149] *See Joiner v. Fulton Cnty.,* 160 F. App'x 891, 893-94 (11th Cir.2005) (affirming district court's dismissal of claims against defendants in their official capacities as duplicative of the claims against the county).

[150] *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

[151] *Holloman v. Harland,* 370 F.3d 1252, 1264 (11th Cir. 2004).

[152] *Id.* (emphasis in original).

plaintiff must show "(1) a constitutional right was violated by the defendant, and; (2) at the time of the alleged violation, this right was clearly established.[153]

The Court agrees Sheriff Cleveland is entitled to the protection of qualified immunity in this case. A sheriff clearly acts within his discretionary authority in deciding how to provide medical care to inmates.[154] Supervisory officials like Sheriff Cleveland can only be held liable under Section 1983 if they personally participate in the alleged constitutional violation or implement a policy which violates Plaintiff's constitutional rights.[155] There is no evidence in the record showing Sheriff Cleveland personally participated in the delayof adequate medical care in this case or that a policy he implemented led to a violation of Plaintiff's constitutional rights.[156] The undisputed evidence shows Sheriff Cleveland was unaware of Plaintiff's condition until the night of August 11, 2010, when she was en route to the hospital and had no knowledge of her prior medical needs.

Alternatively, based on Plaintiff's failure to address the merits of his qualified immunity defense, the Court finds Plaintiff has abandoned her claim against Sheriff Cleveland in his individual capacity.[157] Accordingly, Plaintiff's Motion to Dismiss

---

[153] *Brown v. Pastrana*, 446 F. App'x 270, 273 (11th Cir. 2011).

[154] *Nelson v. Prison Health Servs., Inc.*, 991 F. Supp. 1452, 1461 (M.D. Fla. 1997).

[155] *See Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995).

[156] *See Nelson*, 991 F. Supp. at 1461.

[157] *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (holding that a claim included in a complaint but not raised at summary judgment is deemed abandoned); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("Judges are not expected to be mindreaders. Consequently, a litigant has an

Sheriff Cleveland [Doc. 85] is **GRANTED in part**; however, **dismissal is with prejudice**.

## II.      PENDENT STATE LAW CLAIMS

In Counts 2 and 5 of her Amended Complaint, Plaintiff asserts pendent state law claims against Dr. Williams for professional negligence and against the County for inmate medical expenses pursuant to O.C.G.A. § 42-5-2.   Both Defendants now move for summary judgment on these claims.

### A. Professional Negligence Claim against Dr. Williams[158]

In order to prevail on her medical malpractice claim against Dr. Williams, Plaintiff must show (1) a duty created by a physician-patient relationship, (2) breach of that duty, and (3) the breach proximately caused her injury.[159]

The Court is unpersuaded by Dr. Williams's argument that Plaintiff has failed to show the existence of a physician-patient relationship because he never saw or treated Plaintiff.   When determining whether a physician-patient relationship exists, Georgia courts have held that a relationship may be implied "where a physician has done

---

obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.") (internal quotation omitted)).

[158] Plaintiff's professional negligence claim is based on two theories of liability.  First, Plaintiff alleges Dr. Williams owed her a duty as the supervising physician.  Second, Plaintiff alleges that Dr. Williams owed her a separate duty as the medical director of IDHS.  Dr. Williams does not address this second theory of liability in his Motion for Summary Judgment.  Therefore the Court does not address it either.

[159] *Anthony v. Chambliss*, 231 Ga. App. 657, 659 (1998).

something, such as <u>participate in the patient's diagnosis and treatment</u>."[160]  Whether such a relationship exists is generally a question of fact for the jury.[161]  Evidence in this case shows that Bailey consulted with Dr. Williams at least two, if not three, times regarding Plaintiff's symptoms and treatment.   During those consultations, Dr. Williams prescribed three different pain medications and participated in her treatment decisions.  Based on this evidence, a jury could find that such a relationship existed.[162]

With respect to the second element, Dr. Williams does not concede he acted negligently, but he does not argue his actions comported with the standard of care.  In addition, Plaintiff has provided expert testimony of Dr. Lawrence Mendel, purporting to show Dr. Williams deviated from the standard of care by failing to take blood cultures, failing to have her seen by a physician, failing to get a full medical history, failing to personally examine her, and failing to properly supervise IDHS medical staff.[163]   Thus, a genuine issue of material fact remains as to whether Dr. Williams breached the standard of care as the supervising physician.

The Court is also unpersuaded by Dr. Williams's argument that Plaintiff has failed to show how his negligence, if any, caused her injuries.  To meet her burden, Plaintiff must use medical experts to testify "to a reasonable degree of medical

---

[160] *Rindsberg v. Neacsu*, 317 Ga. App. 269, 273 (2012) (emphasis added).
[161] *Walker v. Jack Eckerd Corp.*, 209 Ga. App. 517, 524 (1993).
[162] *See id*. at 524-25 (holding an issue of material fact existed as to whether a physician-patient relationship existed where doctor called in a prescription for plaintiff).
[163] Lawrence Mendel Aff. ¶¶ 9-10 [Doc. 41-1].

certainty" that Dr. Williams's negligence proximately caused her injuries.[164]  "What amounts to proximate cause is undeniably a jury question[.]"[165]

Dr. Williams argues Plaintiff fails to show causation because the condition requiring surgery was present when Plaintiff was first incarcerated on July 21, 2010, and her own expert cannot testify within a reasonable degree of medical certainty at what point she could have avoided surgery entirely.[166]  Plaintiff's expert did, however, testify that if she had been properly diagnosed and surgery had been performed before the onset of neurological deficits on August 9th, her recovery would have been much shorter.[167]  In other words, earlier treatment would have lessened the time required to regain neurological function.[168]  The Court finds this testimony sufficient to create a triable issue of fact as to whether Dr. Williams's negligence caused her injuries.

Accordingly, Dr. Williams Motion for Summary Judgment is **DENIED**.

## B.  Inmate Medical Expenses pursuant to O.C.G.A. § 42-5-2

In Count 5 of her Amended Complaint, Plaintiff seeks compensation for inmate medical expenses pursuant to O.C.G.A. § 42-5-2.[169]  Specifically, Plaintiff argues the County has a statutory obligation to pay her medical expenses despite releasing her

---

[164] *Knight v. Roberts*, 316 Ga. App. 599, 604 (2012).
[165] *Zwiren v. Thompson*, 276 Ga. 498, 500 (2003) (internal citation and quotation omitted).
[166] Vascik Dep. 75:5-10, 79:16-19 [Doc. 57].
[167] Vascik Dep. 84:3-24, Ex. 1, p. 3 [Doc. 57].
[168] Vascik Dep. 71:24-72:1-2 [Doc. 57].
[169] O.C.G.A. § 42-5-2 states, "it shall be the responsibility of the governmental unit, subdivision, or agency having the physical custody of an inmate to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention[.]"

from custody on August 12, 2010, and the County's attempt to release her from custody was an unauthorized attempt to shirk its statutory obligation.

In its Motion for Summary Judgment, the County argues Plaintiff cannot pursue this claim because O.C.G.A. § 42-5-2 does not waive the County's sovereign immunity. The Court agrees the County has not waived its sovereign immunity under O.C.G.A. § 42-5-2 for claims arising from a failure <u>to provide</u> adequate medical care.[170]  The Georgia Court of Appeals, however, has held that sovereign immunity does not bar a claim for failure <u>to pay</u> for medical care provided.[171]  Moreover, "a county's last-minute release of a detainee will not obviate its need to pay h[er] medical expenses."[172]  Because sovereign immunity does not bar a claim against the County to pay for medical expenses pursuant to O.C.G.A. § 42-5-2, the County's Motion for Summary Judgment on Count 5 is **DENIED**.

## CONCLUSION

Based on the foregoing, Hart County and Sheriff Cleveland's Motion for Summary Judgment [Doc. 47] is **GRANTED in part** and **DENIED in part**.  The Motion is **GRANTED** as to Sheriff Cleveland but **DENIED** as to Hart County.  Dr. Robert J. Williams Motion for Summary Judgment [Doc. 67] is **DENIED**.  Plaintiff's Motion to

---

[170] *See, e.g., Gish v. Thomas,* 302 Ga. App. 854, 864 (2010); *Howard v. City of Columbus,* 239 Ga. App. 399, 410 (1999).

[171] *Macon-Bibb Cnty. Hosp. Auth. v. Houston Cnty.,* 207 Ga. App. 530, 532 (1993).

[172] *Bunyon v. Burke Cnty.,* 306 F. Supp. 2d 1240, 1263 (S.D. Ga. 2004), *aff'd sub nom., Bunyon v. Burke Cnty., Ga.,* 116 F. App'x 249 (11th Cir. 2004) (citing *Macon–Bibb County Hosp. Auth.,* 207 Ga. App. at 532).

Dismiss [Doc. 85] is **GRANTED in part**, and Sheriff Cleveland is **DISMISSED with prejudice** as party in this case.

**SO ORDERED,** this 28th day of March, 2014.

<u>S/  C. Ashley Royal</u>
C. ASHLEY ROYAL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

ADP/jlr/ssh